# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MENTE CHEVROLET OLDSMOBILE, INC.<br>F/K/A MENTE CHEVROLET, INC. t/a<br>MENTE CHEVROLET | **CIVIL ACTION**<br><br>NO. 08-cv-2403 |
| and | |
| MENTE CHRYSLER DODGE, INC. | |
| and | **JURY TRIAL DEMANDED** |
| DONALD M. MENTE<br>              *Plaintiffs* | |
|     v. | |
| GMAC<br>          *Defendant,* | |

### FIRST AMENDED COMPLAINT

*Jurisdiction and Venue*

1.      This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this Court has original jurisdiction of all civil actions arising under the laws of the United States (i.e. 15 U.S.C. § 1221, 15 U.S.C. § 1 and 42 U.S.C. § 1983).

2.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Plaintiffs' places of business are located in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

3.      This Court has supplemental jurisdiction over Plaintiffs' pendent state law claims herein pursuant to 28 U.S.C. § 1367.

### *Identification of the Parties*

4.      Plaintiff Mente Chevrolet-Oldsmobile, Inc. f/k/a Mente Chevrolet, Inc. t/a Mente Chevrolet is a Pennsylvania corporation maintaining a place of business at 15032 Kutztown Road, Kutztown, Berks County, Pennsylvania 19530.

5.      Plaintiff Mente Chrysler Dodge, Inc. is a Pennsylvania corporation maintaining a place of business at 15040 Kutztown Road, Kutztown, Berks County, Pennsylvania 19530.

6.      Plaintiff Donald M. Mente is an adult individual residing at 12 Palmer Lane, Kutztown, Berks County, Pennsylvania 19530.

7.      Defendant GMAC is an entity organized under the laws of the state of Delaware, with a principal place of business in Detroit, Michigan and registered to conduct business in the Commonwealth of Pennsylvania, at all times relevant hereto, maintaining an office at 555 Business Center Drive, Horsham, Pennsylvania 19044.

### *Relevant Background Facts*
*GM's "Massive" Turnaround Plans*

8.      In April of 2006, the Board of Directors of General Motors ("GM") green-lighted a "dramatic" turnaround plan for the company.

9.      In that month, GM's Board approved the company's CEO's "massive" turnaround plan.  As part of and contemporaneously therewith, GM brought Cerberus Capital Management LP ("Cerberus") on-board as GM's agent and an integral partner in

2

its efforts in that, GM also approved a sale of 51% of its then wholly owned subsidiary, Defendant GMAC to Cerberus (See Exhibit A, attached hereto and incorporated herein).

10.    Both GM and GMAC heralded the sale as allowing GMAC to operate with "fewer taboos" and allowing for additional "alliances."

11.    The GM/Cerberus transaction officially closed on November 30, 2006 (See Exhibit B, attached hereto and incorporated herein).

12.    Within months, in April of 2007, Automotive News reported that GM, Ford Motor Co. and the Chrysler group (the first and last of these being tied at the hip through Cerberus -- who, at that time, owned all of Chrysler and Chrysler Financial) were "pursuing consolidation programs aimed at creating fewer, more profitable dealerships" (See Exhibit C, attached hereto and incorporated herein).

13.    Contemporaneous with GM's announcement, Plaintiff Donald M. Mente, President of both Mente dealer Plaintiffs, was called to meet with GMAC's head of commercial lending at GMAC's headquarters in Horsham, Pennsylvania.

14.    With no prior notice, in fact no formal notice or demand at all, Donald Mente was told that the Mente Chevrolet store would be expected to make an accelerated payment on its line of credit not later than June 15, 2007 or GMAC intended to make his life "miserable."

15.    At all times relevant, Mente was current on its payments to GMAC for the subject line of credit.

16.    GMAC also informed Mente that GMAC needed to "update" some of their forms and forced Mente, under threat of immediate curtailment of its operations, to

3

execute an undated "amendment" to Mente Chevrolet's financing agreement with GMAC, a financing agreement that had been honored and adhered to for over twenty (20) years.

17.    Having just restored Mente Chrysler Dodge, Inc. to profitability and Mente Chevrolet to approximately break-even (and trending upward), and without any formal notice or demand for repayment on the subject line of credit, Mente did not make any accelerated payment under GMAC's unilateral, ad-hoc deadline.

18.    One month after the artificial and wholly arbitrary deadline, on July 19, 2007, GMAC entered both Mente dealerships and, again without any prior notice or demand, declared Mente Chevrolet "out of trust."

19.    Prior to GMAC's entry into the Mente dealerships in July of 2007, Mente Chevrolet operated for over 40 consecutive years and was one of GMAC's highest ranked dealerships.

20.    Mente Chrysler Dodge, Inc. is and was a completely separate corporate entity from Mente Chevrolet, an award winning dealership in its own right.

21.    At no time relevant herein, was Mente Chrysler Dodge, Inc. alleged or declared to have been out of trust.

22.    All financing agreements by and between GMAC and Mente Chevrolet and Mente Chrysler Dodge, Inc. were separate and distinct.

23.    Within a month after GMAC's unilateral and unlawful entry and seizure of the Mente dealerships, both Mente dealerships were closed.

24.     GM and Chrysler, through GMAC and united by Cerberus, had accomplished what they announced they would do just three months prior: they unilaterally and unlawfully closed two (2) dealerships that did not fit into their "restructuring" plan.

*GMAC's Role As An Angel of Death*

25.     GMAC was created in 1919 by Alfred Sloan as an integral part of GM's plan to expand. Its creation was specifically to make credit available for dealer floor-planning and installment sales to consumers (See Exhibit D, attached hereto and incorporated herein).

26.     In the current age, "[j]ust about every dealer in the nation uses borrowed money to floor-plan vehicles... . One of the most important factors in the growth of the auto business was the establishment of large credit companies as subsidiaries of the Detroit 3" (id.).

27.     GMAC is, and was, what industry insiders call a "captive financer."

28.     Restated, Alfred Sloan's child was conceived entirely to finance and fund GM's massive dealer network, a network GM announced in April of 2007 that it no longer wanted.

29.     It is believed, and therefore averred, that when GM's Board approved Rick Wagoner's "massive" restructuring effort contemporaneously with the sale of 51% of GMAC to Cerberus, GM was also approving the use of GMAC as its agent to close dealerships that no longer fit into GM's long-term plans.

5

30.    Within a month of Chrysler and GM's April 2007 announcement that they intended to close dealerships, Mente was called to GMAC's Horsham headquarters and threatened with closure.

31.    Within three months of Chrysler and GM's April 2007 announcement that they intended to close dealerships, GMAC unilaterally and unlawfully entered the Mente dealerships and, as alleged herein, shut down both dealerships.

32.    Consistent with the April 2007 announcement, and the same time that it was acting against Mente, GMAC also swiftly moving across the country, declaring "out of trust" situations and, within weeks, closing dozens of stores in a manner identical to that alleged herein against the Mente dealerships as part of GM's declared "massive restructuring efforts."

33.    GMAC's efforts on behalf of GM continue to this day.  Despite having "trimmed" its dealership network by 226 stores in 2008 alone, GM's point-person for dealership closures stated recently that "by year end" GM wants to reach 350-400 dealer closures (See Exhibit E attached hereto and incorporated herein).

34.    Toward that end, just recently, GMAC entered Bill Heard Enterprises' fourteen stores on August 21, 2008, declared them "out of trust" and, like Mente, within one month, shut down every one of them, putting GM's largest dealer into bankruptcy (See Exhibit F attached hereto and incorporated herein).

35.    It is believed and thus averred that as part of the "massive" restructuring plan ,GM approved using GMAC to trim dealerships consistent with the plan announced in April of 2007.

6

36.     GMAC's grounds for entering Mente and the seizure of Mente's vehicles and assets (i.e., being "out of trust") was a pretext for GM's internal business decision to trim dealerships to improve its profitability.

*Mente's Relationships With GMAC*

37.     As alleged herein, every new car dealership holds financing for its inventory of vehicles which, in the automotive industry, is known as a "floor-plan."

38.     When a dealership sells a vehicle that is floor-planned, it remits a check to the entity that provided the financing for the purchase of that vehicle from the manufacturer.

39.     In the industry vernacular, if a dealership fails to timely remit payment on its floor-plan after a vehicle is sold, it is considered to be "out of trust."

40.     There is no special "trust" account per se that a dealership uses, as the typical financing arrangement allows the dealership to comingle funds.

41.     The term "out of trust," therefore simply means that a dealership has failed to timely remit monies to the financing entity and, thus, has broken its financing agreement with that entity.

42.     Most, if not all, vehicle sales involve the trade of a used vehicle to offset the cost of the vehicle being purchased and financing through a third party entity for the balance of funds owed by the purchaser on the transaction with the dealer.

43.     Most vehicles being traded in to offset the cost of the newly purchased vehicle have an outstanding balance owed to a lending institution that a dealership must pay-off to obtain the traded vehicle's title free and clear of encumbrances and liens.

7

44.     Thus, while a dealership is obligated to remit a check which represents the cost of the floor-planned vehicle to the entity that provided the financing for the dealer's purchase of that vehicle from the manufacturer, it is the industry-wide custom and practice for a dealership to remit the floor-plan funds for the sold vehicle after it has received the finds from the third party entity who financed the balance owed of the purchase transaction and after the prior loan on the traded vehicle has been paid off so that the dealer can obtain title to that trade in free and clear of any liens or encumbrances—an essential condition precedent to a dealer's ability to floor-plan the cost of the trade in.

45.     This process can take a few business days to a few weeks, and specifically requires that a dealerships business manager or controller track the receipt of funds from various entities on a deal by deal, daily basis.

46.     GMAC was the entity which floor-planned all of Mente's new and used vehicle inventories at the Mente dealerships.

47.     Both Mente Chevrolet and Mente Chrysler Dodge, Inc. had separate and distinct wholesale financing agreements with GMAC.

48.     The respective financing agreements GMAC held against Mente's assets contain the following terms relative to payment of floor plan financing:

> We understand that we may sell and lease the vehicles at retail in the ordinary course of business. We further agree that as each vehicle is sold, or leased, we will faithfully and promptly remit to you the amount you advanced or have become obligated to advance on our behalf to the manufacturer, distributor or seller … .

8

(See GMAC's Wholesale Security Agreement, Exhibit G hereto dated June 11, 1982. See also GMAC's Wholesale Security Agreement, Exhibit H hereto, dated March 7, 2000.)

49.      These agreements also state:

> In the event of repossession of the vehicles by GMAC, **the rights** and remedies applicable **under the Uniform Commercial Code shall apply.**

(See GMAC's Wholesale Security Agreement, Exhibit G, dated June 11, 1982. see also, GMAC's Wholesale Security Agreement, Exhibit H, dated March 7, 2000 emphasis added).

### *GMAC's Blitzkrieg Against Both Mente Stores*

50.      On July 19, 2007, knowing that Mente's controller was on vacation, GMAC entered the Mente dealerships, declared that Mente Chevrolet was "out of trust" by approximately $250,000.00 and took control of all of both store's new and used vehicle inventory.

51.      There was no allegation that Mente Chrysler Dodge, Inc. (a separate company with a separate financing agreement) was out of trust, yet GMAC acted against it as well.

