IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MENTE CHEVROLET OLDSMOBILE, INC: F/K/A MENTE CHEVROLET, INC. t/a MENTE CHEVROLET<br><br>and<br><br>MENTE CHRYSLER DODGE, INC.<br><br>and<br><br>DONALD M. MENTE,<br>                *Plaintiffs,*<br>v.<br><br>GMAC,<br>                *Defendant.* | CIVIL ACTION<br><br>NO. 08-cv-2403 |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR DECLARATORY JUDGMENT**

    The plaintiff Mente dealerships and Donald M. Mente individually (collectively, "Mente" or "plaintiffs") hereby submit the following Statement of Undisputed Material Facts in connection with their accompanying Motion for Partial Summary Judgment and for Declaratory Judgment:

    1.    The plaintiff Mente dealerships and GMAC were parties to Wholesale Security Agreements under which GMAC provided financing to Mente for the purchase of vehicles from General Motors Corporation ("GM") and DaimlerChrysler Motors Company LLC ("Chrysler"). This type of financing arrangement is called "wholesale floor-plan financing." (*See* accompanying Declaration of Kenneth A. Jacobsen ("J"), Ex.

1; Ex. 27, Transcript of the September 17, 2009 Deposition of William Tierney ("Tierney N.T.") Pgs. 9, 10-11, 118, 119; Ex. 28, Transcript of the September 15 2009 Deposition of Jeffrey J. Lovell ("Lovell N.T.") Pgs. 10; Ex. 29, Transcript of the September 11, 2009 Deposition of Christopher S. Carey ("Carey N.T.") Pgs. 64, 65; Ex. 30, Transcript of the September 11, 2009 Deposition of Paul O'Neill ("O'Neill N.T.") Pgs. 54, 55).

2.  The Wholesale Security Agreements, form documents drafted by GMAC, do not provide a specific date or time period within which the Mente dealerships were required to pay GMAC for vehicles sold by Mente that were financed by GMAC under the floor-plan. Rather, the Wholesale Security Agreements state generally that Mente must remit such payments "faithfully and promptly." (J. Ex. 1; *see also* 9/17/09 Tierney N.T. Pgs. 86–87, 115-116; 9/11/09 Carey N.T. Pgs 64, 66-67, 71, 72; 9/11/09 O'Neill N.T. Pgs 54-57).

3.  GMAC had the right and ability to revise or amend the Wholesale Security Agreements at any time to expressly provide a specific period of time within which Mente was required to remit payment to GMAC for sold vehicles which had been floor-planned with GMAC, but never did. (9/11/09 O'Neill N.T. Pgs. 56-57; 9/11/09 Carey N.T. Pgs 66-67).

4.  Under the Wholesale Security Agreements, interest continues to accrue to GMAC until it receives repayment for floor-planned vehicles. (J. Ex. 1; 9/17/09 Tierney N.T. Pgs. 10-11, 144-145; 9/11/09 O'Neill N.T. Pgs. 107-108; 9/11/09 Carey N.T. Pgs 48-49).

5. Mente Chevrolet's floor-plan financing relationship with GMAC under the Wholesale Security Agreement dated back to 1971. (9/17/09 Tierney N.T. Pgs. 74, 98; 9/11/09 Carey N.T. Pgs. 105).

6. Mente Chrysler's floor-plan financing relationship with GMAC under the Wholesale Security Agreement dated back to 2000. (9/17/09 Tierney N.T. Pg. 74).

7. On July 19, 2007, without prior notice, and knowing that plaintiffs' Controller Donna M. Johnson ("Johnson"), who handled all financial matters for the Mente dealerships, was away on vacation, a team of employees from defendant GMAC conducted audits of the plaintiff Mente Chevrolet and Chrysler dealerships (jointly, the "July 19th audit"). (J. Ex. 2; 9/17/09 Tierney N.T. Pgs. 38, 141-142, 145-146; 9/15/09 Lovell N.T. Pgs. 65, 100; 9/11/09 Carey N.T. Pgs. 35-37, 38; 9/11/09 O'Neill N.T. Pgs. 31, 42-43).

8. GMAC knew that Johnson presence during an audit was necessary because of her position as Controller at the dealerships and her familiarity with the financial operations at the dealerships, her directly responsibility for the paperwork on vehicle sales, her handling of payoffs to third parties and payments to GMAC and similar responsibilities. That is why Johnson informed GMAC in advance that she would be away on vacation from July 13, 2007 through July 23, 2007. (J. Ex. 3, 4, 5; 9/17/09 Tierney N.T. Pgs. 143, 145; 9/11/09 O'Neill N.T. Pg. 44; 9/11/09 Carey N.T. Pgs. 37, 55-56).

