

# Woodward & Associates, Inc.

Certified Public Accountants
Phone (309) 662-8797  •  Fax (309) 662-9438

Carl S. Woodward, CPA
Philip C. Wegeng, CPA
Karen E. Wilson, Principal

September 21, 2009

Joseph A. O'Keefe
O'Keefe & Sher, P.C.
15019 Kutztown Road
Kutztown, PA 19530

Subject:    Mente vs. GMAC  / Case No. 08-cv-2403

Dear Mr. O'Keefe:

You have asked me to prepare a report on the above matter between Mente Chevrolet Oldsmobile Inc. ("Dealership") and General Motors Acceptance Corporation ("GMAC").

I am a Certified Public Accountant ("CPA") and own the majority interest in a CPA firm that serves new vehicle dealers all over the United States, serving more than 200 new vehicle dealerships every year. Other than the Big 4 accounting firms, my firm is one of the top five CPA firms in terms of new vehicle dealerships served in the United States.

My experience in the dealership business began in the early 1970's when I worked as an office manager, general manager, lease and rental manager, controller and CFO in several dealerships. Since 1980, I have worked in CPA firms that specialize in serving new vehicle dealerships. My firm serves new vehicle dealers by preparing income tax returns and financial statements and by consulting on financial issues, dealership operating issues and purchasing or selling new vehicle dealerships. I have been involved in several hundred executed and proposed buy-sell agreements for new vehicle dealerships all over the United States, in which I have represented either the buyer or seller. I am regularly involved in buying and selling new vehicle dealerships which includes price consulting, assisting in the negotiating and pricing of dealerships and preparing financial models on the purchase of dealerships. I also assist dealers in arranging financing for their vehicle inventory, capital loans, and real estate loans. And, I have testified in various federal and state matters (a complete listing of all cases in which I have provided expert testimony within the past 4 years are at pages 16-18)

I write a national monthly new vehicle dealer newsletter called POWER STEERING which has approximately 500 subscribers. I have testified since the early 1980's on dealership financial models, dealership valuations, dealership damage calculations, and other financial disputes involving new vehicle dealers. I have testified in

state and federal courts as well as before various state administrative boards. I am charging $225.00 per hour for my time plus reimbursement of expenses. Any of my employees involved in this matter will be charged at their standard hourly rate.

You have asked me to comment on the dealership's financial arrangements with GMAC including the inventory check that was performed by GMAC on July 19, 2007 and the subsequent events that occurred after this date as it relates to GMAC and the dealership.

The documents I reviewed and analyzed include:

| | |
|---|---|
| GMAC 0225 | GMAC 5345 |
| GMAC 3402 | GMAC 6101 |
| GMAC 3403-04 | GMAC 6120 |
| GMAC 3458 | GMAC 6126 |
| GMAC 3460 | GMAC 6127-55 |
| GMAC3512 | GMAC 6156-6176 |
| GMAC3541 | GMAC 6180-6200 |
| GMAC 3623-38 | GMAC 6204-6226 |
| GMAC 3639 | GMAC 6295 |
| GMAC 3670 | GMAC 6433 |
| GMAC 3721-3734 | GMAC-6434 |
| GMAC 3748 | GMAC 6577 |
| GMAC 3749 | GMAC 6663-6707 |
| GMAC 3751 | GMAC 6715 |
| GMAC 3774-3776 | GMAC 6763 |
| GMAC 3951 | GMAC 6763 |
| GMAC 4107 | Bates No. 6432 |
| GMAC 4108 | Bates No. 6433 |
| GMAC 4109 | Bates No. 062106-062136 |
| GMAC 5148 | Bates No. 061933-062010 |
| GMAC 5157 | 9/11/2008, NT of Donna Johnson |
| GMAC 5158 | GMAC 3730-1 WS Audit Overview |
| GMAC 5238 | GMAC Letter to Pennsylvania Attorney General's Office and attachments |
| GMAC 5239-40 | |

The representations made to me along with the materials supplied in this matter in preparation of this Opinion reveal that:

\*   The dealership had its new and used vehicle floor plan (notes payable) with GMAC.

\*   The dealership had a GMAC floor plan audit on July 19, 2007.

\*   GMAC knew the dealership's CFO-controller-office manager (office manager) was not at the dealership before the floor plan audit started at the dealership on July 19, 2007.

\*   The dealership historically remitted payment for sold vehicles whose purchase was financed with third party lenders only once the dealership actually received payment for the vehicle.

