# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MENTE CHEVROLET OLDSMOBILE, INC
F/K/A MENTE CHEVROLET, INC. t/a
MENTE CHEVROLET

    and

MENTE CHRYSLER DODGE, INC.

    and

DONALD M. MENTE

                Plaintiffs                Civil Action
         vs.                          No.:08-2403

GMAC,

                Defendant.

## Expert Report of
# Joseph F. Roesner, MBA, CMA

**The Fontana Group, Inc.**
3509 N. Campbell Avenue
Tucson, Arizona 85719
(520) 325-9800  Fax (520) 325-9847

**September, 2009**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MENTE CHEVROLET OLDSMOBILE, INC. :<br>F/K/A MENTE CHEVROLET, INC. t/a :<br>MENTE CHEVROLET :<br> :<br>  and :<br> :<br>MENTE CHRYSLER DODGE, INC. :<br> :<br>  and :<br> :<br>DONALD MENTE :<br>             Plaintiff, :<br> :<br>        v. :<br> :<br>GMAC :<br>             Defendant. : | CIVIL ACTION<br>NO. 08-cv-2403 |

## EXPERT REPORT OF JOSEPH F. ROESNER, M.B.A.

1.   I am Vice President of The Fontana Group, Inc. ("Fontana Group"), a consulting firm
     with over 30 years of experience in analysis of the retail motor vehicle industry
     throughout the United States and Canada.  The company is headquartered at 3509 North
     Campbell Avenue, Tucson, Arizona 85719.  This report is, except where indicated, based
     on my personal knowledge and, if sworn, I can testify competently to all matters
     contained herein.  I have been acknowledged and accepted as an expert in the retail
     automotive industry before federal district court, state trial court, various state
     administrative tribunals, and arbitration panels adjudicating disputes in the retail
     automotive industry.

2.   Mente Chevrolet Oldsmobile and Mente Chrysler Dodge (collectively "Mente") was an
     authorized dealer of new Chevrolet and new Chrysler products.  Mente was located in

Kutztown, PA.  Mente, like most new vehicle dealerships, financed their vehicle inventories ("floor plan") through external finance sources.  General Motors Acceptance Corporation ("GMAC") was the finance source for Mente's new vehicle inventory. Additionally, GMAC financed some retail contracts for Mente's customers.

3.    On July 19, 2007, GMAC personnel entered the Mente Chevrolet dealership, purportedly for the purpose of conducting an audit of Mente's floor plan inventory.  As a result of this audit, GMAC alleged that Mente had not timely paid GMAC for vehicles ("out of trust") that Mente had sold to its retail customers.  Mente alleges that GMAC has not established that the dealership was materially out of trust, and that GMAC's actions, following its declaration of Mente's alleged out of trust condition, effectively terminated Mente's dealership, causing financial and other economic harm to Mente.

4.    Counsel for Mente retained The Fontana Group for the following purposes:

A) Opining on the state of the retail automotive industry that existed in mid-2007, specifically relating to domestic manufacturers' desire to reduce dealership counts;

B) Conducting certain analyses regarding vehicles GMAC deemed out of trust on July 19, 2007;

C) Estimating the proceeds that Mente likely would have secured had it been able to dispose of its inventory in a commercially reasonable manner and comparing that figure to the actual proceeds of inventory disposed of by GMAC;

D) Determining the approximate Blue Sky value of the Mente franchises as of July 19, 2007.

5.    This report sets forth my opinions on these matters and the bases therefor.  I reserve the right to modify and supplement my report if/when additional information becomes available.

## QUALIFICATIONS

6.   My curriculum vitae is attached as **Tab 1** to this report.  I have Bachelor degrees in Business Administration and History from Marymount College of Kansas.  I received a Masters of Business Administration degree with a concentration in Finance from the University of Arizona.  I am a Certified Management Accountant.  After receiving my M.B.A. in 1990, I became employed by The Fontana Group, Inc., first as an analyst, then as case manager, and currently as Vice President.  A list of cases in which I have provided deposition, hearing or trial testimony during the past four years can be found in **Tab 2**.

7.   My experience in the retail automobile industry encompasses studies, including some now in progress, of hundreds of new motor vehicle dealerships that sell or sold vehicles of one or more of the following line makes: Acura, Audi, BMW, Buick, Cadillac, Chevrolet, Chrysler-Plymouth, Dodge, Ford, GMC, Harley-Davidson, Honda, Hyundai, Infiniti, Isuzu, Jaguar, Jeep-Eagle, Kawasaki, Kia, Lexus, Lincoln-Mercury, Mack, Mazda, Mercedes-Benz, Mitsubishi, Nissan, Oldsmobile, Pontiac, Saab, Sterling, Subaru, Suzuki, Toyota, Volkswagen, and Volvo.  These studies have been performed both on a consulting basis and in connection with litigation.

8.   These studies of the retail motor vehicle industry have concerned the addition, location, relocation or termination of dealerships, the non-approval of dealership buy-sell agreements, manufacturers' systems for allocating new vehicles to dealerships, customer satisfaction measurement, economic damages and other topics.  These studies have been performed across the United States and in Canada.

## DATA RELIED UPON

9.   I have reviewed pleadings and documents generated by both parties to this lawsuit.  I have visited with Mente dealership representatives and Mente's counsel by phone.  On a

regular basis, I review print media and other publications relating to the retail automotive industry. Where appropriate, exhibits in my report include references indicating data or sources of information used in the creation of the exhibit. A list of data/documents considered in forming my opinions appears in **Tab 3.**

10.    My review of the data and documents in this matter, as well as my industry training and experience lead to the following conclusions:

## SUMMARY OF OPINIONS:

I.    **General Motors and Chrysler were, as of 2007, actively seeking to reduce the sizes of their dealer networks.**

11.    Recent events, such as the General Motors and Chrysler bankruptcies, highlighted the desires of domestic auto manufacturers to reduce the size of their dealer networks. However, the bankruptcies were not the starting point of these plans. For many years, General Motors and Chrysler sought to streamline their dealer networks through consolidation, closure of underperforming, struggling and antiquated locations, and an overall focus on a dealer body with higher average throughput. These efforts were active as of the summer of 2007.

II.    **Mente had many characteristics that were consistent with those dealerships that General Motors and Chrysler sought to eliminate. Mente alleges that GMAC's actions were in furtherance of General Motors' dealer network desires. While I cannot confirm this assertion, neither can I rule out that broader manufacturer consolidation plans contributed to GMAC's actions against Mente.**

12.    Mente was a small dealership without extensive capital resources or a large modern facility. Additionally, the purchaser of a neighboring GM store recently invested heavily

in the GM brands pursuant to GM strategy. Thus, Mente was a dealership that embodied many concerns that GM had with its dealer network; the facing dealership was much more consistent with General Motors' plans going forward.

