# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MENTE CHEVROLET OLDSMOBILE, INC:
F/K/A MENTE CHEVROLET, INC. t/a
MENTE CHEVROLET

    and

MENTE CHRYSLER DODGE, INC.

    and

DONALD M. MENTE,
                *Plaintiffs,*

    v.

GMAC,
                *Defendant.*

**CIVIL ACTION**

**NO. 08-cv-2403**

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT GMAC'S MOTION FOR SUMMARY JUDGMENT

/s/ Kenneth A. Jacobsen
Kenneth A Jacobsen
**JACOBSEN LAW OFFICES**
PA Attorney I.D. No. 31208
12 Orchard Lane
Wallingford, PA 19086
(610) 566-7930

Joseph A. O'Keefe
**O'KEEFE & SHER, P.C.**
PA Attorney I.D. No. 77068
15019 Kutztown Road
Kutztown, PA 19530
(610) 683-0771

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

ARGUMENT.....................................................................................................................1

I. STANDARDS GOVERNING SUMMARY JUDGMENT..............................1

II. DISPUTED MATERIAL FACTS ARE RAISED BY DEFENDANT'S OWN
MOTION WHICH PRECLUDE SUMMARY JUDGMENT............................2

A. There Are Contested Material Facts on the Ultimate Issue of Default............2

B. There Are Contested Material Facts Regarding GMAC's Rights Under Its
   Security Agreements and Whether Any Such Rights Were Lawfully
   Exercised...............................................................................................7

C. There Are Disputed Material Facts Surrounding the Validity and
   Enforceability of the September 30, 2007 Forbearance Agreement..........15

   1. There Was No Consideration for the Forbearance Agreement................20

   2. There Was No "Free" and "Voluntary" Waiver of Plaintiffs' Rights.....22

   3. GMAC's Conduct in Falsely Declaring Mente "Out of Trust" and
      Perpetuating that Deceit Knowing the True Facts Voids the
      Forbearance Agreement.......................................................................24

   4. The Forbearance Agreement Did Not and Could Not Release Future
      Claims Which Had Not Yet Accrued.....................................................25

   5. GMAC's "Unclean Hands" Bars It from Enforcing the Forbearance
      Agreement..........................................................................................28

III. PLAINTIFFS' SECTION 1983 CLAIMS (COUNT II) CANNOT BE
DISMISSED..................................................................................................29

IV. PLAINTIFFS' CONVERSION CLAIM (COUNT VIII) CANNOT BE
DISMISSED..................................................................................................35

V. PLAINTIFFS' CLAIM FOR INTERFERENCE WITH CONTRACTUAL
RELATIONS (COUNT VI) CANNOT BE DISMISSED.............................40

VI. PLAINTIFFS' BREACH OF CONTRACT CLAIM (COUNT VII)
CANNOT BE DISMISSED...........................................................................41

**VII. PLAINTIFFS' CLAIMS UNDER THE FEDERAL AND STATE "DEALERS DAY IN COURT" STATUTES (COUNTS III AND V) CANNOT BE DISMISSED**.............................................................42

**CONCLUSION**.........................................................................44

The plaintiff Mente dealerships and Donald M. Mente individually (collectively, "Mente" or "plaintiffs"), by and through their undersigned counsel, submit this Memorandum of Law in opposition to defendant GMAC's motion for summary judgment. While GMAC correctly states the standards governing summary judgment, GMAC's entire motion is constructed on highly contested material facts which are inappropriate for summary adjudication but, instead, involve disputed factual issues which must be decided by a jury. Accordingly, for the reasons explained in further detail below, GMAC's motion must be denied in its entirety.

## ARGUMENT

## I. STANDARDS GOVERNING SUMMARY JUDGMENT

It is well settled that, in ruling on a motion for summary judgment and evaluating the evidence submitted by the parties, the Court must "view all inference to be drawn from the underlying facts in the light most favorable to the party opposing the motion." *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). As explained further by our Court of Appeals in *Sciavone Const. Co. v. Time, Inc.*, 847 F.2d 1069, 1091 (3d Cir. 1988), quoting the Supreme Court's decision in *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986):

> "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions....The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial."

Measured against these and the other standards governing summary judgment, GMAC's

motion must be denied.

## II. DISPUTED MATERIAL FACTS ARE RAISED BY DEFENDANT'S OWN MOTION WHICH PRECLUDE SUMMARY JUDGMENT

### A. There Are Contested Material Facts On The Ultimate Issue Of Default

GMAC's entire motion is constructed on the foundation of ***the*** core disputed

factual issue in this case: whether Mente was "out of trust" when GMAC descended upon

the Mente dealerships on July 19, 2007 and seized all of Mente's vehicles, keys, titles,

accounts and other property, thereby undermining Mente's franchise agreements with

General Motors Corporation ("GM") and DaimlerChrysler Motors Company

"Chrysler").[1] As observed by Judge Yohn in *Krajewski v. American Honda Finance*

*Corp.*, 557 F. Supp.2d 596 (E.D. Pa. 2008) (denying summary judgment), a case cited by

GMAC in its own moving papers:

> "[W]hether plaintiff was in default according to the terms of the contract is an
> issue for the jury to decide. Whether AHFC had the authority to repossess the
> car—i.e., whether plaintiff had, in fact defaulted—logically precedes the issue
> whether AHFC's disposition of the car was commercially reasonable."

*Id.* at 606. And that same core disputed factual issue dooms GMAC's motion here.

GMAC's entire motion is grounded on its alleged "right" to exercise "self help" on July

19, 2007 and thereafter under various security agreements which it had with Mente, and

under Section 9609(b)(2) of the Pennsylvania Uniform Commercial Code, 13 Pa. C.S.A.

---

[1] Both GM and Chrysler terminated their dealer contracts with Mente Chevrolet and Mente Chrysler, respectively, when the Mente dealerships failed to maintain continuous operations for seven days as required by those dealer contracts after GMAC initiated the actions which shut the dealers down on July 27, 2007. *See* Supplemental Declaration of Kenneth A. Jacobsen in Opposition to Defendant GMAC's Motion for Summary Judgment ("Supp. Jacobsen Dec.") Ex. A, B, GM and Chrysler termination letters to the Mente dealerships.

§ 9609(b)(2).[2] But those contractual and statutory provisions have one critical thing in common—they both require a "default" ***before any*** purported contractual or statutory right to "self-help" may be invoked. Just because GMAC wrongfully declared a default does not mean that one existed. Indeed, that is one reason why GMAC was required to follow Pennsylvania's replevin Rules and procedures in the first place—to obtain a judicial determination of the "probable validity" of GMAC's claim of default and resulting right to possession of Mente's property ***before*** GMAC seized those assets and put Mente out of business. *See Ford Motor Credit Co. v. Northern Assoc.*, 2007 U.S. DIST. 6819 (M.D. Pa., Jan. 31, 2007). *See also GMAC LLC v. Gustman Chevrolet-Olds-Cadillac,* 2009 U.S. Dist. LEXIS 46514, at *11 (E.D. Wisc., June 3, 2009) (denying GMAC's motion for preliminary injunction in a formal replevin action (something GMAC did *not* file here), noting that the immediate seizure of vehicles at the dealership "will close the dealership and put roughly forty people out of work" (something GMAC *did* do to Mente here)). And make no mistake about it, the property seized by GMAC ***was Mente's property***, not GMAC's. That GMAC may have had a security interest in it did not give GMAC any ownership rights or, conversely, divest Mente of its ownership interest and right to lawful possession of its own assets.

If there was no default, then GMAC's self-help remedies, whether contractual or statutorily based, were not only improper, they were unlawful. The only "default" ever declared by GMAC on July 19, 2007 or at any time thereafter was Mente's alleged failure to "promptly" pay GMAC for vehicles sold by Mente which were floor-planned by

---

[2] *See* GMAC's Memorandum of Law ("Mem.") pgs 10-11. For reasons discussed later in this Memorandum, the enforceability and outright validity of those contractual and statutory provisions are hotly contested under the facts of this case.

GMAC.[3] GMAC has repeatedly stated that it "discovered" this alleged "out of trust"

situation during its July 19, 2007 audit.[4]  But GMAC can't even get the facts of its own

alleged "out of trust" claim straight. At first, GMAC claimed that 14 vehicles had been

sold "out of trust."[5] But in a Default Notification Report issued the day after the audit,

GMAC Portfolio Manager Paul O'Neill ("O'Neill"), the GMAC representative

responsible for the Mente dealerships, reported to his superiors that only 11 sold vehicles

were "outside of [the] release period" (*i.e.*, "out of trust").[6] Still other GMAC reports,

including the one attached to GMAC's present motion, inexplicably raised that number to

19 vehicles. Indeed, GMAC's own confusion was so complete that, in its letters to Mente

on July 25, 2007 declaring the default (six days *after* it had seized Mente's assets),

GMAC gave up entirely and referred generally to "certain" motor vehicles for which

Mente purportedly had "fail[ed] to promptly pay" the amounts due.[7] Similarly, in its

verified Answers to plaintiffs' Interrogatories in this case, when asked specifically about

the *details* of the alleged "out of trust" situation on July 19, 2007, GMAC responded

---

[3] *See* Motion of Defendant, GMAC, for Summary Judgment ¶ 29. *See also* Plaintiffs' Statement of Undisputed Material facts in Support of their Motion for Partial Summary Judgment and for Declaratory Judgment filed September 28, 2009 ("Plaintiffs' Statement") ¶¶ 34-38; Declaration of Kenneth A. Jacobsen in Support of Plaintiffs' Motion for Partial Summary Judgment and for Declaratory Judgment filed September 28, 2009 ("Jacobsen Dec.") Ex. 6, 15 and 18. To avoid undue burden and volume of paper, Plaintiffs' Statement and the Jacobsen Dec. are instead incorporated herein fully by reference since they squarely address many of the issues and evidence raised in GMAC's own present motion for summary judgment.
[4] It is undisputed that GMAC never declared any default under Mente's Line of Credit Agreement with GMAC, nor could there be, since Mente was current on all payments and GMAC would have had to give Mente 90 days advance notice before terminating those credit lines and demanding immediate payment. *See* Supp. Jacobsen Dec. Ex. C, D and E.
[5] Supp. Jacobsen Dec. Ex. F.
[6] *See* Plaintiffs' Statement ¶ 27; Jacobsen Dec. Ex. 14.
[7] *See* Plaintiffs' Statement ¶¶ 31, 34, 35; Jacobsen Dec. Ex. 15, 16 and 17.

equally generally that "Mente Chevrolet did not promptly pay the principal amount financed by GMAC for **certain** motor vehicles which the dealership had sold."[8]

