IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

MENTE CHEVROLET OLDSMOBILE,
INC. f/k/a MENTE CHEVROLET, INC. t/a
MENTE CHEVROLET,

     and

MENTE CHRYSLER DODGE, INC.,

     and

DONALD M. MENTE,

     Plaintiffs,

vs.

GMAC,

     Defendant.
_____/

CIVIL ACTION

Case No. 08-cv-2403

## ORDER GRANTING GMAC'S RENEWED MOTION FOR JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50

    **AND NOW**, this _____ day of December, 2009, upon consideration of GMAC's Renewed Motion for Judgment Pursuant to Federal Rule of Civil Procedure 50 ("GMAC's Motion"), and the Court having considered any response or objection filed by Plaintiffs, it is hereby **ORDERED** that GMAC's Motion is **GRANTED**.

**SO ORDERED.**

                            **BY THE COURT:**

                            _____

                            Honorable Juan R. Sanchez
                            United States District Judge

Cc: All Counsel of Record

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

Case No. 08-cv-2403

MENTE   CHEVROLET   OLDSMOBILE,
INC. f/k/a MENTE CHEVROLET, INC. t/a
MENTE CHEVROLET,

     and

MENTE CHRYSLER DODGE, INC.,

     and

DONALD M. MENTE,

     Plaintiffs,

vs.

GMAC,

     Defendant.

_____/

**RENEWED MOTION FOR JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL
PROCEDURE 50 AND INCORPORATED MEMORANDUM OF LAW**

Defendant, GMAC, Inc. ("GMAC"), pursuant to Federal Rule of Civil Procedure 50, and

based upon the undisputed material facts, taken in a light most favorable to Plaintiffs,

respectfully requests the Court to enter Judgment as a matter of law in its favor on the sole claim

upon which the jury returned a verdict for Plaintiffs.[1]

---

[1]  Furthermore, GMAC also incorporates by reference all arguments set forth in GMAC's written
Motion pursuant to Federal Rule of Civil Procedure 50 filed on November 19, 2009.

## ARGUMENT

### Standard of Review

In evaluating GMAC's Motion for Judgment in accordance with Federal Rule of Civil Procedure 50, the Court should consider the evidence in the light most favorable to the non-moving party and deny the motion if there is evidence reasonably supporting the non-moving party. *Doby v. DeCrescenzo*, 171 F.3d 858, 873-874 (3rd Cir. 1999). "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Adams v. Teamsters Local 115,* 214 Fed. Appx. 167, 171 (3d Cir. 2007).  Although inferences are to be viewed in the light most favorable to Plaintiffs, as the Supreme Court long ago said in *Improvement Co. v. Munson,* 14 Wall. 442, 448, 20 L.Ed. 867 (1872), and has several times repeated:

> Nor are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." (Footnotes omitted.)

*Id.*

### STATEMENT OF UNDISPUTED FACTS PRESENTED IN A LIGHT MOST FAVORABLE TO PLAINTIFFS

Mente Chevrolet Oldsmobile, Inc. and Mente Chrysler Dodge, Inc. (the "Dealers" or "Dealerships") were two automobile dealerships located in Kutztown, Berks County,

Pennsylvania. The dealer principal of each was Donald Mente ("Mente") and the Dealerships' controller was Donna Johnson (Nov. 17 Tr. at 140).

GMAC provided wholesale floor plan financing to the Mente Dealerships. Mente Chevrolet also had an outstanding revolving line of credit from GMAC with a balance of $500,000.00 (Nov. 9 Tr. at 178). Mente executed a personal guaranty of all debts of the Dealers to GMAC, and the Dealers executed a Cross-Collateralization, Cross-Guaranty and Cross-Default Agreement encompassing both Mente Dealerships (Nov. 19 Tr. at 91-92). GMAC protected itself by taking a security interest in all of the Dealers' personal property assets. Thus, if the Dealerships defaulted in connection with any agreement with GMAC or if any part of the debts or obligations due to GMAC were unpaid, including if vehicles were sold or leased and the sale proceeds not used to repay the loan financing that vehicle, GMAC could exercise its rights as a secured creditor under the Uniform Commercial Code with respect to any or all of the collateral (Nov. 10 Tr. at 79). Accordingly, it was undisputed that GMAC had a duly perfected security interest in all personal property assets of the Dealers (Nov. 12 Tr. at 99).

When it is discovered that a dealer has sold or leased vehicles and payment has not been timely received by GMAC, the dealer is deemed to be "out of trust." (Nov. 9 Tr. at 135). If GMAC determines based upon an inspection of its collateral or otherwise that vehicles have been sold or leased and GMAC has not been immediately paid for the amount financed for those vehicles, GMAC is entitled under its Agreements to demand immediate repayment of amounts owed for the financing for the acquisition of the vehicles (Ex.. 27). If the Dealer fails to honor its contractual obligation and pay to GMAC immediately upon the sale or lease of the vehicle the amount financed to purchase that vehicle, GMAC may declare the Dealer in default, and exercise

its rights with respect to the collateral in accordance with the provisions of Article 9 of the Uniform Commercial Code (*id.*).

On July 19, 2007, during an inspection of collateral and collateral audit by GMAC, it was discovered that Mente Chevrolet had failed to pay GMAC $317,841.20 in proceeds for vehicles that had been sold or leased, the acquisition of which had been financed by GMAC (Nov. 10 Tr. at 75). This constituted a default by Mente Chrysler under the plain and unambiguous terms of a Cross Collateralization, Cross-Guaranty and Cross Default Agreement between the Dealers and GMAC (*id.*). Moreover, it is undisputed that GMAC demanded the Dealerships pay as required, but the Dealerships never paid all sums due in connection with the sale of the vehicles subject to the Agreements (Nov. 10 Tr. at 75, Nov. 19 Tr. at 87). Accordingly, GMAC demanded payment of the entire debt owed it by both Dealers, and exercised its rights as a secured creditor under the Uniform Commercial Code and pursuant to its Agreements. These rights included, but were not limited to, seeking to take immediate possession of the keys, the titles, and manufacturers' certificates of origin so that there would not be a further deterioration of GMAC's collateral (Nov. 17 Tr. at 263).

The Dealers also granted to GMAC a specific written assignment of all funds due to the Dealers by the respective vehicle manufacturers which are known in the trade as "open accounts." (Nov. 10 Tr. at 92). Upon the default in this case, GMAC exercised its rights as a secured creditor with respect to the open accounts of the Dealers. Additionally, in order to preserve and protect the vehicle collateral, GMAC requested the Dealers to turn over to GMAC keys to all of the vehicles, manufacturers' statements of origin (documentation of ownership) for new vehicles, as well as titles for used vehicles to be held by GMAC to make sure that no further vehicles were sold without GMAC being paid therefore (Nov. 17 Tr. at 263). GMAC also

exercised its rights to place a representative at each of the Dealers' locations to monitor GMAC's collateral (Nov. 19 Tr. at 90). This also facilitated the Dealers' ability to continue operations despite the default (Nov. 19 Tr. at 94-95). During that time, if the Dealer sold or leased a vehicle and was able to pay GMAC the amount financed to acquire the vehicle, the GMAC representative would surrender the manufacturer's statement of origin or title to the Dealer (*id.*).

On or around July 27, 2007, the Dealers terminated virtually all of their employees (Nov. 17 Tr. at 106-07). However, the Dealers remained open and continued to sell vehicles with the consent of GMAC, and further liquidated the Dealers' assets that served as collateral for the obligations due to GMAC (Nov. 19 Tr. at 113).

Plaintiffs, through their attorney, requested that GMAC forbear from exercising its agreed-upon rights as a secured creditor under the Uniform Commercial Code and to forbear from taking action until the Dealers could work towards either a negotiated sale of one or both of the Dealers as going concerns or effect a liquidation of the Dealers' assets (Ex.. 293 at ¶ H). The result of counsels' negotiation was the parties' execution of a Forbearance Agreement on September 20, 2007 (Ex. 293). The Forbearance Agreement granted an agreed-upon period of time for the Dealers to attempt to effect the sale or disposition of the collateral securing GMAC's debts (*id.* at ¶ 10). The Agreement further provided that GMAC would advance to the Dealers approximately $59,000 in order for the Dealers to pay unsecured trade debts and other expenses in order for the Dealers to be able to continue to operate the business (*id.* at ¶ I). At all times, the Dealers, Mente and Donna Johnson enjoyed representation by counsel, who negotiated the terms and conditions of the Forbearance Agreement (*id.* at ¶ 30).