52.      No prior notice or demand was made by GMAC with respect to any alleged violation or breach by Mente of its financing arrangements with GMAC.

53.      Included among in the inventory that GMAC seized that day were approximately 21 vehicles worth $154,740.08 that had been recently traded, $85,098.00 of which were eligible to be floor-planned --but had yet to be – and the balance of which were freely transferable for cash but for GMAC's seizure of them.

9

54.    Included among the Mente assets that GMAC seized that day were both "Open Accounts," (i.e. those accounts into which the manufacturers wire monies owed to Mente by virtue of on-going operations and from which the manufacturers draw funds to cover payables derived by virtue of on-going operations).

55.    GMAC took control of both Open Accounts retroactively.

56.    GMAC timed its entry so that it seized the Open Accounts back to June 19, 2007 (which ensured that GMAC, and not Mente, would obtain the monies owed Mente by the manufacturers for June's business activities) and, thus, obtain all monies Mente was owed by Chrysler and GM for holdback (a % of a vehicle's wholesale cost returned to the dealer on a quarterly basis) for the second quarter of 2007.

57.    GM and Chrysler only remit holdback monies into the Open Accounts on a quarterly basis.

58.    Therefore, GMAC's actions were precisely timed to ensure that it would receive $65,898.50 in cash that Mente had "floated" with GM and Chrysler from the prior quarter.

59.    In sum, on July 19, 2007, on an alleged out-of-trust situation involving approximately $250,000.00, GMAC seized $65,898.50 in cash and vehicles that otherwise could have been liquidated or financed for $154,740.08, for a total of $220,638.58.

60.    From GMAC's seizure of Mente's assets on July 19, 2007 forward, GMAC mandated that every deal for a new and used vehicle be approved by GMAC and funded with actual certified funds before the transaction was allowed to be consummated.

10

61.     GMAC unilaterally terminated Mentes' financing arrangement (again, for both stores, despite the fact that Mente Chrysler Dodge, Inc. was never alleged or declared to be out of trust) which meant that no new vehicles could be financed through GMAC or anyone else, as GMAC seized every title or certificate of origin for every vehicle. But GMAC was still not done.

62.     GMAC also seized all chattel paper derived from the sale of new and used vehicles and all proceeds derived there-from, i.e. all wired funds from third party lenders who had financed the balance owed on newly purchased vehicles.

63.     And compounding all of this, GMAC immediately required titles for every vehicle being added to Mente's inventory by trade to be additional collateral for GMAC.

64.     Mente was now required to self-fund the purchase of every vehicle going forward if it wanted to remain in business.

65.     And, for a short while, Mente was able to do so in hopes that GMAC would loosen its unilateral and unlawful stranglehold on the dealerships.

66.     For a week, Mente self-funded its deals and, as required, turned over titles (free and clear) to GMAC for each and every trade Mente took in.

67.     Operating in this manner, within a week, GMAC seized an additional $220,638.58 of operating capital out of Mente and $25,457.00 in profits derived from the sales that had occurred post-takeover (all but covering the alleged "out of trust" situation). But GMAC still was not done.

*GMAC's Misappropriated Monies Not Secured By Any Agreement, Rendering Mente And Their Officers Vulnerable To Criminal Prosecution And, In The Face Of Such, Force Mente's Execution Of A Forbearance Agreement*

68.        When Mente would sell a vehicle, it would also sell other collateral products

such as "Gap Insurance" (insurance to cover any loss in excess of insurance coverage

necessary to ensure all financing obligations are paid off in the event of a total demolition

of a vehicle in a wreck), life insurance (an insurance policy to pay off any outstanding

loan in the event of death), accident and health insurance (an insurance policy which

covered monthly car payments in the event of illness or injury), service contracts

(policies which covered the cost of repairs other than ordinary maintenance for a term

certain), and similar products (collectively "F & I Products").

69.        Also, when Mente arranged for the financing of a vehicle (either a lease or a

purchase), Mente would add a certain percentage of interest to the wholesale rate of the

particular lender as compensation for their financing efforts.

70.        And Mente, as required by law, also collected Pennsylvania sales tax and

license and registration fees at the time a sold vehicle was delivered to the customer.

71.        When Mente sold their F & I Products, Mente was required to remit a monies

to the entity whose product Mente sold as none of these products were Mente's.

72.        Under law, when a customer terminated their contract for an F & I Product

early, Mente was required to return to them a portion of the profits it had derived from

the sale.

73.    Similarly, if a customer paid off a vehicle early or traded it in on another vehicle, thus terminating that loan early, Mente would be responsible for returning a portion of the finance income it derived as well.

74.    And, subject to penalty under law, Mente was required to remit to the Commonwealth of Pennsylvania all sales taxes, registration fees, and the like which Mente collected within a time certain.

75.    GMAC, having reviewed and approved every single purchase order before releasing any vehicle for sale – and thus being fully aware of what monies were attributable to the sale of the vehicle and which were for F & I Products and/or immediately payable to the Commonwealth of Pennsylvania, -- required a certified check for the entire amount (including the pay-off amount of any trade).

76.    Despite repeated demands and notice that a portion of the funds that GMAC had seized from Mente were not Mente's to be retained under any agreement, GMAC steadfastly refused to remit payment for any F & I Products, to the Commonwealth of Pennsylvania for taxes, or otherwise.

77.    In just a few short weeks of GMAC's reign of terror, Mente and its officers faced criminal liability because over $110,000.00 in funds that should have gone to pay Pennsylvania sales tax and registration fees, for F & I Products, and duly owed rebates were diverted by GMAC into GMAC's pockets.

78.    On August 17, 2007, less than a month after GMAC entered both stores and seized Mente's assets, Mente was forced to take the unusual step of reporting itself to the Pennsylvania Attorney General's office, outlining all monies that were owed and why it

13

was that Mente had not been able to pay them (see Exhibit I attached hereto and incorporated herein).

79.      Capitalizing on Mente's predicament -- and consistent with its other tactics against Mente -- GMAC presented Mente with a "Forbearance Agreement" and, in a "take it or be prosecuted" manner notified Mente that only upon Mente's execution of the Agreement would GMAC release certain funds (funds that were not Mente's for GMAC to seize in the first place) to be paid to the third parties who were owed them, including the Commonwealth of Pennsylvania for tax payments.

80.      As Mente had already cashed in life insurance policies and other personal assets that GMAC had not seized, and faced with criminal prosecution (particularly as it pertained to the sales tax and registration fees), Mente executed the subject agreement under duress and coercion.

81.      Thereafter, because GMAC still refused to change its practices relative to the illegal conversion of monies that were not Mente's to be retained, Mente ceased the sales of vehicles entirely.

82.      A few weeks later, the Pennsylvania Attorney General's office opened an investigation into Mente. Only because Mente had self-reported and placed its legal obligations above its personal interests was it that they were cleared of any potential wrongdoing.

83.      In less than a month, in addition to the more than $246,095.50 that GMAC seized upon entering and taking over Mente, GMAC diverted another $211,930.16 from Mente by illegally refusing to dispense those funds to the Commonwealth of

Pennsylvania and to other third parties, monies that Mente had to "find" elsewhere under the threat that it, and its officers, were criminally prosecuted.

84.      In sum, GMAC seized nearly double the money which it alleged Mente was "out of trust" in under a month. But it was still not through.

*The Day GMAC Forced Mente To Close Its Doors*

85.      On July 26, 2007, GMAC had possession and control of hundreds of thousands of dollars of additional collateral (cash and vehicles) that it obtained from its illegal and unilateral seizures.

86.      Mente contacted GMAC to inform Defendant that unless GMAC loosened its financial stranglehold over Mente, Mente could not make payroll and release several vehicles that had been sold.

87.      Mente further informed GMAC that the salespersons (whose commissions were derived from, and to be paid out of, the proceeds from vehicle sales that GMAC was retaining) had made it clear that if they could not deliver the sold vehicles and receive their commissions, they would walk-out of the dealerships and Mente would be forced to cease operations.

88.      GMAC refused to budge.

89.      Mente simply asked GMAC to allow the seized collateral to be sold in the ordinary course of business.

90.      GMAC flatly refused.

91.      Immediately upon hearing that Mente did not have the funds to make payroll and deliver the sold vehicles, Mente's employees walked out and Mente Chevrolet, and a

15

Case 5:08-cv-02403-JS    Document 21-2    Filed 02/12/2009    Page 17 of 67.

Case 5:08-cv-02403-JS    Document 18    Filed 01/23/2009    Page 16 of 66

family owned company employing nearly 80 persons that has been a part of Berks County for over 40 years, was forced to cease its normal operations. Mente Chrysler Dodge, Inc., despite never having been accused of being "out of trust," was similarly shuttered.

92.      GMAC's actions relative to the misappropriation of monies and GMAC's Draconian business practices (practices that were outside of the normal operations of any dealership and which rendered it impossible for Mente to remain in operation), severely impaired Mente's operations, jeopardized all collateral which GMAC had unilaterally seized, and rendered Mente's irreparable failure a *fait d'Accomplis.*

93.      GMAC never gave notice of any default or made any demand for payment.

94.      GMAC never filed any Writ of Replevin nor posted any Bond nor ever obtained any Writ of Seizure before it unilaterally and unlawfully seized Mente's assets on July 19, 2007.

95.      GMAC went out of its way to ensure that the seized collateral could not be sold in the ordinary course and custom of the industry.

96.      GMAC's actions can only be explained in the context of the April 2006 "massive" restructuring plan, the execution of which was heralded by GM in April of 2007.

97.      Had GM elected to close dealerships pursuant to the terms of its agreements, it would have been compelled to compensate those dealers for the store closures.

98.      Instead, through GMAC, it concocted this "out of trust" scheme.

99.     By the close of the business quarter subsequent to the April 2007 announcement (Exhibit C), both Mente stores were closed and all employees were gone.

*GMAC's Compounds Its Unlawful Activity By Intentionally Underselling the Runoff*

100.     When Mente ceased its normal operations, hundreds of new and used vehicles remained at the two dealerships.

101.     As with any retail business, much depends on the timely turnover of inventory as stale inventory often is devalued due to its age.  This is particularly true with used vehicles.

102.     Mente continued to be present at his dealerships in hopes that he could sell the remaining inventory in a commercially reasonable manner.

103.     On numerous occasions, Mente had opportunities to dispose of much of its inventory if GMAC would agree to loosen its control and allow, for example, used vehicles to be brought to various automobile auctions.

104.     GMAC rebuffed each of these efforts by Mente.

105.     On December 20, 2007, GMAC pulled the plug entirely and loaded all vehicles onto car carriers and took them (including all of the vehicles that Mente had not floor planned with GMAC and that Mente owned outright) physically elsewhere.

106.     It is believed, and therefore averred, that GMAC brought all of these seized vehicles to Manheim Auto Auction, in Manheim Pennsylvania.

107.     Manheim Auto Auction is a "dealer only" auction that has multiple lanes, each created for a specific sort of vehicle.

108.     Lane 1 at Manheim is for vehicles that are the bottom of quality and value, (i.e. frame damaged, bad title history, material drive-train defects, or similar defects or deficiencies).

109.     GMAC ran each and every vehicle seized from Mente through Lane 1 despite its condition.

110.     Based upon information and belief, Mente is aware that some new vehicles were sold for one-half to one-third of their actual value.