9. GMAC had previously scheduled audits around Johnson's vacation schedule to ensure that she was available on the date of the audit and "to give her a chance to make sure all was in order" for the audit. (J. Ex. 3; *see also* 9/11/09 Carey N.T. Pgs. 54-55).

10. GMAC also knew that payments for sold vehicles floor-planned by GMAC often awaited Johnson's return to the office from vacation or other absences. (J. Ex. 2, 3, 4, 5; *see also* 9/11/09 Carey N.T. Pgs. 52-53, 56-58).

11. As a result of the July 19th audit, GMAC claimed that "certain vehicles" at the Chevrolet store were "out of trust," meaning that Mente Chevrolet purportedly had failed pay GMAC in a timely manner for vehicles sold by that store which had been financed by GMAC. (J. Ex. 6, GMAC Responses Nos. 1-4 to Plaintiffs' First Set of Interrogatories; 9/17/09 Tierney N.T. Pg. 28; 9/11/09 O'Neill N.T. Pgs. 13, 19, 41, 51, 53; 9/11/09 Carey N.T. Pg. 102; 9/15/09 Lovell N.T. Pgs. 117-118).

12. The Mente Chrysler store was not declared by GMAC to be "out of trust" or otherwise in default to GMAC from its own operations. Rather, the Mente Chrysler store was declared in default by GMAC because of a cross-collateralization agreement, under which a default at the Chevrolet store would constitute a default at the Chrysler dealership. (J. Ex. 6, GMAC Response No. 5; *see also* 9/17/09 Tierney N.T. Pgs. 90–93, 96–97; 9/11/09 O'Neill N.T. Pg. 60).

13. On July 19, 2007, GMAC immediately suspended payment of all funds that were then owed by GMAC to the Mente dealerships, (J. Ex. 7; 9/17/09 Tierney N.T. Pgs. 75–78, 105).

14. According to GMAC's own accounting and reconciliation of funds at Mente Chevrolet, GMAC withheld payment of $ 15,646.39 in funds that GMAC owed Mente between July 19, 2007 and February 4, 2008. These items are identified as "DWCAP Credits," "SDFI," Platinum Funds" and "Credit Account" on GMAC's accounting and reconciliation. (J. Ex. 8).

15. On July 19, 2007, GMAC sent a Demand for Payment Change via telecopy to GM, demanding that monies owed by GM to Mente Chevrolet under the "Open Account" between GM and Mente Chevrolet be instead diverted to GMAC. (J. Ex. 9; 9/17/09 Tierney N.T. Pgs. 103-104; 9/15/09 Lovell N.T. Pgs. 74-77).

16. GM acknowledged GMAC's Demand the next day on July 20, 2007. (J. Ex. 9; 9/17/09 Tierney N.T. Pgs. 104-105).

17. According to GMAC's own accounting and reconciliation of funds at Mente Chevrolet, GMAC took $ 95,523,25 in Open Account monies owed by GM to Mente Chevrolet between July 19, 2007 and February 4, 2008. (J. Ex. 8).

18. On July 19, 2007, GMAC sent a similar Demand for Payment Change to Chrysler, demanding that monies owed to Mente by Chrysler under the Open Account between Chrysler and Mente Chrysler be instead diverted to GMAC.

19. According to GMAC's own accounting and reconciliation of funds at Mente Chrysler, GMAC took $ 34,000 in Open Account monies owed by Chrysler to Mente Chrysler between July 19, 2007 and February 4, 2008. (J. Ex. 10).

20. On July 19, 2007, GMAC Operations Manager Kilvin Carrier ("Carrier") sent a letter via telecopy to GM stating that GMAC had indefinitely suspended its wholesale floor-plan credit lines to Mente Chevrolet. (J. Ex. 11; 9/15/09 Lovell N.T. Pgs. 73-75).

21. Without floor-plan financing from GMAC as reflected in Carrier's July 19th letter, Mente Chevrolet was unable to purchase new cars from GM for sale to its customers. (9/17/09 Tierney N.T. Pgs. 9, 10-11, 118, 119; 9/15/09 Lovell N.T., Pg. 10; 9/11/09 Carey N.T., Pgs. 49, 64, 65; 9/11/09 O'Neill N.T., Pgs. 54-55).