\*   GMAC's definition of "out of trust" as applied within this matter has been varying and vague and is inconsistent with GMAC's published Policies and Procedures, the Wholesale Financing Agreement, and industry standards.

\*   Therefore, based upon the above, it is clear that on July 19, 2007, the dealership was not "out of trust" based on the documents supplied and the lack of documentation by GMAC which defines exactly what constitutes an "out of trust" situation.

# ISSUE # 1

## GMAC's Claim That the Dealership was "Out of Trust"

Almost all dealerships have what is called "floor planning" of their new vehicles and in many cases some of their used vehicles. This floor planning is where the dealer owes money on the vehicle and when the vehicle is sold and the dealership has been paid for the vehicle, the amount owed on the vehicle's "floor plan" is due to be paid to the financing institution. In other words, once the dealership has been paid for the vehicle, the dealership is obligated to payoff the "loan" on the vehicle in a prompt manner. If a dealership does not pay off the vehicles that are owed for to its financing institution in a timely matter, the term used to call this is "sold out of trust", or "SOT". GMAC, specifically, labels an "out of trust" situation a "conversion of funds."

As it relates to the floor plan inventory check by GMAC on July 19, 2007, an employee from GMAC arrived at the dealership with their listing of vehicles its records showed was owed to them. This listing would be compared to the vehicles that they were able to "touch". Vehicles that they would not be able to "touch" would normally include vehicles in-transit that had not yet arrived at the dealership, vehicles that would be at repair shops and third party vendors with accessories to be added, vehicles not sold and loaned to customers, vehicles "spot delivered" to customers hoping they would decide to purchase the vehicle after trying it out for several hours to several days, along with sold vehicles. GMAC would want to resolve the disposition of the vehicles "not touched". Of these vehicles, GMAC would want to be paid timely for those vehicles that were sold based on the guidelines in effect for that dealership. As the records reviewed herein demonstrate, the guidelines and practice for this dealership were for the vehicles sold to be paid off within a reasonable time once the dealer has been fully funded for the transaction.

Despite the dealership's actual practices, at no time historically did GMAC declare them "out of trust." For example a file memo dated June 12, 2003 plainly and specifically validated the dealership's practice of waiting until vehicles are actually paid for before remitting payment to GMAC:

> "It was determined that it takes the Chevrolet store an average of 8 days to be funded for contracts placed with lenders which Mente has no drafting privileges with; an average outstanding dollar figure is $20.6M. For the Chrysler store the figures are 10 days and $20.7 M. Total contracts in transit for April were $566.3 M.... . [T]here was no evidence of any non-standard dealership accounting practices."

Further, it was noted that GMAC "would not consider audit delays on units the dealership can't draft on if paid within 5 days." Indeed, in June of 2003, the same month GMAC

4

released the above memorandum, a random review of the dealership's records reveals the following:

| Stock No. | Sold Date | Funded Date | Paid Date | Days to Pay | Balance |
|---|---|---|---|---|---|
| 11714 | 6/27/03 | 7/2/03 | 7/3/03 | 7 | $13,709.08 |
| 11733 | 6/19/03 | 6/23/03 | 6/25/03 | 6 | $29,784.43 |
| 11937 | 6/28/03 | 7/3/03 | 7/7/03 | 10 | $39,094.35 |
| 11867 | 6/26/03 | 7/1/03 | 7/2/03 | 7 | $25,691.00 |
| 11944 | 6/30/03 | 7/8/03 | 7/9/03 | 10 | $19,796.60 |
| 11568 | 6/26/03 | 7/15/03 | 7/17/03 | 23 | $24,388.90 |
| 11514 | 6/30/03 | 7/9/03 | 7/10/03 | 11 | $24,788.25 |
| 4665 | 6/27/03 | 7/7/03 | 7/8/03 | 12 | $15,208.41 |
| 94609T | 6/9/03 | 6/12/03 | 6/17/03 | 8 | $32,133.00 |
| 4854 | 6/9/03 | 6/12/03 | 6/17/03 | 8 | $17,137.00 |
| 4881 | 6/27/03 | 7/3/03 | 7/7/03 | 11 | $29,625.00 |
| 4833 | 6/30/03 | 7/3/03 | 7/9/03 | 10 | $31,010.00 |
| 4882 | 6/30/03 | 7/16/03 | 7/17/03 | 18 | $24,209.00 |
| 117047 | 6/28/03 | 7/9/03 | 7/10/03 | 13 | $17,092.68 |
| 4795T | 6/10/03 | 6/17/03 | 6/18/03 | 8 | $26,772.00 |
| 4686 | 6/30/03 | 7/9/03 | 7/10/03 | 11 | $27,811.00 |
| 11962 | 6/30/03 | 7/8/03 | 7/9/03 | 10 | $18423.20 |
| 11881 | 6/24/03 | 6/26/03 | 6/30/03 | 6 | $25,329.65 |
| 11845 | 6/25/03 | 6/30/03 | 7/1/03 | 7 | $25,015.83 |
| 11698 | 6/27/03 | 7/3/03 | 7/7/03 | 12 | $27,580.51 |
| 12039 | 6/24/03 | 6/26/03 | 7/1/03 | 8 | $22,436.38 |
| 4691 | 6/30/03 | 7/16/03 | 7/17/03 | 18 | $32,688.00 |
| 12061 | 6/24/03 | 6/26/03 | 6/30/03 | 6 | $30364.65 |