III.    **GMAC declared Mente in default of a standard that purported to require Mente to pay off floor plan obligations within three days of a vehicle's delivery. GMAC's "discovery" of this alleged default on July 19, 2007, is questionable at best. This condition appeared to exist at Mente on a regular basis, including times at which GMAC did not declare Mente in default. GMAC did not establish how its "discovery" on July 19, 2007 was materially different from previous conditions that it tolerated at Mente. Nor did GMAC point to a contractual standard for governance of the definition of out of trust. This means that the basis for GMAC's out of trust declaration was neither standard practice within its relationship with Mente nor an enumerated contractual standard.**

13.    GMAC purported to enforce a standard that Mente was required to pay off floor plan obligations within three days of the vehicle's delivery. I have seen no evidence that Mente ever regularly paid off vehicles within that time frame. According to Mente, the dealership generally, if not always, waited until securing third-party funds before paying off floor plan obligations. GMAC even acknowledged in a previous audit that Mente faced delays (of well over three days) in securing third-party funding. Whatever GMAC's internal expectations were, its standard practice with Mente was not to require payment within three days of the vehicle's delivery. To the extent that the three-day period was the basis for GMAC's out of trust declaration, this basis was inconsistent with GMAC's standard practices with Mente.

14.    GMAC also cannot demonstrate that its purported three-day payoff standard is contractually based. The *Wholesale Financing Agreement* governs the relationship between Mente and GMAC. This document states only that Mente faithfully and

promptly repay its floor plan obligations.  GMAC acknowledges that it could have inserted specific repayment standards in its agreement but did not.  Rather, it chose to enforce its agreement ex poste.  Thus, GMAC's out of trust declaration is consistent neither with standard practice nor specific contractual terms.

15.    It is more likely than not that GMAC's discovery on July 19, 2007 was not a discovery at all.  GMAC's experience with Mente's payment practices, combined with the fact that Mente's controller, Donna Johnson, had been out of the office for the three business days leading up to July 19, made it both highly probable that payment delays beyond three days would exist and that GMAC would have been aware that payment delays beyond three days from delivery would exist on the day of the audit.  Accordingly, it is more likely than not that GMAC entered Mente on July 19, 2007 with the expectation of documenting the alleged default that they claimed to discover.

IV.    **GMAC's actions after declaring Mente out of trust were reasonably and predictably likely, absent extreme remedies by Mente, to result in the dealership's demise.**

16.    GMAC secured keys, titles, and Manufacturers' Certificates of Origin ("MCOs") from Mente beginning on July 19, 2007.  It required certified funds from Mente and redirected incoming manufacturer funds from Mente to GMAC.  GMAC also suspended credit lines, which included refusing to floor plan additional incoming vehicles.  Barring a substantial capital influx by Mente or securing a new financing source, Mente was unlikely to (and did not) survive these actions that increased cash needs while decreasing cash availability.

V.    **Reason dictates that GMAC should not only establish that Mente was materially out of trust, but that the dealership's alleged inability to remedy that situation justifies GMAC's subsequent actions, such as seizing capital and freezing credit lines.  This is because the latter actions relate to the exposure to and magnitude of potential loss-whereas an alleged out of trust situation does not necessarily imply that the**

**dealership cannot or will not remedy the condition. In order to advance from an out of trust allegation (or conclusion) to the seizure and/or control of inventories and accounts, GMAC would need to establish that it held a good-faith belief that Mente could not or would not repay the purported obligations. Barring the establishment of additional facts that are contested and not clearly on the record, GMAC does not offer sufficient justification for its actions subsequent to its out of trust declaration.**

17.   The justification for actions taken by GMAC after the out of trust declaration, such as freezing credit lines, seizing vehicles, and appropriating cash and equivalents, were purportedly undertaken to protect GMAC against loss from conversion. This requires that GMAC's loss exposure made these actions necessary. Accordingly, justification for these actions must be separate and distinct from the justification for initially declaring Mente out of trust. In other words, an allegation that Mente *had not yet paid* is not the same as an allegation that Mente *could not pay* or *would not pay*. Credible justification of the latter two situations would be necessary to justify GMAC's actions.

18.   In order to establish that it held a good-faith belief that Mente would not or could not repay its purported floor plan obligations, GMAC would have to point to some contemporaneous basis for its belief. Possible responses by GMAC follow. Each possible response is considered in turn.

   A)   Mente's owner, Mr. Donald Mente, allegedly stated to GMAC that Mente was unable to pay off the floor plan obligations that were purportedly due on July 19, 2007.

   B)   GMAC, through its own independent analysis and conclusions, determined that Mente was unable to pay off the floor plan obligations purportedly due on July 19, 2007.

C) Mente represented that it could pay the purported obligations. However, repayment would be delayed until Mente's controller, Donna Johnson, either returned to the office in two business days or became available to make payment remotely. GMAC believed that the delay itself justified its actions.

**A) *Mente's owner, Mr. Donald Mente, allegedly stated to GMAC that Mente was unable to pay off the floor plan obligations that were purportedly due on July 19, 2007.***

19.   This is a question of fact and evidence. However, a contemporaneous e-mail on July 19, 2007, from Mr. Mente to GMAC is inconsistent with this proposition. "The dealership cannot pay the purported obligations," is not the same as "the dealership cannot pay the purported obligations until Monday." While 'A' is, again, ultimately a question of fact, to reasonably justify its actions following the out of trust declaration, GMAC would need to establish that Mente unambiguously expressed an inability to pay–not just an inability to pay immediately.

**B) *GMAC, through its own independent analysis and conclusions, determined that Mente was unable to pay off the floor plan obligations purportedly due on July 19, 2007.***

20.   GMAC describes no independent conclusion, or even analysis, that Mente was unable to pay the floor plan obligations. GMAC had already effectively seized or controlled over $180,000 worth of assets by July 19, 2007. The definition of GMAC's disposition of those assets is not important. What is critical is that GMAC's ability to control certain of Mente's assets in some form implied Mente's ability to repay *at least* that amount of floor plan obligation. Thus, to support the proposition that their own analysis led to a conclusion that Mente could not pay the amount purportedly due, GMAC would have to show that it ruled out the possibility Mente would have been able to pay an additional amount of approximately $62,000.

21.     The arguments advanced by GMAC do not cite Mente's financial condition–particularly
        as those conditions relate to Mente's ability to repay purported obligations.  Mente
        personnel have expressed that Ms. Johnson's absence would have impaired GMAC's
        ability to determine if the vehicles in question had even been funded by the July 19.
        However, even if GMAC had conducted this analysis, it is highly unlikely that it would
        have been able to establish that Mente would have been unable to meet the obligations
        purportedly due on July 19, 2007–or, at a minimum, that Mente would have been unable
        to meet said obligations promptly upon the return of its controller.