A similar "moving target" was the *amount* which GMAC claimed that Mente owed on July 19th for these alleged "out of trust" vehicles. The original audit sheets list that amount as $ 242,240.22.[9] O'Neill's Default Report lists that amount as $ 213,417.00.[10] Other contemporaneous documents list the figure at $ 297,319.47.[11] And GMAC's calculation for the 19 vehicles attached to its motion papers bumps that number up almost 50% from O'Neill's Report to $ 317,941.20. This is critical because, as discovery has confirmed and as the evidence at trial will unequivocally demonstrate, Mente had ample funds to pay of any alleged "out of trust" situation once his controller Donna M. Johnson ("Johnson") returned to the dealerships the next day, but GMAC kept moving the numbers around and refused payment in any event.[12]

But one thing is certain. Mente has consistently and vigorously *denied* that any alleged "out of trust" situation on July 19, 2007, and has come forward with compelling evidence which overwhelmingly rebuts GMAC's contention and further demonstrates that GMAC's unannounced siege of the dealerships was a premeditated subterfuge to close those businesses down.[13] That evidence includes not only Mr. Mente's own sworn testimony and that of his controller Johnson, and written communications sent by Mente

---

[8] *See* Plaintiffs' Statement ¶ 36; Jacobsen Dec. Ex. 6, GMAC Answers to Interrogatories Nos. 2, 3, 4, 5 (emphasis added). GMAC attached to these Answers a so-called "audit report" listing an astonishing *250 vehicles* and (confusing matters even further) noting generally 17 "irregularities" (as sales of "out of trust" vehicles are called by GMAC) but without specifically identifying, as expressly requested in plaintiffs' Interrogatories, any of the "out of trust" vehicles or explaining how or why they were in default. *See* Supp. Jacobsen Dec. Ex. G.
[9] Supp. Jacobsen Dec. Ex. F.
[10] Plaintiffs' Statement ¶ 28; Jacobsen Dec. Ex. 14.
[11] Supp. Jacobsen Dec. Ex. H.
[12] *See* Plaintiffs' Statement ¶ 49.
[13] Indeed, Mente bitterly protested GMAC's occupation of his premises, and demanded that they leave his dealerships and allow him to resume normal operations. GMAC refused. *See* Plaintiffs' Statement ¶¶ 51-52; Jacobsen Dec. Ex. 18.

(through his attorney) to GMAC after GMAC's occupation of the dealerships in July 2007,[14] but also the expert report of Carl Woodward, CPA, who reviewed Mente's records and concludes unequivocally that Mente Chevrolet was not "out of trust" on July 19, 2007.[15] Indeed, Christopher S. Carey ("Carey"), GMAC's Portfolio Manager who handled the Mente account until just days before GMAC's siege on July 19th, and who had personally overseen audits of those dealerships earlier that same year, himself candidly acknowledged that he would not have been surprised if "payment delays" *were* observed during the July 19, 2007 audit:

> "Q: So if there were any payment delays in July of 2007 during the audit, that would not have been any surprise to GMAC, correct?
>
> A: I don't think it would have been a surprise, no.
>
> Q: In fact, prior audits of Mente you are aware had shown payment delays for the wholesale floorplan financing, right?
>
> A: To my recollection, I believe there were delays on prior audits, yes."[16]

According to Carey, prior "payment delays" were caused by Mente's reliance on third parties to finance most sales transactions—a practice and "extenuating circumstance" which GMAC had accepted for decades at the Mente dealerships:[17]

> "Q: Why was it of interest to GMAC what the funding source was?
>
> A: Well, that would basically be to see if there were extenuating circumstances which could have caused the delay. Whereas if it says cash deal, then there's no extenuating circumstances. If the customer came in and paid cash for the vehicle, the dealership should be able to pay that vehicle immediately.

---

[14] *See* Plaintiffs' Statement ¶ 49; Supp. Jacobsen Dec. Ex. I, J (explicitly contesting "out of trust" and alleged default while dealing with GMAC's counsel).

[15] *See* September 21, 2007 Expert Report of Carl Woodward, Woodward & Associates, Inc., filed with the Court by plaintiffs on September 28, 2009, p. 3.

[16] Supp. Jacobsen Dec. Ex. K, excerpts from Carey deposition, pgs. 86-87.

[17] Car buyers often finance their purchases through third party lenders over which neither Mente nor any other dealer has any control. Complicating and delaying the payment process further, those buyers often trade in old vehicles, and loans on those trades must also be paid off before the sales transaction and full funding of the new car deal can be completed.

Q: But of the vehicle is being funded, as we talked about before, the vehicle was being funded by a third party source where the dealership wouldn't get [promptly] paid, that would be an extenuating circumstance, right?

A: It would be a consideration and have to do with the dealer's cash flow....

Q: That would also be a factor in when the dealer might be in a position to pay GMAC for the floorplanning of that vehicle, you would agree with that, right?

A: Yes, that would affect their cash flow.

Q: And their ability to repay the floorplan for that vehicle?

A: Yes, promptly, yes.[18]

The simple fact is, GMAC "discovered" nothing on July 19, 2007; there were **no** payment delays and Mente was not "out of trust." And since that is a disputed factual issue—not just a "material" one but the ultimate contested issue in this case—summary judgment on GMAC's alleged right to self help cannot be granted. GMAC had no right to do *anything*—either under its security agreements with Mente or under Section 9609(b)(2) of the UCC—unless there was a "default." *See Krajewski, supra*. The overwhelming evidence of record on GMAC's motion, far from establishing that critical fact which bears squarely on the legality of everything that GMAC did on and after July 19, 2007, proves just the opposite.

### B. There Are Contested Material Facts Regarding GMAC's Rights Under Its Security Agreements And Whether Any Such Rights Were Lawfully Exercised

While GMAC attaches various security agreements to its motion, only two in particular are germane—the Wholesale Security Agreement dated June 11, 1982 (the "WSA"), and the General Security Agreement dated simply "March 2007" (the "GSA"). The October 29, 1999 Revolving Line of Credit Agreement (the "RLCA") does not come

---

[18] Supp. Jacobsen Dec. Ex. K, Carey transcript, pgs. 63-64.

into play because GMAC never declared Mente in default under that agreement; the only default declared by GMAC was Mente's alleged failure to "promptly pay" for "certain" vehicles floor-planned by GMAC under the WSA.[19] But that RLCA is relevant to GMAC's motion in another way, discussed below.

True, the WSA purports to give GMAC the right to repossess the vehicles "without demand or further notice and without legal process." But that agreement, on its face, applies only to the specific "vehicles" which were floor-planned by GMAC and to no other property of Mente. The WSA gave GMAC no security interest in any other property other than those specific GMAC-financed vehicles. And as demonstrated above, GMAC's "right" to self help existed, if at all, only if there had been a "default" by Mente. The *sine qua non* of GMAC's purported "right" to self help is the existence of a "default." On the present record, the compelling and overwhelming evidence is that there was no such "default" on July 19, 2007, so the propriety of GMAC's conduct in exercising its so-called "right" of "self help" cannot even be assessed until that critical "default" determination is made by the jury. If the jury finds that there was no "default" (*i.e.*, no uncured "out of trust" situation), then GMAC had no right to do *anything* to the Mente dealerships, let alone seize property and take other measures that shuttered them forever.

The RLCA, too, admittedly purports to give GMAC the right to take "immediate possession of Collateral without demand or further notice and without legal process." But as also demonstrated above, there was no default by Mente under the RLCA. None is

---

[19] *See* p. 4 & n. 3 *supra*. *See also* Jacobsen Dec. Ex. 6, GMAC Answer to plaintiffs' Interrogatory No. 5 (in response to plaintiffs' specific and detailed inquiries about whether Mente was in default under its line of credit with GMAC, GMAC acknowledges no independent default and only identifies alleged default created by alleged "out of trust" situation purportedly "discovered" by GMAC during July 19, 2007 audit).

identified in GMAC's discovery responses (despite plaintiffs' detailed Interrogatories addressed to that specific issue), and GMAC's July 25, 2007 default letters state only that the "dealership is in default of its obligations to GMAC by failing to promptly pay the principal amount owed to GMAC for certain motor vehicles which the dealership has sold."[20] There is no mention anywhere of any default under the RLCA. And as with the WSA, any purported "right" to "self help" under the RLCA arises only if there has been a "default," which compelling evidence demonstrates never happened.

More to the point, when GMAC expanded the collateral subject to its security interest in March 2007 in the GSA to include cash, accounts, inventory and a whole laundry list of other property seized from Mente by GMAC under the "self help" authority purportedly conferred by that GSA, it made several critical changes to that agreement which eliminated any alleged "right" to act in the unilateral manner that it did. First and foremost, GMAC deliberately ***deleted*** the express provision which purported to confer on GMAC the right to take possession of that collateral ***"without legal process."*** Unlike the WSA (limited by its terms specifically to particular floor-planned vehicles) and the RLCA (inapplicable in any event), GMAC intentionally ***eliminated*** that previously delineated "right" from the GSA. By deliberately taking the "without legal process" language out of the GSA, GMAC forfeited its "right" to proceed other than through a formal replevin action with all of the attendant procedural protections to which Mente was entitled (including a judicial determination of the "probable validity" of GMAC's claim, the posting of a bond, and other protections). GMAC's exercise of self

---

[20] *See* Jacobsen Dec. Ex. 15, 16, 17. Those default letters go on to state that Mente purportedly had "failed to cure this default"—a patently false statement given the funds available to the dealerships on July 20, 2007 and other sources of capital which GMAC refused to accept. *See* Plaintiffs' Statement ¶ 49 and Expert Reports of Joseph F. Roesner, MBA, CMA and Carl Woodward, CPA. *See also* Plaintiffs' Statement ¶¶ 41-46; Jacobsen Dec. Ex. 19, 20, 21 and 22.

help not only was not authorized by the GSA, but by having knowingly ***deleted that language from the GSA***, GMAC violated that agreement by acting unilaterally in contravention of it.[21] Mente never consented to repossession or seizure of his property "without legal process," and by deleting that language from its own security agreement, neither did GMAC.

In a similar vein, GMAC deleted the language from the GSA which purported to allow it to exercise self help and repossess collateral "without demand or further notice." That language appears in the WSA and the RLCA, but GMAC took it out of the GSA completely.[22] Accordingly, under the terms of its own agreement, GMAC was contractually obligated under the GSA to make a formal written "demand" on Mente ***before*** it seized Mente's assets. GMAC also was required to give Mente advance written "notice" of default ***before*** seizing and disposing of any of Mente's property. Indeed, the GSA, like the UCC, explicitly required that such written notice be given "at least ten days before the scheduled disposition of any of the Collateral…addressed to the Dealer at the address shown above." *Accord* 13 Pa. C.S.A. § 9612(b) advance written notification period for disposition of collateral in non-consumer transaction is 10 days).