As partial consideration for the forbearance and the advance of funds, Plaintiffs unconditionally released GMAC from any claims, demands or causes of action that may have

existed in favor of Plaintiffs against GMAC or anyone acting for or on behalf of GMAC (*id.* at ¶ 14). Thereafter, in compliance with the Forbearance Agreement, GMAC advanced the approximately $59,000 to the Dealers, and withheld taking any action against the Dealers and the collateral securing GMAC's debts until the expiration of the forbearance period. It is undisputed that GMAC took no action during the forbearance period and Plaintiffs have never suggested that GMAC did not fully honor its obligations under the Forbearance Agreement (Nov. 10 Tr. at 106). Nonetheless, at the expiration of the forbearance period, Plaintiffs had not repaid their obligations to GMAC At that time, GMAC exercised its rights as a secured creditor under the Uniform Commercial Code, and took possession of the remaining vehicle collateral securing the debts due to GMAC (Nov. 19 Tr. at 115).

I.    **THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' BREACH OF CONTRACT CLAIM BECAUSE THE ANALYSIS AND INTERPRETATION OF A CONTRACT IS FOR THE COURT, NOT THE JURY, AND THE VARIOUS CONTRACTS AT ISSUE COMPLETELY GOVERN AND CONTROL ALL OF PLAINTIFFS' CLAIMS.**

Although couched within multiple causes of action, the crux of Plaintiffs' claim against GMAC rested entirely upon two distinct elements. First, Plaintiffs asserted that, notwithstanding the plain and unambiguous terms of the Agreements, whether the Dealers were actually "out of trust" was subject to differing interpretations and relegated to a jury consideration as a question of fact. As explained herein, however, based upon Plaintiffs' concessions at trial and the plain language contained in the Forbearance Agreement, it is undisputed that the Dealerships were in material default of their obligations and out of trust on July 19, 2007.

Plaintiffs' second contention was that the Forbearance Agreement and Release Plaintiffs signed in September, 2007, which included an admission that the Mente Dealerships were in material default under the Agreements and out of trust on July 19, 2007 (and released any

possible claims against GMAC), should not apply because Plaintiffs signed it under conditions of "fraud, duress or undue influence." Therefore, Plaintiffs maintained they had no real choice but to sign the Forbearance Agreement and Release and, further, that "unclean hands" barred GMAC from enforcing its rights under the Forbearance Agreement. Plaintiffs' basic arguments that form the foundation of the jury verdict are totally without legal merit and fall well beyond the rubric of jury consideration.

The verdict is based upon four, interrelated findings. One, that the doctrine of "unclean hands" bars enforcement of the Forbearance Agreement; two, that Plaintiffs signed the Forbearance Agreement under "fraud, duress or undue influence;" three, that certain claims pursued by Mente accrued after the date of execution of the Forbearance Agreement; and four, GMAC breached its contracts, which encompassed the General Sales Agreement, Wholesale Security Agreement, and Revolving Line of Credit Agreement (the "Agreements"). Of the foregoing "findings" only one actually reflects a claim for affirmative relief – the conclusion that GMAC breached its contracts with Plaintiffs. The jury appropriately rejected most of Plaintiffs' assertions, including the contention that the Forbearance Agreement was the product of either duress or fraud. But in light of the undisputed material facts taken in a light most favorable to Plaintiffs, the conclusion that GMAC breached any contract with Plaintiffs or that the Forbearance Agreement is the product of undue influence, is irreconcilable and cannot survive scrutiny.

As explained in greater detail herein, whether GMAC breached the Agreements rests entirely upon the interpretation and application of plain contract terms in light of the undisputed

material facts established before the jury. This is for the Court, not the jury to decide.[2]
Moreover, and as explained below, the finding that GMAC acted with "unclean hands" is a legal
anomaly that is unsupportable and totally inapplicable to the parties' contractual relationships.
Therefore, based upon the undisputed material facts, examined in a light most favorable to
Plaintiffs, the Court should enter Judgment as a matter of law as to all counts, including the
breach of contract claim, upon which the jury returned a verdict for Plaintiffs.

> **A.    The only claim for relief upon which the jury returned a verdict – for breach of contract – presents a purely legal issue for the Court's consideration as a matter of law and is far beyond the jury's consideration.**

The Agreements granted GMAC certain rights as a secured creditor, including, but not
limited to, the right to secure collateral upon the Dealers' default and to payment on demand
from the Dealers for security in connection with GMAC's financing (Nov. 10 at Tr. 79; Nov. 19
at Tr. 62). Mente and Johnson repeatedly admitted and acknowledged GMAC's rights thereunder
and evinced a clear understanding of the obligations imposed upon Plaintiffs (Mente, Nov. 10 at
Tr. 69-71; Johnson, Nov. 17 at Tr. 160-61). Thus, the analysis and application of the
Agreements, as well as the separate Forbearance Agreement, should be addressed by the Court as
a matter of law, without regard to extraneous or parol evidence. *RCN Corp. v. Paramount
Pavilion Group LLC,* 2004 WL 627057, at *6 (E.D.Pa. March 10, 2004) (when contract terms
are plain and unambiguous, their meaning and the parties' intent is derived from the four corners

---

[2] The Court ultimately instructed the jury that the terms "faithfully and promptly" in the Wholesale Security Agreement were ambiguous and subject to different interpretations (Nov. 19 Tr. at 184, 218). But this finding does not undermine the application of the term "out of trust" because the Forbearance Agreement has not been challenged as ambiguous, and it contains an express concession that the Dealerships were "out of trust" on July 19, 2007 – a concession Mente and Johnson reaffirmed at trial (Nov. 10 Tr. at 74).

of the instrument); *Elite Sportswear Products, Inc. v. New York Life Ins. Co.*, 2006 WL 3052703, at *9 (E.D.Pa. Oct. 24, 2006) (where "a contract is clear and unambiguous [the court's] inquiry is limited to the four corners of the document").

As one court crystallized, "[i]n interpreting contract language it is essential that the court ascertain and give effect to the parties' intent. It is beyond cavil that the meaning of a clear and unambiguous contract must be determined from the four corners of the contract . . . . *Loff v. Granville*, 2005 WL 4677370, at *25 (Pa. Com. Pl. Oct. 17, 2005). Additionally, "the court may not ignore the clear, plain and unambiguous language of the contract simply because one party to the agreement failed to anticipate associated complications prior to performance." *Id.* (internal citations omitted); *see Maksin v. United Steel Workers Of America*, 136 F.Supp. 2d 375, 384 (W.D. Pa. 2000) citing *Western United Life Assurance Co. v. Hayden,* 64 F.3d 833, 837 (3d Cir. 1995) ("Under Pennsylvania law, interpretation of unambiguous contracts is a matter of law, not a matter of fact for the jury").

The Agreements outlined specific obligations imposed upon the Dealerships. For example, the Wholesale Security Agreement provides that the Dealerships agree "upon demand to pay GMAC the amount it advances or is obligated to advance to the manufacturer or distributor for each vehicle with interest at the rate per annum designated by GMAC from time to time and then in force under the GMAC Wholesale Plan" (Ex. 27). Neither Plaintiffs nor this Honorable Court have ever suggested that the demand obligation contained within the Wholesale Security Agreement is ambiguous or unclear. *See Scott v. Bryn Mawr Arms, Inc.*, 312 A.2d 592, 594-97 (Pa. 1973) (concluding that note providing for "payment on demand" to be unambiguous and refusing to consider parol evidence of an alleged oral agreement that varied or contradicted the terms of the note).