111.     To date, despite repeated demands, GMAC has refused to give a complete accounting of that inventory.

112.     To date, despite repeated demands, Mente has yet to learn with certainty how GMAC disposed of those vehicles and to whom they went.

113.     But for GMAC's tactics, Mente could have sold the subject inventory in a commercially reasonable fashion, timely, and for fair value.

114.     But for GMAC's tactics, Mente could have maintained operations long enough to obtain substitute floor-plan financing and/or to sell the vehicles and even the dealerships themselves at a fair price.

115.     GMAC failed to take reasonable action to preserve the collateral it unilaterally and unlawfully seized and, in fact, rebuffed every single attempt to do so.

                    *Chrysler and GM Cancel Mente's Service and Sales Agreements*

116.     Because Mente could not get out from under GMAC's terms and conditions, the Mente dealerships were unable to maintain or resume normal business operations.

18

117.    All of Mente's Service and Sales Agreements with its manufacturers contain a clause that requires Mente to maintain normal business operations for a set period of time.

118.    In the automotive industry, the geographic area in which a dealership has exclusive rights to sell a manufacturer's product is called a "point."

119.    As alleged above, in April of 2007, as part of "massive" restructuring efforts, both Chrysler and General Motors announced that they were cutting their dealer networks considerably by electing to close certain points.

120.    Shortly thereafter, both GM and Chrysler notified Mente that they were cancelling Mente's Service and Sales Agreements because Mente had been unable to continue to operate in the ordinary course of business due to GMAC's unlawful conduct.

121.    Mente attempted to sell its stores.

122.    However, after GMAC had dismantled Mente's stores, Mente was informed by both Chrysler and GM that Mente's points were among those that GM and Chrysler intended to remain closed.

*GMAC's Actions "Saved" GM and Chrysler More Than Five Million Dollars*

123.    Pursuant to both manufacturers' Sales and Service Agreements, Mente is entitled to compensation for its facilities if either GM or Chrysler (or both) desired to close the Mente points.

124.    Mente operated out of three facilities which had an aggregate value of more than $5 million.

125.     In April of 2007, Mente was entitled to receive such financial compensation
and assistance from both manufacturers as both Mente stores were part of the articulated
plan to dramatically reduce GM and Chrysler's dealership network.

126.     But the manufacturers' plans were designed, calculated, and implemented
specifically to avoid making these payments to Mente.

127.     GMAC was enlisted to shut both stores down in a manner which enabled GM
and Chrysler to assert that Mente is not entitled to financial compensation and assistance,
regardless of their prior intent to shut those points and the terms of their Sales and
Service Agreements with Mente, because Mente purportedly failed to maintain normal
business operations as Mente was required to do.

128.     After GMAC wound up its campaign of destruction against Mente, both
Chrysler and GM have raised Mente's termination for failure to conduct normal
operations as a bar to any financial compensation or assistance for the dealerships despite
the manufacturers declared intent months prior to close stores (Exhibit C).

129.     It is believed, and therefore averred, that GM and Chrysler illegally used
GMAC to close Mente as part of their "massive" restructuring efforts precisely because
doing so would save them in excess of $5 million in Mente's case and more than a billion
dollars nationwide.

### Mente's Total Losses Due to GMAC's Actions

130.     GMAC's actions, to date, are the direct and proximate cause of Mente's
inability to obtain anything for the good-will that previously was associated with the

subject dealer points ($2,000,000.00) and for the loss of dealer termination assistance relative to the properties (in excess of $5,000,000.00).

131.    In all, GMAC impaired the collateral it seized and the value of the dealerships themselves, and drove up its fees allowable under law unnecessarily, in an amount in excess of $7.5 million.

### Count I

#### *Violation of Robinson-Patman Act*

132.    All of the above averments are incorporated herein as though set forth in complete detail below.

133.    GMAC, at all times relevant herein and pursuant to Alfred Sloan's design, holds/held well over 80% of the floor-plans for GM dealerships and for GM dealers like Mente who also own other brand stores, such as Chrysler.

134.    GMAC conspired and acted to deprive Mente of the financial assistance Mente was due under Mente's Sales and Service Agreements with GM and Chrysler.

135.    GMAC used its market dominance to shut both Mente stores down in such a manner as to provide GM and Chrysler with the ability to avoid providing the financial assistance that Mente was entitled to receive.

136.    Specifically, Mente was entitled to receive the assistance outlined in both GM and Chrysler's Sales and Service Agreements relative to Mente facilities at more than $5 million.

21

137.     Section 2(e) of the Robinson-Patman Act, 15 U.S.C. § 13(e), makes it unlawful for GMAC to act to prevent Mente from receiving the financial compensation and assistance which Mente was entitled to receive.

WHEREFORE, Plaintiffs demand judgment in their favor and as against GMAC in an amount equal to the lost good-will of the dealerships' points and the financial assistance that Mente would have received from Chrysler and GM relative to the dealership properties, plus costs (including reasonable attorney's fees), expenses, and such other relief as the Court deems necessary and proper.

### Count II
#### Violation of 42 U.S.C.A. § 1983



138.     All of the above averments are incorporated herein as though set forth in complete detail below.

139.     GMAC's declaration that Mente Chevrolet was "out of trust" was factually false and was mere pretext.

140.     Mente Chrysler Dodge, Inc. was, and never has been, alleged to have been "out of trust."

141.     GMAC's entry into both stores was with a specific intent to close them down pursuant to the manufacturers' pre-announced plan to close those points.

142.     GMAC acted without notice.

143.     GMAC acted without demand.

144.     GMAC acted in violation of the Pennsylvania Rules of Civil Procedure.

22

145.     GMAC acted in violation of statutory law and its obligations under common law.

146.     GMAC acted without valid authority or valid cognovit clauses.

147.     GMAC'S actions were taken under color of law.  Subsequent to its initial unilateral and unlawful seizure, GMAC belatedly filed a replevin action to seize what little assets (fixtures, etc.) remained at the Mente dealerships.

148.     GMAC's actions were taken absent due process.

149.     As a result of GMAC's actions, Mente has been unlawfully deprived of property.

150.     GMAC's actions proximately caused substantial damage to Plaitiffs.

151.     GMAC is liable for the full value of the property improperly seized by GMAC and for the damage to Plaintiffs proximately caused by its unlawful acts.

WHEREFORE, Plaintiffs demand judgment in their favor and as against GMAC in an amount equal to the lost good-will of the dealerships' points and the financial assistance that Mente would have received from Chrysler and GM relative to the dealership properties, punitive damages, costs (including reasonable attorney's fees), expenses, and such other relief as the Court deems necessary and proper.

### Count III
### _Violation of the Federal Automobile Dealer's Day in Court Act – 15 U.S.C.A. §1221_

152.     All of the above averments are incorporated herein as though set forth in complete detail below.

153.    GMAC's actions against Mente were in bad faith and were prohibited by 15 U.S.C.A. § 1221 et seq.

154.    GMAC, as GM and Chrysler's agent, falls within § 1221(a) of the Automobile Dealer's Day in Court Act ("ADDCA").

155.    Mente falls within § 1221(c) of ADDCA.

156.    The Sales and Service Agreements to which Mente was a party fell within § 1221(b) of ADDCA.

157.    GMAC's bad faith conduct and wrongful acts as set forth above render GMAC liable to Mente pursuant to ADDCA in an amount not less than $7.5 million.

WHEREFORE, Plaintiffs demand judgment in their favor and as against GMAC in an amount equal to the lost good-will of the dealerships' points and the financial assistance that Mente would have received from Chrysler and GM relative to the dealership properties, punitive damages, costs (including reasonable attorney's fees), expenses, and such other relief as the Court deems necessary and proper.

### Count IV
#### Violation of 15 U.S.C. § 1

158.    All of the above averments are incorporated herein as though set forth in complete detail below.

159.    15 U.S.C. § 1 prohibits any conspiracy or combination in restraint of trade.

160.    In April of 2006, GM initiated a "massive" restructuring effort which included plans to close a substantial number of dealerships.

24

161.     The execution of the "massive" restructuring plan began in or around April of

2007.

162.     At all times relevant herein, it is believed and therefore averred that GMAC

assisted in this "massive" restructuring plan and the closing of stores by illegally acting to

shut them down.

163.     It is believed and therefore averred that GMAC has conspired to unlawfully

reduce the number of GM and Chrysler dealerships in existence after April of 2006.

164.     GMAC's actions have unreasonably restrained trade and commerce in that

hundreds of stores, including Mente's, have been shut down in a manner identical to that

which Mente experienced.

     WHEREFORE, Plaintiffs demand judgment in their favor and as against GMAC

in an amount equal to the lost good-will of the dealerships' points and the financial

assistance that Mente would have received from Chrysler and GM relative to the

dealership properties, treble damages pursuant to 15 U.S.C. §15, costs (including

reasonable attorney's fees), expenses, and such other relief as the Court deems necessary

and proper.

### Count V
#### Violation of 63 P.S. §818.12

165.     All of the above averments are incorporated herein as though set forth in

complete detail below.

166.     The actions against Mente were in bad faith and prohibited by 63 P.S. §

818.12 et seq.

167.     GMAC, as GM and Chrysler's agent, falls within the Commonwealth of Pennsylvania's Automobile Dealer's Day in Court Act ("CADDCA").

168.     Mente falls within CADDCA.

169.     The Sales and Service Agreements to which Mente is a party fall within CADDCA.

170.     GMAC's bad faith conduct and wrongful acts as set forth above render GMAC liable to Mente pursuant to CADDCA, 63 P.S. § 818.12 (b)(14) specifically, in an amount not less than $7.5 million.

WHEREFORE, Plaintiffs demand judgment in their favor and as against GMAC in an amount equal to the lost good-will of the dealerships' points and the financial assistance that Mente would have received from Chrysler and GM relative to the dealership properties, punitive damages, costs (including reasonable attorney's fees), expenses, and such other relief as the Court deems necessary and proper.

### Count VI
#### Tortuous Interference With Contractual Relationships

171.     All of the above averments are incorporated herein as though set forth in complete detail below.

172.     Until GMAC shut Mente down, Mente was in good standing and in full compliance with its Sales and Service Agreements with both Chrysler and GM.

173.     Because of GMAC's actions, both Chrysler and GM terminated Mente's Sales and Service Agreements with Mente.

174.    As a result, Mente has lost the good-will value of those dealership points which, prior to GMAC's unilateral and unlawful conduct, was valued at more than $2 million.

175.    Additionally, because GMAC failed to preserve its collateral and allow Mente to remain open and continue to operate, both GM and Chrysler have refused financial compensation and assistance to Mente with their properties as they otherwise would have been required to provide under their Sales and Service Agreements.

176.    As a result, Mente has lost more than $5 million in termination assistance from GM and Chrysler.

WHEREFORE, Plaintiffs demand judgment in their favor and as against GMAC in an amount equal to the lost good-will of the dealerships' points and the financial assistance that Mente would have received from Chrysler and GM relative to the dealership properties, plus costs (including reasonable attorney's fees), expenses, and such other relief as the Court deems necessary and proper.

### *Count VII*
#### *Breach of Contract*

177.    All of the above averments are incorporated herein as though set forth in complete detail below.

178.    Inherent and implied in every contract executed according to the law of this Commonwealth there is a duty of good faith and fair dealing.