22. On July 20, 2007, GMAC Operations Manager Carrier sent a letter via telecopy to Chrysler, stating that GMAC had indefinitely suspended its wholesale floor-plan credit lines to Mente Chrysler. (J. Ex. 12).

23. Without floor-plan financing from GMAC as reflected in Carrier's July 20th letter, Mente Chrysler was unable to purchase new cars from Chrysler for sale to its customers. (9/17/09 Tierney N.T. Pgs. 9, 10-11, 118, 119; 9/15/09 Lovell N.T., Pg. 10; 9/11/09 Carey N.T., Pgs. 49, 64, 65; 9/11/09 O'Neill N.T., Pgs. 54-55).

24. GMAC required on July 19, 2007 and thereafter that it receive only certified checks or other "good funds" (*i.e.*, cash) for the entire proceeds of all sales of vehicles before those cars could delivered to Mente's customers, and that all proceeds from all such sales must be given to GMAC. (J. Ex. 13; 9/11/09 O'Neill N.T. Pg. 77).

25. GMAC required on July 19, 2007 and thereafter that it receive an assignment of all financing contracts for those same vehicles. (J. Ex. 31, Transcript of the September 9, 2009 Deposition of Glenn Jackson ("Jackson N.T.") Pgs. 12, 23)

26. GMAC required on July 19, 2007 and thereafter that it receive an assignment of all contracts in transit for the Mente dealerships. (9/9/09 Jackson N.T. Pgs. 12, 23)

27. On July 20, 2007, GMAC Portfolio Manager Paul O'Neill ("O'Neill"), who at the time oversaw the Mente dealerships and was supervising and directing the GMAC "keepers" whom GMAC had placed at the dealer properties to supervise Mente's operations, issued an internal "GMAC ERO Default Notification Report" to the GMAC Director of Finance & Commercial Lending at GMAC in which O'Neil reported that the July 19th audit purportedly had revealed that eleven vehicles sold by Mente Chevrolet were "outside [of the] release period;" that is, that payments had not been timely made by

6

Mente for these eleven vehicles within the period that GMAC contends it should have received payment for those eleven sold vehicles. (J. Ex. 14; 9/11/09 O'Neill N.T. Pgs. 50-54, 57-59).

28. The total amount due GMAC by Mente for these eleven alleged "out of trust" vehicles indicated on O'Neill's Report was $ 213,417. (J. Ex. 14; 9/11/09 O'Neill N.T. Pg. 59)

29. According to O'Neill, among the steps taken by GMAC in response to this alleged "out of trust" situation were:

>    a. diversion of funds to GMAC from Mente's Open Account with GM;
>
>    b. the "holding" of keys, titles and Manufacturer's Certificates of Origin ("MCOs") on all new and used vehicles on the Mente lots; and
>
>    c. the placement of GMAC "keepers' on site at both the Mente Chevrolet and Chrysler stores to oversee and control the operations at both dealerships, including the disposition of proceeds from sales of vehicles at both stores, all of which proceeds were taken by GMAC. (J. Ex. 14; *see also* 9/11/09 O'Neill N.T. Pgs. 75-77, 105-107; 9/17/09 Tierney N.T. Pgs. 74-75, 100; 9/15/09 Lovell N.T. Pgs. 105-109, 123, 161)

30. Vehicles cannot be sold without keys, titles and MCOs. (9/11/09 O'Neill N.T. Pgs. 76-77; 9/9/09 Jackson N.T. Pg. 35).

31. On July 25, 2007, six days after GMAC had conducted its July 19th audit, GMAC Director of Commercial Lending William A. Tierney ("Tierney") sent separate letters to the Mente Chevrolet and Chrysler dealerships and to Mr. Mente personally

demanding the immediate payment of $ 5,228,904.36 (by Mente Chevrolet) and $ 2,363,489.23 (by Mente Chrysler) [or a total of $ 7,592,393.59] "by the close of business tomorrow" [*i.e.*, by July 26, 2007]. (J. Ex. 15, 16, 17; 9/11/09 O'Neill N.T. Pgs. 88-89, 108-109; 9/17/09 Tierney N.T. Pgs. 69-70, 84, 87, 89-90, 96, 99-100).

32. In his letter, Tierney also demanded immediate "surrender" of all collateral and stated that "GMAC may take possession of all dealership property in which it has a security interest, including, but not limited to, all of the motor vehicles financed by GMAC for the dealership[s]," even though GMAC already had seized the keys, titles and MCOs for those and other vehicles six days earlier on July 19th and already had confiscated Mente's Open Account monies with GM and other funds and property. (J. Ex. 15, 16, 17).