Yet, GMAC took no action against the dealerships in that month either because, as was further explained in the 6/12/03 Memorandum,

* A high number of unpaid, sold units existed
* Justifiable Reasons Existed, Including:
    -- a high number of deliveries at the end of April;
    -- a high amount of monies were owed Mente in contracts in transit;
    -- Mente was owed various incentive monies from GM and Chrysler; and,
    -- Mente had a weak cash position.

And, these audits of 2003 are not mere anomalies, nearly every audit GMAC provided in discovery in this matter, including those up to and including June of 2007, demonstrate the same trends. Therefore, it is clear, GMAC's claims that Mente was found to be "out of trust" on July 19, 2007 does not match up with the prior GMAC audits or practices.

It is suspect that GMAC chose July 19th to conduct the audit. This dealership would be considered a smaller than average in size new vehicle dealership. It has a very limited office staff to handle administrative matters such as paying off new and used vehicles owed to GMAC when the payment was due. GMAC was notified by the dealership's CFO-controller-office manager (controller) a month prior to the subject audit that she would be on vacation the week that GMAC arrived. She gave this notification because she would be needed to assist the GMAC person in performing their job in a timely accurate professional manner. With the GMAC person arriving at the dealership without the controller being there, it would be expected to cause a lot of wasted time and disruption. This is due to the fact there is only one person that handles these transactions at a dealership this size and that person was not at the dealership that week. Also, with this "key" person not being at the dealership that week, it would be expected that some, if not all, of the vehicles that had been sold where payment was due would not be paid that week. No one else at the dealership would have all the answers to the questions that would normally need to be answered to resolve open items from the inventory check. Historically, GMAC accepted and understood that when the controller was not on site, Mente may need a day or so upon the controllers return to fully remit payment for sold vehicles that had been funded in her absence.

GMAC is also unable to consistently define what "out of trust" means and the wholesale financing agreement it relies upon does not contain any reference to any specific number of days in which a dealer must pay for a sold vehicle. The entire payment provisions contained within GMAC's Wholesale Security Agreement are as follows:

> "We ... agree that as each vehicle is sold, or leased, we will, faithfully and promptly remit to you the amount you advanced or have become obligated to advance on our behalf to the manufacturer, distributor or seller... ."

A review of GMAC's actual policies and procedures clearly evidences that beyond the historical context (discussed above), "faithfully and promptly" means a reasonable time after a dealership has been fully paid for the vehicle. For example:

GMAC Policy 3720-2(a):      Sold Vehicle Audit Procedures

> \*      an auditor should determine if the dealership has received payment for a sold vehicle.

GMAC 3730-1 WS Audit Overview

> \*      Because GMAC is fundamentally a collateral-based lender, physical inspection of the floor planned inventory is an important tool for verifying the existence of collateral and the borrower's compliance with established policies and procedures.

> \*   ... consideration must be given to ... reviewing the dealership's new vehicle log to monitor for evidence of delayed drafting by non-GM manufacturers and distributors.
>
> Recovery of Conversion Proceeds
>
> When a potential loss (conversion) is discovered, it is recommended that the GMAC personnel on site at the dealership complete the following process on a priority basis:
>
> 1) Obtain the dealership's vehicle sales file for each converted unit.
>
> ...
>
> 3) Complete the Conversion Proceeds Worksheet for each converted unit to determine where the money from the sale went. Items from which to obtain information include:
>
> ...
>
> D. Trace the case receipts noted to the actual bank deposit slips and verify that the deposits were made by reviewing bank stamps on the deposit slips or request interim bank statements where necessary.