        *C) Mente represented that it could pay the purported obligations, but repayment would
        be delayed until Mente's controller, Donna Johnson, either returned to the office in
        two business days or became available to make payment remotely.  The delay itself
        justified its additional measures.*

22.     In and of itself, a two-day delay (or less) is minor relative to the actions taken by GMAC
        after the out of trust declaration.  While unacceptable payment delays may lead to other
        measures, there is little significant difference between the two scenarios, the first of
        which where Mente repays GMAC on July 19 and the second where Mente repays
        GMAC a few days thereafter.  Perhaps the best illustration of this is that the record is
        absent of any statement by GMAC that delay until Ms. Johnson's return would have been
        unacceptable.

23.     The step from an out of trust declaration to the seizure and control of vehicles and
        accounts is distinct and substantial.  The only default alleged is that Mente had not timely
        paid floor plan obligations by July 19, 2007.  Satisfying those purported obligations
        would have remedied the default.  Given the severity of the results of GMAC's actions, it
        would be unreasonable for GMAC not to wait approximately for Ms. Johnson's return.

**VI.**  **One consequence of the closure of Mente was that GMAC liquidated Mente's seized inventory in a manner that reduced the likely proceeds from those items. Mente's counsel asked me to determine the harm suffered by Mente from GMAC's disposal of remaining inventories. I entitle this category of damages "liquidation damages."**

24.  Mente suffered liquidation damages in at least four ways. First, GMAC's liquidation of Mente's inventory was done in a manner likely to garner lower prices than what would have been realized under more reasonable conditions. Second, delays in the sale of vehicles reduced those vehicles' values through normal aging and depreciations. Third, those delays also resulted in additional floor plan costs to Mente. Finally, GMAC's actions blocked Mente from disposing of its parts inventory in a reasonable way.

25.  I employ as a guideline for new vehicle proceeds the terms of General Motors' standard contract for termination benefits. This results in proceeds that are substantially below invoice cost and excludes some vehicles from damages. Resulting damage to Mente from the disposal of new vehicles is between $27,677 and $64,993 for new Chevrolet Vehicles and between $61,956 and $137,504 for new Chrysler Vehicles.

26.  I assume for used vehicles that the dealership would only capture net proceeds equal to its historical wholesale margins. This approach assumes a substantial reduction compared to actual dealership used vehicle profits. For the used vehicles from the Chevrolet dealership, damages range between a low of $120,591 and a high of $190,184. The high value is most realistic and most appropriately compared to the dealership's actual wholesale experience. For the Chrysler dealership's used vehicles, damages range between $37,045 and $53,485. Again, the higher number is the most realistic estimate.

27.  Excess floor plan costs are those that accrued after a reasonable average expected sale date for Mente's inventory. Excess new Chevrolet floor plan charges are approximately

$20,968. Excess new Chrysler vehicle floor plan charges are approximately $33,683. Excess floor plan charges on used vehicles are $17,790 and $5,744 respectively.

28.     It is my understanding that GMAC's actions have prevented an effective disposal of Mente's remaining parts. To determine the likely proceeds associated with this inventory, I employ a conservative estimate of inventory value then discounted that value by 10%. This estimate assumed that, on average, Mente would have been unable to extract any retail margins from remaining parts. While the baseline for parts values is related to standard termination benefits, the conservative amount employed also would enable another dealership to buy the parts at cost with a discount that would likely cover a year or more of carrying costs. Liquidation damages for Chevrolet parts are approximately $99,543; for Chrysler parts, that figure is $83,722.

|  | Summary of Damages | |
| --- | --- | --- |
| Category | Low Value | High Value |
| New Chevrolet Proceeds | $27,677 | $64,993 |
| New Chrysler Proceeds | $61,956 | $137,504 |
| Subtotal | $89,633 | $202,497 |
| | | |
| Used Chevrolet (store) Proceeds | $120,591 | $190,184 |
| Used Chrysler (store) Proceeds | $37,045 | $53,485 |
| Subtotal | $157,636 | $243,669 |
| | | |
| Excess Floor Plan Charges | | |
| New Chevrolet | $20,968 | $20,968 |
| New Chrysler | $33,683 | $33,683 |
| Used Chevrolet (store) | $17,790 | $17,790 |
| Used Chrysler (store) | $5,744 | $5,744 |
| Subtotal | $78,185 | $78,185 |
| | | |
| Chevrolet Parts | $99,543 | $99,543 |
| Chrysler Parts | $83,722 | $83,722 |
| Subtotal | $183,265 | $183,265 |
| | | |
| Total Liquidation Damages | $508,719 | $707,616 |

VII.   Counsel for Mente requested that I make a conservative estimation of the Blue Sky Value of Mente's dealerships as of July 2009. For the Chrysler franchise, I assumed no Blue Sky Value. For the Chevrolet franchise, I relied upon a contemporaneous buy-sell agreement that embodied many factors that would depress the sale price, such as a distressed sale and a non-existent income stream. Thus, the Blue Sky amount is inherently conservative. After deducting the approximate value of certain assets from the purchase price, I find the Blue Sky value to be $1.15 Million.

## BASES FOR OPINIONS

### Industry Background

29.   Both General Motors and Chrysler Corporation have had plans since at least the middle of this decade calling for a reduction in their dealer networks. These plans were brought to fruition when both companies declared bankruptcy in 2009. Operating under the protection of bankruptcy, the companies were able to release themselves of hundreds of sales and service agreements. **(Tab 4)**

30.   Both General Motors **(Tab 5)** and Chrysler **(Tab 6)** touted the benefits of higher sales per dealer that would supposedly come from a reduced dealer network. Both argued that such a reduction was essential for the companies to be viable going forward.

31.   The call for a reduction in dealerships was certainly not a new stance for the companies. Representatives of both General Motors and Chrysler had been saying for some time that a restructuring of their dealer network was a part of company plans. In his supplemental affidavit General Motors' Frederick Henderson reported that efforts to "..enhance the competitiveness and profitability of the GM dealer network" had been underway since at least 2004.

32.   In a February 2, 2007 Automotive News article GM North America President Troy Clark said that although the automaker still had too many dealers there was not enough money to invest in buyouts to reduce the dealer network.  He stated that "We don't have a lot of cash to invest in that".   Because of the money spent on the closure of the Oldsmobile dealer network "GM is a company that knows what that costs." **(Tab 7)**

33.   The April 9, 2007 edition of Automotive News reported on the "Detroit 3's" efforts to reduce retail outlets to create "fewer, more profitable dealerships." **(Tab 8)** The second article is a DealersEdge Daily headline reports that in early 2008 General Motors chief executive Rick Wagoner said "his company needed to step up the pace of dealership consolidation."  At the same time Mark LaNeve, GM's Vice President for Marketing and Sales was calling for a 30% reduction of GM dealers in urban markets.

34.   The September 22, 2008 Automotive News reported that Mark LaNeve expected the closure rates of GM stores to increase. **(Tab 9)**  Through August, 226 stores had closed in 2008.  His expectation was for there to be 350 to 400 closures for 2008 as compared to 260 in 2007 and 87 in 2006.  Automotive News reported that LaNeve told them GM wants consolidation activity to pick up.