GMAC did none of this. Instead, GMAC seized Mente's Open Accounts with GM and Chrysler immediately ***on July 19, 2007***, diverting to itself and converting Mente's funds in those accounts. GMAC also immediately seized the keys, titles, Manufacturers' Certificates of Origin ("MCOs"), negotiable contracts and certified checks from all

---

[21] GMAC can find no refuge in the general language of the GSA which purports to give it "the remedies of a secured party under the Uniform Commercial Code." That loose, general language is no substitute for the specific express language which GMAC itself ***deleted from the GSA***. Mente certainly never agreed in the GSA that GMAC could seize Mente's assets "without legal process." And by taking that language out of the GSA, neither did GMAC.

[22] The only "demand" provision that appears in the GSA relates solely to Mente's obligation to segregate and account for collateral upon request by GMAC (similar to identical provisions which appear in the WSA and RLCA), ***not*** to any right to repossess any collateral.

vehicles sales transactions that took place on July 19, 2007 and thereafter. GMAC also immediately placed "keepers" at the dealerships to oversee their operations, and hired armed security guards to ensure GMAC's control over the facilities. It was not until July 25, 2007—six days *after* GMAC had appropriated Mente's assets and taken over the stores—that GMAC sent a letter declaring a default and demanding possession of all collateral and proceeds that it *already had seized a week earlier*, and suspending credit lines *that GMAC already had cut off on July 19th*. That was a clear violation of the GSA.

The GSA did not confer on GMAC the rights that GMAC insists it had on July 19th. Nowhere within the "four corners" of the GSA did Mente ever waive its right to notice, demand or "legal process". The courts view any such waiver of the debtor's rights with extreme suspicion and skepticism, and interpret and construe the underlying documents with strict scrutiny against the creditor. And for good reason. As the Pennsylvania Superior Court stated in *Jackson v. Richards 5 & 10, Inc.*, 289 Pa. Super. 445 (Pa. Super. 1981):

> "**[F]orfeitures meet with great disfavor both at law and in equity**. As the court said in *Penn-Ohio Gas Co. v. Franks' Heirs*, 322 Pa. 233, 185 A. 280 (1936), '[t]he general rule is that equity abhors a forfeiture. An agreement providing therefore must be strictly construed where a loss will be incurred which is contrary to equity.' *Id.*, 322 Pa. at 237, 185 A. at 282. Furthermore, "[a]lthough a forfeiture may be sustained in equity in some circumstances, equity should scrutinize the transaction to assure that all of the rights of the party from whom forfeiture is sought have been protected. [Citations omitted.]"  Barraclough v. Atlantic Refining Co., 230 Pa.Super. 276, 281, 326 A.2d 477, 479 (1974)."

*Id.* at 452 (emphasis added). Based on this judicial skepticism, Pennsylvania law will not presume an intent of the parties to perpetuate a provision allowing unilateral seizure and forfeiture of property without judicial process in a later, modified document which lacks such an explicit provision. *See Solazo v. Boyle*, 76 A.2d 179, 180 (Pa. 1950).

Even in situations involving signed confessions of judgment, where the debtors

retain the procedural right to strike or open the judgment, *see Thomas Assoc. v. GPI Ltd.*,

711 A.2d 506 (Pa. Super. 1998), the inclusion of forfeiture provisions in a "body of

contract" amid a "mass of fine type verbiage" does not "of itself make it part of the

contract." *Jordan v. Fox Rothschild O'Brien & Frankel*, 20 F.3d 1250, 1275 (3d Cir.

1994), *quoting* in *Cutler Corp. v. Latshaw*, 97 A.2d 234, 236 (Pa. 1953). The

Pennsylvania Supreme Court in *Cutler* harshly criticized the practice decades ago in

colorful terms as follows:

> "A warrant of attorney authorizing judgment is perhaps the most powerful
> and drastic document known to civil law. The signer deprives himself of
> every defense and every delay of execution, he waives exemption of
> personal property from levy and sale under the exemption laws, he places
> his cause in the hands of a hostile defender. The signing of a warrant of
> attorney is equivalent to a warrior of old entering a combat by discarding
> his shield and breaking his sword. *For that reason the law jealously
> insists on proof that this helplessness and impoverishment was
> voluntarily accepted and consciously assumed*."

*Id.* at 236 (emphasis added). GMAC cannot avail itself of any "self help" under the GSA

**because GMAC itself deleted that purported right from its own document**. Nor can

GMAC credibly argue that such a right was "implied" in the GSA or incorporated

through the general reference in the GSA to GMAC's "remedies" under the UCC. *See*

*Solazo, supra*. The UCC contains dozens of provisions which authorize a creditor to

enforce a security interest (again, only after a "default") through a "judicial procedure."[23]

Indeed, Section 9609 itself, upon which GMAC relies as authority for its actions,

expressly permits a creditor to protect its security interests and seize collateral after a

default "pursuant to judicial process." § 9609(b)(1). Sure, the GSA may have explicitly

---

[23] *See, e.g.*, 13 Pa.C.S.A. § 9601(a)(1).

granted GMAC the right to take possession of the collateral, and even to enter the Mente

dealerships to do so, but only if Mente was in "default," **and then only after formal**

**written notice, demand and pursuant to "legal process,"** since GMAC itself took all

other "self help" remedies out of that agreement. *See  Nelson Co. v. Counsel for the*

*Official Committee of Unsecured Creditors,* 959 F.2d 1260 (3d Cir. 1992), *citing Rusiski*

*v. Pribonic*, 515 A.2d 507, 510 (Pa. 1986) (under Pennsylvania law, any "doubtful

language is construed most strongly against the drafter.")

　　　Here, it is not even a close call. There is a complete absence in the GSA of any

explicit waiver by Mente of its right to "legal process" before GMAC could declare a

default on July 19th and seize his property. Pennsylvania requires a much clearer

manifestation of consent in forfeiture situations than it does to sustain a contract

provisions in other contexts.  *See Scott v. 1523 Walnut Corp.,* 447 A.2d 951, 956 (Pa.

Super. 1982), *citing Egyptian Sands Real Estate, Inc. v. Polony*, 294 A.2d 799 (Pa. Super.

1972).

　　　Nor can this Court find as a matter of law that there was no "breach of the peace"

by GMAC as explicitly required by Section 9609(b)(2) as a prerequisite for any

legitimate exercise of self help under that statute "without judicial process." On July 19,

2007, GMAC: 1) entered the Mente dealerships, confiscating all titles, MCOs and keys

for all vehicles on the lots (including $114,000 of used vehicles that Mente had not floor-

planned with GMAC and which Mente owned outright; 2) appropriated all monies due

Mente under its Open Accounts with GM and Chrysler; and 3) converted all monies due

Mente by GMAC itself. Mente never consented to these actions. To the contrary, Mente

demanded in writing not only that GMAC immediately return all of the property that

GMAC had seized beginning on July 19th, but also that the "keepers" which GMAC had physically placed at the dealerships to control their operations immediately vacate the premises so that Mente could resume normal business operations.[24] GMAC refused to withdraw its "keepers" or the armed security purportedly hired to "protect its collateral."[25]  Upon that written demand by Mente, GMAC was required to immediately leave the dealerships and pursue proper legal process.  Mente was not required to break out guns or start a fistfight—Mente's lack of consent and demand that GMAC leave was enough:

> "Section 679.609 does not specifically define a 'breach of the peace'; however, the Uniform Commercial Code Comment following the section states:
>
> [T]his section does not define or explain the conduct that will constitute a breach of the peace, leaving that matter for continuing development by the courts. In considering whether a secured party has engaged in a breach of the peace, however, courts should hold the secured party responsible for the actions of others taken on the secured party's behalf, including independent contractors engaged by the secured party to take possession of collateral.
>
> ....The test to determine whether a breach of the peace has occurred is whether there was entry by the creditor upon the debtor's premises; and whether the debtor or one acting on his behalf consented to the entry and possession....**Consent must be freely given to enter the property of a debtor in order to repossess; the debtor may revoke the right to self-help repossession by objecting to the repossession.** *Seibel v. Society Lease, Inc.*, 969 F. Supp. 713, 718 (M.D. Fla. 1997) (citing *Quest*, 397 So. 2d at 1023).  **Entry after consent has been revoked is a breach of the peace.** *Id.*

*In Re: The 53 Foot Trawler Pegasus*, 2008 U.S. Dist. LEXIS 96332, *13 (M.D. Fla., Nov. 18, 2008) (emphasis added) (citations omitted). *See also MacLeod v. C & G Investment Group*, 118 B.R. 1 (Bkrptcy, D.N.H. 1990) (repossession under self help

---

[24] *See* Plaintiffs' Statement ¶¶ 51-53; Jacobsen Dec. Ex. 18.
[25] *Id.*

provisions of UCC "was unlawful because the plaintiffs in no way *consented* to the repossession") (emphasis in original) (citations omitted). There does not have to be actual physical confrontation before a "breach of the peace" occurs. *See Jackson v. Richards 5 & 10 Inc.*, 433 A.2d 888, 895 (Pa. Super. 1981). Mente's demand that GMAC leave, and GMAC's refusal to do so (with keepers and armed security on premises), constituted a constructive, if not actual, "breach of the peace" expressly prohibited by Section 9609(b)(2). *Id.*; *53 Foot Trawler, supra*.[26] On the face of Section 9609(b)(2) itself, GMAC was obligated to pursue "judicial process" when Mente objected to GMAC's occupation of its dealerships and seizure of its property. Far from establishing that GMAC is entitled to judgment as a matter of law in exercising its self-described "right" to "self help" under these security agreements and Section 9609(b)(2), they do just the opposite.

### C. There Are Disputed Material Facts Surrounding the Validity and Enforceability of the September 30, 2007 Forbearance Agreement

Not surprisingly, GMAC glosses over and, in some instances, avoids outright any discussion of the circumstances surrounding the execution of the Forbearance Agreement more than three months *after* GMAC had seized Mente's assets and closed the dealerships. That is because those troublesome facts call squarely into question the validity and enforceability of that agreement, and preclude summary judgment based on that document. Those facts follow.