As the Wholesale Security Agreement also provides, "We further agree that as each vehicle is sold, or released, we will faithfully and promptly remit to you the amount advanced or have become obligated to advance on our behalf to the manufacturer, distributor or seller, with interest at the designated rate per annum then in effect under the GMAC Wholesale Plan. The GMAC Wholesale Plan is hereby incorporated by reference." (Ex. 27).

The Wholesale Security Agreement further requires that "[i]n the event we default in payment under and according to this agreement, or in due performance or compliance with any terms and condition hereof, or in the event of a proceeding in  bankruptcy, insolvency or receivership . . . or in the event GMAC deems itself insecure or said vehicles are in danger of misuse, loss, seizure or confiscation, GMAC may take immediate possession of said vehicles, without demand or further notice and without legal process." (*Id.*).

When confronted with these provisions, including the "demand" obligation contained within the Wholesale Security Agreement or the obligation that the Dealers remit funds within three days following sale or lease of a vehicle, neither Mente nor Johnson characterized them as ambiguous. Instead, they repeatedly testified that historically they would pay GMAC following automobile sales without regard to any time constraints (Mente, Nov. 10 at Tr. 135-37; Johnson, Nov. 17 at Tr. 175). But again, this does not present a subject for jury consideration because it is the clear terms of a written contract that govern the parties' rights and obligations, and regardless, a course of dealing cannot override express contract terms. *William M. Hendrickson, Inc. v. National Railroad Passenger Corp.*, 2002 WL 398641 (E.D.Pa. 2002) (citing *Associated Metals & Minerals Corp. v. Sharon Steel Corp.*, 590 F.Supp. 18, 24 (S.D.N.Y. 1983) and describing it as "applying Pennsylvania law and rejecting the plaintiff's course of dealing

argument where course of dealing 'would render the express terms of the contracts meaningless.'").

As explained below, it is undisputed that Plaintiffs – not GMAC – breached the Agreements by failing to remit hundreds of thousands of dollars following the sale of collateral upon which GMAC held a security interest (Nov. 10 at Tr. 75). Mente agreed that the Wholesale Security Agreement obligated Plaintiffs to pay GMAC "on demand," and that this encompassed all new or used vehicles, and attached to the proceeds from sales thereof. Exhibit 60; (Nov. 10 Tr. at 70-71; Nov. 17 Tr. at 253). Mente and Johnson also begrudgingly admitted that the Dealerships had a legal obligation to remit funds to GMAC within three days of selling a vehicle subject to the Agreements (Mente, Nov. 10 at Tr. 136-37; Johnson, Nov. 17 Tr. at 175).

Although the interpretation of the Agreements presents a legal issue, the trial testimony of Mente and Jonson eliminates any suggestion that the documents or obligations imposed upon the Dealerships were unclear or ambiguous. Therefore, the question of whether the Dealerships were "out of trust" on July 19, 2007, particularly when Plaintiffs have admitted their failure to pay on demand, is a straightforward application of unambiguous contract terms to undisputed material facts. Here, it is absolutely undisputed that on July 19, 2007, during a routine audit, GMAC discovered that the Dealerships had not fulfilled their contractual obligations because multiple cars had been sold, and the Dealerships had not remitted the necessary funds in accordance with the Agreements (Nov. 19 Tr. at 87). As GMAC's corporate representative, William Tierney, explained, this is the severest of situations because it means that GMAC's collateral protecting its loans has been eliminated (Nov. 19 Tr. at 87). Mr. Tierney further explained that the same action would have been taken with any dealership if a routine audit had uncovered similar circumstances (Nov. 19 Tr. at 88). There is simply no basis to support the

jury's conclusion that the Dealerships were not out of trust on July 19, 2007 when GMAC

discovered that the Dealerships did not pay as required and could not afford at that time to do so

upon GMAC's demand (Nov. 18 at Tr. 121-22).

Plaintiffs based much of their argument at trial upon the fact that Johnson was on

vacation during the audit and, therefore, nobody could pay GMAC (Nov. 9 at Tr. 164-65, Nov.

10 at Tr. 27, Nov. 12 at Tr. 196-97, 204). As a threshold matter, this position is wholly irrelevant

because it does not dispute the existence of a default on July 19, 2007 or undermine GMAC's

rights under the Agreements. Moreover, Johnson's absence cannot justify the Dealerships failure

to remit nearly $250,000 as required after dispensing with collateral securing GMAC's loan.

Regardless, it is beyond dispute that when GMAC conducted its July 19, 2007 audit and

discovered the shortfall it did not seize any of Dealership assets or bank accounts (Nov. 19 Tr. at

90). Therefore, even in a light most favorable to Plaintiffs, Johnson could have immediately

resolved the situation when she returned from her vacation the following day, but did not do so

(Nov. 12 at Tr. 250-51). Moreover, despite the suggestion that the Dealerships did have the

money to pay GMAC but simply could not do so because Johnson was not available to sign the

check, it is undisputed that the Dealerships had been losing money for at least 18 months

preceding the July 19, 2007 audit and were in dire financial circumstances (Nov. 17 at Tr. 166).

Although Plaintiffs seek to blame GMAC for their unfortunate inability to raise sufficient capital,

the undisputed facts established that the Dealerships were struggling and simply could not pay

GMAC as required under the Agreements.[3]  And while the governing documents and undisputed

facts, even when examined in a light most favorable to Plaintiffs, leave no doubt that the

---

[3] It is also undisputed that the Dealerships had used their entire $500,000 credit line (also secured
by the Dealership's inventory) (Nov. 10 at Tr. 83-84).

Dealerships were out of trust on July 19, 2007, it is also undisputed that over one week later, Plaintiffs still had not paid for eleven vehicles (Nov. 12 at Tr. 250-51). Also notable is that at no time after GMAC concluded that the Dealerships were out of trust did Mente ever object to GMAC's findings or dispute the fact that vehicles had been sold but funds not remitted (Nov. 19 Tr. at 97). Instead, Mente advised GMAC that he was attempting to raise money by, among other things, selling personal stock holdings (Nov. 12 Tr. at 234).

As a matter of law, the Court should enter Judgment for GMAC on Plaintiffs' breach of contract claim. Based upon the undisputed material facts, and the express concessions by both Mente and Johnson that cars were sold without remitting the funds to GMAC upon demand or within the three-day window provided by the Agreements, the jury's conclusion is totally misplaced and cannot stand.

**B.    The Admissions, Recitals Of Fact, And The Release Contained Within The Forbearance Agreement is a clear, unambiguous contract that confirms that the Dealerships were out of trust on July 19, 2007 and eliminates any cause of action against GMAC.**

Although the Court should enter Judgment for GMAC solely on the issue of whether Plaintiffs were "out of trust" as that term is used within the Agreements and in light of the undisputed material fact that the Dealers did not pay on demand, the Forbearance Agreement Plaintiffs signed further demonstrates that this case presents a purely legal issue of contract interpretation for the Court. In addition to the language contained within the Agreements, the Forbearance Agreement contains multiple findings and conclusions unequivocally establishing Plaintiffs' acknowledgement that the Dealers were in material default of their obligations and out of trust on July 19, 2007. At no point during trial did Mente or Johnson ever characterize the Forbearance Agreement as ambiguous or suggest that they did not understand the terms thereof. On the contrary, both Mente and Johnson systematically agreed with the factual conclusions

identified in the Forbearance Agreement but simply suggested that they had no choice based upon economic duress and a fear of criminal prosecution – two excuses the jury rejected in any event.

Additionally, the Release, which has also never been challenged as ambiguous or unclear, eliminates Plaintiffs' claims as a matter of law, including the claim that GMAC breached the Agreements. The Forbearance Agreement and Release, like the Agreements, are appropriately analyzed and applied by the Court as a matter of contract interpretation – again a legal question for the Court, not a factual question for the jury. *Wastak v. Lehigh Valley Health Network*, 342 F.3d 281, 295 (3d Cir. 2003); *Hummel v. AstraZeneca LP*, 575 F.Supp. 2d 568, 570 (S.D.N.Y. 2008); see also *Difilippo v. Barclays Capital, Inc.*, 552 F.Supp. 2d 417, 426 (S.D.N.Y. 2008); *Flynn v. AerChem, Inc.,* 102 F.Supp. 2d 1055, 1061 (S.D. Ind. 2000).