179.     The financing agreements by and between the parties specifically incorporate the Uniform Commercial Code ("UCC") which itself specifically incorporates good faith and fair dealing in every transaction subject thereto.

180.     GMAC's conduct, as alleged herein, has violated both of these duties.

181.     As a result, GMAC has breached its obligations to Mente.

182.     As a direct and proximate result of GMAC's breach, Mente has lost the good-will value of those dealership points which, prior to this, was valued at over $2 million.

183.     Additionally, because GMAC failed to preserve its collateral and allow Mente to remain open, both General Motors and Chrysler have refused to provide compensation and financial assistance to Mente with its properties as they otherwise would have been required to do under their Sales and Service Agreements with those manufacurers.

184.     As a result, Mente has lost over $5 million in termination assistance from GM and Chrysler and suffered other damages alleged above.

WHEREFORE, Plaintiffs demand judgment in their favor and as against GMAC in an amount equal to the lost good-will of the dealerships' points and the financial assistance that Mente would have received from Chrysler and GM relative to the dealership properties, plus costs (including reasonable attorney's fees), expenses, and such other relief as the Court deems necessary and proper.

### Count VIII
#### Conversion

185.     All of the above averments are incorporated herein as though set forth in complete detail below.

186.    GMAC committed acts of conversion when it unilaterally and unlawfully seized Mente's Open Account funds, vehicle inventory and proceeds from the sale of new and used vehicles without justification.

187.    GMAC exercised dominion wrongfully over Plaintiffs' personal property in a manner that was inconsistent with the title and rights of Plaintiffs and in derogation, exclusion and defiance of Mente's rights thereto.

188.    GMAC's actions proximately caused substantial damage to Plaintiffs as described above.

189.    GMAC is liable for the full value of the property improperly converted and should be held liable for the damage proximately caused by its unlawful acts.

WHEREFORE, Plaintiffs demand judgment in their favor and as against GMAC in an amount equal to the unlawfully converted property, plus costs (including reasonable attorney's fees), expenses, and such other relief as the Court deems necessary and proper.

### Count IX
#### Declaratory Relief

190.    All of the above averments are incorporated herein as though set forth in complete detail below.

191.    GMAC required Mente to execute both the undated March 2007 "amendment" and the subsequent forbearance agreement under threat, coersion and duress.

192.    These documents are contracts of adhesion and contain clauses that inure exclusively to the benefit of GMAC and to the detriment of Plaintiffs. Both were

proposed as "take it or leave it" documents and the latter of the two was forced on Mente under threat of criminal prosecution.

193.    GMAC's actions, and the documents themselves, are procedurally and substantively unconscionable.

194.    Declaratory relief under the Federal Declaratory Judgment Act, 28 USCS § 2201 et seq., is appropriate in this action in that there is a real, actual and substantial controversy between the parties regarding the validity and enforceability of these two documents. The controversy is ripe for adjudication as GMAC has already asserted claims and defenses against Mente based on these documents. Therefore, declaratory relief would serve a useful purpose in declaring the parties' rights and would eliminate the legal uncertainty regarding the enforceability of these documents.

WHEREFORE, Plaintiffs demand judgment in their favor and as against GMAC that both documents are contracts of adhesion and, thus, unenforceable as against Plaintiffs, and such other relief as the Court deems necessary and proper.

### *Count X*
#### *Demand for Jury Trial*

195.    All of the above averments are incorporated herein as though set forth in complete detail below.

196.    All matters averred by Mente are questions of fact properly tried before a Jury.

197.    The amounts in controversy herein exceed the statutory arbitration amount.

WHEREFORE, Mente respectfully demands a jury trial in this matter.

**JACOBSEN LAW OFFICES LLC**

By: /s/ Joseph A. O'Keefe
    Kenneth A. Jacobsen
    Identification No. 31208
    12 Orchard Lane
    Wallingford, PA 19086
    (610) 566-7930

    O'Keefe & Sher, P.C.
    Joseph A. O'Keefe
    Identification No. 77068
    15019 Kutztown Road
    Kutztown, PA 19530
    (610) 683-0771

31

## VERIFICATION

I, Donald M. Mente, am the President of both Defendants in the above matter. As the proper corporate representative of the Defendants, I do hereby affirm that while the language of the foregoing Amended Complaint is that of counsel, the averments therein are based upon the facts and circumstances I have provided to them and are true and correct to the best of my knowledge, information, and belief. I understand that this Verification is made subject to the penalties of 28 USCS § 1746 relating to unsworn falsification to authorities.

Dated: _11/25/08_                                        _____
                                                        Donald M. Mente

# Exhibit A

# Pivot Point: A vote of confidence for the CEO

## BOARD'S DRAMATIC '06 VOTE GAVE SUPPORT TO WAGONER'S REPAIR PLAN

### Massive turnaround effort continues — and the stakes couldn't be higher

**JAMIE LAREAU**
**AUTOMOTIVE NEWS**
SEPTEMBER 14, 2008 - 12:01 AM ET

In April 2006, General Motors CEO Rick Wagoner went before the board of directors. He sought two things: permission to raise cash by selling 51 percent of GM's finance arm, GMAC Financial Services, for $14 billion; and a vote of confidence in his leadership.

He got both — and the chance to move forward on the turnaround plan that is still a work in progress.

To understand the background of that board meeting, let's step back to October 2005. That was when GM's leadership realized just how dire the company's condition was. GM would finish the year with a loss of $10.6 billion. Executives had to come up with a comprehensive turnaround plan.

Wagoner announced GM would close 12 plants and cut at least 30,000 jobs, but he knew more changes were needed. GM had to address high costs, particularly in wages and benefits.

"In the old days in the auto business when things get tough, OK, everybody cut head count by 5 percent, stop magazine subscriptions, don't travel and no dinners out," Wagoner said in an interview with *Automotive News.*

"We couldn't let those actions substitute for, hey, we have a fundamental issue here of an uncompetitive cost structure related to the fact that we've been around a long time."

The two years that followed would be one of the most stressful periods in GM's history as the automaker overhauled its business structure, changed its marketing strategy and negotiated a landmark contract with the UAW. It all happened while Wagoner fended off harsh media criticism calling for his job and quietly beat down billionaire investor Kirk Kerkorian.

In late 2005, Wagoner and his staff identified components that GM must address:

• Reduce health care costs for workers and retirees.

• Increase spending on product development.

• Structure the business to make more money on cars and become less dependent on trucks.

In late 2005, GM announced that the launch of its redesigned full-sized SUVs, scheduled for the following spring, would be moved forward by several months in an effort to boost revenue. Product chief Bob Lutz also rushed to market the <u>Saturn Aura</u> sedan, which won the 2006 North American Car of the Year award.

On the marketing side, GM had to increase the residual value of its cars. So executives lowered sticker prices so they were closer to actual transaction prices, cut incentives, reduced sales to daily rental fleets and grouped brands into retail channels, such as Buick-Pontiac-GMC.

"Coming out of '05, we first set a plan to reduce our cost. I think we started out at $5 billion and then went up," recalls COO Fritz Henderson, who was CFO at the time. "Finally, we realized $9 billion of cost savings between '05 and '07 in North America, including the corporate staffs."

A key piece of the puzzle would come in October 2007, when the UAW ratified a contract in which it agreed to administer retiree health care benefits under a trust, the Voluntary Employee Beneficiary Association. That will take retiree health care obligations off GM's books.

GM also got other concessions, such as a two-tier wage system under which new workers will earn less than current employees.

> **Elements of the turnaround plan**
> • Close 12 plants
> • Cut at least 30,000 jobs
> • Work with the UAW to cut health care costs
> • Move up the launch of full-sized pickups and SUVs
> • Set sticker prices closer to transaction prices; cut incentives
> • Cut sales to daily rental fleets by 240,000 units over 2 years
> • Sell 51% of GMAC
> • Negotiate 2-tier wage system with the UAW

### The Kerkorian factor

While GM addressed its finances, another potential problem surfaced. Kerkorian, 89 years old at that time, had been slowly increasing his ownership stake in GM. Kerkorian eventually bought 9.9 percent of GM stock. That prompted the automaker to offer a board seat to Kerkorian's representative, Jerry York, in December 2005.

"It was a period of craziness," recalls Lutz. "Then Paul Ingrassia of *The Wall Street Journal* wrote that (editorial) calling for GM to fire Rick immediately. It became clear that the situation would only go away if the board provided a strong statement of support for Rick. I know Rick was suffering horribly during that period, but he's so unflappable that you never saw a thing."

That led to the board's vote of confidence for Wagoner in April 2006. But insiders say the vote was not unanimous. Had Wagoner not gotten that vote, those close to him said, he was prepared to resign. Wagoner recalls the episode today:

"At the time it was sensitive, and we were going through tough issues, and I thought it was important to make sure we had everybody aligned. So let's just say I appreciated the support, and I will not speculate on what would have happened."

York was eager to speed GM's turnaround progress. On June 30, 2006, GM held an emergency board meeting to consider a proposal by Kerkorian and York. The proposal asked GM to consider an alliance with Renault-Nissan.

In October of that year, GM's research concluded an alliance would favor Renault-Nissan. So GM called off any further alliance talk. York soon resigned from GM's board, saying in a letter that GM board members were not inclined to question management.

GM remains deep in the red as it struggles, with the rest of the industry, to cope with high gasoline prices and a sluggish economy. Henderson says GM has set its eye on stabilization rather than growth in North America and Europe. "We can drive a huge amount of earnings and revenue growth internationally in the emerging markets," Henderson says. "But we need our developed markets to be stable, sustainable, and develop both earnings and cash flow. That is my singular goal."

# Exhibit B

# RECONFIGURED GMAC MAPS ITS NEW AGENDA

## Lender looks to non-GM, used-car, mortgage markets

**JIM HENRY**
**AUTOMOTIVE NEWS**
APRIL 23, 2007 - 12:01 AM ET

The new GMAC Financial Services is pursuing several growth strategies it had trouble achieving as a wholly owned subsidiary of General Motors.

Among the lender's strategies:

- Financing more used cars.
- Seeking more business with non-GM dealers.
- Cross-selling more GMAC products, such as mortgages and insurance, to consumers and dealers.

A group of investors led by Cerberus Capital Management LP of New York agreed to pay GM $14 billion over three years for a 51 percent stake in the former General Motors Acceptance Corp.

Day One for the renamed GMAC Financial Services LLC, was Nov. 30, 2006.

Cerberus is gaining a big footprint in the auto industry. Separately, Cerberus is exploring the purchase of the Chrysler group and is set to buy two suppliers, Tower Automotive Inc. and Delphi Corp., which are operating under bankruptcy court protection.

GM still owns 49 percent of GMAC. In 2006, GMAC financed 44 percent of GM's U.S. retail loans and leases -- around $50 billion worth.

The lender reported net income of $2.1 billion in 2006, down about 7 percent from 2005. GMAC's Automotive Finance Operations had operating earnings of $791 million, down 10 percent. The rest of the earnings came from home mortgages and insurance.

GMAC executives say they are not making radical changes.