33. Tierney further stated that GMAC had suspended Mente's "wholesale credit lines effective immediately," even though those credit lines, too, already had been suspended by GMAC six days earlier on July 19th. (*Id.*).

34. The sole basis for "default" declared by GMAC in Tierney's three July 25th demand letters was the Chevrolet store's purported "fail[ure] to promptly pay the principal amount financed by GMAC for certain motor vehicles which the dealership has sold." Tierney stated that "this situation was discovered by us on July 19, 2007." (*Id.*). Tierney further stated that Mente Chevrolet purportedly had failed to "cure this default" between the date of GMAC's audit on July 19th and the date of his letter six days later. (J. Ex. 15; *see also* 9/11/09 O'Neill N.T. Pgs. 88-89, 108-109; 9/17/09 Tierney N.T. Pgs. 69-70, 84, 87, 89-90, 96, 99-100).

35. No other defaults were identified or declared in Tierney's July 25th demand letters or in any other notice issued by GMAC, other than the alleged "out of trust" situation at Mente Chevrolet for "failing to promptly pay...GMAC for certain motor vehicles" after those vehicles were sold by Mente.

36. GMAC's discovery responses in this case similarly limited Mente's purported default to that same isolated situation. In response to the Mente plaintiffs' narrowly targeted Interrogatories seeking the details of any alleged default situation at the Mente dealerships on July 19, 2007, GMAC responded "Yes" to plaintiffs' specific inquiry about whether Mente was "out of trust" on that date. Explaining its response and providing all of the details of that alleged default as requested by plaintiffs in their Interrogatories, GMAC went on to simply state:

> "During a routine audit conducted by GMAC representatives on July 19, 2007, it was discovered that Mente Chevrolet did not promptly pay the principal amount financed by GMAC for certain motor vehicles which the dealership had sold. This was considered a default of Mente Chevrolet's financial obligations pursuant to the terms of the Wholesale Security Agreement signed by Mente Chevrolet and GMAC."

(J. Ex. 6, GMAC Responses Nos. 1-4 to Plaintiffs' First Set of Interrogatories). No other "default" was identified by GMAC in its discovery responses other than Mente Chevrolet's alleged failure to "promptly pay" GMAC for sold vehicles, which situation GMAC stated it had "discovered" only as a result of the July 19, 2007 audit.

37. In those same discovery responses, GMAC defined an "out of trust" situation as a situation where "a dealership sold or otherwise disposed of a vehicle from its inventory and has not immediately paid the floorplan lender the principal and interest owed associated with that collateral supporting its floorplan credit line." (J. Ex. 6, GMAC response No. 1).

9

38. Nor were Tierney's July 25, 2007 demand letters and GMAC's discovery responses the only documents in which GMAC explicitly limited the alleged default to Mente Chevrolet's purported failure to "promptly pay" GMAC for sold vehicles floor-planned by GMAC. In an August 1, 2007 letter from GMAC's outside counsel refusing to return the titles, keys and MCOs which GMAC had confiscated from Mente and to vacate the dealerships entirely (*see* ¶¶ 52 and 53 *infra*), GMAC's attorneys similarly limited the alleged default to the same alleged lack of "timely" payment:

> "…Chevrolet is in default of its floor plan obligations to GMAC by failing to timely pay the principal amount financed by GMAC for certain motor vehicles which the dealership has sold (the 'Out of Trust')."

(J. Ex. 18).

39. In a "Potential Loss Report" prepared by O'Neill on August 30, 2007 and sent to his superiors at GMAC, O'Neill again stated that the alleged "out of trust" situation on July 19, 2007 situation at Mente Chevrolet involved "11 units outside [the] release period." O'Neill further confirmed in his "Chronological Summary of Events and Recommendations" that on July 19, 2007, GMAC "required possession of MCOs, titles and keys" for all vehicles at the Mente dealerships. (J. Ex. 13).

40. O'Neill repeated this statement in his entry for the next day (July 20, 2007), when he again confirmed that "MCOs, titles and keys of both stores" were being "held" by GMAC. In addition, O'Neill acknowledged:

    a. "Credit lines at both stores suspended"

    b. "[K]eeper has been place on site at both;" and

  c. "Assignment of the Chevrolet Open Account invoked," meaning that GMAC had taken Mente's funds under its Open Account with GM for itself. (*Id.*)

41. GMAC Director of Commercial Lending Kristen K. Olsen, GMAC Portfolio Manager Christopher S. Carey ("Carey") and others at GMAC knew at least as far back as April 3, 2007 that Mr. Mente was seeking to refinance the dealership properties through Citizens Bank ("Citizens"). (J. 19; *see also* 9/11/09 O'Neill N.T. Pgs. 94-95; 9/15/09 Lovell N.T. Pg 160; 9/11/09 Carey N.T. Pgs. 75-76).