I find it further suspect that GMAC has been unable to consistently define the exact number of vehicles the dealership payment was overdue for or the exact amount of the funds converted. On August 2, 2007, GMAC provided the dealership with a list of 19 vehicles that GMAC claimed were not resolved when the GMAC person had completed their inventory check. The written worksheet filled out by the auditor on July 19th lists 14. But, GMAC's "Default Notification Report" submitted internally on July 20th lists only 11. The dollar amounts the dealer is alleged to have converted also vary depending upon which GMAC document you review. On August 2nd, GMAC claimed the amount was $224,323.41. On the 19th, the auditor's written worksheet totals $242,240.22. The internal reporting of the 20th lists the amount at $213,417.00. One would think that if the issue was of such significance that a team of 8 persons was assembled and on site in mere hours after the auditor called back to the main office, somebody at GMAC would have gotten the numbers right before they took steps that ensured the demise of a 40 year old dealership. Regardless, from my evaluation of the August 2nd worksheet prepared by GMAC and information supplied by GMAC, some of which appears to be erroneous – as noted above, GMAC's claim that the dealership failed to timely remit payment for certain vehicles on July 19, 2007 is not supported. This is especially true if the controller being on vacation is allowed for, which it was not.

If GMAC had simply waited for the dealership's controller to return, they would have had full payment by the close of business on July 20th. A review of the July bank statement for the dealer and GMAC's own documentation of the un-floored vehicles

whose titles and keys they took shows that between the cash the dealership would have had on hand and the used vehicles the dealership could have either liquidated or floor-planned, but for GMAC's actions, the dealership would have ended the day with $337,000.00 (plus or minus). GMAC's internal Default Notification Report lists $213,417.00 as the amount owed as of the 20th. Applying some simple math, I conclude that if it wasn't for GMAC, the dealer could have written a check for the amount owed and had enough left over to maintain its normal operations. Instead, GMAC made it impossible for the dealership to obtain money from the un-floored vehicles and cut off the dealership's cash flow by demanding certified checks for the entire proceeds of all sales before they could be delivered, demanding an assignment of all finance contracts for those same sales and for all contracts in transit, notifying the manufacturers that open account funds were to be remitted care of GMAC versus the dealership, and withholding reserve funds it owed the dealership. For all intensive purposes, while apparently unsure of how many vehicles were at issue or of the amounts owed for them, GMAC's actions made certain that the dealership would never be able to "cure" the so-called out of trust situation.

And, it is less than clear that the dealership did, in fact, owe GMAC the money it claimed was due on the 20th. Attached as Tables 1, and 2 are analysis derived from a review of the deal jackets for all 19 vehicles listed on GMAC's August 2nd correspondence to Mente (as opposed to only the 14 contained on the contemporaneous notes created on July 19th or the 11 unidentified units found on July 20th's internal Default Notification Report) that, when consideration is given to GMAC's actual policies and procedures and the sanctioned historical practices of the dealership are applied, clearly evidence the fallacy of GMAC's claim. The first, table 1 calculates when payment for the subject vehicles would be due under the historical standard (as supported by GMAC's own policies and procedures themselves) with a strict 3 day payment period after the dealership received payment for the vehicles (versus the 5 day privilege the dealership officially was granted in 2003). Under this standard, only 1 of the listed 19 vehicles falls due before July 19th and, in that instance, only by one day. Table 2 calculates when payment was owed under the historical standards (as supported by GMAC's own policies and procedures themselves) with the 5 day privilege that the dealership appears to have been officially granted in 2003. In that instance, not a single vehicle was outside of the ordinary terms and conditions acknowledged and followed by GMAC and the dealership.

Based upon all of this, with a reasonable degree of professional certainty, I conclude that GMAC's claim that the dealership was "out of trust" on July 19, 2007 was and remains without merit based on the documents supplied by GMAC along with past policies of GMAC toward this dealership.

## ISSUE # 2

### THE PROCEDURES GMAC EMPLOYED ON JULY 19, 2007 DO NOT COMPORT WITH GMAC'S POLICIES AND PROCEDURES AS HISTORICALLY APPLIED AND FIND NO SUPPORT IN THE RECORD

The person from GMAC arriving at the dealership on July 19, 2007 was joined later that day by a team of GMAC employees. I understand this team was a total of 3-4 individuals, up to 8 persons for both stores, which "took over" the dealership from a vehicle inventory standpoint. My experience in the past would have expected that if there was an audit irregularity, GMAC would have someone leave a listing of vehicles that needed to be resolved with someone at the dealership with instructions to have the controller call GMAC the next day to resolve the matter. As an alternative, someone from GMAC would have stayed at the dealership to approve and accept payment on vehicles being sold from that day forward until the controller came back from vacation to resolve the 19, 14, or 11 (depending upon what GMAC source you use) vehicles. I do not ever remember seeing or hearing from one of my hundreds of dealership customers where a whole team or people would arrive later in the afternoon on the same day of an inventory check like this. This is especially true for a small dealership like this with a limited number of vehicles in inventory.