35.   In its December 2, 2008 submission to U.S. Congress entitled "Restructuring Plan for Long-Term Viability" GM indicates that the number of dealer locations is expected to decrease from 6,450 in 2008 to 4,700 in 2012.  The plan states that "GM intends to have the right number of brands, sold by the right number of dealers, in the right locations to obtain maximum profitability for GM and the retailer network." **(Tab 10)**

36.   The January 24, 2009 Automotive News reported on a Question and Answer Session with Joe Chrzanowski, GM's executive director of dealer network planning. **(Tab 11)**  Mr. Chrzanowski characterized the closures as being dealerships GM was "working very closely with."  He states that "What we're doing is we're influencing the underperforming

dealer that hasn't updated his facility in seven, 10 or 20 years, where he doesn't have enough working capital to run an effective operation, a dealer whose customer satisfaction index is below average - those are the dealers that we're focused on. Generally, those are the dealers who are in the wrong location, in old buildings, and they're understaffed."

37.  In the same article Mr. Chrzanowski stated that GM does try to influence which dealers remain in business. "If we have an underperforming dealer who's undercapitalized, we're not trying to influence that dealer to stay in business if there's not enough money and wherewithal to be successful and handle some of these bigger, higher-throughput stores."

38.  The February 2, 2009 Automotive News reported that GM had told its dealer body that the planned 400 dealer a year reduction until 2012 is a target but that "its more an average than a hard-set number." General Motors reportedly told dealers that "it will determine which dealerships it targets based on such criteria as the age of the store, location, volume, consumer satisfaction and capitalization." **(Tab 12)**

39.  GM's "Restructuring Plan" submitted to the U.S. Department of the Treasury on February 17, 2009 summarizes GM's opinion that it has too many dealers. "Due to the Company's long operating history and legacy locations, many GM dealerships now operate from outdated facilities that are also no longer in the prime locations required to succeed. As a result, the traditional strength of GM's broad dealer network in major markets has become a disadvantage for both the dealerships and the Company. GM has long recognized this issue and, since 1970, has reduced the U.S. dealer body by over 6,000 dealerships." **(Tab 13)**

40.  The Plan also addresses GM's future plans in relation to the dealer network. "To continue to address this issue, GM will accelerate the right-sizing and re-shaping of its dealer network in major markets, increasing volume throughput in better locations.

Fewer, better located dealerships increase dealer profits, allowing for recruitment and retention of the best retail talent and more effective local marketing initiatives. Improving the profitability of GM's independent dealers helps the Company by increasing sales, attracting private investment, and driving greater customer loyalty. In the major markets GM will continue to benchmark key locations, facilities, and throughput versus target competitors. The Company's objective is to have the right number of dealers in the right locations operated by the right entrepreneurs."

41.    As reported in an April 6th, 2009 Automotive News article, GM's new CEO Fritz Henderson says that GM has to make deeper faster cuts to its dealer network.  He states that GM's buy-out of the Oldsmobile dealers cost $1 billion and that the current situation "is considerably more difficult than when we did Oldsmobile - not even close." **(Tab 14)**

42.    The April 6th article also reported that a team reporting to Mark LaNeve had been assembled by GM to hasten consolidations.  Mr. LaNeve is reported as stating that more than 90 percent of the attrition was 'in alignment with' GM's plan."

43.    Chrysler has also been working to reduce its dealer network for some time.   In November 2005, both Jim Diamond, DaimlerChrysler's National Dealer Placement Manager, and I were invited speakers at a conference in Orlando, Florida entitled "Art of the Deal."  As such I had the opportunity to listen to Mr. Diamond's presentation concerning the need for fewer Chrysler dealers each selling more vehicles.  Chrysler's strategy of seeking fewer, more profitable dealerships has also been documented in the automotive press.  A key component of that strategy was the combination of Chrysler, Jeep and Dodge stores into single locations.  Articles documenting Chrysler's strategy are included as **Tab 15**  to this report.

44.    As previously discussed, both GM and Chrysler were able to expedite their reduction plans in 2009 under the shield of bankruptcy.  In 2007 those protections were not

available.  As indicated above in Tab 7, in 2007 GM did not feel they had the cash to invest in buyouts to expedite a dealer reduction.  Such a reduction would have been much more expensive than the $1 billion buyout of the Oldsmobile network.

45.   The closure of dealerships would have to be done in accordance with both state laws and under the guidelines of each dealer's Sales and Service Agreement with the manufacturer.

46.   The standard provisions of the General Motors Sales and Service Agreement also include a summation of GM obligations in case of a termination for cause.  Similar to the Statute the Agreement calls for the repurchase of certain inventories, tools and equipment as well as assistance with the dealership facility. **(Tab 16)**

47.   It is clear that at the time of GMAC's actions against Mente both General Motors and Chrysler were seeking to reduce their dealer network.  It also clear that at least in the case of General Motors (and quite likely Chrysler) the funds to undertake the size of reduction contemplated were not available.  It is also clear that the Mente dealerships fit a number of the criteria company representatives gave as preferred candidates for reduction.

48.   The complaint in this case alleges that GMAC acted on behest of General Motors.  I am aware of the longstanding relationship between the two entities.  While at this point in time I can not confirm such an allegation, neither can I rule out the possibility of its truth.

49.   General Motors and GMAC had a long standing relationship going back to 1919 when GMAC was founded as a wholly owned subsidiary of GM.[1]  In November of 2006, after selling a controlling interest of 51% to a group of investors including Cererbus FIM

---

[1]Motion for Entry of Order Authorizing Debtors to Enter Into, and Approving, Ratification Agreement with GMAC LLC, pg. 4 paragraph 9.

Page 16 of 34

Investors[2] (also the primary investor in Chrysler LLC), GM still maintained a 49%
interest in GMAC.  After that and until the bail-out package in late 2008, GMAC's 12-
member board of directors included 4 executives from Cerebus as well as 4 executives
from GM.  **(Tab 17)**

50.    As stated in the notes to its 2006 Annual Report issued in March of 2007, GMAC
       acknowledges that "the profitability and financial condition of our operation are
       dependent upon the operation of General Motors Corporation....In 2006 our shares of GM
       retail sales and sales to dealers were 38% and 80%, respectively, in markets where GM
       operates."[3]

**Mente's Wholesale Financing Obligations:**

51.    **Tab 18** contains a list of vehicles audited by GMAC on July 19, 2007.  Nineteen of the
       Vehicle Identification Numbers ("VINs") listed have the word "sold" in the *Status*
       column.  It is my understanding that these VINs represent the vehicles that GMAC
       considered to be out of trust.

52.    **Tab 19** includes two vintages of the *Wholesale Security Agreement* between GMAC and
       Mente.  Neither document appears to define "out of trust."[4]  Neither document appears to
       define a specific time period within which the dealership must pay GMAC after the sale
       of a vehicle.  Neither document appears to define conditions that would constitute a
       breach of the agreement or whether a party were in default.