When the Mente dealerships sold a vehicle, they also often would sell certain additional products or services as part of that sales transaction. Examples of those "add-

---

[26] GMAC's defiant encampment at the Mente properties and assumption of control over the dealers' operations constituted both criminal and civil trespass. *See* 18 Pa.C.S.A. § 3503; *Kuriger v. Cramer*, 498 A.2d 1331, 1337-38 (Pa. Super. 1985) (landlord's use of "self help" rather than legal process to evict tenant constituted trespass).

ons" were gap insurance,[27] life insurance,[28] accident and health insurance,[29] service

contracts[30] and similar products.[31] These "add-ons" were sold by Mente on behalf of third

parties who actually underwrote those extra products and services. Mente collected the

premiums and fees for these products, which the dealerships were then required to turn

over to those third parties (retaining a portion for Mente's own administrative costs and

small profit). If a car buyer cancelled a contract within the permissible period, or paid off

the car earlier than expected and no longer needed the insurance coverage securing the

car loan, Mente also was required to return those partial premiums to that purchaser. It is

a crime not to pay the premiums to the third parties who underwrote those "add on"

services. It also is a crime not to return any unused premiums to the car buyers. *See,

e.g.,* 18 Pa.C.S.A. §§ 3927,[32] 3921.[33] Automobile dealers, including some in the same

geographic area as the Mente dealerships, have been criminally prosecuted for not

making these payments. *See Commonwealth v. Coley,* CR-0000340-09 (Chester Co. Ct.

Common Pleas).[34]

      At the time of the sale of a vehicle, Mente also collected Pennsylvania sales tax

for each transaction and state license and registration fees. Those taxes and fees were

required to be remitted by Mente directly to the Commonwealth. It is a crime for a dealer

---

[27] "Gap Insurance" covers additional losses beyond existing coverage in the event the vehicle is damaged or destroyed in an accident before all financing obligations are paid off.
[28] This coverage pays off the car loan in the event of the death of the buyer/borrower.
[29] This coverage pays off the car loan in the event the buyer/borrower becomes disabled.
[30] These cover repairs not covered by existing warranties.
[31] *See* Complaint ¶¶ 68-84.
[32] "Theft by Failure to Make Required Disposition of Funds Received."
[33] "Theft by Unlawful Taking or Disposition."
[34] Supp. Jacobsen Dec. Ex. L, Docket Sheet in *Coley. See also Commonwealth* v. *Schorpp,* TR-0001504-08 (Cumberland Co. Ct. Common Pleas), Supp. Jacobsen Dec. Ex. M, Docket Sheet. This Court can take judicial notice of these public records.

like Mente not to pay those funds in a timely manner to the Commonwealth as well. *See* 18 Pa.C.S.A. § 4113[35] and notes 32 and 33 *supra*.

When GMAC seized Mente's dealerships and all assets on July 19th, GMAC confiscated not only premiums that Mente owed to the "add on" underwriters and refunds due to consumers, but also sales tax and license and registration fees owed directly to the Commonwealth of Pennsylvania. This exposed the Mente dealerships—and Mr. Mente personally—to criminal prosecution.

From the very first day that GMAC occupied the dealerships and diverted the dealers' funds and proceeds, Mente implored GMAC to release these monies and taxes owed to the Commonwealth and to these third parties. Mente estimated the aggregate amount of these outstanding obligations at approximately $ 110,000. Within days of GMAC's seizure, on July 31, 2007, Mente's attorney wrote to GMAC's counsel:

> "I note on this point that GMAC holds monies for goods and services which customers have paid for and to which funds to 3rd parties have not been remitted. As GMAC has sole control of those contracts, and of the sales operations at that time…all legal consequences thereof—including criminal penalties—shall be GMAC's…."[36]

GMAC strung Mente along for weeks, never paying those so-called "must pays" or, in the colloquialism of Mente's counsel, "stuff that gets people arrested." Things got so desperate for Mente that, on August 17, 2007, Mente's attorney took the extraordinary step of self-reporting these non-payments to the Attorney General's Office of the Commonwealth of Pennsylvania in order to avoid criminal prosecution.[37] But that voluntary effort only triggered even greater scrutiny by the Attorney General, including direct inquiries to GMAC's counsel about the seizure of these funds, and the details of

---

[35] "Misapplication of Entrusted Property and Property of Government or Financial Institutions."
[36] Supp. Jacobsen Dec. Ex. Ex. J, p. 3, July 31, 2007 e-mail from Mente's counsel to GMAC's counsel.
[37] *Id.* Ex. N.

the sales transactions for the vehicles which GMAC had deemed on July 19th to be "out of trust."[38] But that did not relieve the pressure from Mente or absolve it of ultimately responsibility (criminal and otherwise) for these payments—monies that GMAC continued to withhold from Mente. With time running out, and while GMAC continued to dicker about the exact amount owed, Mente controller Johnson cashed in her own personal life insurance policies in order to repay consumers who were entitled to refunds.[39] But the Mente dealerships still owed more, much more, and Mente's attorney continued to implore GMAC to free up these funds and take the "boot off [Mente's] neck." [40] In that same September 11, 2007 e-mail from Mente's counsel, Mente again underscored the urgency of these "must pays" and the immediate need to refund all amounts owed to consumers and to the Commonwealth as well as the need to update the Attorney General's Office about the disposition of these funds.[41] And the Attorney General's investigation was heating up. On September 26, 2007, Mente was served with a subpoena from the Attorney General's office which bore the ominous caption: "*Commonwealth v. Mente Chevrolet Oldsmobile, Inc., Mente Chrysler Dodge, Inc. and Mente Chrysler Dodge Jeep, Inc.*"[42] Like the request to GMAC a month earlier on August 23, 2007, the subpoena to the Mente dealerships sought production of voluminous documents relating to the alleged "out of trust" vehicles, Mente's Open Accounts with GM and Chrysler seized by GMAC, and other information. The Attorney General's

---

[38] *Id.* Ex. O.
[39] See *id.* Ex. P, p. 3.
[40] *Id.* Ex. Q.
[41] *Id. See also id.* Ex. P, September 20, 2007 e-mail from Mente's counsel to GMAC's counsel attaching various criminal statutes under which Mente could be prosecuted and again imploring GMAC to release third party funds that it had unlawfully confiscated.
[42] *Id.* Ex. R, Attorney General subpoena to Mente.

Office sent GMAC sent a copy of that subpoena as well.[43] It was only then that GMAC

agreed to advance Mente $ 59,000 so that Mente could repay this "stuff that gets people

arrested."[44] And that threat of arrest and prosecution was real and immediate. As Mr.

Mente testified at his deposition, in response to questions from GMAC's counsel seeking

to downplay the duress calculatingly exercised by GMAC:

> "Q: Did anybody ever threaten you with bodily harm to get you to sign
>      this agreement?
>
> A: Bodily harm, no. but going to jail is pretty much a good
>      inducement."[45]

Mr. Mente went on to testify, as did his controller Johnson, that the sole reason that they

signed GMAC's so-called Forbearance Agreement was because of the imminent threat of

criminal prosecution and possible incarceration, and that their signatures were coerced

and involuntary:

> -"If, in fact, I didn't [sign the agreement] I could have been criminally
>      prosecuted and go to jail for what money that [GMAC] took that
>      didn't belong to me or them"
>
> -"Because if I didn't sign it, there was a good possibility I was going to be
>      prosecuted and going to jail."
>
> -"[The State Attorney General] said well, somebody is going to have to
>      pay these must pays. And if you don't, you could very well be
>      criminally prosecuted for this."
>
> -"[I]f I wouldn't have done this, we wouldn't have gotten the money to do
>      what we needed to do to keep us out of jail."
>
> -"And if we didn't pay, we could be criminally prosecuted. That's why I
>      signed this."
>
> -"[I]t was to the point where we could go to jail and I wasn't going to deal
>      with that...."

---

[43] *Id.* Ex. S, e-mail from GMAC's counsel confirming earlier receipt of subpoena.
[44] Id. Ex. T, Mente letter to Attorney General.
[45] *Id.* Ex. U, excerpts from Mr. Mente's deposition, p. 33.

-"Those are things we call must-pays. If, in fact, I didn't do that, I could have been criminally prosecuted and sent to jail for what money that they took and didn't belong to me or them…."

-"That was the only reason I signed this (indicating [the Forbearance Agreement] was to keep my butt out of jail and to make sure that my customers got what they were promised they were going to get. That's really why I signed this."

-"[W]e needed the money that was tied in with this in order to pay items that needed to be paid or we could potentially go to jail for not having paid them."[46]

It is against this factual backdrop—utterly missing from GMAC's moving papers, deliberately concealed by GMAC for obvious reasons—that the validity and enforceability of the Forbearance Agreement in this case must be evaluated. The duress here is even more pronounced than the threats and outright lies employed by GMAC to obtain a similar "forbearance agreement" from the dealer in *Giles v. GMAC*, 494 F.3d 865, 870 (9th Cir. 2007) (reversing summary judgment for GMAC). But the outcome should be the same—the denial of GMAC's motion for summary judgment.

### 1. There Was No Consideration for the Forbearance Agreement

Significantly for purposes of GMAC's motion, the Forbearance Agreement here was signed on September 30, 2007—three months *after* GMAC already had seized and destroyed Mente's dealerships. As with GMAC's so-called right to "self help" in the first place, the validity of that agreement must be tested against whether there was any "default" at all. If there was no default, then the Forbearance Agreement must fail as a matter of law. As Mr. Mente correctly testified during his deposition:

"Q: So you would agree if [the Forbearance Agreement] were to be binding on you that you would have waived your right to bring this lawsuit?

---

[46] Id. pgs. 32-42. *See also* Supp. Jacobsen Dec. Ex. V, excerpts from Johnson deposition, pgs. 108, 110-12.

> A: No. And I'll tell you why, you know, had it not been for the drastic measures they took on the 19th of July that year, none of this would have ever happened."[47]

This alone defeats GMAC's motion for summary judgment under the Forbearance Agreement, since the existence *vel non* of a "default" is the core disputed factual issue in this case that impacts everything else.

In this regard, there can be no consideration for the Forbearance Agreement if all GMAC did was return to Mente funds owed to third parties that GMAC had no right to confiscate in the first place. Nor can there be any "forbearance" on GMAC's alleged "right" to "repossess" the vehicles (which already had occurred in any event on July 19th by seizing their keys, titles and MCOs) if there was no "default" and no right to repossession at all. So the validity and enforceability of the Forbearance Agreement, like GMAC's alleged rights under the security agreements (particularly the GSA) and the UCC, depend entirely on whether a "default" had occurred—the ultimate factual issue in this case. No "default"? No right to "self help" and certainly no right to compel Mente to accept "forbearance" of anything.

Perhaps cognizant of this fatal defect in its motion, GMAC recasts and outright mischaracterizes the Forbearance Agreement as a "settlement agreement," as if giving it that label makes it one. The Forbearance Agreement "settled" nothing. All it did was return to Mente its own money (well, not actually Mente's, but funds owed to third parties, including the Commonwealth) to keep the principals of Mente out of jail. And to the extent that it purported to confer additional "rights" on GMAC, those rights are invalid and unenforceable.