The jury concluded that the Forbearance Agreement and Release did not bar Plaintiffs' claim for breach of contract because it was the product of "undue influence" and GMAC acted with "unclean hands" in connection with its execution. The verdict reveals that Plaintiffs successfully, albeit improperly, transformed a legal issue regarding the interpretation and application of binding contracts for this Court's consideration into a plea for sympathy before a jury based upon the unfortunate closing of a family-owned car dealership. This is completely without legal support. The jury's conclusion constitutes an improper intrusion into this Honorable Court's legal province, and the Court should enter Judgment for GMAC on the breach of contract claim because the Forbearance Agreement, as a matter of law, solidifies the legal conclusion that the Dealerships were out of trust on July 19, 2007 and further releases and bars the breach of contract claim that went to the jury.

Like the Agreements, Plaintiffs, never challenged the clarity of the Forbearance Agreement and, as explained in greater detail herein, Mente and Johnson repeatedly testified that they understood what they were signing and did so with advice of counsel (Mente, Nov. 10 at Tr. 117-18; Johnson, Nov. 17 at Tr. 151, 155). Mente specifically testified that the Forbearance Agreement and Release were clear (Nov. 10 Tr. at 108). Mente repeatedly agreed and acknowledged that the Forbearance Agreement found that the Dealers "failed to conform to certain of the terms and conditions of the loan documents and are presently in material default of obligations under the loan documents." (Nov. 10 Tr. at 74). Mente further admitted, in accordance with the language of the Forbearance Agreement, that the Dealers were in material default for failing to tender payment to GMAC for vehicles which were sold or otherwise transferred, and that as a result, the Dealers were "out of trust" in an amount of at least $317,841.20 on July 19, 2007 (Nov. 10 Tr. at 75). Thus, the jury's conclusion that Plaintiffs were not "out of trust" on July 19, 2007 is not only a question left solely to this Court, but is also contrary to the Forbearance Agreement and Mente's admission at trial. This simply cannot withstand this Honorable Court's scrutiny.

Mente further admitted that GMAC acted completely within its rights pursuant to the Agreements but granted the Dealers extra time under the Forbearance Agreement (Nov. 10 Tr. at 79). Mente and Johnson also admitted that, in accordance with the Forbearance Agreement, GMAC provided an additional $59,000 from GMAC's collateral to assist the Dealers in fulfilling their obligations (Mente, Nov. 10 Tr. at 80-81; Johnson, Nov. 17 Tr. at 109). Mente and Johnson further acknowledged that GMAC had no obligation to provide the $59,000 but only did so as an accommodation and as consideration in accordance with the terms and conditions of the Forbearance Agreement (Nov. 10 Tr. at 82; Exhibit 27).

Mente and Johnson also acknowledged that as of September 19, 2007, the total debt due to GMAC was $4,503,528.40 pursuant to the Wholesale Security Agreement and that the Dealers were "out of trust," again devastating the jury's so-called factual conclusion to the contrary (Nov. 10 Tr. at 83; Ex. 293 at ¶¶ F and 1). Mente and Johnson further admitted that, as articulated within the Forbearance Agreement, as of September 19, 2007, there was an obligation by the Chevrolet dealer of $500,000, and the Chrysler dealership owed GMAC $1,554,077.80 (Nov. 10 Tr. at 84-85; Ex. 293 at ¶ 1). Mente and Johnson also admitted that Plaintiffs were "out of trust" in connection with the outstanding obligations owed by the Chevrolet dealership, and that Plaintiffs waived any right to further demands for payment or notices (Nov. 10 Tr. at 85; Ex. 293 at ¶¶ F and 2). Mente and Johnson also conceded that "on or before the termination forbearance period" Plaintiffs would pay GMAC the total amount due, including the out of trust amount, plus interest and fees (Nov. 10 Tr. at 87; Ex. 293 at ¶ 3(a)). However, it is undisputed that Plaintiffs did not pay as obligated (Nov. 17 at Tr. 185). Indeed, even at trial the Plaintiffs did not introduce any evidence suggesting that funds received from the subject vehicles were ever remitted to GMAC as required.

### C.    The Release contained within the Forbearance Agreement bars Plaintiffs' breach of contract claim as a matter of law.

In addition to the unrefuted concession that the Dealerships were, in fact, out of trust, which is completely solidified by the recitals contained within the Forbearance Agreement, Plaintiffs also executed a comprehensive Release provision that, as a matter of law, eliminates the breach of contract claim and warrants entry of Judgment as a matter of law for GMAC. As the Release provided:

> Obligors and Johnson hereby forever waive, relinquish and release all defenses and claims of every kind or nature, whether existing by virtue of state, federal, bankruptcy or non-bankruptcy Federal Law, by agreement or otherwise,

(collectively "Claims") against GMAC, its affiliates and its respective board of directors, consultants, successors, assigns, directors, officers, agents, employees and attorneys, (individually and collectively "GMAC parties") whether known or unknown, whether in dispute or not, whether liquidated or contingent, foreseen or unforeseen, whether in contract, tort, equity or otherwise, whether heretofore or now existing, arising out of or related to any transactions or dealings between any of the GMAC parties on the one hand and Obligors and Johnson, on the other, or otherwise including without limitation, any affirmative defenses, counterclaims, set-offs, deductions or recoupments ("Release"). The foregoing Release includes, without limitation, the right to contest, in the event GMAC enforces its rights under the Loan Documents, Guaranty, and/or this Agreement:

    (a)    any events of default under the Loan Documents, whether or not declared by GMAC;

    (b)    any provisions of the Loan Documents, Guaranty or this Agreement;

    (c)    the security interest or liens of GMAC in any property (whether tangible or intangible), right, or other interest, now or hereafter arising;

    (d)    the conduct of GMAC in administering credit lines, financing accommodations and loans to Dealers, in exercising any and all rights under the Loan Documents, or otherwise; or

    (e)    the amount of Total Indebtedness.

Faced with the foregoing, insurmountable obstacle to their lawsuit against GMAC, Plaintiffs advanced a specific trial strategy that sought to play upon the emotions of the jury, portraying Mente and Johnson as helpless victims of GMAC's financial superiority. Indeed, rather than challenge the terms of the Release, Plaintiffs argued that GMAC left Plaintiffs with no choice but to sign it under onerous conditions and circumstances. The verdict reflects a conclusion based upon the jury's sympathy for Plaintiffs. As explained in greater detail below, the attack on GMAC's "conduct" for exercising its rights under the written documents is totally misplaced as a matter of law. Moreover, from the perspective of contract interpretation, the

jury's verdict cannot stand in the face of Plaintiffs' concession that the Forbearance Agreement contained a clear and unambiguous Release that eliminated any prospective causes of action.

Critically, Mente and Johnson admitted that the Forbearance Agreement and Release were was signed following advice and guidance of counsel, who negotiated the terms thereof (Nov. 10 at Tr. 117-18; Nov. 17 at Tr. 151, 155). As with other contracts, the Court – not the jury – evaluates the terms and obligations presented by a release, which should be enforced unless procured by fraud, duress, accident or mutual mistake. *Three Rivers Motors Company v. The Ford Motor Company,* 522 F.2d 885, 892 (3d Cir. 1975) (citing *Kent v. Fair*, 392 Pa. 272, 140 A.2d 445 (1958)); *Degenhart v. The Dillon Co.*, 669 A.2d 946 (Penn. 1996); *Smith v. Lenchner*, 205 A.2d 626 (Penn. 1964). Mente's testimony demonstrates unequivocally that he signed the Forbearance Agreement which included a release willingly, knowingly, with advice of counsel, and free of duress or undue influence.

Mente's testimony unequivocally established as follows:

*      Mente read and executed the Forbearance Agreement (Nov. 10 Tr. at 72).

*      Mente had a business background and college degree (*Id.* at 53).