"We have told the dealers that the people who call on your dealerships are not going to change," said Barbara Stokel, executive vice president of GMAC's North American Operations, in an interview last month. "If we make any changes, we will make them for the same business reasons as before."

But though GM and GMAC remain closely linked, the greater independence makes it possible for GMAC to pursue new strategies.

### Plan for growth
To boost business, GMAC Financial Services plans to

- Increase used-car financing
- Offer financing thorough more non-GM dealers
- Sell more products such as mortgages and insurance to consumers and dealers

**The cost of money**

The key factor is the cost of funds: the interest rate at which GMAC borrows the money it lends to dealers and consumers.

"GMAC was really constrained, because of our funding problem," Stokel said.

As GM's losses mounted, credit rating agencies penalized GMAC, too. That made it more expensive for GMAC to borrow money.

GM reported a net loss of $2 billion for 2006, after a crushing $10.4 billion deficit in 2005.

As an independent finance company, GMAC's credit rating -- and thus cost of funds -- should improve. Standard & Poor's, for instance, raised its rating on GMAC to "BB+/B-1" in late November as a direct result of the spinoff. The rating agency kept GM several rungs lower, at "B/Negative/B-3."

Cheaper funds make GMAC more competitive. The lower cost of funds should help GMAC win more business with dealers it already works with and enable the lender to attract more new business from dealers.

"We are going to pass on to dealers that lower cost of funds at every available opportunity," Stokel said.

GMAC's cost of funds began improving even before the spinoff. When GM in 2005 announced its intent to sell a stake, the interest rate that GMAC pays on certain investments started to fall -- even as rates for GM rose. But GMAC's cost of borrowing rose in 2006 to an average of 5.9 percent from 4.8 percent in 2005. Archrival Ford Credit's cost of funds was an average of 5.5 percent for 2006, up from 4.5 percent in 2005.

**Fewer taboos**

Besides the prospect of cheaper funds, GMAC is now freer to pursue business that may not have been a priority for GM -- or that maybe even conflicted with GM's priorities. Used cars are a prime example, Stokel said.

"We put all available resources into funding new GM products -- of course we did, we were owned by GM," she said.

Used-car financing suffered. The value of used cars and trucks as a percent of GMAC's new business fell to 11 percent in 2006, down from 17 percent three years earlier.

With a lower cost of funds and less pressure to move mostly new vehicles, GMAC can pursue more used-car business.

"It's something we're now going to be able to do seriously and consistently," Stokel said. "Before, we were in it and out of it."

In addition to used-car loans to consumers, Stokel said GMAC wants to pursue floorplan loans to dealers to finance used inventory.

The lender also wants to target more business with non-GM dealers. Among new vehicles, non-GM nameplates made up only about 3 percent of GMAC's portfolio of loans and leases in 2006.

"We are looking for growth on the GM side and on the non-GM side," Stokel said. "We have always had dealer loan programs, but the rates were not very competitive. They're terrific now. We have very, very competitive loan programs."

**Better integration**

Also on the agenda is cross-selling other GMAC services, such as insurance, mortgages and potentially even banking services.

In 2001, GMAC said it pulled 70 percent of its profit from auto finance, 19 percent from mortgages, and 11 percent from insurance. In 2005, 48 percent of profit came from mortgages, 37 percent from auto finance, and 15 percent from insurance. (The GMAC spinoff and other one-time items make 2006 results hard to compare.)

Stokel said GMAC's divisions now speak with one another a lot more than they did. "There was very little interaction in the past," she said.

Meanwhile, Stokel said, GMAC is engaged in a "deep dive" to figure out how to market its services.

As an independent financial services company, Stokel said, GMAC is more motivated to make cross-selling work.

"The sale of GMAC was not only essential to the business," she said. "It's been like a huge dose of oxygen the last few months. We're healthier, stronger, more aggressive in the marketplace, and we're growing."

*You may e-mail **Jim Henry** at autonews@crain.com*

# Exhibit C

# Automotive News

## Detroit 3 consolidate more stores

**Arlena Sawyers**

Automotive News | April 9, 2007 - 12:01 am EST

Last week, Marvin Tamaroff closed the suburban Detroit Buick dealership that he had run since 1969.

He transferred his stand-alone Buick franchise to Art Moran, who now sells Buicks along with Pontiac and GMC vehicles at his nearby store.

The transaction reflects General Motors' "channel" strategy of combining Buick, Pontiac and GMC franchises into single dealerships in major U.S. metropolitan markets. Tamaroff's son Jeffrey, a principal of the Tamaroff Automotive Group, says GM effectively forced the family-owned business to kill the Buick dealership.

"If it sounds like I'm bitter, it's because I am," Jeffrey Tamaroff tells *Automotive News*. He says of his father: "This is his life."

GM, Ford Motor Co. and the Chrysler group are pursuing consolidation programs aimed at creating fewer, more profitable dealerships.

This year's *Automotive News* dealership census suggests those plans are substantially reducing the number of Detroit 3 retail outlets.

Last year, the Detroit 3 collectively shed 462 dealerships, according to the census. At the start of 2007, GM had 6,901 dealerships, down 222 from the previous Jan. 1.

In the same period, GM subtracted just 97 franchises, reflecting the consolidation effort. On a smaller scale, GM seeks to combine Cadillac, Saab and Hummer franchises within luxury dealerships in some markets.

**Ford, Chrysler group down**

Ford Motor Co. had 4,270 dealerships on Jan.1, down 126 from the year-ago date. The Chrysler group had 3,749 dealerships, down 134.

Overall, there were 21,761 new-vehicle dealerships in the United States on Jan. 1, down 328 from the previous year -- the largest reduction in the past decade. The number of new-vehicle franchises dropped by 356, to 40,285.

Joe Chrzanowski, GM's executive director of dealer network planning and investment, says 1,643 dealerships in major metro areas sell Buick, Pontiac and GMC vehicles, up from 1,619 last year and 1,512 in 2005. Those consolidated dealerships account for about 70 percent of the three brands' sales, he says.

Dealer Jeffrey Tamaroff says GM added four Buick points to Detroit-area Pontiac-GMC dealerships in the past 18 months. New-vehicle sales at the now-closed Tamaroff Buick dealership dropped from 675 units in 2005 to about 500 last year, he estimates.

Tamaroff says GM did "throw some money our way" to encourage his father to transfer the Buick franchise. But he complains that GM is letting viable dealerships die under the channel strategy.

Chrzanowski concedes that a dealer's decision to give up a franchise is emotional. He says GM tries to be sensitive to such concerns.

**Fewer stores, more profits**

"We're working to make our dealers healthier and more profitable, not just get them on channel," he says. "There is an underlying objective -- to make them very successful financially."

The Chrysler group's consolidation plan, called Alpha, seeks to combine Chrysler division, Dodge and Jeep franchises in the same dealerships.

The group's retail network shed 119 franchises in 2006. The number of dealerships selling all three brands rose by 31, to 1,934.

"We want to work to increase profitability and dealer throughput," says Markus Mainka, Chrysler group spokesman. "To achieve that goal, we see potential for network optimization."

Ford Motor launched a plan last summer to cut at least 600 dealerships over the next few years.

The Detroit 3 are reducing their counts faster than their import competitors are raising theirs.

Toyota Motor Sales U.S.A. Inc. outsells the Chrysler group in the United States and sells almost as many units as Ford Motor. But on Jan. 1, Toyota Division had 1,224 franchises, nine more than it had on Jan. 1, 2006, and barely one-third as many as Ford division's count.

Three second-tier imports each lost more than 20 dealerships last year. Isuzu's franchise count declined by 67, to 227 on Jan. 1. Mitsubishi's fell by 42, to 503. Mazda's declined by 22, to 687.

*You may e-mail Arlena Sawyers at asawyers@crain.com*

# Exhibit D

# KEITH CRAIN

## CARS RUN ON MONEY AND CREDIT, NOT GAS

**KEITH CRAIN**
**AUTOMOTIVE NEWS**
SEPTEMBER 22, 2008 - 12:01 AM ET

The sky may be falling at Wall Street firms, and the repercussions in the automobile business could be mighty.

Many suppliers need credit to finance their work in progress. They need cash to run their businesses. It just got tougher and more expensive for them to borrow money, and they'll have to raise their prices.

Just about every dealer in the nation uses borrowed money to floorplan vehicles. Without a reasonable rate for floorplanning inventory, the factories will sell fewer cars and trucks, and consumers will pay more for vehicles.

Consumers lease and buy millions of cars and trucks. They depend on borrowed money. When credit dries up or borrowing becomes more expensive, they will be out of the market. Leasing disappears without a lot of capital from somewhere. And leasing has disappeared for a lot of dealers.

Wall Street does matter. The automobile business runs on credit, and already you hear a bunch of folks singing the blues.

It will be interesting to see whether Congress is more or less likely to approve $25 billion in low-interest loans to the automobile industry. Chances are that the recent financial disasters will make it a lot more difficult for automobile companies, both vehicle manufacturers and suppliers, to get the money.

Meanwhile, automakers, suppliers and dealers are scrambling for cash. A lot of credit sources have disappeared. The rest seem to be gun-shy, and well they should be.

One of the most important factors in the growth of the auto business was the establishment of large credit companies as subsidiaries of the Detroit 3. The creation of GMAC was a critical part of Alfred Sloan's plan to expand General Motors back in 1919, making credit available for dealer floorplanning and installment sales to consumers. Ford and Chrysler followed. The credit companies are important profit centers as well as an essential part of marketing.

When a new auto company establishes roots in the United States, one of the first things it does is establish a credit subsidiary for its dealers.

The auto industry needs the free-flowing availability of credit. Let's hope that the federal government doesn't do anything to impede that.

# Exhibit E

# Automotive News

## GM store count down 226 so far this year

**Amy Wilson**

Automotive News | September 22, 2008 - 12:01 am EST

DETROIT — Through August, General Motors trimmed its U.S. dealership count this year by 226 stores, to 6,550.

And through year end, GM's U.S. sales chief expects the closure rate to quicken. The final toll for 2008? It could be 350 to 400 closed stores, said Mark LaNeve, GM's vice president of North America vehicle sales, service and marketing. That's what GM expects, not a target, he said.

That would compare with a reduction of 260 stores in 2007 and 87 stores in 2006. Given the industry sales downturn this year and the projection for 2009, GM wants consolidation activity to pick up, LaNeve told *Automotive News.*

"We see (sales) recovering, but not immediately," he said. "In that kind of a market, you're going to have less dealer throughput, a lot of pressure on profitability."

GM is forecasting 2008 light-vehicle sales in North America in the low-14-million range, down more than 3 million vehicles from the U.S. peak of 17.4 million units in 2000. In a market such as this, more closures occur because dealers are financially stressed.

But even without the industry sales downturn, GM executives and many dealers say there are too many dealerships for the automaker's shrinking sales to support.

GM's dealership network was built when the automaker dominated U.S. sales. In 1962, GM's market share peaked at 51.1 percent. By 2007, market share had dropped to 23.5 percent.

### GM dealership count

Through August, General Motors trimmed 226 dealerships. Here is a store count as of Sept. 1; GM says stores with multiple franchises are counted under the brand considered to be the controlling franchise.

| | |
|---|---:|
| Chevrolet | 3,786 |
| Pontiac | 1,083 |
| Buick | 557 |
| Saturn | 404 |
| Cadillac | 301 |
| GMC | 289 |
| Saab | 106 |
| Hummer | 24 |

**Total**                                                                      6,550

During the past 12 years, GM has reduced its dealership count by 25 percent, LaNeve said. GM chips in money to facilitate some deals and will continue to do so, he said.