42. Citizens had performed a "complete review" of the "financial records" of the Mente dealerships and other information prior to July 19, 2007 in connection with that refinancing. (J. Ex. 20, Declaration of Joseph Galvin, Citizens Bank Vice President for Dealer Financial Services ("Galvin Dec.") ¶¶ 1, 4).

43. Citizens obtained an appraisal as of July 16, 2007 for the real estate at Mente Chevrolet as part of that refinancing. (Galvin Dec. ¶ 4; *see* J. Ex. 21).

44. On July 20, 2007—the day after GMAC entered the Mente dealerships and declared the Chevrolet store to be "out of trust"—Citizens Bank issued a commitment letter offering Mente a $ 2.5 million real estate loan and a $ 1.5 million used car floor-plan for the Chevrolet dealership. (J. Ex. 20, Galvin Dec. ¶ 2 and attached commitment letter).

45. Mr. Mente sent Tierney the Citizens commitment letter on July 24, 2007, the day before Tierney sent his July 25, 2007 demand and default letters to the Mente dealerships and to Mr. Mente personally demanding full repayment of all outstanding indebtedness to GMAC by no later than the next day (*i.e.* July 26, 2007). (J. Ex. 22;

9/17/09 Tierney N.T. Pgs. 67-70; 9/15/09 Lovell N.T. Pgs. 161-162; 9/11/09 O'Neill N.T. Pgs. 92-93, 95-96, 109).

46. Tierney and others at GMAC (*e.g.*, O'Neill) were personally aware of the Citizens commitment letter at least as early as July 24, 2007. (J. Ex. 22; 9/17/09 Tierney N.T. Pgs. 67-70)

47. In a July 27, 2007 e-mail to O'Neill, Tierney and others at GMAC, GMAC Operations Manager Carrier again confirmed that "GMAC has possession of Keys and MCOs for Chevrolet and Chrysler location." Carrier went on to report in the same e-mail that Mr. Mente had stated that "GMAC put us out of business" by initiating its actions against the Mente dealerships on July 19, 2007. (J. Ex. 23; 9/11/09 O'Neill N.T. Pg. 137; 9/15/09 Lovell N.T. Pgs. 106-107).

48. Mente has steadfastly denied that he was "out of trust" on July 19, 2007, and the evidence overwhelmingly supports this fact. (*See* Expert Reports of Joseph F. Roesner, MBA, CMA and Carl Woodward, CPA filed separately herewith).

49. The Mente dealerships had sufficient funds and other assets immediately available to pay GMAC for any alleged "out of trust" situation had GMAC merely awaited Johnson's return from vacation early the next day on July 20, 2007 as it had repeatedly done on prior occasions. (*Id.; see also* J. Ex. 2, 3, 4, 5).

50. In an e-mail from Mr. Mente to GMAC Operations Manager Jeffrey J. Lovell ("Lovell") dated July 19, 2007 and sent to Lovell at 12:38 p.m., Mr. Mente specifically asked GMAC to await Johnson's return from vacation to enable him to "get the needed info[rmation] to cut the [check]." (J. Ex. 2). GMAC refused.

51. On July 30, 2007, Mente's attorney hand delivered a Notice to the GMAC "keepers" who had been placed on site to run the operations at the Chevrolet and Chrysler stores and to ensure that all proceeds from sold vehicles were remitted immediately to GMAC. In that Notice, Mente's attorney demanded that GMAC:

    a. immediately vacate the dealerships;

    b. return all of the keys, titles and MCOs that GMAC had confiscated; and

    c. no longer interfere with the operations of the dealerships. (9/11/09 O'Neill N.T. Pgs. 137-139; 9/15/09 Lovell N.T. Pgs. 106-109).

52. In a letter dated August 1, 2007, GMAC's outside counsel, writing on behalf of and with the authority of GMAC, responded to the July 30th Notice from Mente's counsel, stating among other things:

    a. "Representatives of GMAC have been at the Dealerships and have obtained the MCOs, Titles and keys of the vehicles that are part of the overall collateral in which GMAC has a security interest...."

    b. "[N]otwithstanding the delivery of such Notice to GMAC's representatives [by Mente's attorney], GMAC intends to maintain possession of the MCOs, Titles and keys for the vehicles which are part of its security...." and

    c. GMAC would continue to "maintain a presence at the dealership lots where the vehicles are maintained in order to continue to protect its security as a result of the Chevrolet's Out of Trust."