If the dealership owes for vehicles where it has been paid for the vehicles and it can not pay for them, they are usually given a minimal number of days to resolve this issue. It could be dealers are owed a large amount of money by its manufacturer; the dealership needs to sell or is selling excess used vehicle inventory, which has consumed its cash. Also, the dealership could generate cash by borrowing, floor planning used vehicles, etc. However, as I noted above, GMAC not only refused to wait for the controller to come back from vacation, they took affirmative steps to ensure that once she got back, her hands were tied.

GMAC has presented as many versions as to the "options" it gave the dealership on July 19th when the purported out of trust was "discovered" and as to why it was that it proceeded further against the dealerships as it has defined "out of trust" in this matter and the number of affected vehicles and amounts owed. The record simply does not support GMAC various claims and assertions.

On August 28, 2007, in response to a subpoena issued by the Pennsylvania Attorney General's Office, GMAC, through counsel, claimed that "[a]n out of trust situation arises when a dealership sells vehicles that are financed under a floor plan and does not pay the floor plan lender the amount loaned to such dealer for the purchase of those vehicles, but instead diverts those funds for other purposes," further represented that this was the case with the dealership as it "[sold] nineteen new and used vehicles and

9

[did not pay] GMAC $317,941.20 that was due for Chevrolet's floor plan obligation for those vehicles ('the Out of Trust')", and specifically represented that:

> "GMAC discussed and offered the Dealers three alternatives to continue selling their vehicles while at the same time assuring GMAC that it would get paid the Dealer's floor plan obligations due GMAC upon the sale of such vehicles; namely, (1) the Dealers were to open a new bank account under the Dealers' control and not GMAC with a bank that the Dealers did not already have some business relationship so that such bank would not have the ability to offset balances in such account against any amounts that may be due such bank from the Dealers (which would assure that such banks could not take proceeds from the sale of vehicles), (2) executing an assignment of retail contracts so that GMAC would obtain payment for amounts due for the floor plan obligation for such vehicles from the proceeds of such retail contracts provided by other lenders (providing retail credit to purchasers for those vehicles), or (3) providing payment to GMAC by certified check for the amount of its floor plan obligation due on a vehicle upon the sale of such vehicle."

The documents I have reviewed reveal that GMAC continued its theme, that the dealership "would be unable to remit payoffs on 11 units," that an "[i]nitial audit [revealed] dealer not able to pay for 11 units outside of release period.... Dealer could not provide any information as to how payment will be made on sold units outstanding." and, therefore:

> "Dealer advised by BC that no further deliveries are to take place without GMAC being paid in good funds and credit lines will be suspended and required possession of MCO's, titles and keys."

Thus, contrary to the representations made by GMAC's counsel to the Pennsylvania Attorney General's Office, GMAC, itself, acknowledged – contemporaneously – that upon entering the dealership on July 19, 2007, it immediately took the dramatic step of instantly cutting off the dealership's credit lines, seizing inventory, and requiring payment by certified funds.

Further, I understand that, with advance notice the controller would be on vacation, a GMAC employee showed up at the dealership and demanded payment for certain vehicles that had been sold. At 12:38 pm, on the 19th, Donald Mente, sent an e-mail to Jeff Lovell, GMAC's Operations Manager for the Philadelphia Business Center, which stated, in its entirety:

> Jeff
>
> We told the women (sic) who does floor ck;s that Donna would on (sic) vacation till Tuesday of next we. She informed you guys last month.... She came today and Donna is not hear (sic) to transfer the funds... we

10

> need to wait for Donna... I have tried to reach her by phone and e-mail and when I do I'll get the needed info to cut the ck.
>
> Don Mente
>
> In the mean time the ladsy (sic) is waiting here I don't know what to do with her.

Despite Mr. Mente's e-mail, the GMAC employee called their office to report on the inventory check, and a staff of employees, 4-5 individuals per store, from GMAC showed up later that day to "take control" of the dealership's vehicle inventory as GMAC has acknowledge in its internal documents. On that same day, July 19, 2007, GMAC's records reveal that GMAC also:

* Demanded Payment Change for the Open Accounts GM was due to fund with monies owed for the month's prior;

* Notified GM that the dealership's credit lines were suspended until further notice; and

* Notified all offices, internally, that until further notice, no funds were to be released to the dealership.