------------------------------------

[2]Ibid, pg. 5 paragraph 10.

[3]GMAC 2006 Annual Report, notes, pg. 5.

[4]In its *Response to Interrogatories,* GMAC states, "The *Wholesale Security* Agreement"
does not contain the term, 'out of trust.' Therefore, GMAC is unable to define such a term as it
relates to Defendants (Mente). *Berks County Court* of *Common Pleas, PA* (No. 08-4170).

53.    GMAC's actions presumes that it may interpret the contract on an ex poste basis. It
       asserts in a July 25, 2007 letter to Mr. Donald Mente that it "discovered" a situation on
       July 19, 2007 that Mente had failed "to promptly pay the principal amount financed by
       GMAC for certain motor vehicles which that dealership has sold." **(Tab 20)**  GMAC
       asserts that "promptly pay" equates to three days after the delivery of the vehicle.  In at
       least one case, GMAC offered the three-day standard as a response to the court's question
       regarding the terms of the agreement.[5]

**GMAC's "discovery" on July 19, 2007.**

54.    Mente's controller, Donna Johnson, was on vacation on July 19, 2007 and had been since
       the previous week.  Additionally, Ms. Johnson had informed GMAC in advance of her
       vacation.  According to Mente and other sources, Ms. Johnson held exclusive
       responsibility for most of Mente's financial activity, including writing checks.[6]  Even
       GMAC recognized her significance in that role.  For example, former GMAC employee
       Chris Carey cited that Ms. Johnson's absence would likely result in payment delays,
       delays in check-writing, and difficulty in correctly conducting an audit.  Tellingly, when a
       previous vacation by Ms. Johnson led to delays in floor plan pay-offs, GMAC did not
       take any additional action such as declaring Mente to be in default.[7]  At the very least, it
       is likely (if not certain) that Ms. Johnson's vacation would result in payment delays to
       GMAC, and that the existence of those delays would be reasonably expected by GMAC.

---

[5]Counsel for GMAC cited the three-day standard in a hearing in the *Court of Common
Pleas in Berks County, PA*   [No. 08-1760, p.14, 10/29/2008].

[6]Deposition of Berrado Feretti, Jr., pp. 46-47.;Deposition of Glenn Jackson, pp. 34.

[7]Deposition of Chris Carey (rough transcript).

55.  Based on the above facts, it is not clear what GMAC actually "discovered" on July 19,
     2007. The only thing that would have been a surprising discovery on that date would
     have been if Mente *had not* been outside the three-day period. Consider the following:

-    Ms. Johnson was and had been on vacation.
-    GMAC knew that Ms. Johnson was and had been on vacation.
-    Ms. Johnson was the only Mente employee who paid floor plan obligations.
-    GMAC knew that Ms. Johnson was the only employee who paid floor plan
     obligations.
-    GMAC likely knew that Mente withheld floor plan payments until receipt of
     third-party funds.[8]
-    GMAC selected an audit date that was three business days after the first date that
     Ms. Johnson had been on vacation.
-    GMAC truly believed that the purported three-day period governed the
     relationship between Mente and GMAC.

56.  Barring an occurrence that no vehicles sold the previous week had resulted in third-party
     funding destined to Mente during (or after) the week of July 19, 2007, delays outside the
     three-day period were virtually inevitable. As demonstrated above, it is likely that
     GMAC would have been aware that these delays would be inevitable. By choosing a day
     three business days after Ms. Johnson's first day out of the office, no vehicles sold the
     prior week (with third-party funding) whose third-party funding had not yet reached
     Mente would have been paid off. Moreover, July 19 would have been more than three

_____

[8]This proposition is quite likely. Mente asserts that its payment practices in this regard
were unambiguous. GMAC noted in previous audits that Mente experienced delays in third party
payment (which would be irrelevant to GMAC if Mente paid floor plan obligations before
securing third-party funding). Finally, in his deposition, Mr. Chris Carey discusses the need to be
aware of a deal's financing source as it is a circumstance that affects the timing of a dealership's
ability to repay floor plan obligations (Deposition of Chris Carey, (rough transcript)).
Collectively, it is doubtful that GMAC had not materially discerned that Mente's practice was to
wait for third-party funding to pay floor plan obligations.

business days beyond those vehicles' sales dates. Collectively it is more likely than not that, rather than "discovering" an alleged out of trust situation on July 19, 2007, GMAC entered Mente expecting to find and document an alleged default.

**Vehicles alleged by GMAC to be not timely paid off by Mente after sale:**

57.    **Tab 21** includes a list dated July 19, 2007. This list is a GMAC document and shows vehicles that Mente had sold but that still had floor plan balances as of that date. The total at the bottom of the page is $242,240.22. Fourteen vehicles constitute this amount.

58.    Later, I address the possibility that not all fourteen pay-offs ($242,240.22) were actually due on July 19, 2007. However, had Mente paid this amount on that date, nothing in the record suggests that any delayed or untimely balance remained. In other words, while $242,240.22 may not withstand scrutiny as the correct amount due on July 19, 2007, paying $242,240.22 to GMAC would have discharged any immediate obligations from Mente to the lender.

59.    Tab 21 also contains a contemporaneous account by GMAC relating to Mente's alleged out of trust condition. Notably, the entry for July 19, 2007 states, "dealer not able to pay for 11 units outside release period." Thus, while GMAC appeared to have demanded payment for fourteen vehicles on July 19, an internal GMAC document suggests that a "release period" explained three of those fourteen alleged delinquent payoffs.

60.    **Tab 22** contains a spreadsheet printed out from a GMAC computer file.[9] This document lists vehicles that Mente is alleged to have "sold out of trust." This document lists nineteen vehicles. Five vehicles appear on this document that do not appear on the July 19 list. These vehicles have sale dates on or after July 17, 2007. None of the vehicles

---

[9]*Mente Daily Log.*

listed in Tab 21 have sales dates after July 16, 2007. Thus, the document in this tab appears to apply a "release period" of three days.

61. The prior three documents do not reconcile. The first demands payment for 14 vehicles. The second states that only 11 units were outside of the "release period." The third document (in concert with the first) appears to presume that a three-day release period exists. To the extent that GMAC misapplied its own "release periods" or repayment standards, the demand from July 19, 2007 may have been overstated and erroneous.

62. Mente personnel and my review of available data in this case indicate that Mente did not pay off its floor plan obligations for vehicles before securing third-party funding. There is evidence of substantial delays in third-party funding, including GMAC's own recognition of these delays. Nothing in the July 19th audit appears to consider whether Mente had been funded for these vehicles.

63. The Document appearing in **Tab 23** is an internal GMAC document discussing sold vehicle audits. This document notes that, in the presence of possible risk and exposure, the audit scope should expand to include determining whether the dealership had actually been funded for the sold vehicles. Mente represents that GMAC did no search of the dealership's bank records, and that because Mente's controller was unavailable, deal jackets would not have been updated to include third-party funding information. Additionally, GMAC does not appear to refer to third-party funding status in its audit report. It is difficult to reconcile that "risk and exposure warrant" freezing credit lines, seizing vehicles, and appropriating funds but do not warrant following internal audit parameters.