---

[47] *Id.* Ex. U, p. 41.

**2. There Was No "Free" and "Voluntary" Waiver of Plaintiffs' Rights**

As the UCC (GMAC's own source of authority for its *ex parte* seizure) makes

clear, post-default waivers of a debtor's rights are particularly disfavored under the law:

> "[I]n the context of rights and duties after default, our legal system
> traditionally has looked with suspicion on agreements that limit the
> debtor's rights and free the secured party of its duties."

Comment 2 to 13 Pa.C.S.A. § 9602. Continuing, the Comment states:

> "The context of default offers greater opportunity for overreaching. The
> suspicious attitude of the courts have been grounded in common sense."

*Id.* Due to this well-grounded "suspicion" of creditors with superior bargaining power

and leverage after they have unilaterally declared a debtor in default and put the debtor in

a financial stranglehold (as GMAC did to Mente here), the UCC expressly prohibits the

waiver of many of a debtor's rights under the UCC. *See* 13 Pa.C.S.A. §§ 9602, 9624.

Addressing specifically "post-default" waivers, the Comments state that any agreement

embodying any such waivers must memorialize "the bargain of the parties in fact," and

must be "carefully scrutinized" by the courts. *Id.*, Comment 5. Post-default waivers, like

the ones purportedly contained in the Forbearance Agreement here, also are suspect if

they are included in agreements which "address many additional or unrelated matters."

*Id.*

GMAC's Forbearance Agreement, presented to Mente on a "take it or leave it

basis" without any opportunity for revision or modification, fails miserably under the

UCC. The purported waivers and releases of Mente's rights are interspersed among 32

paragraphs, spread over 14 pages that "address many additional or unrelated matters."

The confession of judgment provisions alone, the first time that *any* such provision

appeared in *any* agreement with Mente, are nine pages deep into the Forbearance

Agreement and clearly violate the strict and prominent disclosure requirements of *Cutler* and *L.B. Foster*, *supra*. *See also Jordan v. Fox Rothschild O'Brien & Frankel*, 20 F.3d 1250, 1256, 1275 (3d Cir. 1994).

But it is oppressive and coercive circumstances surrounding the execution of the Forbearance Agreement that, in particular, precludes summary judgment under that document. The duress to which Mente was subjected by GMAC in forcing Mente to sign the Forbearance Agreement under a crushing threat of criminal prosecution before GMAC would release funds that were not GMAC's to seize in the first place dooms both its validity and enforceability. A release of claims or waiver of rights like the ones here must be "freely," "intelligently" and "voluntarily" made. *Jordan*, 20 F.3d at1256, 1272 ("genuinely disputed issues of material fact concerning waiver" of right to judicial process prior to seizure of property precluded summary judgment). Accordingly, a court facing a challenge to an *ex parte* seizure and forfeiture like the one perpetrated by GMAC here, which GMAC then tried to legitimize after-the-fact in its Forbearance Agreement, "should always inquire whether the judgment debtor's execution of a document…is a valid waiver of his constitutional right to pre-deprivation notice and hearing." *Id.* at 1272.

"A wrongful act or threat which prevented a party from exercising his free will and judgment constitutes duress" sufficient to void a waiver of rights or a release of that party's claims in a contract. *Coventry v. United states Steel Corp.*, 856 F.2d 514, 524 (3d Cir. 1988) (holding that "in the determination of whether a waiver was signed knowingly and voluntarily, review of the totality of the circumstances in which it was signed must be had"), *quoting Plechner v. Widener College, Inc.*, 569 F.2d 1250 (3d Cir. 1977). In assessing the "totality of the circumstances" surrounding the execution of a release and

waiver to determine if they were "free from duress," the courts look to a variety of

factors, most of which are fact-sensitive and preclude summary adjudication. *See*

*Coventry*, 856 F.2d at 523-24. And while GMAC argues in its brief that economic

pressure alone is insufficient to establish a claim of duress that would void an otherwise

valid release and waiver, GMAC's argument is too facile. In *Coventry*, the plaintiff was

faced with the "Hobson's Choice" (*id.* at 524) of either refusing to sign a waiver and

thereby face immediate termination of his income and health benefits, or signing the

release and continue to receive those benefits. *Id. See Cirillo v. Arco Chemical Co.*, 862

F.2d 448, 452 (3d Cir. 1988) (describing the situation in *Coventry* as "sign the waiver or

starve"). That was only economic pressure, but of sufficient magnitude to constitute

duress. Here, Mente's "choice" was to "sign the Forbearance Agreement or go to jail."

GMAC engaged in a "wrongful act" when it seized the third party funds (and Mente's

own assets) in the first place, directly causing the immediate and real "threat" of criminal

prosecution had Mente not signed the Forbearance Agreement to obtain the cash needed

to pay those customer refunds and state taxes and fees and thereby avoid jail. A jury

should decide from the "totality" of these "circumstances" whether any waiver or release

in the Forbearance Agreement was "voluntary" and "freely made" by Mente or, as the

evidence compellingly shows, was made under coercion and duress.

### 3. GMAC's Conduct In Falsely Declaring Mente "Out of Trust" and Perpetuating That Deceit Knowing The True Facts Voids the Forbearance Agreement

Pennsylvania law is clear: a "contract is voidable for fraudulent inducement

'where a party is induced to enter into a transaction with another party *that he was under*

*no duty to enter into by means of the latter's fraud.*'" *McCloskey v. Novastar Mortgage,*

*Inc.*, 2007 U.S. Dist. LEXIS 62297, at *19 (E.D. Pa., Aug. 22, 2007) (emphasis added)

(citations omitted). Fraud consists of "anything calculated to deceive," and is proven by showing that a false statement which is material to a contract was made "knowingly, in conscious ignorance of the truth, or recklessly without caring whether it be true or false." *Id.* at *20 (citations omitted).

Here, GMAC knew that Mente was not "out of trust" on July 19th when it unilaterally seized the dealerships and confiscated their assets. The evidence at trial will show not only that Mente had not failed to "timely pay" GMAC for "certain motor vehicles" as belatedly declared by GMAC in its untimely July 25, 2007 default notice, but also that Mente could have repaid GMAC every penny that Mente allegedly owed had GMAC not embarked on its premeditated mission to shut Mente down. And GMAC similarly knew in August 2007 and thereafter, when it pressed the Forbearance Agreement on Mente, that Mente was never "out of trust" on July 19th. Having created the situation—unilaterally, unlawfully and through rank deceit and subterfuge—which led to Mente's complete downfall in July 2007 after 40 years in business, GMAC's false representations that Mente was "out of trust" which underlie the Forbearance Agreement (and are explicitly recited by GMAC in that document) render that agreement void.

### 4. The Forbearance Agreement Did Not And Could Not Release Future Claims Which Had Not Yet Accrued

As demonstrated above, a signed waiver of rights or release of claims will not be binding if procured by fraud or duress. *Bowersox Truck Sales and Service v. Harco Nat'l Ins. Co.,* 209 F.3d 273, 279 (3d Cir. 2000) (citations omitted). Furthermore, "a release covers only those matters which may be fairly said to have been within the contemplation of the parties when the release was given." *Id., quoting Restifo v. McDonald,* 230 A.2d 199, 201 (Pa. 1967). "Releases are strictly construed 'so as to avoid the ever present

possibility that the releaser may be overreaching." 209 F.3d at 280, *quoting Restifo*,

*supra*. Continuing, the Third Circuit in *Bowersox* held that "the general words of a

release will not be construed so as to bar the enforcement of a claim **which has not**

**accrued** at the date of release." 209 F.3d at 279 (emphasis added). Applying these well

settled principles, our Circuit Court in *Bowersox* held as a matter of law (and reversing

summary judgment for the releaser) that the release there released only those claims

which existed at the time the release was executed, but did not "release any such claims

that may accrue in the future."

The Forbearance Agreement here, on its face, purported to release only those

claims "heretofore or now existing" on September 30, 2007 at the time of its execution.[48]

There is no mention at all of any release of any "future" claims which may "accrue" to

Mente by virtue of GMAC's conduct. Under the authority of the Third Circuit's decisions

in *Parks v. "Mr. Ford,"* 556 F.2d 132, 141 (3d Cir. 1977) (*en banc*) and *Jordan v. Fox*

*Rothschild O'Brien & Frankel*, 20 F.3d 1250, 1267 (3d Cir. 1994), despite the unlawful

seizure of Mente's property on July 19th (which certainly gave rise to immediate causes

of action), other claims did not "accrue" until later when GMAC actually disposed of the

property that it had unlawfully confiscated. It is undisputed that GMAC did not

"liquidate" all of the vehicles that it has seized until January 2008—four months *after* the

Forbearance Agreement was signed.[49] Among Mente's specific claims in this case are

that GMAC sold those vehicles at auction in a "fire sale" in a commercially unreasonable

manner in violation of state law—a claim supported by the extensive analysis and reports

---

[48] *See* Forbearance Agreement, pgs. 10-11, ¶ 14.
[49] *See* Jacobsen Dec. Ex. 25.

of Mente's experts.[50] Clearly, those claims did not and could not have "accrued" on September 30, 2007, because they arose and are based entirely on GMAC's conduct long after that date.

In a similar vein, GMAC's belated filing of its state court replevin action on February 12, 2008[51] and its even more untimely filing of a confession of judgment action against Mente two months later in April 2008, perpetuated the unlawful seizure of Mente's property which had occurred on July 19th and reaffirmed the "under color of state law" aspect of that unconstitutional deprivation of Mente's property rights. Those claims, too, did not *fully* "accrue" until six months *after* the Forbearance Agreement was signed, and were neither released nor affected in any manner by that document.

Similarly, Chrysler did not terminate its dealer franchise with Mente until October 16, 2007—weeks *after* the Forbearance Agreement was signed—and the effective date of that termination was January 7, 2008 under the requisite notice provisions and a brief extension. So Mente's claims against GMAC for tortious interference with that agreement between Mente and Chrysler could not possibly have "accrued" on September 30th.[52] GM's final termination letter, extended while Mente scrambled to pursue what few options he had, was sent even later on January 14, 2008 with a retroactive termination date to January 11, 2008, so that similar interference claim did not "accrue" until then.[53]

---

[50] *See* Complaint ¶¶ 105-115; Expert Report of Joseph F. Roesner, MBA, CMA ¶¶ 24, 73-96.
[51] Although the state court, in response to GMAC's September 15, 2008 motion, issued a writ of seizure on November 5, 2008, GMAC has to this day, almost a full year later, disobeyed that court's directive that it post the requisite bond under the replevin rules. *See* Supp. Jacobsen Dec. Ex. W, state court seizure Order.
[52] Supp. Jacobsen Dec. Ex. X, Chrysler termination letter. *See* pages 41-42 *infra* for a discussion of plaintiffs' tortious interference claim.
[53] Supp. Jacobsen Dec. Ex. Y, GM final termination letters.