*      Mente signed the Forbearance Agreement upon advice of counsel who actually negotiated terms of the Forbearance Agreement (*Id.* at 72-73, 75-76).

*      Mente understood paragraph 14 to provide for the release of the claims, and found the language to be clear (*Id.* at 108).

*      Mente intended to fully perform his obligations under the forbearance agreement (*Id.* at 73).

*      The forbearance agreement declared Plaintiffs to be "out of trust" (*Id.* at 75).

*      Mente acknowledged the defaults and the amounts due to GMAC (*Id.* at 74-75, 82-85).

*      Mente acknowledged that GMAC was entitled to possession of the titles, papers, keys, etc. *(Id.* at 88-90).

*    Mente acknowledged that GMAC performed its part of the agreement, gave Plaintiffs $59,000 and did forbear for 90 days (*Id.* at 81, 106).

*    Mente conceded that he agreed through the Forbearance Agreement that there were no "claims, set-off or defenses to the payment to GMAC." (*Id.* at 105).

*    Mente further acknowledged that GMAC fulfilled its obligations by providing an additional advance and forbearing to take any action for 90 days (*Id.* at 106).

*    Mente acknowledged and did not dispute the validity or accuracy of any Recitals of the Forbearance Agreement (*Id.* at 107).

*    Mente admitted waiving any further demand for payment or notices for non-payment under the Forbearance Agreement (*Id.* at 85).

Johnson's testimony was in accord. She testified that:

*    She signed the Forbearance Agreement on September 20, 2007 (Nov. 19 Tr. at 149).

*    Johnson also admitted that she was given a chance to review the Forbearance Agreement and did, in fact, review it (*id.* at 150).

*    Johnson admitted that Mente Chevrolet, Mente Dodge, she, and Mente were represented by counsel in connection with the Forbearance Agreement (*Id.* at 151).

*    Johnson testified that she signed the Forbearance Agreement because she thought she would be arrested based upon what her attorney told her and what she read in the newspaper (*Id.* at 152-53).

*    Johnson expressly admitted that nobody from GMAC threatened her in connection with the Forbearance Agreement and that she voluntarily signed the Forbearance Agreement following advice and guidance of counsel (*Id.* at 152-55).

*    Johnson also admitted that the Dealers had given their inventory as collateral under the General Security Agreement with GMAC (*Id.* at 162-63).

*    Johnson also admitted that based upon the terms of the Wholesale Security Agreement, the Dealers had an obligation to pay GMAC within three days of selling a vehicle (*Id.* at 166; 175).

In light of the foregoing undisputed material facts, taken in a light most favorable to Plaintiffs, it is clear that this Honorable Court, rather than the jury, should interpret and apply the terms of the Forbearance Agreement and Release, which together warrant judgment for GMAC on the breach of contract claim as a matter of law.

**II.    PLAINTIFFS' CHALLENGE TO THE FORBEARANCE AGREEMENT BASED UPON GMAC'S CONDUCT, AND THE JURY'S CONCLUSION THAT THE FORBEARANCE AGREEMENT SHOULD BE RENDERED INVALID DUE TO GMAC'S ALLEGED "UNDUE INFLUENCE" OR "UNCLEAN HANDS" CANNOT WITHSTAND LEGAL SCRUTINY.**

Plaintiffs' entire challenge to the Forbearance Agreement and Release is mired in an attack upon GMAC's conduct.  Specifically, Plaintiffs argued that Mente and Johnson signed it under duress, which they characterized during trial as a) economic duress and b) fear of criminal prosecution as well as fraud.  But it was established a trial that the Dealerships were losing money for at least 18 months preceding GMAC's declaration of default (Nov. 17 Tr. at 166), and had no available credit left on their $500,000 line of credit (Nov. 10 Tr. at 83-84).  Therefore, if Plaintiffs felt financial pressure, it had nothing to do with GMAC.

Moreover, Mente and Johnson both unequivocally admitted that nobody from GMAC threatened them with criminal prosecution or in any other way (Mente, Nov. 10 Tr. at 179-80; Johnson, Nov. 17 Tr. at 152-55).  Thus, the jury ultimately rejected the claims of duress and fraud in connection with Plaintiffs' execution of the Forbearance Agreement, leaving only the specter of "undue influence" and "unclean hands" which, as explained below, this Court should reject.  *See* Verdict Form at 1(b) and 1(d).

**A.    The jury's conclusion that the Forbearance Agreement was the subject of undue influence is legally insufficient in light of the nature of the relationship between GMAC and Plaintiffs as well as the undisputed material fact that Plaintiffs enjoyed representation by counsel in connection with the Forbearance Agreement.**

Because the jury concluded that the Forbearance Agreement was not the subject of fraud or duress and that Plaintiffs received consideration in exchange for signing it, this left only the conclusion that the Forbearance Agreement is the product of undue influence and, as explained below, unenforceable based upon GMAC's "unclean hands."  Once again, the jury's conclusion is legally unsupportable and flies in the face of settled legal principles.

Undue influence is defined as a situation "where [a] party is under domination of another, or by virtue of the relationship between them is justified in assuming that the other will not act in a manner inconsistent with his welfare, a transaction induced by unfair persuasion of the latter, is induced by undue influence and is voidable." *Plechner v. Widener College, Inc.,* 418 F.Supp. 1282, 1297 (E.D. Pa. 1976); *see also Francois v. Francois*, 599 F.2d 1286, 1292 (3d Cir. 1979) ("the essence of the idea is the subversion of another's free will in order to obtain assent to an agreement).

Significantly, the law only recognizes certain types of relationships which can implicate the principles of undue influence. *Plechner,* 418 F.Supp. at 1297. Those relationships include: "parent and child; guardian and ward; husband and wife; physician and patient; attorney and client; and clergyman and parishioner. " *Id.* Alternatively, the party claiming undue influence must prove the existence of "a situation of virtual dependence or absolute trust." *Id.* In *Francois*, the court considered how and to what extent a party can unduly influence another party into executing an agreement. *Id.* That court stated:

> If a party in whom another reposes confidence misuses that confidence to gain his own advantage while the other has been made to feel that the party in question will not act against his welfare, the transaction is the result of undue influence. The influence must be such that the victim acts in a way contrary to his own best interest and thus in a fashion in which he would not have operated but for the undue influence.

*Id.*

Nothing in this trial record suggests that Plaintiffs reposed confidence in GMAC in connection with the Forbearance Agreement. On the contrary, the parties engaged in a months-long, arms-length transaction, where both sides were represented by counsel (Mente, Nov. 10 at Tr. 117-18; Johnson, Nov. 17 at Tr. 151, 155). Plaintiffs never alleged or offered any evidence

tending to prove that GMAC and Plaintiffs had a relationship of dependence or absolute trust among each other.[4] Therefore, the jury's conclusion that the Forbearance Agreement was signed under conditions of "undue influence" is unsupportable as a matter of law, and the Court should reject it and conclude that the Forbearance Agreement is totally enforceable.

> **B.** **The jury's conclusion that GMAC acted with "unclean hands" is a legal *non-sequitur* that is totally inapposite to the case at hand and, as a matter of law, cannot override the clear and unambiguous terms of the wholesale security agreement, general security agreement, and forbearance agreement.**

Plaintiffs' improper focus upon GMAC's conduct, and the jury's mistaken reliance thereon in reaching its verdict, is captured by the jury's separate conclusion that GMAC acted with "unclean hands." This finding exemplifies the essence of the jury's rationale underlying the ultimate conclusion that GMAC breached its Agreements with Plaintiffs when GMAC declared the Dealerships out of trust on July 19, 2007. As explained above, however, GMAC's conduct is not at issue, and as a matter of law, the doctrine of unclean hands is inapplicable to an action where the plaintiff is seeking damages. *See Neyer, Tiseo & Hindo, Ltd. v. Russell*, 1993 WL 195432, at *3 (E.D. Pa. June 9, 1993); *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 756 n.10 (3d Cir. 1990) (since the party is "seek[ing] damages, the unclean hands doctrine is not applicable); *see also S & R Corp. v. Jiffy Lube Intern., Inc.,* 968 F.2d 371, 377 n.7 (3d Cir. 1992) (emphasis added) ("[t]o prevail on an unclean hands defense, the defendant must show fraud, unconscionability, or bad faith on the part of the plaintiff"); *Equibank v. Adle, Inc.,* 595 A.2d 1284, 1287 (Pa. Super. Ct. 1991) (emphasis added) ("[t]he clean hands doctrine is applicable

---

[4] GMAC has also noted, in its alternative Motion for New Trial pursuant to Federal Rule of Civil Procedure 59, that the Verdict Form should not have contained any reference to undue influence or unclean hands.

when the court, within its discretion, finds *the party seeking affirmative relief* is guilty of fraud, unconscionable conduct or bad faith directly related to the matter at issue which injures the other party and affects the balance of equities between the litigants").