The dealership count could go down even more than the 400 stores GM expects, said Mike Bowsher, president of Carl Black Automotive Group in Kennesaw, Ga. "It's no secret the business climate out here is very difficult, and there's pressure from all sides, particularly the credit side," he said.

Bowsher runs seven dealerships, including three Buick-Pontiac-GMC stores. He said GM is doing a good job so far of staying on top of the consolidation activity.

"GM has to get involved with this at some level to ensure the right dealers stay," Bowsher said. "It's very difficult, and they just can't save everybody out here."



Mark LaNeve: By year end, 350 to 400 GM dealerships could be closed.

# Exhibit F

# Automotive News

## Bill Heard shuts Arizona dealership

**Chrissie Thompson**

Automotive News | September 22, 2008 - 12:01 am EST

Bill Heard Enterprises Inc. — whose owner calls himself "Mr. Big Volume" — has shut its Chevrolet dealership in Scottsdale, Ariz.

A tough Phoenix auto market, the effect of rising gasoline prices on truck purchases, and floorplan financing difficulties contributed to the Sept. 12 closing of the 150-employee store, spokesman Alan Ulman said.

On Aug. 21, GMAC Financial Services discontinued the company's floorplanning credit. Not all Bill Heard Enterprises stores relied on GMAC for floorplanning. GMAC declined to explain its decision to yank floor-plan financing for Heard. Neither company said how many stores the credit cutoff affected.

Bill Heard Enterprises is seeking new sources of floorplanning credit, Ulman said. The dealership group also is seeking to vary product mixes at its remaining 13 Chevrolet dealerships, including one store that also sells Cadillacs and Saabs.

Bill Heard Enterprises, of Columbus, Ga., ranks No. 13 on *Automotive News'* list of the top 125 U.S. dealership groups, with 2007 group revenue of $2.13 billion. It is the world's top-selling Chevrolet dealership.

But pickups and SUVs aren't selling well, Ulman said. In July, Bill Heard, 74, told the Columbus *Ledger-Enquirer* that he planned to sell two or three of his dealerships because of slow sales.

Heard's stores have had several legal run-ins over allegations of misleading marketing. Last month the Georgia Governor's Office of Consumer Affairs amended a complaint that sought a penalty of up to $5,000 for each of 10,000 deceptive fliers that the agency says Bill Heard sent to consumers in October 2006.

The state now says the number of deceptive fliers exceeds 10,000. The Office of Consumer Affairs seeks penalties on the new ones, too.

Georgia also will seek thousands of dollars in penalties for alleged instances of signature forgery and other illegal practices.



Bill Heard had said he planned to sell some of his dealerships because of slow sales.

# GM MOVES TO END PACTS WITH 3 HEARD STORES

**CHRISSIE THOMPSON**
**AUTOMOTIVE NEWS**
NOVEMBER 4, 2008 - 11:50 AM ET
**UPDATED: 11/4/08 3:55 P.M. EST**

General Motors wants to terminate its
dealership agreements with three more stores
owned by bankrupt Bill Heard Enterprises Inc.,
court documents say.

GM wants to end sales points at Chevrolet dealerships in Union City and , Ga., Sandy Springs, Ga., and one
of Heard Enterprises' two Houston area stores. The automaker already terminated its dealership agreement
last month with Heard Enterprises' store in Scottsdale, Ariz.

Heard Enterprises, formerly the world's top-selling Chevrolet dealership group, closed its stores Sept. 24
and soon began liquidation of its 14 locations. On Sept. 26, GM sent a notice to the three stores in question,
terminating the dealership agreements if the stores did not reopen within six business days, as the
agreement outlines.

The bankruptcy filing postponed the effects of that letter, court documents say. But liquidators had received
"no viable offers" for the stores. Heard Enterprises will allow the dealership agreement to end if no
acceptable bid arrives by a hearing on Thursday, the documents say.

Heard Enterprises has bidders lined up for four stores in Las Vegas; Houston; Kennesaw, Ga.; and Plant
City, Fla.

The proposed buyers the dealership group has chosen for the four stores still can be outbid. According to a
court-prescribed procedure, the stores go up for auction early next week if liquidators receive competitive
bids by two business days before the auction dates.

To solicit higher bids, Heard Enterprises is using a Web site at the address formerly associated with the
dealership group's 14 Chevrolet stores: **http://www.billheard.com**.

Additional bidders must file a $500,000 cash deposit for sales including real estate and $250,000 to bid on
stores without real estate to sell, the site says. Bankruptcy Court Judge Jack Caddell must approve final bids
Nov. 12 at a hearing.

Heard Enterprises has also filed a motion establishing a procedure for handling the about 250 trade-ins that
were in process when it closed. The motion, which the judge will hear at the hearing Thursday, also
addresses repayment of deposits for transactions the dealerships had not completed.

# Exhibit G

## WHOLESALE SECURITY AGREEMENT

To:   General Motors Acceptance Corporation (GMAC)

In the course of our business, we acquire new and used cars, trucks and chassis ("Vehicles") from manufacturers or distributors. We desire you to finance the acquisition of such vehicles and to pay the manufacturers or distributors therefor.

We agree upon demand to pay to GMAC the amount it advances or is obligated to advance to the manufacturer or distributor for each vehicle with interest at the rate per annum designated by GMAC from time to time and then in force under the GMAC Wholesale Plan.

We also agree that to secure collectively the payment by us of the amounts of all advances and obligations to advance made by GMAC to the manufacturer, distributor or other sellers, and the interest due thereon, GMAC is hereby granted a security interest in the vehicles and the proceeds of sale thereof ("Collateral") as more fully described herein.

The collateral subject to this Wholesale Security Agreement is new vehicles held for sale or lease and used vehicles acquired from manufacturers or distributors and held for sale or lease, and all vehicles of like kinds or types now owned or hereafter acquired from manufacturers, distributors or sellers by way of replacement, substitution, addition or otherwise, and all additions and accessions thereto and all proceeds of such vehicles, including insurance proceeds.

Our possession of the vehicles shall be for the purpose of storing and exhibiting same for retail sale in the regular course of business. We shall keep the vehicles brand new and we shall not use them illegally, improperly or for hire. GMAC shall at all times have the right of access to and inspection of the vehicles and the right to examine our books and records pertaining to the vehicles.

We agree to keep the vehicles free of all taxes, liens and encumbrances, and any sum of money that may be paid by GMAC in release or discharge thereof shall be paid to GMAC on demand as an additional part of the obligation secured hereunder. We shall not mortgage, pledge or loan the vehicles and shall not transfer or otherwise dispose of them except as next hereinafter more particularly provided. We shall execute in favor of GMAC any form of document which may be required for the amounts advanced to the manufacturer, distributor or seller, and shall execute such additional documents as GMAC may at any time request in order to confirm or perfect title or security in the vehicles. Execution by us of any instrument for the amount advanced shall be deemed evidence of our obligation and not payment therefor. We authorize GMAC or any of its officers or employes or agents to execute such documents in our behalf and to supply any omitted information and correct patent errors in any document executed by us.

We understand that we may sell and lease the vehicles at retail in the ordinary course of business. We further agree that as each vehicle is sold, or leased, we will, faithfully and promptly remit to you the amount you advanced or have become obligated to advance on our behalf to the manufacturer, distributor or seller, with interest at the designated rate per annum then in effect under the GMAC Wholesale Plan. The GMAC Wholesale Plan is hereby incorporated by reference.

GMAC's security interest in the vehicles shall attach to the full extent provided or permitted by law to the proceeds, in whatever form, of any retail sale or lease thereof by us until such proceeds are accounted for as aforesaid, and to the proceeds of any other disposition of said vehicles or any part thereof.

In the event we default in payment under and according to this agreement, or in due performance or compliance with any of the terms and conditions hereof, or in the event of a proceeding in bankruptcy, insolvency or receivership instituted by or against us or our property, or in the event that GMAC deems itself insecure or said vehicles are in danger of misuse, loss, seizure or confiscation, GMAC may take immediate possession of said vehicles, without demand or further notice and without legal process; for the purpose and in furtherance thereof, we shall, if GMAC so requests, assemble said vehicles and make them available to GMAC at a reasonable convenient place designated by it, and GMAC shall have the right, and we hereby authorize and empower GMAC, to enter upon the premises wherever said vehicles may be and remove same. We shall pay all expenses and reimburse GMAC for any expenditures, including reasonable attorney's fees and legal expenses, in connection with GMAC's exercise of any of its rights and remedies under this agreement.

In the event of repossession of the vehicles by GMAC, then the rights and remedies applicable under the Uniform Commercial Code shall apply.

Any provision hereof prohibited by law shall be ineffective to the extent of such prohibition without invalidating the remaining provisions hereof.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed by its duly authorized representative this _____ day of_____ June ___19 _82_.

Witness and Attest:

_____

Accepted

GENERAL MOTORS ACCEPTANCE CORPORATION

By:_____
         Its Authorized Agent

2491 Paxton Street
Harrisburg, Pa.   17111
            Address

Monte Chevrolet-Oldsmobile, Inc.
                Dealer's Name

By:_____

Its:_____
        Rt. 222    Box 188
        Kutztown, Pa.   19530
                Address of Dealer

GMAC 178 4/76
PRINTED IN U.S.A.

# Exhibit H

## SECURITY AGREEMENT

In order to induce General Motors Acceptance Corporation (GMAC) to extend or continue credit to the undersigned dealership ("Dealer"), and in consideration of the future extension or continuation of such credit, the undersigned Dealer hereby grants GMAC a security interest in the following property of Dealer ("Collateral"):

1.  All inventory of new and used motor vehicles, trailers and semi-trailers ("Vehicles") now owned or hereafter acquired by Dealer, including such Vehicles held for demonstration purposes and also including all Vehicles traded in to the Dealer and all repossessions, together with all attachments, parts, accessories, additions, replacement parts, substitutions and accessions thereto and thereof;

2.  All inventory of attachments, parts and accessories and supplies relating in any way to Vehicles as well as other goods used or intended to be used in conjunction therewith and all inventory of supplies, now owned or hereafter acquired by Dealer;

3.  General intangibles, contract rights, chattel paper, accounts, notes, loans and assignments of accounts, notes and loans, certificates of deposit and bank accounts, and tax refunds, now owned or hereafter acquired, including, but not limited to, any of those arising out of the sale or lease of Vehicles, including rents receivable under leases and rental agreements;

4.  All tools, machinery, equipment, furniture and fixtures, wherever located, now owned or hereafter acquired or now or hereafter in the possession, custody or control of Dealer and all replacements, substitutions and accessions thereto and thereof;

5.  All reserves, however created, of Dealer in the possession or control of GMAC;

6.  All of Dealer's rights to any rebates, discounts, credits, factory holdbacks and incentive payments which may become due to Dealer by the manufacturer or distributor with respect to any inventory and any and all amounts now or hereafter owed to the Dealer by any Vehicle manufacturer, including any credit balances that may exist in any account of Dealer with any such Vehicle manufacturer, including but not limited to the "Open Account" maintained by Dealer with General Motors Corporation; and

7.  All proceeds from all or any part of the above described Collateral including, but not limited to, insurance proceeds payable by reason of loss or damage to any of the Collateral, cash, goods, equipment, instruments, accounts, chattel paper, contract rights, leases, rentals, general intangibles, replacement inventory or otherwise and proceeds of the proceeds.