(J. Ex. 18; 9/11/09 O'Neill N.T. Pgs. 137-139; 9/15/09 Lovell N.T. Pgs. 106-109). In other words, GMAC refused every demand made by Mente to return Mente's property

and to allow Mente to resume and conduct normal business operations, particularly in light of the Citizen's commitment.

53. According to the August 1, 2007 letter from GMAC's counsel, GMAC's actions were unilaterally undertaken based on its "security interest" in the vehicles and other collateral as a result of the alleged "Out of Trust" situation which GMAC purportedly had "discovery" on July 19th. (*Id.*)

54. In an e-mail distributed on August 3, 2007 to GMAC managers and employees throughout the Philadelphia Metropolitan Area office of GMAC in Horsham, PA, Lovell confirmed that GMAC still "retains possession of the keys, titles and MCOs" for all new and used vehicles at the Mente dealerships. In the same e-mail, Lovell similarly confirmed that GMAC '[k]eepers remain on site at both dealerships and a security company is monitoring the sites during non-business hours." (J. Ex. 24).

55. July 27, 2007, because GMAC refused to allow sales of new and used vehicles in the normal course of business, refused to release commissions to sales personnel at the Mente dealerships for sold vehicles, and diverted and appropriated all proceeds from sales for its own account, Mente was unable to make payroll and meet its other obligations, with the result that the sales staff, service and parts shop personnel and office staff (other than Johnson and Mr. Mente) vacated the dealerships. (*See* J. Ex. 13, 23).

56. GMAC charged Mente for the "keepers" and the security guards, billing plaintiffs $ 81,536.28 for those services (neither requested nor desired by Mente) through February 4, 2008 and diverting proceeds from the Open Accounts, vehicles sales and other sources to pay those GMAC-imposed fees and expenses. (J. Ex. 24).

57. GMAC similarly charged Mente extra interest for an Electronic Revolving Line of Credit ("ERLC"), extra Wholesale Interest Charges, Forbearance Fees and other fees and expenses, billing Mente $ 353,801.36 for those fees and expenses and diverting proceeds from the Open Accounts, vehicles sales and other sources to pay those GMAC-imposed fees and expenses. (J. Ex. 8).

58. GMAC did not file an action in replevin prior to confiscating the GM Open Account funds. (9/11/09 O'Neill N.T. Pgs. 87-88, 119).

59. GMAC did not file an action in replevin prior to confiscating the Chrysler Open Account funds. (*Id.*)

60. GMAC did not file an action in replevin prior to confiscating the keys, titles and MCOs for the new and used vehicles on the Mente dealers' lots. (*Id.*)

61. GMAC did not file an action in replevin prior to suspending and eventually refusing to pay monies which GMAC itself owed to Mente. (*Id.*)

62. GMAC did not seek issuance of a writ of seizure from any court pursuant to Rule 1075.1 or Rule 1075.2 Pennsylvania Rules of Civil Procedure prior to undertaking any of the actions set forth in paragraphs 58-61 above. (*Id.*)

65. GMAC did not ask, nor did any court opine, that there was "probable validity" to GMAC's underlying legal claim and right to possession to the property which GMAC had seized from Mente on July 19, 2007 and thereafter, held, refused to return to Mente, and liquidated from that date through February 4, 2008. (*Id.*)

66. GMAC did not file an action in replevin until February 11, 2008. (J. Ex. 26).

67. GMAC did not file a Motion for the Issuance of a Writ of Seizure in the replevin action until September 15, 2008. (*Id.*).

68. GMAC has never posted a bond pursuant to Rule 1075.3 of the Pennsylvania Rules of Civil Procedure, which is a condition and a perquisite to the issuance of a writ of seizure.

Dated: September 28, 2009                    Respectfully submitted,

/s/ Kenneth A. Jacobsen
Kenneth A Jacobsen
**JACOBSEN LAW OFFICES**
PA Attorney I.D. No. 31208
12 Orchard Lane
Wallingford, PA 19086
(610) 566-7930

Joseph A. O'Keefe
**O'KEEFE & SHER, P.C.**
PA Attorney I.D. No. 77068
15019 Kutztown Road
Kutztown, PA 19530
(610) 683-0771

*Attorneys for Plaintiffs*