As I noted prior, it has been my experience that if the dealership owes for vehicles where it has been paid for the vehicles and it cannot immediately pay for them, they are usually given a minimal number of days to resolve the issue. It could be dealers are owed a large amount of money by its manufacturer or the dealership needs to sell or is selling excess used vehicle inventory which has consumed its cash. Also, the dealership could generate cash by borrowing, floor planning used vehicles, etc. Indeed, the documents I have reviewed demonstrate that on numerous occasions, this is exactly how GMAC handled an audit irregularity or delayed payment from the dealership. In this instance, GMAC immediately acted as it did and, a review of GMAC's Policies and Procedures themselves clearly indicate that GMAC acted irregularly. Specifically, Bulletin No: 42, issued by GMAC to all field executives and entitled "Termination of Vehicle Credit Lines and Noncompliance Fee" specifically denotes that:

> In order to ensure that all business and legal concerns have been adequately addressed ... GMAC Legal must be contacted whenever a decision has been made to terminate vehicle credit lines. In most instances, GMAC Legal advises the branch to issue a written notice (i.e. termination letter) demanding full payment of all GMAC indebtedness by a specified date. Typically, a 90 day period is provided to allow the borrower sufficient and reasonable time to secure alternate financing. ... .

This practice is consistent with my experience and, indeed, is essential if a dealership is to survive once a determination to cancel its credit has been made. In this instance, because GMAC deemed that the dealer had failed to pay for 19, 14, or 11 vehicles,

11

GMAC, terminated the dealership's credit lines, took possession of open accounts, and all used vehicles eligible for floor-planning. I understand that GMAC now alleges that the 90 day period does not apply because of the deemed default. That claim is suspect. On June 29, 2007, having met with the dealer on June 13th, GMAC wrote the dealer and summarized GMAC's "expectations from the meeting." On July 17, 2007, GMAC received a voice-mail from the dealer refuting the "expectation" of a reduction in the dealership's credit line, demonstrators, and aged used units allowed to be floored. Exactly two days later, at 9:19 am on July 19, 2007, when the dealer's message is read by GMAC's Director of Commercial Lending, he instructs his Operations Manager:

> Jeff- If Mente has not complied with what was agreed to in our meeting we will need to send a 90 day letter prior to the report that needs to be sent to region on 8/15/07.

Within three hours of the Director's e-mail, the dealer had an auditor in his office who refused to leave without a check. Within an hour or so of the dealer informing GMAC that he needed to await the return of his controller to cut the check GMAC was demanding, a team of up to 8 persons descend upon both of the dealer's stores to take control of both dealership's vehicles. Within an hour or so of GMAC's teams taking control of both dealerships' vehicles, GMAC had notified GM that it had suspended the dealer's credit lines and demanded that all monies to be placed into the dealership's open accounts were to be re-routed to it. I understand that GMAC asserted all of this is "coincidence," but the planning and approvals necessary for such an operation would have taken more than the drive time from GMAC's offices to the dealership.

GMAC's "paper-trail" does not add up. For example, putting aside GMAC's inability to define "out of trust" consistently or to maintain a consistent number of exactly how many vehicles the dealership is alleged to not timely paid or to maintain a consistent amount the dealership owed them on July 19, 2007, on July 25, 2007 GMAC reports internally that it had issued (6 days after entering the stores and taking them over), a Demand for Payment and Surrender of Collateral noting:

> "Dealer advised that he was turned down on home equity loan, however is pursuing proposal from local bank for RE loan and wholesale accommodations."

In fact, on April 4, 2007, the dealer informed GMAC he was taking actions to recapitalize the companies. And, on July 24, 2007, the day prior to GMAC's claims that it was just "advised" of the dealer's intentions, GMAC was faxed a loan commitment from Citizen's bank that would have provided $1.5 million dollars for used floor-plan line of credit, and a $2.5 million dollar commercial real estate mortgage. Closing on the Citizen's loan would have allowed the dealer to pay off its $500,000 line of credit, its used vehicle line of credit with GMAC, expand its service operations, and inject needed capital into the company. In response, GMAC's Director of Commercial Lending rejects any compromise because the offer did not cover a new vehicle floor plan and, a day later, sends a demand that the dealership remit over five million dollars within 24 hours. The

dealerships closed not more than two days after that when GMAC refused to budge and sold vehicles could not be delivered because the dealer used their last remaining cash to meet that week's payroll.