64. The table in **Tab 24** shows all vehicles itemized on GMAC's "sold out of trust" schedule. The first section shows those vehicles listed on the July 19 document. The second section

shows additional vehicles added later.  There is no claim that payment was due on [July 19] for the second category of vehicles.

65.   According to Mente personnel, when Mente was unable to pay the alleged outstanding floor plan balance on July 19, GMAC seized control of dealership assets.  These assets included $65,898.50 from Mente's Open Account with GM and vehicles owned outright by Mente worth at least $114,405.  A GMAC tabulation of the vehicle values appears in **Tab 25.**

66.   GMAC demanded payment on July 19, 2007 for the floor plan amounts allegedly due on that date.  If Mente met the demand on that date, it would have remedied the alleged breach. After the seizure/control of assets, Mente only owed a maximum of less than $62,000.

67.   While GMAC may argue about the definition of its actions on July 19, the above reasoning is intuitive.  Imagine that a dealership kept gold in its safe.  If that dealership owed a debt of $10,000, and the bank seized gold, at some point the value of the gold seized would exceed the amount of the debt.  The logic is perhaps best illustrated by negation.  If the value of the gold did not offset the debt, then it would not matter if the bank seized $1,000, $10,000, or $1 million worth of gold.  The debt would be unaffected. At the very least, the lender's ability to take the gold implies the dealership's ability to pay back at least the seized amount.

68.   GMAC asserts that its July 19, 2007 discovery of vehicles that Mente had sold but allegedly not timely repaid was the basis concluding that Mente had breached its agreement.  GMAC does not point to other evidence or refer to other conditions that support the alleged breach.  Thus, the validity and merit of GMAC's actions on and after the 19th depend on the alleged breach for justification.

**Consequences of GMAC's Actions**

69.    GMAC's actions starting on July 19, 2007 were predictably likely to and ultimately did
       lead to the closure of Mente.  Short of extreme measures, such as urgently securing new
       financing or a large capital infusion, Mente's financial situation was inextricable.  In
       contrast to these severe and determinant actions by GMAC are cracks in the foundational
       conclusions that purported to justify GMAC's extreme measures.

70.    The document in Tab 23 discusses the need to consider funding sources of sold vehicles
       that have not been paid off.  I have seen no documents that contemporaneously
       demonstrate that GMAC considered whether Mente had actually been funded for those
       sold vehicles.  Former GMAC employee, Chris Carey echoes this reasoning.  He testifies
       that a sold vehicle audit requires the listing of a funding source, as third-party funding
       delays could be an impediment to the dealership's payment of floor plan obligations.
       Additionally, information discerned from funding source documents sheds light on when
       the dealer might be able to repay floor plan obligations.  As discussed earlier in this
       report, even if GMAC had determined that Mente had not paid off floor plan obligations
       within three days of delivery, it has presented little to nothing regarding the exposure to
       and magnitude of risk from the purported payment delay.

71.    Even assuming that a valid payment delay existed, determining the exposure and potential
       magnitude of loss would be critical to the justification for the steps GMAC took
       following its out of trust declaration.  The only contemporaneous statement is that Donald
       Mente stated he could not pay off the vehicles.  However, it is very questionable that this
       alleged statement was absolute, rather than an expression that Mente could not
       immediately pay off the vehicles.  **Tab 26** contains an e-mail from Donald Mente to Jeff
       Lovell, GMAC's Operations Manager for the Philadelphia Business Center.  This e-mail
       states that Donna (Johnson) would be on vacation until the following week.  The message

follows that Ms. Johnson was not available to transfer funds, and when she became available, "....I'll get the needed info to cut the ck (sic)." [10]

72.   The only breach alleged by GMAC is the alleged payment delay "discovered" on July 19. Absent other justifications, the actions GMAC took would logically flow either from the alleged breach itself or from additional information that GMAC obtained because of and after the alleged breach. Other than offering the alleged statement regarding Mr. Mente's purported inability to pay, GMAC does not appear to have conducted any meaningful investigation of its exposure to and potential magnitude of loss. However, their seizure of control of Open Account funds and of used vehicles substantially mitigated any risk to the extent that it did exist. Absent viable additional contemporaneous justification by GMAC, it appears to have taken actions reasonably likely to result in the demise of Mente over an exposure of approximately $62,000. The justification for these actions is insufficient.

**GMAC's Liquidation of Mente's Assets:**

73.   Mente alleges that GMAC illegally seized and retained control of the dealership's assets following the July 19, 2007 out of trust allegations. Legal instruction from Mente's counsel is that even if GMAC's seizures were legal, UCC standards require that GMAC liquidate the seized assets in a commercially reasonable manner. Counsel for Mente requested that The Fontana Group analyze the extent to which GMAC's liquidation of Mente's inventory reduced the likely proceeds that would have occurred under reasonable circumstances. If the findings indicated harm to Mente, counsel requested that then I determine a conservative estimate of damages.

---

[10]This message also appears to state that Ms. Johnson had informed GMAC the previous month that she would be out of the office.

74. For simplicity, I entitle this category of potential harm as "Reasonable Liquidation Damages." Reasonable Liquidation Damages are illustrated by the following hypothetical example. Asssume that GMAC believed that Mente owed them $1 million and seized Mente's assets. Believing that Mente could and would pay the full million dollars, GMAC sold assets for $100,000 that would garner $1 million in ordinary wind-down conditions. Believing that Mente could and would pay the alleged remaining balance ($900,0000), GMAC did not have the incentive to sell the assets in a commercially reasonable manner and instead sold them in the manner that was most expedient. If a finder of fact ultimately found that GMAC's disposal of Mente's assets was unreasonable, damages would be the additional $900,000 Mente would have earned had reasonable disposal of the assets occurred.

75. After July 19, 2007, GMAC stationed an employee at Mente who appropriated the proceeds of sales of vehicles as payment of the remaining floor plan balance and of other indebtedness that GMAC alleged.[11] This action did not require the extension of additional credit to Mente. Additionally, it only increased GMAC's loss exposure to the extent that the vehicle could have sold for net amounts lower than that which GMAC garnered in its actual liquidation of Mente's inventory.

76. Under normal circumstances, the calculation of liquidation of Mente's inventory would be a straightforward exercise. Actual dealership financial information would provide the recent profit, volume, and expense structure necessary to determine the profits associated with the relevant sales. However, counsel's instruction is to assume that this calculation is specifically related to the disposal of seized assets. Inherently, this assumes that Mente was less able to replenish its inventory. As a consequence, the environment would be one of declining inventories, which would eventually affect selection and profitability. Under these parameters, the theoretically maximum proceeds occur under the assumption that

---

[11]GMAC Chronology.

seized inventories would have been sold under conditions like those that existed before the seizure.