### 5. GMAC's "Unclean Hands" Bars It From Enforcing the Forbearance Agreement

GMAC's "unclean hands" in declaring a bogus default on July 25th (the first such written notice, sent six days *after* its seizures) and systematically looting the dealership properties throughout 2007 also bars enforcement of the Forbearance Agreement. *See, e.g.*, *McCloskey, supra*, at *25-28 (factual issues on issue of "unclean hands" precludes summary judgment). The application of the "unclean hands" doctrine rests within the sound discretion of the Court. *In re New Valley Corp.*, 181 F.3d 517, 525 (3d Cir. 1999). Our Circuit, as have the Pennsylvania state courts, rejects any strict application of the "unclean hands" doctrine as a defense only in matters of equity. Rather, our courts apply the doctrine even in civil actions which involve claims for damages and other relief. *See id.* at 522-28, *discussing Gaudiosi v. Mellon*, 269 F.2d 873, 879-82 (3d Cir.), *cert. denied*, 361 U.S. 902 (1959) (proxy contest); *Monsanto v. Rohm & Haas Co.*, 456 F.2d 592 (3d Cir.), *cert. denied*, 407 U.S. 934 (1972) (suit for patent infringement same). Indeed, *New Valley* itself involved purely damage claims under contested lease assignments.

The overarching concern in the application of the "unclean hands" doctrine is the integrity of the court and its desire not to assist those who engaged in unconscionable conduct:

> "Courts are concerned primarily with their own integrity,…and with avoiding becoming the abettor of iniquity."

*Monsanto*, 456 F.2d at 598. *Accord Northeast Women's Center v. McMonagle*, 868 F.2d 1342, 1354 (3d Cir. 1989); *Gaudiosi*, 269 F.2d at 879-82. Accordingly, the doctrine has been applied where a party concealed or misrepresented evidence, or advanced a theory or argument in a case which would allow that it to benefit from prohibited conduct. *See*

*New Valley*, 181 F.3d at 523-24; *Northeast*, 868 F.2d at 1354, *citing  In re Estate of Pedrick*, 482 A.2d 215, 222 (Pa. 1984). To guard against abuse of the doctrine, "the primary principle guiding application of the unclean hands doctrine is that the alleged inequitable conduct must be connected, *i.e.*, have a relationship, to the matters before the court for resolution." *New Valley*, 181 F.3d at 525.

Here, the Forbearance Agreement, signed with a "boot on Mente's neck," unquestionably relates directly to "matters before the court for resolution," since GMAC advocates that agreement as grounds for dismissing plaintiffs' claims in their entirety. But GMAC's "unclean hands" in its dealings with Mente, overwhelmingly proven on this record, bars its reliance on that coerced agreement.

Having addressed GMAC's arguments based on its security agreements and the Forbearance Agreement, plaintiffs turn to GMAC's attack on the individual counts of plaintiffs' Complaint.

## III. PLAINTIFFS' SECTION 1983 CLAIM (COUNT II) CANNOT BE DISMISSED[54]

In 1975, the Pennsylvania Rules of Civil Procedure regarding replevin were revised because the United States Supreme Court had found that they were unconstitutional.  The commentators noted:

> "The revision of the Rules was necessitated by the United States Supreme Court decision in *Fuentes v. Shevin* and in *Parham v. Cortese*, 92 S.Ct. 1983, 2002, 407 U.S. 67, 90, 32 L.Ed.2d 556 (1972) in which the Court held that the:
>
> > 'Pennsylvania prejudgment replevin provisions work a deprivation of property without due process of law insofar as they deny the right to a prior opportunity to be heard before the chattels are taken from their possessor.'"

---

[54] The Mente plaintiffs have filed their own motion for partial summary judgment and for declaratory judgment on their Section 1983 and conversion claims. Rather than repeat that discussion and those arguments here, they are incorporated herein by reference.

In seeking summary judgment on plaintiffs' Section 1983 claim and arguing that it is immune from Pennsylvania's replevin laws and rules, GMAC relies entirely on ten cases, all but two of which are from other Circuits and nine of which deal specifically with repossession of consumer automobiles by a secured creditor. The consumer automobile repossession cases actually undermine GMAC's position since, as the Third Circuit has explicitly observed, they are based on a uniform state statute, the Motor Vehicle Sales Finance Act ("MVSFA"), which contains extensive procedural safeguards designed to protect the due process rights of consumers and discourage repossession.

In *Gibbs v. Titelman*, 502 F.2d 1107 (3d Cir. 1973), the Third Circuit went to great lengths to explain why a private repossession of an automobile is not "state action" for purposes of Section 1983 liability. Critical to the Court's analysis was the fact that the MVFSA does not, absent direct state action, infuse private repossessions with the quality of "action under color of law" because the Commonwealth of Pennsylvania (through its enactment of the MVSFA) did not "significantly" encourage or foster self-help repossessions. To the contrary, through the "comprehensive state regulation" of repossessions of consumer automobiles, the state actually acted to ***curb*** repossessions and their abuses. *Gibbs*, 502 F.2d at 1110-12. As the Court noted:

> "Actually, far from encouraging private repossessions, the MVSFA was enacted in 1947, among other reasons, to curb the abuses associated with private repossessions. The statute displays a noticeable concern for protecting a broad range of consumer interests, including, but not limited to, private repossessions. The MVSFA then not only makes it more difficult to repossess, but also, by protecting various other interests of the buyer, indirectly minimizes the circumstances which give rise to repossessions."

*Id.* (citations omitted). Central to the Court's holding was a review of the labyrinth of provisions in the MVFSA protective of the debtor which avoid the due process concerns specifically addressed by the Supreme Court in *Fuentes* and *Mitchell*. *Id.* at 1111-12.[55]

Unlike the MVSFA and the automobile repossession cases relied upon by GMAC, Section 9609(b)(2), on its face, significantly fosters and promotes self-help seizures of the type condemned by the Supreme Court in those cases without any of the procedural protections available in the MVSFA. According to GMAC, Section 9609(b)(2) purportedly gives GMAC a "free pass" to completely circumvent *Fuentes, Mitchell* the Pennsylvania Rules regarding replevin. In GMAC's view, Section 9609(b)(2) trumps the changes in seizure law and procedure mandated by the Supreme Court thirty five years ago.[56] Why would a creditor ever afford a debtor due process if Section 9609(b)(2) appoints them the "judge, jury, and sheriff…without providing for any supervision or other procedural safeguards"? *Cox Bakeries v. Timm Moving & Storage, Inc.*, 554 F.2d 356, 358 (8th Cir. 1977) (finding "state action" for § 1983 liability purposes where private warehouse sold private plaintiffs' property under state statute authorizing such sale). As the Eight Circuit held in *Cox*:

> "In light of these cases, we conclude that the case law requires that **where a creditor is given authority by the state to unilaterally act on the resolution of legal disputes, his exercise of such authority must be delimited by the restraints of due process**."

*Id.* at 360 (emphasis added).

GMAC fares no better with its heavy reliance on similar consumer vehicle repossession cases from the Ninth Circuit. In *Culbertson v. Leland*, 528 F. 2d 426 (9th

---

[55] *See, e.g.*, 69 Pa.C.S.A. §§ 615, 618, 619, 623, 624, 624, 632.
[56] Since that provision was first enacted in 1953—before *Fuentes* and its progeny—and has remained materially unchanged since then, it has never been evaluated in the context of those constitutional cases.

Cir, 1975), where action "under color of law" was found when a private hotel seized and

sold a tenant's property under a state lien law for non-payment of rent, the court noted the

significant constitutional differences between that type of action and repossessions under

highly protective and procedurally detailed state motor vehicle laws:

> The purchasers signed written security agreements which explicitly set forth the sellers' right to repossess on default; **and title remained with the sellers**.  The eventual repossessions were only of the chattels covered by the security agreements - the automobiles - and **they were performed by the title holders**. They were thus as much a matter of private contractual law as of state statute repossession of the specific chattel giving rise to a debt is an activity much more narrowly confined **than general seizures of collateral.** The former, particularly where a written instrument defines the rights of the parties, can be left and has traditionally been left to private hands. **The latter, because its extent is broad and undefined and because its impact is potentially much more severe, is the type of activity which is a function of the state and over which, ordinarily, the state has a monopoly.** *Cf.* For the above reasons, **we find that the State of Arizona has significantly involved itself in appellee Leland's seizure of appellants' property**....

*Id.* (emphasis added).

It is these critical facts which distinguish car repossession cases under the

MVFSA from the blanket seizure authority purportedly conferred by Section 9609(b)(2)

and exercised by GMAC here. When a consumer finances the purchase of a vehicle

through bank, that financing entity is specifically identified by name on the face of the

title, and the title itself is held by that bank. Yes, they are "secured parties," holding

"security interests," but in a very specific sense.  They have physically *retained the title*

and thus *are* the actual "holders" of that title under the UCC. *See* 13 Pa.C.S.A. §

1201(16)(i). That is not the situation here, where Mente (not GMAC) held titles to all

vehicles issued in Mente's own name.

Other courts besides the Eighth Circuit in *Cox* and the Ninth Circuit in *Culbertson* have recognized this distinction and the need for procedural safeguards when a general forfeiture statute like Section 9609(b)(2), instead of repossessions subject to the extensive protections of the MVSFA, is involved. *See, e.g., Audio Odyssey, Ltd V. Brenton First National Bank*, 245 F.3d 721 (8th Cir. 2001) (finding "state action" and reversing summary judgment in favor of creditor who seized debtor's store). The UCC section upon which GMAC relies actually goes one step beyond the invalidated statutes of old: it allows the creditor--nay, *invites* the creditor – to be not only "judge" and "jury," but the clerk and "sheriff" as well. *Cox, supra*.

Our Circuit Court in *Gibbs* explicitly stated that it "did not reach or decide" the question of whether "state action" would be present if the creditor seized the debtor's property solely under the self help provisions of the UCC in the absence of a written contract conferring such authority. 502 F.2d at 1113. Other courts similarly note the existence of a private written agreement as tilting the scales in the "under color of state law" analysis, in the absence of which contract "state action" is found from the authority conferred by the statute itself. *See Cox, supra; Culbertson, supra. Accord Parks v. "Mr. Ford,"* 556 F.2d 132 (3d Cir. 1977) (*en banc*). But as demonstrated above, GMAC intentionally **deleted** from the GSA any right to proceed "without legal process," so no such contractual right or provision is implicated in this case. Not only was GMAC compelled through its own documents to pursue its rights only through the "legal process" of a formal replevin action, the absence of any such contractual seizure right brings this case squarely within *Parks*, *Cox* and *Culbertson* and outside the MVSFA and similar cases upon which GMAC exclusively relies.