Moreover, the doctrine is merely an affirmative defense. *Ciba-Geigy Corp. v. Bolar Pharm. Co.,* 747 F.2d 844, 855 (3d Cir. 1984) (emphasis added) (doctrine "requires a showing by defendant that plaintiff's conduct is inequitable and that it involves the subject matter of the plaintiff's claim"). There is no support for the contention that unclean hands can be used by a plaintiff to evade the existence of a binding contract that governs the parties' rights and obligations. Accordingly, where the defendant does not seek any type of affirmative relief, the plaintiff cannot invoke the doctrine of unclean hands in connection with a complaint or another original proceeding. *See Dimet Proprietary Ltd. v. Indust. Metal Protectives, Inc.,* 109 F.Supp. 472 (D.Del. 1952) ("the equitable doctrine of unclean hands cannot [be used as a sword by] an actor seeking affirmative relief by [instituting] infringement proceedings [when the opposing party] has sought no affirmative relief"). Consequently, "the doctrine should not be applied except where the person guilty of inequitable conduct was himself seeking relief in the court either in an original proceeding or by affirmative counterclaim." *Id.* at 458. The doctrine is "seldom or never . . . applied to one not seeking judicial relief but merely brought there at the suit of another." *Id.*

In the context of this lawsuit, Plaintiffs utilized the doctrine of unclean hands affirmatively, admitting the existence of clear and unambiguous contracts that governed the rights of the parties but evading the import of those documents by criticizing GMAC's conduct and suggesting that GMAC had "unclean hands." This is a legal impossibility under any construction of law interpreting contractual relationships. In essence, Plaintiffs have turned

settled contract principles upside down by evading their contractual obligations through a doctrine that only applies to bar a party seeking affirmative relief. Consequently, the Court should reject the jury's conclusion relating to "unclean hands" and enter Judgment as a matter of law in favor of GMAC on Plaintiffs' breach of contract claim.

**III.    THE COURT SHOULD ENTER JUDGMENT FOR GMAC BECAUSE PLAINTIFFS NEVER SOUGHT TO DISAFFIRM THE FORBEARANCE AGREEMENT BUT INSTEAD RATIFIED IT.**

A completely independent basis exists for judgment under Rule 50 because "even if [a party] consented to [the contract or] to the inclusion of the release provision in the contract though undue influence or duress, the release [or the contract] for that reason [alone is] not void, but merely voidable." *Duffy Theatres, Inc. v. Griffith Consol. Theatres, Inc.,* 208 F.2d 316, 324 (10th Cir. 1953). Therefore, "after knowledge of the facts constituting grounds for rescinding or disaffirming the release [or the contract, the party must elect] to rescind or disaffirm with due diligence and within a reasonable time." *Id.*; *Washington Sewer Co. v. Warrington Tp.*, 29 Pa. D. & C.3d 66, 69 (Pa. Com. Pl. 1982). "It is clear that a contract obtained under duress or undue influence is merely voidable, continuing in operative effect until the injured party acts in opposition to the contract. *Loizos v. Mutual of Omaha Insurance Company,* 229 Pa. Super. 552, 326 A. 2d 515 (1974). Further, a party who possesses a power of voiding a contract executed under business duress or coercion, loses it by electing to affirm or ratify the transaction. *National Auto Brokers Corp. v. Aleeda Development Corp.,* 243 Pa. Super. 101, .364 A. 2d 470 (1976). Ratification results if a party who executed a contract under duress accepts the benefits flowing from it, remains silent, or acquiesces in the contract for any considerable length of time after the party has the opportunity to annul or avoid the contract. *Id.*; *see also Francois*, 599 F.2d at 1290, 1294 (3d Cir. 1979) (court deemed a property settlement agreement to be voidable on undue influence grounds only after the party instituted an action to rescind the agreement).

Otherwise, the complaining party will be deemed to ratify the release or the entire contract (whichever is the object of the dispute). *Duffy*, 208 F.2d at 324.

In *Fitzpatrick v. Queen,* 2005 WL 1172376, at 9 n.18 (E.D.Pa. May 16, 2005), the court explained:

> The Court further notes that [w]hen a contract is induced by fraud, the injured party has a choice of alternate remedies: he may either rescind the contract *or* affirm it and maintain an action in deceit for damages." *Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Invs.,* 951 F.2d 1399, 1408 (3d Cir. 1991) [brackets added] (citations omitted). In seeking damages in connection with its claim for fraudulent inducement in Count III, Pennexx elected to affirm the Forbearance Agreement and the general release contained therein. As the legal remedy of damages and the equitable remedy of rescission are inconsistent and mutually exclusive, Pennexx thereby waived any claim for rescission of the Forbearance Agreement on the basis of fraudulent inducement. *See Allied Erecting & Dismantling Co. v. USX Corp.,* 249 F.3d 191, 199 (3d Cir. 2001) (noting that affirmance of contract bars rescission).

*Id.* at 9 n.18.

Therefore, as a matter of law, the doctrines of undue influence and unclean hands, which are inapplicable anyway, cannot operate to invalidate an agreement where a party elects to sue for damages and not to rescind or disaffirm the agreement. This stands as a separate and independent basis to uphold the enforceability of the Forbearance Agreement, which bars Plaintiffs' breach of contract claim.

## IV.    THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW IN FAVOR OF GMAC BECAUSE PENNSYLVANIA LAW DOES NOT RECOGNIZE A BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING AS A SUBTERFUGE FOR CHALLENGING A CONTRACT.

To the extent the doctrine of "unclean hands" is tantamount to a finding that GMAC acted in bad faith in connection with the Forbearance Agreement, it remains totally outside the jury's purview, and the undisputed facts presented at trial support Judgment for GMAC. The Third Circuit in *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 93-94 (3d Cir.

2000) expressly rejected this cause of action and held that it would "not recognize an independent cause of action for breach of good faith in this case." 227 F.3d at 92; *see also Chrysler Credit Corp. v. B.J.M., Jr., Inc.*, 834 F.Supp. 813 (E.D. Penn. 1993); *Bagasra v. Thomas Jefferson Univ.*, 1999 WL 517404, at *1 (E.D.Pa. July 20, 1999); *Drysdale v. Woerth*, 1998 WL 966020, at *3 (E.D.Pa. Nov. 18, 1998); *EEOC v. Pathmark, Inc.*, 1998 WL 57520, at *6 (E.D.Pa. Feb. 12, 1998). As the Court explained in *Chrysler Credit Corp.*, the Pennsylvania Supreme Court "refuse[s] to recognize an implied contractual duty of good faith in the lender/borrower relationship or to impose a duty of good faith which would modify or defeat the legal rights of a creditor." *Id.* at 842. As the Court continued:

> [A] lending institution does not violate a separate duty of good faith by adhering to its agreement with the borrower or by enforcing its legal and contractual rights as a creditor. The duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given under the terms of its contract. A lender has not violated a duty of good faith merely because it has negotiated loan terms which are favorable to itself. As such, a lender generally is not liable for harm caused to a borrower by refusing to advance additional funds, release collateral or assist in obtaining additional loans from third persons.

*Id.* So it is here. To the extent unclean hands is deemed to relate to the doctrine of good faith and fair dealing, it cannot override clear and unambiguous contract terms contained within the Forbearance Agreement.