The Collateral subject to the security interest granted to GMAC hereunder secures the payment of any and all liabilities or obligations of Dealer to GMAC, matured or unmatured, now existing or hereafter arising, absolute or contingent, and whether created by Dealer as maker, endorser, drawer, guarantor or in any other capacity.

Dealer shall protect and secure the Collateral.  Dealer will keep the Collateral free of taxes, liens or encumbrances and any sums which may be paid by GMAC, in its discretion, in release and discharge thereof shall be paid by Dealer to GMAC upon demand.  Dealer will not sell, transfer or otherwise dispose of Collateral other than in the ordinary course of Dealer's business.  GMAC shall have the right to inspect the Collateral and Dealer's books and records related thereto.

In the event Dealer defaults under any obligation due GMAC, or if the Collateral is in danger of misuse, loss, seizure or confiscation, GMAC may take immediate possession of the Collateral without demand or further notice, and without legal process.  In furtherance thereof, Dealer shall, if GMAC so requests, assemble the Collateral and make it available to GMAC at a reasonable place designated by GMAC.  GMAC shall have the right, and Dealer hereby authorizes and empowers GMAC to enter upon the premises wherever the Collateral may be and remove same, in accordance with applicable law.  Dealer shall pay all expenses and reimburse GMAC for any expenditures, including reasonable attorney's fees and legal expenses, in connection with GMAC's exercise of any of its rights and remedies hereunder.  In the event of such repossession by GMAC, in addition to the rights specified herein, all the rights and remedies afforded GMAC by applicable law shall apply.

The invalidity of any provisions of this Agreement shall not affect the validity of any other provision.  This Agreement benefits GMAC, its successors and assigns, and binds the Dealer and its successors and assigns.  This Agreement shall be governed by the laws of the state of Pennsylvania.

Executed this ___7___ day of MARCH , 2000.

| General Motors Acceptance Corp. | | Mente Chrysler Plymouth Dodge, Inc. | |
| | | (Dealer) | |
| By: | K. J. Jahoda | By: | Donald M. Mente |
| | (Signature) | | (Signature) |
| Title: | Assistant Secretary | Title: | President |
| Address: | 555 Business Center Drive | Address: | 15040 Kutztown Road |
| | Horsham, PA  19044 | | Kutztown, PA  19530 |

# Exhibit I

Joseph A. O'Keefe, Esq.
jokade@okeefesher.com
• U.S. Tax Advocacy
• Also admitted before
  U.S. District Court for
  the Eastern Districts and



O'KEEFE & SHER, P.C.

ATTORNEYS AT LAW

Kutztown
Ph 610.683.0771
Fx 610.683.0777

James E. Sher, Esq.
jsheresq@okeefesher.com

Konrad B. Jarzyna, Esq.
konrad@okeefesher.com

August 17, 2007

John Abel, Esquire
Office of Attorney General,
Bureau of Consumer Protection
801 Hamilton Street, 4th Floor,
Allentown, PA 18101

   RE: *Mente Chevrolet, Oldsmobile, Inc. & Mente Chrysler, Dodge, Jeep, Inc.*

Dear John:

  I write you today to advise you of recent developments involving Mente Chevrolet, Oldsmobile, Inc. & Mente Chrysler, Dodge, Jeep, Inc. ("Mente") because they have the potential to affect consumers and are of a reportable nature. On July 19, 2007, General Motors Acceptance Corporation ("GMAC") notified Mente of an alleged Out of Trust situation. They immediately confiscated all Certificate of Origins, all Titles, and all keys to floor-planned vehicles. From that point forward, Mente could not sell or trade a vehicle without remitting to them certified checks, despite GMAC retaining any financing agreements and all profits derived from the sales (profits that include monies attributable to service contracts and other insurance policies marketed and sold to consumers).

  GMAC's actions essentially forced Mente to notify GMAC approximately a week after their July 19, 2007 action that there were essentially two (2) options because all operating capital and capital reserves had been run dry by GMAC's lock-down. The first option is that GMAC could agree to allow vehicles to be sold and delivered absent the requirement for a certified check each time (instead being satisfied with the financing contract as collateral) and allow sufficient time for a recapitalization of the company to cure any Out of Trust situation as there were no more monies left to give them and only enough remaining in the account to cover outstanding payroll obligations (including 401k remittances). The second options is that Mente would inform its sales staff that they could not deliver cars as Mente did not have the money to meet GMAC's demands. GMAC refused to budge and, as a result, Mente sales staff exited *en mass* and the remaining employees, upon learning that there would be no money for payroll past due, exited as well.

  Thereafter, Mente began negotiating for the sale of its stores as well as assessing all accounts payable versus accounts receivables. A particular priority was focused on Mente covering all of the "stuff that gets someone arrested," including, but not limited to, outstanding sales tax, service contracts, GAP refunds. Despite GMAC taking those monies (which were not Mente's for them to take), Mente was confident that it could

– 2 –

August 17, 2007

cover them as its quarterly remittances from the manufacturers were due nearly any day. When that day came and went without any monies placed into Mente's Open Account, Mente contacted the manufacturers and learned that effective June 13th (nearly a month prior to the alleged Out of Trust) GMAC had those monies diverted to it. Essentially, Mente learned that all incoming revenue at that point, as well as all monies remitted by consumers for sales taxes, contracts, and others similar, as well as that necessary for mandatory consumer rebates were now effectively under GMAC's control. Immediately after learning this, on August 14, 2007, I wrote GMAC's counsel a detailed e-mail outlining that his client had well in excess of $238,738.92 as against an alleged Out of Trust amount of $224,323.41; that a majority of those monies were not Mente's for them to appropriate; and, that Mente, immediately, needed a commitment to free up $110,082.98 from those funds to (nearly entirely) pay outstanding taxes, contracts, and rebates owed to consumers. I also informed GMAC that should they fail to agree to either remit these monies or directly pay those items, your office absolutely would need to be notified as there are criminal as well as civil penalties potentially arising from this situation and Mente shall not be liable when GMAC has taken monies it was not entitled to take. (See Attachment "A," a true and correct copy of my e-mail dated 8/14/07 to GMAC's counsel).

GMAC has scheduled a meeting to discuss a "forbearance" but has not committed to the release of the subject monies or to pay the subject items. Mente cannot allow a consumer to contact you absent them having informed you of this and having identified to you the affected consumers. (See Attachment "B," a true and correct spreadsheet of affected consumers). I am requesting your intervention so that the consumers are not further affected by this matter or, alternatively, that a file is opened which indicates, plainly, that Mente has voluntarily contacted you to disclose this situation and to request assistance and/or guidance in how to proceed in addressing these matters.

Should any questions remain, please feel free to contact me directly.

Sincerely,

BY: _____

Joseph A. O'Keefe, Esquire
O'Keefe & Sher, P.C.

JAO'K
CC: D.J., D.M., J.Weiner, Esq. (counsel for GMAC)

# EXHIBIT "A"

# EXHIBIT "A"

Subj:      **Mente/GMAC**
Date:      8/14/2007 8:21:49 P.M. Eastern Daylight Time
From:      JOkade
To:        jweiner@lavin-law.com
CC:        susan@okeefesher.com

J...

As promised earlier today, I am attempting to address some of the outstanding issues raised in your letter (those which I can intelligently speak to-- until such time as I can get complete accountings from Donna (there, as your client can attest, has been a flurry of activity relative to placing floor-planned vehicles which has largely consumed her time) -- any omissions are intentional although I intend to address the remainder once she has been able to slow down enough to get me the accountings (that are changing daily) I need  and to raise a few issues of pressing concern...

First... I note that you have confirmed your client holds collateral and monies totaling One Hundred and Eight Thousand, Nine Hundred and Nine Dollars and Twenty Three Cents ($108,909.23) of which $20,909.23 is profit on used vehicle sales up to (presumably) August 2nd (a profit number that has likely doubled or tripled over the past week or so...) And, despite Donna providing a list of used vehicles that GMAC holds the title to but otherwise cannot "locate" within their records, there are a substantial number of vehicles held by your client yet to be accounted for...

Next, I am somewhat surprised that your client has not acknowledged to you that, (despite a date of an alleged "out of trust" being denoted as July 19, 2007), they took possession of the Chevrolet and the Chrysler stores' open accounts as of June 13th, 2007.  Currently, the funds held in those accounts totals One Hundred and Twenty Nine Thousand, Eight Hundred and Seventy Four Dollars and Sixty Nine Cents ($129874.69)...  Combined with the $108,909.23 that GMAC has acknowledged, my math indicated that GMAC currently holds Two Hundred and Thirty Eight Thousand, Seven Hundred and Eighty Three Dollars and Ninety Two Cents ($238,783.92) as against an alleged out of trust amount of $224,323,41 (and we have yet to account for the profits derived from sales since the last accounting was provided to you or for the missing vehicles that GMAC has yet to find on their records)...  Similarly, while you are correct that Mente has transferred the floor-plan of numerous new vehicles, the hold-back monies for those vehicles (plus the advertising fees) will be flowing into the open accounts and is similarly a substantial figure...

Because it is essentially Donna managing these figures, while addressing the necessary details of transferring titles and c/o's, as well as other essential functions necessary for a "successful" wind-down of the corporate affairs and she is somewhat understandably overwhelmed, we have prioritized the big ticket items and will be addressing everything else in turn...

Which brings me to a main issue of concern...  We need to make a hard choice and which route we take next is entirely dependent upon your client...  Currently, from the open accounts and other monies GMAC holds, we need One Hundred and Ten Thousand, Eighty Two Dollars and Ninety Eight Cents ($110, 082.98) pretty much immediately.  These monies are dividable into two categories...  First (the largest) comes what I call "the stuff that is going to get someone arrested."...  This would be the things owed to the Commonwealth or to customers who are entitled to refunds or for payment on service contracts that they have paid for...  The second (which is relatively miniscule) goes to preservation of assets (insurances & computer systems)...  As denoted the last time I asked your client for some leeway to keep the dealership operations fully functioning (a request that was rejected and which led to the entire staff leaving because Mente was prevented from delivering vehicles as contracted with customers) GMAC has effectively locked up all operating capital, including the monies specifically earmarked to cover the above...  Given that I opened today's newspaper and learned a dealer had been sentenced to four (4) years in state prison for failing to remit monies on "the stuff that is going to get someone arrested," unless I can obtain a commitment from your client (or its agent(s) and employees) to either give Donna and I the money to pay these essential bills (or confirmation that GMAC will remit the monies directly), I am left no other choice but to voluntarily notify the Attorney General's office of the current situation, (providing them with detailed lists of who the affected consumers are), and request their intervention/investigation...  In such an event, I am disclosing now that it will be Mente's position that your client (as overseen by its agent/employees) has knowingly converted those monies even though they are not Mente's and thus not subject to such action...  (and, as I hear other GM stores in the Commonwealth may be operating –or have been terminated—under similar circumstances, I am certain the AG will be concerned about a wide-

spread consumer effect due to these recent market events)... Please note, absent confirmation that we can rely on the funds to make these remittances immediately, I intend to contact the counsel in charge of the regional AG's office this Friday... Therefore, I appreciate the courtesy of a prompt reply...