All of this, in my professional experience and with a reasonable degree of professional certainty, leads me to conclude that GMAC's refusal to yield, when it already had acted so extraordinarily, supports a conclusion that GMAC entered the dealership on a pretext and fully intended to shut it down when it did so.

The conclusions in this analysis are based on information currently available. I reserve the right to supplement my report as more information is obtained on this matter. Based on this, it is possible that my conclusions would change.

Sincerely,

*[signature]*

Carl Woodward

# CARL WOODWARD
Woodward & Associates, Inc.
Certified Public Accountants
1707 Clearwater Ave. - P. O. Box 1584
Bloomington, IL 61704
Phone: 309.662.8797   Fax 309.662.9438
carlswoodward@cpaauto.com

**Employment:**

| | | |
|---|---|---|
| Continental Bank | 1970-1971 | Accounting Manager |
| Dealerships-Ford | 1971-1975 | Office manager-Controller-CFO |
| Dealer Management, Inc. | 1975-1979 | Controller (multi-dealer org.) including lease company, auto auction, service contract and insurance company |
| Woodward & Associates, P.C. (1998-   ) | 1979-to date | CPA firms - serving almost exclusively Automobile/Truck Dealers and their related entities |

**Education:**

| | |
|---|---|
| University of Illinois, BA | January 1970 |
| DePaul University | 1971-1973 |
| Certified Public Accountant Certification | February, 1974 |

**Continuing Education:**
Illinois CPA Societies Valuation Conference + 40 hours per year CPE (most years)
NADA Valuation Conference

**Business Activities**
Served over 300 Automobile Dealers in the following areas, over the past 30 years:
   Profitability Consulting and Dealership Management
   Valuations and Appraisals
   Dealer Income Tax, LIFO computations and Estate Planning
   Financial Statement Analysis, Budgeting, Projections
   Internal Control & Theft Reviews studies
   Operations and Internal Control Evaluation
   Compensation Consulting and Planning
   Ownership Succession of Dealerships
   Purchase and Sale of Dealerships (Over 200 transactions)
   Buy-Here, Pay-Here Dealerships
   Expert Testimony on Automobile Dealership matters
   Lecturer to CPA firms and others on Automobile Dealer matters

Dealership owner – Dodge World of Des Plaines, IL 1993-1999
Dealer related entities including service contract and leasing companies

**Publications:**

Co-authored Automobile Accounting manual for American Institute of CPA's
*Power Steering*, a national publication written by Carl Woodward with subscribers spanning the nation, including automobile dealers and financial institutions.
*Headlights*, a national publication, with subscribers including several thousand automobile dealers.

Quoted in *Automotive News*
Quoted in *Automotive Executive*
Quoted in *Car Dealer Insider*
Quoted in *Auto Age*
Quoted in *Accounting Today*

**Presentations:**
**Guest Presenter** for:
National Automobile Dealers Association (NADA's highest attended seminar in Dallas, Texas 1995); NADA Twenty Groups; Chicago Automobile Trade Association; AUTO CPA Group; Chevrolet Motor Division; Chrysler Corporation, Hyundai Motor America; Cleveland & Des Moines Automobile Dealers Association; Banker Groups; Iowa, Kansas, Nebraska, Texas, Georgia, Pennsylvania Automobile Dealers Associations; CPA Groups; American Institute of CPA's; ADP, Reynolds & Reynolds, and CPA Associates, Minnesota and Georgia CPA societies

**Presentation Topics:**
Dealership Operations; Internal Controls for Automobile Dealers; Buy-Sell-Valuations-Appraisals for Automobile Dealers; Anatomy of Failed Dealerships; Buy-here pay-here Operations; Keys for an effective office; Dealership Balance Sheet Accounts; Automobile Dealer Financial Statements; Dealership Profitability and Management; Expenses and Profitability, A Different Perspective; Fraud Issues in Automobile Dealerships

**Membership:**
Illinois Certified Public Accountants Society since 1980
American Institute of Certified Public Accountants since 1980
Auto CPA Group - past Chairman
Illinois Automobile Dealers Association
Iowa Automobile Dealers Association

**Witness Status:**
Qualified expert testimony in both federal and state courts on issues of valuation, accounting, dealership financial and franchise matters, compensation, employee hiring and tax issues.