77. As a baseline for new vehicle proceeds, I consider the termination benefits described in Mente's Dealer Sales and Service Agreements. This assumes the return or sale of vehicles at a value lower than their invoice values. These vehicles were essentially identical to those being sold locally at their retail values by other dealerships. As Mente would still have been able to contract for retail financing, and the vehicles would have retained the same warranties as their counterparts there is a limit to the extent that their prices would decline below their normal amounts. Thus, the theoretically minimum proceeds would be that the vehicles would have sold near their wholesale values, less some return and/or selling expenses.

78. The most likely option is that the dealership would have continued approximately normal sales operations for some period of time until inventory amounts declined to a constraining level. At that point, when the expected value of continuing a full sales operation approached zero, the commercially reasonable course would have been to liquidate the vehicles near their wholesale values.

79. The minimum required inventory levels for normal operations depends on line make, season, overall market demand, and location (among other factors). Some Japanese import dealerships are able to operate effectively with a 30-45 day supply of vehicles. Line makes that offer more combinations of vehicles (such as multiple option packages and trim lines on trucks) can require more inventory selection. **Tab 27** shows month-end days supply for Mente Chevrolet and Mente Chrysler.

80. **Tab 28** shows the termination benefits section of Mente's Chevrolet Sales and Service Agreement and from the standard provisions of a Chrysler Sales and Service Agreement **(need Mente's Chrysler)**. Specifically, these documents address a terminated

dealership's right to return certain inventories. Current model year vehicles are eligible for return, and prior model year vehicles purchased within the last 120 days are also eligible.

81.    I consider two scenarios for the liquidations of Mente's inventory. In Scenario One, the dealership continues normal operations until its inventories approach a constraining amount, then liquidates its remaining inventories at that point. In the Scenario Two, the dealership expedites its shutdown by returning or selling near wholesale all eligible new vehicles. It scales down and eventually returns remaining parts inventories and wholesales remaining used vehicle inventories. In either case, damages equal the net proceeds from liquidated inventories less the actual proceeds received.

82.    To evaluate the first scenario, I reviewed financial data from Mente's Chevrolet and Chrysler stores for the new vehicle department, used vehicle department, and the parts and accessories department. This review included inventory levels, profit margins, and sales volumes (**Tab 29**).

83.    In theory, a dealership returning its new vehicle inventory would be able to select for return models that were least likely to sell profitably and retain only those models that were most likely to attract profitable transactions. Additionally, a dealership would still be able to provide retail financing services to customers. Mente enjoyed significant profit from retail finance through 2007. Collectively, these factors suggest that a dealership could operate a new vehicle department for some period of time that would be able to emphasize the most profitable transactions while avoiding the significant selling expenses and low (or negative) margins associated with slower-moving inventory.

84.    While there is significant factual and theoretical support for the possibility that Mente could have maintained an incrementally profitable new vehicle department for a period of time, certain factors impair the formation of a sufficiently certain conclusion that Mente

*would have* chosen to and would have successfully maintained a new vehicle operation that was significantly more profitable than the immediate return of eligible new vehicle inventory[12]. These factors include the difficulty of operating under GMAC's floor plan constraints, the possibility that Mente may have had constraints in obtaining and negotiating trade-ins on new vehicle purchases, and historical loss patterns in Mente's new dealership department. Therefore, my model operates under the highly conservative assumption that Mente would not have extracted a single dollar of retail profitability during its wind-down period, an assumption that is likely to understate damages.

85.   The aforementioned assumption overrides the need for a calculation based on Scenario One. However, it would not impair, in the short run, Mente's ability to continue its parts and service operations and used vehicle sales operations. Calculation of damages based on Scenario Two is as follows.

86.   For new vehicle liquidation, I assumed that Mente returned eligible vehicles at their net costs. To calculate this approximate net cost, I assumed that "net cost" was equals to 96% of the vehicle's floor plan amount. Damages equal the difference between expected proceeds and actual proceeds **(Tab 30)**.

87.   Damages in the previous tab differ based on the assumption applied to whether the model is of the current model year. In the first case, I relied on publicly available model changeover data. If the 2008 model year began before September 1, 2007, I calculated liquidation damages only on those vehicles in inventory for less than 121 days as of September 1, 2007. The second model assumed that 2007 models are of the current year. Neither approach considered lost proceeds from 2006 or 2005 models. Damages under these scenarios are between $27,677 and $64,993 for new Chevrolet vehicles and

---

[12]I assumed that Mente incurred no damages on the liquidation of new vehicles of the prior model year. This is also likely a conservative assumption as GMAC's delayed the sales of these vehicles, which likely resulted in depreciation versus their contemporaneous values.

between $61,956 and $137,504 for new Chrysler vehicles. Combined losses from new vehicle liquidation are between $89,633 and $202,497.

88.    Mente's used vehicle operation generally secured positive margins and solid incremental profitability. The scatter-plot in **Tab 31** shows a positive and significant relationship between departmental profit and the number of used retail vehicle sales. This is consistent with the fact that Mente enjoyed substantial used vehicle gross profits and positive finance income on the sale of used vehicles.

89.    To account for the possibility that the wind-down of used vehicle operations would have depressed incremental profitability, I employ a highly conservative assumption. Rather than using Mente's recent historical profit margins, I assumed that Mente could dispose of its used vehicle inventory with per-unit profits equal to the dealership's average wholesale profit per vehicle for the January-through-June 2007 period.

90.    This approach is more likely to result in a minimum amount of profit that Mente would have earned, rather than a most likely amount. Mente had a profitable wholesale operation. This reflects both the conditions of the wholesale market and Mente's dealership operations in terms of the prices paid for its used inventory. Inherently, vehicles selected for retail (and not wholesale) were so selected because of their potential to capture higher profits than their wholesale potential. Additionally, Mente still could have earned some retail margins, as well as finance income and other after-market sales.

91.    In order to determine the likely proceeds from the liquidation of the used vehicle inventory, I needed not just the expected margins, but a base value upon which to apply the margins. To accomplish this task I considered three models. One relied on a very conservative factor of the floor plan amount; the other relied on Mente's internal inventory values.

92.     The first model assumes that the floor plan amount due represents the vehicle value. This
        assumption likely understates damages suffered by Mente. Dealership personnel
        informed me that GMAC financed 70-75% of the vehicle's NADA value[13], which
        equated to approximately 80% of the value that Mente assigned to its vehicles. Using the
        floor plan amount as the base value, when this amount actually equals only approximately
        80% of the vehicle's value reduces the calculated amount of proceeds that Mente would
        receive, which in turn, reduces damages **(Tab 32)**. Lost net proceeds under this scenario
        are $120,591 for the used vehicles from the Chevrolet store (not necessarily Chevrolet-
        badged) and $37,045 from the Chrysler store. Combined lost proceeds are $157,636.