A distillation of the cases in this area essentially boils the "under color of state law" determination into the following inquiry: did the state merely "acquiesce" in the private conduct by allowing the *ex parte* seizure and sale of private property under Section 9609(b)(2), or did the state empower and promote that conduct through the adoption of laws which rendered the creditor "judge, jury and sheriff." Here, the various provisions of the UCC are no different than the garagemen's statutory liens at issue in *Parks*, in that they both "not only extended the power of sale to the [creditor]" but also provided that the disposition of the property "was conclusive" as to the debtor, conferring on the creditor the same rights as a "sheriff or constable" at a judicial sale. *Id.* at 141. As the Third Circuit held in *Parks*:

> "By this authorizing sales to take place, directing how they are to be carried out, and giving them the effect of judicial sales, Pennsylvania has quite literally delegated to private individuals powers 'traditionally exclusively reserved to sheriffs and constables. In our view, that grant of power has the same effect for state action purposes as if Pennsylvania had endowed private individuals with the same authority to arrest suspects and to execute warrants as state and local police possess."

*Id.* This is the *identical* grant of *ex parte* unilateral authority given to creditors under Section 9069(b)(2).

GMAC's own moving papers also answers that "under color of state law" inquiry for the Court. On page 11 of GMAC's supporting Memorandum of Law, GMAC acknowledges that it followed "the ***mandate*** of Section 9609(b)(2) in seizing Mente's assets without judicial process. (Emphasis added). That concession brings GMAC's conduct squarely within the line of cases, including *Parks, Jordan*, *Cox* and *Culbertson*, which uniformly hold that private *ex parte* seizures taken pursuant to statute which

authorizes those forfeitures constitutes action "under color of state law" for Section 1983

liability purposes.

## IV. PLAINTIFFS' CONVERSION CLAIM (COUNT VIII) CANNOT BE DISMISSED

As with its other arguments, GMAC's attack on plaintiffs' conversion claim puts

the rabbit in the hat, and constitutes an exercise in circular reasoning. GMAC argues that

it did not convert Mente's property because all GMAC did was take possession of its own

collateral. That it did so unlawfully, in violation of Pennsylvania state replevin and tort

law, and contrary to federal statutes, is ignored completely by GMAC. Yet, those are the

ultimate disputed issues in this case, against which GMAC's right to do *anything* with

**Mente's property** will be measured and decided.

Apparently mindful of the weakness of that argument, GMAC also contends that

Mente's conversion claim must be dismissed under the "gist of the action" and

"economic loss" doctrines. Those doctrines are closely aligned. In a nutshell, they are

aimed at preventing a plaintiff from turning a run of the mill contract case into a tort case,

with its attendant punitive damages. This very issue was squarely addressed—*and*

*decided against GMAC*—in the Ninth Circuit's decision in *Giles v. GMAC*, 494 F.3d 865

(9th Cir. 2007)--a case conspicuously absent from GMAC's papers.

As our Superior Court recently stated, describing these doctrines:

> "When a plaintiff alleges that the defendant committed a tort in the course
> of carrying out a contractual agreement, Pennsylvania courts examine the
> claim and determine whether the 'gist' or gravamen of it sounds in contract
> or tort. The test is not limited to discrete instances of conduct; rather, the
> test is, by its own terms, **concerned with the nature of the action as a
> whole**. The critical conceptual distinction between a breach of contract
> claim and a tort claim is that the former arises out of 'breaches of duties
> imposed by mutual consensus agreements between particular individuals,'

> while the latter arises out of 'breaches of duties imposed by law as a matter of social policy.'"

*Erie Insurance Exchange v. Abbot Furnace Company et al.,* 972 A.2d 1232, 1238-39 (Pa. Super. 2009) (emphasis added), *citing Pa. Mfrs. Ass'n Ins. Co. v. L.B. Smith, Inc.,* 831 A.2d 1178, 1182 (Pa. Super. 2003); *Reardon v. Allegheny College,* 926 A.2d 477, 486-87 (Pa. Super. 2007). In determining whether the "gist" of an "action" sounds in tort or contract, the court must review the entire complaint as a whole, not just individual counts or claims. Should the court determine that tortious conduct is the "gist" of the *entire* "action," and that some contract was merely collateral or incidental to the challenged conduct, then the doctrine does not apply. *See Erie Insurance Exchange, supra.* That is precisely the case here. Mente's Complaint does not arise from GMAC's failure to floor-plan vehicles or to otherwise comply with its contractual obligations. From its very first paragraph, plaintiffs' Complaint outlines tortious conduct by GMAC calculated to lead to the premeditated closing of Mente. The Complaint also recounts in detail GMAC's "breaches of duties imposed by law as a matter of social policy"—that is, GMAC's abject disregard of Pennsylvania's rules and procedures on replevin, violations of federal statutes and other breaches of duty.  While GMAC may cast its defense in terms of pure "contract" law, the Complaint is not so cast, and plaintiffs are masters of their own Complaint.  For example, in *Reed v. Dupuis,* 920 A.2d 861 (Pa. Super. 2007), the Superior Court reversed the lower court's determination that the plaintiff's negligence claim was barred by the "gist of the action" by virtue of a written residential lease. The landlord's failure to correct water seepage into Reed's apartment led to sinus and respiratory health problems caused by Reed's exposure to mold. Rejecting the argument

that the lease's terms on repairs and maintenance precluded Reed's tort claims, the

Superior Court stated:

> "Since Reed properly stated a claim for negligence under section 357 of
> the Restatement (Second) of Torts, the basis of her complaint derives from
> a duty imposed by the larger social policies embodied in the law of torts.
> Contrary to the trial court's conclusion that 'this dispute arises from the
> allocation of maintenance duties as set forth in the lease[,]' Dupuis's
> liability does not stem from any particular provision of the lease
> agreement. Rather, Dupuis's liability originates from her awareness of, and
> promise to rectify, the water infiltration problem. This, in turn, created a
> legal duty on the part of Dupuis to exercise reasonable care in fulfilling
> her promise and correcting the disrepair - a duty that is separate and
> distinct from her contractual duty/promise to simply repair the water
> infiltration. As such, Reed's negligence claim under section 357 of the
> Restatement (Second) of Torts is not barred by the gist of the action
> doctrine."

*Reed,* 920 A.2d at 866-867 (citations omitted). *See Bohler Uddeholm Am., Inc. v.*

*Ellwood Group, Inc.,* 247 F.3d 79, 104-05 (3d Cir. 2001) (minority partner's claim

against the majority partner for breach of fiduciary duty not barred by "gist of the action"

doctrine because Pennsylvania law imposes a fiduciary duty separate and distinct from

the particular contractual obligations in joint venture agreement). As in *Reed* and the

cases cited by it, Mente's entire case is grounded on the underlying social policies against

unilateral, *ex parte* seizures and conversion of property reflected in state tort law and

under federal and state statutes. Any contracts between Mente and GMAC are merely

"collateral" to that fundamental underlying issue. *See Sullivan v. Chartwell Investment*

*Partners,* LP, 873 A.2d 710 (Pa. Super 2005) (discussing and distinguishing *eToll* case

cited by GMAC). *See also Air Products and Chemicals, Inc. v. Eaton Metal Products*

*Co.,* 256 F. Supp. 2d 329, 341 (E.D. Pa. 2003); *Iron Mountain Sec. Storage Corp. v.*

*American Specialty Foods, Inc.,* 457 F. Supp. 1158, 1165 (E.D. Pa. 1978).

Indeed, in GMAC's primary citation, *eToll*, the Pennsylvania Superior Court described "gist of the action" in similar broad terms—not confined to or defined by individual counts or claims:

> "The test is not limited to discrete instances of conduct; rather, the test is, by its own terms, concerned with the **nature of the action as a whole**….The 'gist of the action' test, then, is a general test concerned with the '**essential ground**,' **foundation**, *or* material part **of an entire 'formal complaint' or lawsuit**."

*eToll*, 811 A.2d at 15 (emphasis added), *citing American Guar. & Liab. Ins. Co. v. Fojanini*, 90 F. Supp. 2d 615, 622, 623 (E.D. Pa. 2000). The *eToll* court explicitly recognized that certain fiduciary or confidential relationships or allegations of violations of law that are outside of the contract are not subject to the doctrine. *eToll* 811 A. 2d at 23, *citing Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.*, 28 F. Supp. 2d 947, 952-953 (E.D. Pa. 1998); *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79 (3rd Cir. 2001) (duties imposed by law or otherwise outside of contract are not barred by the "gist of the action" doctrine).

The "gist" of Mente's complaint is not that GMAC refused to continue wholesale financing of vehicles. The essence of Mente's claims, amply supported by evidence and by plaintiffs' experts, is that GMAC calculatingly and with premeditation put Mente out of business through the subterfuge of declaring Mente to be "out of trust," seizing and converting Mente's assets in the process. That is not contractually-based at all.

Although a lender does not ordinarily owe a fiduciary duty to a borrower, a confidential relationship may arise if the creditor "gains substantial control over the debtor's business affairs." *In Blue Line Coal Company, Inc. v. Equibank et al.,* 683 F. Supp. 493, 496-97 (E.D. Pa 1988). Here, plaintiffs not only have *alleged* tortious seizure and control of the Mente dealerships by GMAC, Mente has produced compelling

*evidence* of such control through GMAC's: 1) placement of "keepers" on site at the

dealerships to run their businesses; 2) conversion of all funds to GMAC from vehicle

sales; 3) appropriation of Mente's Open Accounts with GM and Chrysler; 4) hiring of an

armed security service to guard the dealer properties; 5) requirement of certified checks

or cash before any car would be released to a buyer; and 6) seizure of all keys, titles and

MCOs for all vehicles, and refusal to return those critical items (or to vacate the premises

entirely) when demanded by Mente.

Furthermore, GMAC's "gist of the action" argument flies squarely in the face of

the Federal Rules of Civil Procedure, which expressly allow pleading alternative and

even inconsistent theories of recovery. *See* Fed.R,Civ.P. 8(a)(3) (demand may be for

"alternative or different types of relief"); 8(d)(2) (complaint may allege claims

"alternatively or hypothetically, either in a single count…or in separate ones."). Applying

these Rules, Judge Joyner in *Berger & Montague, P.C. v. Scott & Scott, LLC*, 153 F.