## V.    THE JURY'S CONCLUSION THAT CLAIMS ACCRUED AFTER THE EXECUTION OF THE FORBEARANCE AGREEMENT IS NOT SUPPORTED BY THE EVIDENCE.

Plaintiffs attempted to evade the Forbearance Agreement by arguing that certain claims accrued after the parties executed the document (Nov. 19 Tr. at 239-40). The jury ultimately sided with Plaintiffs on this question, but the Court should reject the verdict as a matter of law because it flies in the face, and is completely at odds with, the jury's conclusion that GMAC did

not tortiously interfere with Plaintiffs' contractual relationships with General Motors or Chrysler Corporation.

Stated simply, Plaintiffs asserted that, as a result of GMAC's conduct in enforcing its rights under the Agreements and Forbearance Agreement, Plaintiffs lost the business relationships enjoyed with General Motors and Chrysler Corporation (DE 18 at ¶¶ 172-73). In fact, Plaintiffs pinpointed the interference with these relationships as the basis of the so-called post-Forbearance Agreement claims against GMAC. As Plaintiffs' counsel expressly argued during closing, "What happened after they signed [the Forbearance Agreement]? Chrysler terminated their franchise. That didn't happen until October. General Motors terminated their franchise. That didn't happen until January. . . . The forbearance agreement, respectfully, should be thrown out completely on the doctrine of unclean hands and other doctrines. But even if it's enforced, even if it's enforced literally, it did not release those claims." (Nov. 19 Tr. at 240).

As Plaintiffs' counsel crystallized for the jury, the alleged post-Forbearance Agreement claims related solely to the assertion that GMAC tortiously interfered with the relationships between the Dealerships and General Motors and Chrysler. However, the jury expressly found that GMAC <u>did not</u> tortiously interfere with the relationships with either automobile manufacturer. See Verdict Form at 6(a). Thus, the only logical conclusion is that the jury did not agree that GMAC tortiously interfered with the relationships at issue, but instead perceived the ultimate closure of the Dealerships and lost relationships as an **injury – not a claim** – arising after the parties executed the Forbearance Agreement.

The distinction between an injury and a claim is critical to the legal analysis. This is because the post-Forbearance damages claimed by Plaintiffs do not constitute independent claims (i.e., tortious interference) but instead merely represent, at most, continuing consequences

from events arising on July 19, 2007 – long before the parties signed the Forbearance Agreement and are barred by the Release. *See Lube Internat'l, Inc. v. Jiffy Lube of Pa., Inc.,* 848 F.Supp. 569, 579 (E.D. Pa. 1994) (applying Maryland law and noting that it was essentially identical to law as in Pennsylvania and concluding "[s]ince [the party] releases all claims arising before [the date of the agreement], any damages which might have arisen after the [agreement was consummated] as a result of . . . conduct" that occurred before or contemporaneous to the execution of the agreement was also released).

Furthermore, even if General Motors or Chrysler ceased doing business with Plaintiffs based upon Plaintiffs' ability to secure alternative financing arrangements, this does not support a claim arising after the Forbearance Agreement or represent any claim as a matter of law. Indeed, Mente admitted during cross-examination that General Motors did not approve of the proposed arrangement Mente offered because it was not consistent with General Motors' channel strategy network plan, which had absolutely nothing to do with GMAC (Nov. 10 Tr. at 123-24). Mente also admitted that he did not submit everything that General Motors required (Nov. 10 Tr. at 130). Therefore, as a matter of law and based upon the undisputed material facts, the Court should reject the assertion that any "claims" arose after the parties signed the Forbearance Agreement.

VI. **PLAINTIFFS DO NOT HAVE STANDING TO ADVANCE THEIR CLAIMS AS TO TWO OF THE PARCELS OF REAL ESTATE, AND MENTE HAS NO STANDING TO ADVANCE ANY CAUSE OF ACTION WHATSOEVER.**

In addition to the various grounds asserted above, Plaintiffs have no standing to advance claims as to two of the parcels of real estate, and Mente has no standing whatsoever. Therefore, as a matter of law, Judgment against Mente overall and against Plaintiffs as to two parcels of real estate is warranted.

Standing cannot be waived because only a real party in interest that suffered injury can maintain a lawsuit. *See Hertzberg v. Zoning Bd. of Adjustment of City of Pittsburgh*, 721 A.2d 43, 46 n.6 (holding that the core concept of standing is that a person who is not adversely affected in any way by the matter he seeks to challenge is not "aggrieved" thereby and has no standing to obtain a judicial resolution of his challenge). Most importantly, "[i]n order to be 'aggrieved' a party must (a) have a substantial interest in the subject-matter of the litigation; (b) the interest must be direct; and (c) the interest must be immediate and not a remote consequence." *Beers v. Com. Unemployment Compensation Bd. of Review*, 633 A.2d 1158, 1161 (Pa. 1993) (internal citations and quotations omitted). Furthermore, standing is a legal question that the court should consider when there is evidence to suggest that the party-plaintiff is not the real party in interest or the aggrieved party.

Plaintiffs do not have standing to recover damages related to the loss or the diminution in value of the real estate for the two dealership properties that were owned by non-plaintiff entities that were in fact owned by registered Pennsylvania limited partnerships, the principal of which was Mente. Pursuant to Rule 2127(a) of the Pennsylvania Rule of Civil Procedure (Actions by Partnerships and Liquidators), "[a] partnership having a right of action shall prosecute such right in the names of the then partners trading in the firm name." PA. R. CIV. P. §2127(a) (2008). Courts have held that a contributor is not the proper plaintiff to commence an action on behalf of a partnership. *Kenworthy v. Hargrove*, 855 F.Supp. 101, 105 (E.D. Pa. 1994). Additionally, losses relating to diminution of value in property are not the type of harm suffered directly by the individual partners but harms suffered by the partnership itself. *Kenworthy v. Hargrove*, 855 F.Supp. 101, 106–07 (E.D. Pa. 1994). Thus Plaintiffs' claim that GMAC's actions caused harm to the value of Mente's properties goes directly to the partnerships, Don's LP and Don's Second

LP, at least as relates to 15040 Kutztown Road and 14218 Kutztown Road. Therefore, Don's LP and Don's Second LP were the proper parties, with standing, to bring an action against GMAC for the alleged diminution in value of those properties and therefore a derivative action, on behalf of the limited partnerships, should have been brought by Mente.

In a derivative action, however, the plaintiff must be a partner at the time of bringing the action and (1) at the time of the transaction of which he or she complains, or (2) his status as a partner must have devolved upon him by operation of law or pursuant to the terms of the partnership agreement from a person who was a partner at the time of the transaction. Additionally, section 8591 of Title 15 of the Pennsylvania Statutes states "[a] limited partner may bring an action in the right of a limited partnership to recover a judgment in its favor if *general partners with authority to do so have refused to bring the action* or *if an effort to cause those general partners to bring the action is not likely to succeed*." Mente never established, as required, that Don's Corporation refused to bring the present action; he also never established that an effort was made on his part to bring this action on behalf of Don's LP and Don's Second LP that "was likely not to succeed," which is a prerequisite to his ability to bring the action in a derivative capacity.

At the heart of the law of damages is the fundamental concept that the damaged party owns or has some interest in the property that gives rise to a claim for compensation. *Brandywine Heights Area School Dist. v. Berks County Bd. of Assessment Appeal,* 821 A.2d 1262, 1267, n. 7 (Pa. Cmwlth. 2003) ("PA. R. CIV P. 2002(a) provides that "all actions shall be prosecuted by and in the name of the real party in interest"). This Rule does not define the term "real party in interest." Nevertheless, "the generally accepted definition of this term is that the real party in interest is the person who has the power to discharge the claim upon which suit is

brought and to control the prosecution of the action brought to enforce rights arising under the claims") (internal citations omitted). In other words, to be a real party in interest, "one must not merely have an interest in the result of the action, but must be in such command of the action as to be legally entitled to give a complete acquittal or discharge to the other party upon performance." *Id.*

It is also axiomatic that to recover damages for loss or diminution in value in real estate, the injured party must have some legally cognizable interest in the disputed property. Awarding Plaintiffs any amount of damages give Plaintiffs a windfall to which they are not entitled. Title to of the parcels of real estate is not and was never held by Plaintiffs. The record owner (during the relevant time period) of the two parcels of real property has neither been joined in this lawsuit as a party nor even alleged as a party-in-interest.