Next... As you are aware, Mente has a Buy/Sell in place for the Chevy Store... Beyond the implications if I cannot clear up the above, (thus being unable obtain a valid Bulk Sales Agreement), the Buyer has inquired if, versus remitting all of the funds in one shot, they can take an assignment of Donald's LOC totaling $500,000.00. As they are a current GM multi-franchise store, I would assume that all of their financial information is either in GMAC's possession or otherwise readily accessible to your client.... If I am mistaken, please advise as to what you will need from them in consideration of this request and we shall endeavor to obtain it post haste... Currently, I understand that tentative approval of the sale has been given but that formal approval is still in process... Once obtained, Mente has prepared its returnable parts (which total approximately Two Hundred Thousand Dollars) for return... We would return those parts and use the monies there-from to pay off the balance of Mente's outstanding Payables... At closing, which is set to occur within thirty (30) days of approval, GMAC would receive the balance of the monies owed it by Mente directly from the settlement table (provided that we have obtained and agreed upon a complete accounting of what is owed and what has been held to that date by GMAC –if we cannot agree, the maximum amount claimed would be escrowed pending said agreement and per the Buy/Sell itself)... Also, Mente (as I understand it) has made arrangements for an alternate floor-plan of all remaining used vehicles... Which brings me to the last issue of the evening... The balance of new vehicles remaining at Mente...

You previously asked if Mente would be willing to tender the new vehicles so that they could be placed... As GMAC has effectively prevented any retail sales, (and time is pressing), either there needs to be some agreement relative to accruing interest pending the run-off and transfer of the stores (and Mente's ability to retail out of them --- something which would afford GMAC not only hold-back and advertising monies, but interest and rebate dollars as well--), please advise as to your time-table for such... Unless something gives immediately in this area, I have advised my client to tender all new inventory to GMAC directly... We do not prefer it at this stage but absent some give at this point, I cannot think of any other responsible alternative... (I remain open to suggestions mind you...)...

In conclusion, I recognize that I owe you further response(s) and fully intend to provide them... My omission of anything herein cannot be read as a waiver of objection or other right of contest as for all of the obvious reasons attributable to the current "circumstances," there simply is not enough hours in the day... However, we shall address each in turn and, respectfully, I would request an updated accounting and list of outstanding issues from GMAC's perspective so that we can begin compiling the essential information as soon as practicable...

As noted earlier today, your courtesy and considerations are much appreciated... Please do not think, in anyway, that full payment to GMAC of all outstanding obligations is not of utmost consideration... Again, when a train of this size is derailed, it takes time to clean it up and get everything routed accordingly... Given the skeleton crew and amount of work, we are doing our absolute best...

Regards,

J


Joseph A. O'Keefe, Esq.
O'Keefe & Sher, P.C.
15019 Kutztown Road
Kutztown, PA 19530
610-683-0771
610-683-0777 (fax)


Get a sneak peek of the all-new AOL.com.

# EXHIBIT "B"

# EXHIBIT "B"

Mente Chrysler Dodge

| Name | VIN | Service Cont. $ | Gap $ |
|------|-----|-----------------|-------|
| Kristy Moyer | 1GNET16S836162365 | $ 148.00 | |
| William Kodash | 4S3BH6653Y7614468 | $ 1,209.00 | |
| Stephen Pastor | 1J4GW48S04C155656 | $ 937.00 | |
| Kurt Kuntz | 1J4FA24147L216443 | $ 904.00 | |
| Leroy Moyer | 1B3EL46R25N696074 | $ 864.00 | |
| David Hibshman | 1B3ELJ46X7YN301640 | $ 1,342.00 | |
| Connie Gardner | 2C3KK63H37H763602 | $ 900.00 | |
| Diane Bitzer | 3GNEK12T64G337813 | $ 249.00 | |
| Virginia Kuser | 2G1WW12E229304164 | $ 148.00 | |
| Keith Hilbert | 1FTZR11X4YTA34774 | $ 1,265.00 | |
| Margaret Castimore | 1J4GW48S74C338763 | $ 819.00 | |
| Ray Schlouch | 1FTZR15E11PB30627 | $ 865.00 | |
| Brianne Cook | 3VWVH69M03M013451 | $ 1,355.00 | $ 297.00 |
| David Kochel | 1B3AS56C93D142374 | $ 705.00 | $ 297.00 |
| Beth Grace | 2A4GP64L67R160234 | $ 1,099.00 | |
| Mark Gehman | SALTL16443A808556 | $ 148.00 | |
| Amy Wisser | 1FMPU16L8YLA28726 | $ 148.00 | $ 297.00 |
| Total Service Contracts | | $ 13,105.00 | |
| Total Gap Contracts | | | $ 891.00 |

| | | | |
|---|---|---|---|
| Mente Chev. Sales Tax-monthly | | $ | 5,179.27 |
| Mente Chrysler Sales Tax-monthly | | $ | 2,632.90 |
| | | | |
| Mente Chevrolet vehicle sales tax | | | |
| Martin Construction | 1GCHK29U64E143686 | $ | 1,277.74 |
| Donald Mente | JM3ER293X70139171 | $ | 1,068.95 |
| Donald Mente | WVWUK63B23P114962 | $ | 829.31 |
| Michael Laskosky | WMWRE334X5TD97926 | $ | 1,818.95 |
| | | | |
| Mente Chrysler vehicle sales tax | | | |
| Service Electric | 1D8HB48277F501146 | $ | 2,020.83 |
| | | | |
| Total Sales Tax | | $ | 14,827.95 |
| | | | |
| Refunds | | | |
| Nicholas Eshbach | | $ | 100.00 |
| Carl Becker | | $ | 281.43 |
| Donna Bailey | | $ | 314.81 |
| Madge Goodwin | estimated | $ | 225.00 |
| Sean Conley | estimated | $ | 450.00 |
| Donald Smith | estimated | $ | 1,205.00 |
| Justin Miller | estimated | $ | 800.00 |
| Steven Lubbers | | $ | 468.17 |
| Kristina Banks | | $ | 537.90 |
| Cathy Kramer | | $ | 430.14 |
| Ronald Moyer | | $ | 183.96 |
| George Neiman | | $ | 258.44 |
| Carl Becker | | $ | 780.37 |
| Phyllis Buskaritz | | $ | 336.28 |
| William Roland | | $ | 1,128.44 |
| Rhonda Hinsperger | | $ | 964.60 |
| Cliff Smith | | $ | 917.26 |
| Michael Weller | | $ | 1,143.30 |
| Dana Christ | | $ | 639.53 |
| Aroll Heller Jr | | $ | 231.77 |
| Total Refunds | | $ | 11,396.40 |

Mente Chevrolet

| Name | VIN | Serv.Contract $ | Gap $ |
|---|---|---|---|
| Lori Burkert | KL1TD56607B109736 | $ 551.00 | |
| Valerie Thompson | 2GCEK13M871548931 | $ 658.00 | |
| James Geake | 2CNDL73f176111963 | $ 868.00 | |
| Ronald Weyer | 1GCHK29K57E556427 | $ 619.00 | |
| Sheila Scheidt | 1G1AK15F877163720 | $ 592.00 | |
| James Gearhart | 2G1WB58K779260105 | $ 912.00 | |
| Catherine Wanner | 1G1AK55f377293394 | $ 527.00 | |
| Gregory Wysong | 3GNFK16397G205678 | $ 1,251.00 | |
| Kenny Williams | 1GKDT13S732134061 | $ 950.00 | |
| James Babiarz | 1GYEE63A540171552 | $ 1,828.00 | |
| Gloria Conrad | 2D4GP74LX3R205359 | $ 1,275.00 | |
| John Brezan | 1GNDT13S652158843 | $ 726.00 | |
| Barbara Harris | 1G1AL55F067763960 | $ 648.00 | |
| Dawn Russell | 3G5DB03E84S564049 | $ 1,062.00 | |
| Lawrence Krause | 1G1AL55F277330514 | $ 488.00 | |
| Jan Cohen-Cruz | 1GKDT13SX32155311 | $ 1,541.00 | |
| Diane Bitzer | 1GNEK13T16R111261 | $ 825.00 | |
| Allen DeLong | 2GCEK19T9Y1215489 | $ 148.00 | |
| Michael Zajac | 1GCEK19VX3E174167 | $ 381.00 | |
| Linda Yanchocik | 1G1AL55F277387893 | $ 463.00 | |
| Wilson Finnery | 1GNEK13X33J182895 | $ 1,266.00 | |
| Paul Geiger | 2CNDL23F356043486 | $ 700.00 | |
| Maryann Cortez | 1GKDT13S642307005 | $ 1,039.00 | $ 319.00 |
| Alice Specht | 3GNDA23D17S560029 | $ 633.00 | |
| David Wheeler | 2G1WT58K679114808 | $ 808.00 | |
| Amber Yeagley | 2CNDL13F556009544 | $ 728.00 | $ 297.00 |
| Zachary Johnson | 5Y2SN62L73Z421590 | $ 738.00 | $ 297.00 |
| Karen Epting | 1G1AK55FX67642954 | $ 534.00 | |
| Teresa Adams | 1G1JC124927430100 | $ 829.00 | $ 297.00 |
| Luther Bartholomew | 2CNBJ734X16933504 | $ 1,089.00 | |
| Colleen O'Neil | 1G1AK15FX77297001 | $ 488.00 | $ 297.00 |
| Thomas Heckman | 1GNFC16J17J252374 | $ 1,148.00 | |
| William Sheppard | 1GNFK13027R387119 | $ 1,148.00 | |
| Leroy Brown | 1GNFK13087J125099 | $ 1,188.00 | $ 319.00 |
| Louis Rodriquez | 1J4GL48K64W148878 | $ 836.00 | $ 297.00 |
| Lucas Hertzog | 1G1AK55F677118573 | $ 559.00 | $ 297.00 |
| Thomas Sheldon | 1G1AK52F157506571 | $ 534.00 | $ 297.00 |
| Allen Dorney | 1G1AK52F357519788 | $ 592.00 | |
| Brian Reeves | 2CNDL23F976100003 | $ 680.00 | |
| Jessica Henderson | 1G1AK15F477324869 | $ 559.00 | $ 319.00 |
| Andrew Logsdon | JM1BK123351285889 | $ 673.00 | |
| William Hevalow | 1G4CW52KXW4644559 | $ 148.00 | |
| Donna DeLong | 1GNDV03E43D204038 | $ 243.00 | |
| Travis Sunday | 4S3BH806017629576 | $ 381.00 | |
| Sharon Ciemiewicz | 1J4GL58K93W645699 | $ 381.00 | |
| Renee Rivera | 2G1WH52K239189719 | $ 148.00 | |
| Total Service Contracts | | $ 34,383.00 | |

| | |
|---|---:|
| Elizabeth Melendez | $ 297.00 |
| James Yerger | $ 297.00 |
| Paul Long | $ 297.00 |
| Total Gap Contracts | $ 3,927.00 |