15

CARL WOODWARD   August 2009

Following is a listing of depositions and testimony I have given since 2005.

| Year | Case | Type |
|---|---|---|
| 2005 | DIEPHOLZ CHEVROLET V. GENERAL MOTORS<br>NEW VEHICLE DEALERSHIP RELOCATION DISPUTE<br>ILLINOIS<br>IRA LEVIN   312-840-7065 | DEPOSITION |
| 2005 | FIRST FEDERAL SAVINGS BANK V. OLD NATIONAL BANK AND FORD MOTOR CREDIT d/b/a MAZDA AMERICAN CREDIT DISPUTE BETWEEN FINANCIAL INSTITUTIONS<br>TENNESSEE | TESTIMONY |
| 2005 | MAALIKI, ET AL. V. TYNAN'S NISSAN INC<br>COMPENSATION DISPUTE INVOLVING DEALERSHIP<br>COLORADO | TESTIMONY |
| 2005 | NIGRI LINCOLN MERCURY<br>VALUATION OF DEALERSHIP FOR DIVORCE PURPOSES<br>ILLINOIS | TESTIMONY |
| 2005 | MAZDA AMERICAN CREDIT V. PETRUCELLI<br>LENDING DISPUTE BETWEEN ABOVE PARTIES<br>NORTHEAST US | DEPOSITION |
| 2005 | MALPRACTICE CLAIM ISSUE BETWEEN CPA FIRM AND DEALERSHIP (HEETER)<br>MISSOURI | DEPOSITION |
| 2006 | TIPTON HONDA V. HONDA MOTOR COMPANY<br>ADD POINT NEW DEALERSHIP<br>CALIFORNIA<br>MICHAEL FLANAGAN | TESTIMONY |
| 2006 | EDDIE ACCARDI  DISPUTE OF VALUATION FEES WITH CPA FIRM<br>FLORIDA | TESTIMONY |
| 2006 | ELMHURST MOTORS<br>RENT DETERMINATION<br>JIM BRENDENMUHLE   ELMHURST, IL. | DEPOSITION |

16

| Year | Case | Type |
|---|---|---|
| 2006 | ANAHEIM CHEVROLET<br>FRANCHISE DISPUTE<br>CALIFORNIA | DEPOSITION |
| 2006 | MICHAEL KAHN V. TOYOTA<br>DEALER APPLICATION DISPUTE<br>CALIFORNIA | DEPOSITION |
| 2006 | JIM M'LADY NISSAN<br>DEALERSHIP VALUATION MARITAL DISPUTE<br>ILLINOIS | DEPOSITION |
| 2006 | PALMA CRAMER<br>CONSUMER DISPUTE AGAINST DEALER<br>ILLINOIS | TESTIMONY |
| 2007 | CHARLES WIMBERLEY<br>TESTIMONY IN REGARDS TO PERSONAL INCOME TAX RETURNS<br>MICHIGAN | TESTIMONY |
| 2007 | MEL ANDERSON V. ASBURY AUTOMOTIVE (PUBLIC COMPANY) CONTRACT DISPUTE WITH PUBLIC AUTO GROUP<br>ARKANSAS | DEPOSITION & TESTIMONY |
| 2007 | MARC PETERSEN<br>DEALERSHIP VALUATION-MARITAL DISPUTE<br>ILLINOIS | TESTIMONY |
| 2007 | LINDQUIST FORD V. MIDDLETON FORD DISPUTE BETWEEN DEALERS<br>WISCONSIN | DEPOSITION |
| 2007 | NORTH COUNTY FORD<br>DEALERSHIP COMPENSATION DISPUTE / ARBITRATION<br>CALIFORNIA | DEPOSITION / TESTIMONY |
| 2008 | SUBURBAN DODGE BANKRUPTCY ESTATE V. CHRYSLER & CHRYSLER FINANCIAL DEALERSHIP-MANUFACTURER/FINANCE COMPANY DISPUTE<br>ILLINOIS | DEPOSITION / TESTIMONY |

| | | |
|---|---|---|
| 2008 | PALMA CRAMER V. SCHAUMBERG HONDA<br>CUSTOMER-DEALERSHIP DISPUTE<br>ILLINOIS | TESTIMONY |
| 2009 | JIM M'LADY V. BARBARA M'LADY<br>DIVORCE MATTER<br>ILLINOIS | TESTIMONY |
| 2009 | MILLENNIUM LUXURY OF DALLAS V. VOLVO<br>DEALERSHIP-MANUFACTURER DISPUTE<br>TEXAS | DEPOSITION / TESTIMONY |
| 2009 | ZIMBRICK AUTO GROUP V. HONDA<br>DEALERSHIP-MANUFACTURER DISPUTE<br>WISCONSIN | DEPOSITION / TESTIMONY |