93.     The second model is analogous to the first, but replaces floor plan amount with the
        vehicle's base value before internal work on the vehicle. This assumes that the dealership
        enjoys no return from the improvements it has made to the vehicle. Alternatively,
        customers would be equally happy to have the vehicle (at the same price) without the
        improvements as they would with the improvements completed. This approach also is
        extremely conservative and likely reduces calculated damages **(Tab 33)**. Under this
        scenario, Mente's lost net proceeds are $145,561 for used vehicles from Mente Chevrolet
        and $37,175 for used vehicles from Mente Chrysler or $182,736 combined.

94.     The third model is similar to the second but replaces the vehicle's initial value with the
        vehicle's value including internal improvements and the effect of write-downs. This
        would have been the basis upon which Mente would have determined profitability.
        Recall, however, that this model is still quite conservative, as it assumes that vehicles that
        are both favorable to those wholesaled and eligible for retail sale and other profit
        opportunities capture only the margins equal to Mente's wholesales. Nonetheless, this
        model is, among th three, the most likely estimate of lost net proceeds. The tabulation of
        damages in this scenario appears in **Tab 34**. Lost net proceeds under this scenario are

---

[13]NADA (National Auto Dealers Association) provides aggregate and benchmark data on
a number of dealership-level and vehicle-level measures, including used vehicle values.

Page 30 of 34

$190,184 for the used vehicles from the Chevrolet store (not necessarily Chevrolet-badged) and $53,485 from the Chrysler store.  Combined damages are $243,669.

95.     The tables in **Tab 35** provide substantial confirmation for the used vehicle liquidation damage model.  These exhibits show the results of research into contemporaneous used vehicle sale data.  The tabulations confirm the expectations developed in this report.  The delays in the disposal of Mente's used vehicle inventories resulted in loss of value from the aging of those vehicles.  Additionally, the proceeds drawn from those vehicles fall below average benchmark levels.  As depreciation from aging generally occurs at greater rates when a vehicle is newer, it is likely that delay in the liquidation of new vehicles caused analogous harm.

96.     For each of these scenarios (new and used vehicles), I assume an average liquidation date of September 1, 2007.  As GMAC liquidated Mente's inventory after this date, Mente incurred additional floor plan expense after this date.  To calculate these excess charges, I count the number of days between September 1 and the vehicle's actual disposal.  I prorate those days to calculate an interest rate percentage and multiply this percentage by the vehicle's wholesale amount.  The product equals excess floor plan expense **(Tab 36)**.  Excess floor plan costs for new Chevrolet and new Chrysler vehicles are $20,968 and $33,683 respectively for a combined total of $54,651.  For Chevrolet-attributable and Chrysler-attributable used vehicles, excess charges are $17,790 and $5,744, which combined equal $23,534.

97.     Mente also asserts that GMAC prevented the liquidation of its parts inventory.  Like the used vehicle department, Mente operated the parts and accessories department with consistent positive margins and incremental profitability **(Tab 37)**.  Thus, substantial evidence exists that Mente could have continued to extract retail profitability from this department for some period of time.

98.     However, to account for the possibility that wind-down effects would have depressed
        profitability, I assumed that, overall, parts would be liquidated only at their cost. This
        assumption relates to the *average* proceeds on parts inventories. While some parts may
        not be eligible for return to the manufacturer, other parts would still attract positive
        margins. Additionally, parts not eligible for return would not be totally valueless; rather,
        they would just capture lower margins. However, in order continue with my conservative
        approach to damages, I apply a 10% discount to the value of the parts. To determine the
        cost value of the inventory, I apply the lowest month-end parts inventory amount from
        January through June of 2007. The tabulation appears in **Tab 38**. A conservative
        estimation of the likely proceeds from Mente's parts inventories is $99,543 for Chevrolet,
        $83,722 for Chrysler, and a combined value of $183,265.

**Blue Sky Value:**

99.     Counsel for Mente asked me to determine an approximate Blue Sky value that existed for
        the dealership as of July 2007. Blue Sky is akin to franchise value and is equal to the
        amount that a willing buyer would pay to a willing seller under normal conditions in
        order to acquire the benefits that the franchise is likely to afford over time. By late July
        2007, normal conditions did not exist at Mente. However, this does not mean that the
        Mente franchises would not have been beneficial to another buyer; rather, the price Mente
        would have accepted for its franchises would have been lower than what it would have
        accepted under normal conditions.

100.    While several methods exist for estimating Blue Sky values, there are two controlling
        factors that may supercede other resulting values. First, while some Chrysler franchises
        continued to change hands during this time period, many sales of Chrysler Corporation
        franchises were in the context of market representation plans preferred by the
        manufacturer. Accordingly, Blue Sky values would depend heavily on the motivations of
        the buyers. Additionally, Chrysler's overall outlook at this time was tenuous. While it is

possible that Mente's franchise would have been valuable to a certain buyer, I did not assign a Blue Sky value to the Chrysler brands.

101.   The second factor is that on July 31, 2007, Mente entered into a buy-sell agreement with Kutztown Buick, Pontiac, Cadillac, GMC Truck to sell its Chevrolet franchise. While this time period would not represent either normal conditions for Mente or a truly willing seller (Mente was a distressed seller), the purchase price was specifically for the franchise in question and would not overstate the value of Mente's Chevrolet franchise. Thus, I consider this offer to be a valid and necessarily conservative estimate of the Blue Sky value of Mente's Chevrolet franchise. Of note, personnel from Mente have informed me that the proposed purchaser made an earlier offer to Mente (in or near 2006) of $3.5 million.

102.   The offer itself appears in **Tab 39**. The purchase price is $1.25 million but includes provisions for Chevrolet-specific special tools, manuals, equipment, etc. Mente's balance sheet shows that the potential book value of these assets is quite minimal. However, certain tools and equipment may be immediately expensed (not depreciated) and would not appear on the balance sheet. To account for this possibility, I deducted $100,000 from the purchase price for tangible assets. The remaining Blue Sky value is approximately $1.15 million.

## OTHER

103.   This report is a good faith effort to disclose my opinions and bases therefor as of September 22, 2009.

104.   I reserve the right to modify or supplement my opinions based on additional discovery or other information that becomes available to me including deposition or trial testimony; to correct any errors; and to prepare exhibits and visual aids for trial. Additionally, if

witnesses for Defendant create exhibits or offer testimony concerning this report, I may have additional responsive opinions as well as create supporting charts, graphs or tables.

## COMPENSATION

105.   For our work in this matter, The Fontana Group, Inc. is currently being compensated for my time at the rate of $330 per hour plus expenses, which are subject to a 5 percent surcharge.  Rates for other staff members range from $45 to $440 per hour.  Travel time is compensated at one-half the usual rates.  My testimony time is compensated at the rate of $440 per hour.

Executed this 22ⁿᵈ day of September 2009.

_____

Joseph F. Roesner

Roesner Report
Exhibits

Filed With Clerk Due
to ECF File
Restriction