Supp. 2d 750 (E.D. Pa. 2001) allowed both contract and conversion claims to go to trial

in a case involving a suit between law firms over a disputed fee under a referral

agreement. In so doing, the court held that once a party has a property interest in

proceeds, the "gist of the action" test and the "economic loss" doctrine do not bar

proceedings on both contract and conversion claims, explicitly stating: "[O]nce a fee has

been received, the referral fee can be the subject of conversion." *Id.* at 753.

GMAC's "gist of the action" argument also defies simple common sense. If

plaintiffs' conversion claim is dismissed on that basis, and if Mente's contract claim falls

as well either before or after trial, then plaintiffs' valid, *bona fide* conversion claim gets

wiped out in a purely procedural "squeeze play" without any adjudication of it on the

merits. The Federal Rules of Procedure do not permit such an anomalous and unfair

result. *See* Fed.R.Civ.P. 8(a)(3) and 8(d)(2). As the very first Rule of Civil Procedure

explicitly mandates, they shall be "construed and administered to secure the

***just***…determination of every action." Fed.R.Civ.P. 1 (emphasis added).

## V. PLAINTIFFS' CLAIM FOR INTERFERENCE WITH CONTRACTUAL RELATIONS (COUNT VI)  CANNOT BE DISMISSED

It is undisputed that, after GMAC seized the Mente dealerships and curtailed their

operations, both GM and Chrysler terminated Mente's dealer franchise agreements with

GM and Chrysler because Mente had failed to conduct normal business operations for

seven days, as required by those contracts.[57] GMAC's actions directly caused Mente to

lose not only those franchises but also "termination benefits" and "facilities assistance"

that would otherwise have been available to Mente, which were similarly denied by GM

and Chrysler due to the manner in which GMAC shut Mente down. It is disturbing that,

in the face of this and similar specific evidence of wrongdoing, GMAC would argue that

plaintiffs have failed to demonstrate purposeful action on the part of GMAC intended to

harm. That is *exactly* what Mente has demonstrated—repeatedly, even redundantly—

throughout its evidence.

And once again, GMAC cites authority which undermines—not advances—its

argument. In *Crivelli v. General Motors Corp.*, 215 F.3d 386 (3d Cir. 2000),[58] the Third

Circuit discussed the factors to be considered in determining whether interference with a

contract is "proper" (factors omitted from GMAC's Memorandum) and held that liability

for tortious interference with contractual relations may be found when the nature of the

interferer's conduct, its motives, the "social interests" involved and other factors indicate

---

[57] *See* Supp. Jacobsen Dec. Ex. A, X, Y, termination letters from GM and Chrysler.
[58] *See* GMAC Mem. at 16, *citing Crivelli*.

that the actor's conduct is "improper." *Id.* at 394-95, *citing* <u>Restatement (Second) of Torts</u>

§ 767. Among the illustrative examples of "improper conduct" giving rise to liability

include "fraudulent representations," "economic pressure," or "unlawful conduct" by the

alleged interferer which "violate[s] a statute [or] regulation." 215 F.3d at 394-95.[59] These

are all present here, but are uniquely fact sensitive inquiries which cannot be determined

in the context of a Rule 56 motion. Indeed, *Crivelli* itself came up on appeal after the

denial of summary judgment motions and a full trial on the merits.

Plaintiffs have already addressed GMAC's other argument---the "gist of the

action" and "economic loss" doctrines—in connection with Mente's discussion of the

conversion claim, *supra*. For the same reasons, GMAC's arguments fare no better here.

## VI. PLAINTIFFS' BREACH OF CONTRACT CLAIM (COUNT VII) CANNOT BE DISMISSED

GMAC flat out misstates the law when it argues that a duty of good faith and fair

dealing is not implied in contracts in Pennsylvania:[60]

> "In addition, we agree with the court that Restatement (Second) of
> Contracts, § 205, is applicable here. Section 205 provides that 'every
> contract imposes upon each party a duty of good faith and fair dealing in
> its performance and its enforcement.'"

*Herzog v. Herzog*, 887 A. 2d 313, 317 (Pa. Super. 2005) (citations omitted). *See also*

*Atlantic Richfield v. Razumic*, 390 A.2d 736, 742 (Pa. 1978) (same); *LJL Trans,. Inc. v.*

*Pilot Air Freight*, 962 A.2d 639 (Pa. 2009) (discussing implied duty of "good faith"

under Pennsylvania law); *Creeger Brivk & Building Supply v. Mid-State Bank & Trust*,

560 A.2d 151 (Pa Super. 1989) (same); *Temple Univ. Hosp., Inc. v. Group Health, Inc.*,

2006 U.S. Dist. LEXIS 1548, 2006 WL 146426, at *6 (E.D. Pa., Jan. 12, 2006), *quoting*

---

[59] The *Crivelli* court made clear that these were merely examples of "improper conduct" and not an exhaustive list.

[60] *See* GMAC Mem. at 15.

*Lyon Fin. Servs. v. Woodlake Imaging*, LLC, 2005 U.S. Dist. LEXIS 2011, 2005 WL 331695, at *8 (E.D. Pa., Feb. 9, 2005)) ("In Pennsylvania, a covenant of good faith and fair dealing is implied in every contract."). Those same duties are mandated by statute in the UCC (upon which GMAC relies as the source of its rights in this case) and cannot be waived. *See* 13 Pa.C.S.A. §§ 1201(b)(20), 1202(3), 1203.

> "Examples of bad faith can include 'evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.'"

*Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. 1992), *quoting* RESTATEMENT (SECOND) OF CONTRACTS § 205 Comment d.

GMAC owed a duty to Mente not to declare a bogus "default" on an "out of trust" situation which did not exist, and to invoke the provisions of the WSA and GSA to unilaterally occupy Mente's businesses and seize Mente's assets. For that, GMAC is liable to Mente. The evidence in the record of such breach is overwhelming.

## VII. PLAINTIFFS' CLAIMS UNDER THE STATE AND FEDERAL "DEALERS DAY IN COURT" STATUTES (COUNTS III and V) CANNOT BE DISMISSED[61]

GMAC's sole argument for dismissal of plaintiffs' claims under state and federal "Dealers Day in Court" statutes is that Mente purportedly has not come forward with sufficient evidence to suggest an "agency" relationship between GMAC and GM. GMAC's motion to dismiss these Counts should be summarily denied due to GMAC's outright defiance and contempt of this Court's discovery Order on this precise issue.

Agency is a uniquely fact sensitive inquiry. *See Glah v. Massachusetts Mutual Life Ins. Co.*, 2003 U.S. Dist. LEXIS 27809, *11 (E.D. Pa., Dec. 3, 2003), *citing Rich*

---

[61] Plaintiffs are voluntarily dismissing by stipulation with GMAC's counsel Counts I and IV of their Complaint under the Robinson-Patman and Sherman Acts, respectively.

*Maid Kitchens, Inc. v. Pa. Lumbermens Mut. Ins. Co.*, 641 F. Supp. 297, 304 (E.D. Pa.

1986). Because of this, plaintiffs sought documents reflecting any agency relationship

between GM and GMAC. In particular, Mente sought production of documents

referenced in various bankruptcy filings by GM which "memorialize" the "extensive

business, financial and operating agreements" between GM and GMAC from which an

agency relationship might be proven or inferred.[62] GMAC refused to produce the

documents. Plaintiffs moved to compel their production. (Document # 52). After

conducting a teleconference on plaintiffs' motion on September 15, 2009, this Court

entered an Order the same day compelling GMAC to produce those agreements to Mente.

(Document # 53, n. 2). GMAC still refused to do so. To this day, despite repeated written

demands by Mente, and a further directive by the Court during a September 25, 2009 that

GMAC "fully comply" with all discovery Orders, GMAC continues to withhold those

documents.[63] Since Mente has been denied access to this discovery and severely

prejudiced by its suppression by GMAC, summary judgment on grounds of alleged lack

of agency is patently improper. *See* Fed.R.Civ.P. 56(f)(1); Supp. Jacobsen Dec. ¶ 3.[64]

Despite GMAC's denials of any agency relationship whatsoever with GM,

plaintiffs have learned through discovery that GMAC has numerous shared computer

systems with GM that it utilized routinely to retrieve information relating directly to its

---

[62] In the same set of document requests, plaintiffs cut right to the issue, and also sought production of "[a]ll documents in which GMAC is identified as an 'agent' of or for GM (in law, in fact or in any other manner." GMAC declined to produce any documents in response to that Request as well.

[63] Without filing a motion for reconsideration of the September 15th Order or any motion seeking permission to allow it to do so, GMAC instead simply sent *some* documents to the Court on October 6, 2009 which GMAC had unilaterally self-selected from those ordered to be produced by the Court three full weeks earlier, asking the Court to conduct an *in camera* inspection of those agreements—a patently improper request and one in direct defiance and contempt of the Court's Order. *See* Supp. Jacobsen Dec. Ex. Z.

[64] Plaintiffs will be filing a motion *in limine* under Rule 37(b)(2)(A)(i) and (ii) deeming plaintiffs' allegations of agency established and prohibiting GMAC from opposing that issue at trial. But in the meantime, GMAC should not be permitted to benefit from its outright contempt of this Court's September 15th Order.

wholesale floor-plan financing of automobile dealerships. Plaintiffs have also learned

that, when Mente's remaining vehicle inventory was liquidated by GMAC through

Manheim Auto Auction in January 2008, the vehicles sold by Manheim under an

agreement *with GM on behalf of GMAC*. And when plaintiffs, in February and March of

2008, finally received an accounting from GMAC of the monies and funds that it had

seized from Mente, that reconciliation was in electronic format. The "metadata"

imbedded on these electronic files, which identifies the source and creator of the data,

reveals that *GM, not GMAC*, created them. GMAC's representations of wholesale

independence and disassociation from GM are simply not credible.

## CONCLUSION

For the foregoing reasons, GMAC's motion for summary judgment should be

denied in its entirety.

Dated: October 12, 2009                          Respectfully submitted,

                                                 /s/ Kenneth A. Jacobsen
                                                 Kenneth A Jacobsen
                                                 **JACOBSEN LAW OFFICES**
                                                 PA Attorney I.D. No. 31208
                                                 12 Orchard Lane
                                                 Wallingford, PA 19086
                                                 (610) 566-7930

                                                 Joseph A. O'Keefe
                                                 **O'KEEFE & SHER, P.C.**
                                                 PA Attorney I.D. No. 77068
                                                 15019 Kutztown Road
                                                 Kutztown, PA 19530
                                                 (610) 683-0771

                                                 *Attorneys for Plaintiffs*