Finally, Mente has no standing whatsoever because he has not introduced any evidence suggesting that he has an ownership interest in any of the property GMAC seized.

## VII.    PLAINTIFFS HAVE ONLY ADVANCED A SPECULATIVE DAMAGES CLAIM WHICH DEFEATS THEIR ABILITY TO SUSTAIN THEIR CLAIM FOR RELIEF AND WARRANTS A JUDGMENT AS MATTER OF LAW FOR GMAC.

The jury returned a verdict suggesting that damages accrued after the parties executed the Forbearance Agreement; however, because the damages are completely speculative, they cannot form the basis for any recovery in this case. Plaintiffs presented evidence concerning unconsummated contracts for the sale of the GMAC collateral, and the prices that *would have* been paid if any of these hypothetical transactions had been completed (Nov. 17 Tr. at 67-68). Such contracts are of no value, however, and cannot support any measure of damages. In *Mellon Bank (EAST) National Association v. Pennsylvania Restaurant of A.B.E. Inc*, 528 A. 2d 654, 655 (Pa. Super. 1987), the court held that while "[a]n offer to purchase particular premises may have

some evidentiary value at trial, such as to show that the property is desirable and marketable . . . the amount of the offer to buy cannot be used to show the value of property at issue." *Id.* at 655 (internal citations omitted).

As in *Mellon Bank*, so it is here. Plaintiffs have introduced this evidence in an attempt to demonstrate that GMAC acted in a commercially unreasonable manner by garnering less for the property than would have been received through the unconsummated sales. As the *Mellon Bank* court held, "[i]n a situation such as this involving a distress sale, an offer to purchase the property is not appropriate to a determination of the actual value of the property." *Id.* at 656. Because the damages measure Plaintiffs rely upon is speculative and cannot support any true value, their underlying cause of action fails, and the Court should enter judgment for GMAC.

Furthermore, the testimony of Joseph Galvin does not support Plaintiffs' damages model. Galvin testified that Citizens Bank presented a letter to Plaintiffs regarding a prospective loan (Nov. 12, 2009 Tr. at 150; Ex. 46, 1). However, the document at issue was nothing more than a proposal for a possible loan – it did not constitute a loan commitment. *Id.* at *6 (*citing Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)). In the letter from Citizens Bank to Mente, Citizens Bank stated as follows:

> Don,
>
> The following are the general terms and conditions under which we would offer a commercial real estate mortgage to you personally for the financing of properties at 15032 Kutztown Road and 14218 Kutztown Road located in Kutztown, PA along with a floor plan line of credit to Mente Chevrolet, Inc. Kindly note that we have **started the process of completing an analysis** of your dealership's operation and **approval will be required by this bank's credit committee** prior to any disbursement of Funds.
>
> Ex. 46, 1 (emphasis added).

Additionally, contained in this letter were the applicable terms and conditions that both Mente and the Dealerships had to satisfy before Citizens Bank would extend credit. Galvin testified at trial that this letter was nothing more than a term sheet or a proposal letter that was contingent upon the approval of the bank's loan approval authority. (Nov. 12 Tr. at 172–73). As Galvin's testimony demonstrates, even if he believed the loan would close, it was purely speculative as to whether the loan <u>would</u> close. Not only did Mente and Mente Chevrolet have to satisfy the conditions stated in the term sheet, but the loan approval authority retained the right to reject the disbursement of funds upon an unsatisfactory credit review.

As a matter of law, a contingent loan approval is not tantamount to a binding promise or a commitment to loan a specified amount. *See RCN Corp. v. Paramount Pavilion Group LLC*, 2004 WL 627057, at *7–8 (E.D.Pa. March 10, 2004) (agreement contingent upon the occurrence of certain events and the evidence submitted was not sufficient to demonstrate the agreement was a binding loan commitment). Nonetheless, the ultimate compensatory damages award of $4,000,000 is based specifically on this speculative damages model. As Plaintiffs' counsel explained in closing, "Mr. Bellairs, you heard Mr. Bellairs, the real estate appraiser. He came in, he looked at the property, what it was worth in 2007. And what did he have? He had the appraisals for Citizens Bank which **was going to give Mr. Mente $4 Million,** he had those appraisals. And those appraisals show a value of $5.69 million." (Nov. 19, 2009 Tr. at 240-41) (emphasis added).

The jury based its damages award, at Plaintiffs' request, upon the sum the Plaintiffs may have received had a contingent loan closed based entirely upon a term sheet. Notwithstanding the inescapable conclusion that, as a matter of law, Plaintiffs' entire breach of contract claim is barred by the Forbearance Agreement, the ultimate damage calculation is completely speculative

and cannot withstand judicial scrutiny.   The jury's ultimate damages award is completely

speculative and presents an independent basis for Judgment as a matter of law in GMAC's favor.

## VIII.   THE CLAIM FOR DECLARATORY RELIEF FAILS BASED UPON THE UNDISPUTED FACTS AND LAW.

In Count 9 of the First Amended Complaint, Plaintiffs alleged that GMAC required

Mente to sign the Forbearance Agreement under threat, coercion, and duress, and that the

contracts were ones of adhesion, forced upon Mente by threat of criminal prosecution.   All of

these assertions have been completely debunked by the undisputed testimony in this case and the

jury verdict, which expressly rejected the claim that the Forbearance Agreement was the subject

of either fraud or duress.

Moreover, the notion that the Forbearance Agreement constituted a "contract of

adhesion" has been proven false by Mente's concession that his lawyer negotiated terms.

"Contracts of adhesion are standardized form contracts presented to consumers without

negotiation or any option for modification."   *Thibodeau v. Comcast Corp.*,   912 A.2d 874, 882

(Pa. Super. 2006).   Because it is undisputed that Plaintiffs negotiated terms of the Forbearance

Agreement and enjoyed legal representation, and in light of the jury's verdict on fraud and

duress, the claim for declaratory relief has been rendered moot and Judgment for GMAC is

warranted.

## CONCLUSION

This case presents a paradigm for legal interpretation and analysis.   The parties'

relationships are governed entirely by plain and unambiguous contracts that deemed Plaintiffs to

be out of trust on July 19, 2007.   The undisputed material facts do not suggest otherwise.

Moreover, the Forbearance Agreement and Release not only solidify as undisputed that the

Dealers were out of trust, but also bars all claims. The Court should disregard the verdict and enter Judgment for GMAC as a matter of law.

                                        Respectfully submitted,

                                        **ADORNO & YOSS LLP**

                                        BY: /s/ Charles Tatelbaum
                                        Charles M. Tatelbaum, Esquire
                                        Steven D. Ginsburg, Esquire
                                        350 East Las Olas Boulevard Suite 1700
                                        Fort Lauderdale, FL 33301
                                        Phone: (954) 766-7820
                                        Fax: 1-866-621-4198

                                        *Admitted Pro Hac Vice*
                                        *Counsel for Defendant GMAC Inc.*

Of Counsel:

Mary Grace Maley, Esquire (PA 37610)
mmaley@lavin-law.com
Lorraine M. McGlynn, Esquire (PA 38974)
lmcglynn@lavin-law.com
Kim N. Nguyen, Esquire (PA 93568)
knguyen@lavin-law.com
190 North Independence Mall West
Suite 500, 6th & Race Streets
Philadelphia, PA  19106
Phone:  (215) 627-0303
Fax:  (215) 627-2551

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of December 2009, the foregoing Motion and Incorporated Memorandum of Law was served electronically through the Court's ECF System on parties requesting electronic service; and via e-mail to Kenneth Jacobsen at jacobsenlaw@aol.com.

                                        /s/ Charles M. Tatelbaum