IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| MENTE CHEVROLET OLDSMOBILE | : | CIVIL ACTION |
|---|---|---|
| INC., et al | : | |
| | : | |
| v. | : | NO. 08-2403 |
| | : | |
| GMAC | : | |

## <u>MEMORANDUM</u>

**Juan R. Sánchez, J.**                                                              **July 23, 2010**

On November 19, 2009, a jury awarded $4 million to Plaintiffs Mente Chevrolet Oldsmobile,

Inc., Mente Chrysler Dodge, Inc., and Donald Mente for Defendant GMAC's breach of contract.

GMAC now asks this Court to overturn the jury's verdict and grant GMAC judgment as a matter of

law under Federal Rule of Civil Procedure 50(b). Alternatively, GMAC requests a new trial under

Federal Rule of Civil Procedure 59.[1] Because this Court finds no grounds to disturb the jury's

verdict, both of GMAC's motions are denied.

## FACTS[2]

For more than fifteen years, Donald Mente owned two car dealerships, Mente Chevrolet

Oldsmobile (the Chevrolet Dealership) and Mente Chrysler Dodge (the Chrysler Dealership). The

Chevrolet Dealership was purchased by Mente's parents in 1971, and Mente began working there

in 1979. In the 1990s, Mente assumed full control of the Chevrolet Dealership. Around the same

---

[1] The parties have also filed motions for costs, which will be addressed in a separate order.

[2] In considering a motion for judgment as a matter of law, the Court "look[s] at the evidence in the light most favorable to . . . the verdict winners, and draw[s] all reasonable inferences in their favor." *Foraker v. Chaffinch*, 501 F.3d 231, 234 (3d Cir. 2007) (citation omitted). Thus, the Court views the facts in the light most favorable to Plaintiffs.

time, the Mente family purchased the Chrysler Dealership.[3]  All financial transactions for the dealerships were managed by Donna Johnson, who worked as the Chevrolet Dealership's controller for almost 30 years.  Johnson was also the controller for the Chrysler Dealership after it was purchased by the Mente family.

Mente operated both dealerships under franchise agreements with General Motors (GM) and finance arrangements known as "floor plans"[4] with GMAC.[5]  The Chevrolet Dealership's floor plan with GMAC began in 1982 and was governed by the Wholesale Security Agreement (WSA).  The Chrysler Dealership's floor plan also operated pursuant to an identical contract.  Under the WSA, Plaintiffs were required to repay GMAC "faithfully and promptly" for all cars sold to customers.[6]  The meaning of the term "faithfully and promptly" was a central issue at trial because this Court determined the phrase was ambiguous.  The WSA did not define the phrase or provide a specific time period for repayment.  GMAC argued the term required immediate payment, transferred to

---

[3] Mente also operated a third car dealership which primarily sold used cars on property referred to as the "Big Lot."

[4] A "floor plan" is a lending arrangement wherein a car dealer borrows money to purchase new and used vehicles.

[5] The evidence introduced at trial showed GMAC and GM were closely related companies. The jury found, however, that GMAC was not acting as an agent of GM for the purposes of the instant litigation.

[6] This obligation was created by the seventh paragraph of the WSA, which reads in full:

> [Plaintiffs] understand that we may sell and lease the vehicles at retail in the ordinary course of business.  We further agree that as each vehicle is sold, or leased, we will, faithfully and promptly remit to [GMAC] the amount [GMAC] advanced or have become obligated to advance on our behalf to the manufacturer, distributor or seller, with interest at the designated rate per annum then in effect under the GMAC Wholesale Plan.  The GMAC Wholesale Plan is hereby incorporated by reference.

Trial Ex. 65, at 1.

GMAC the same day a vehicle was sold. Plaintiffs argued, based on their prior course of dealing with GMAC, they were authorized to wait for their receipt of third-party funds before paying GMAC.[7] If Plaintiffs failed to remit payment "faithfully and promptly," GMAC could declare the dealerships "out of trust."[8]

Mente testified his business relationship with GMAC became problematic in 2006, after GM initiated a plan to decrease the number of GM dealerships. Near the end of 2006, GMAC ordered Mente to reduce the number of used cars on his lot and increase his profits. Around the same time, the parties had disputes related to a revolving line of credit GMAC supplied. GMAC abruptly asked Plaintiffs to reduce their $500,000 line of credit by half within 30 days, a time period 60 days shorter than GMAC normally allowed.[9] Mente told GMAC he would not be able to reduce his credit to $250,000 in such a short period of time. Despite Mente's protest, GMAC sent a letter to Mente purporting to confirm the parties' agreement for Mente to pay down his credit. On July 17, 2007, Mente left a message for his contact at GMAC denying the existence of such an agreement.

Two days later, on July 19, 2007, a GMAC agent audited the Chevrolet Dealership and

---

[7] Most customers did not pay the dealerships in cash the day they purchased a vehicle. Instead, they generally obtained financing for their purchase through a third-party lender, such as a bank. The lender would transfer full payment for the vehicle to the dealerships 10-14 days after the purchase date. Mente testified it was the dealerships' normal practice to repay GMAC for the sold vehicle only after the dealerships received payment from the third-party lender.

[8] By the terms of the WSA, if Plaintiffs were declared "out of trust," GMAC could seize the collateral which secured Plaintiffs' loans, including the dealerships' vehicles and other assets.

[9] Two GMAC officers admitted they normally allow a dealership 90 days to reduce its credit balance because they want to ensure the dealer has time to arrange alternative financing. William Tierney, GMAC's Director of Commercial Lending, and Robert Gerardin, GMAC's Operations Manager, both testified GMAC's general policy was to provide a 90-day window before making a dealership credit reduction.

demanded immediate payment of $317,841.20 for the cars missing from the dealership's lot.[10]  This audit took place while Johnson, the sole person responsible for managing the dealerships' financial records, was on vacation.  Johnson always informed GMAC of her absences to ensure it would not audit the dealerships while she was away[11] and to inform them payments for sold vehicles would not be made in her absence.[12]  Before the July audit, Johnson gave GMAC written notice she leave for vacation on July 16, 2007, and would return to work the following Monday, July 23, 2007.

Mente asked GMAC to give him 24 hours to locate Johnson because he could not access the Chevrolet Dealership's financial records or issue checks in her absence.  He reached Johnson by phone, but she could not return to work until the following day.  GMAC refused to wait and immediately declared the dealerships out of trust.[13]  If GMAC had waited, Plaintiffs claimed they

---

[10] It is unclear whether this sum is solely for the missing vehicles or includes additional fees, but the evidence shows GMAC demanded a total $317,841.20 on July 19, 2007.  *See* Ex. 293, at 2. A transaction list compiled by GMAC the same day listed $242,240.22 as the sum due for 14 vehicle sales.  Ex. 6, at 1.  Although there was some confusion about the number of missing vehicles, Johnson, the dealerships' controller, did not dispute the veracity of GMAC's transaction list.

[11] Under the WSA, GMAC had the authority to audit the dealerships at any time.  In the past, however, GMAC made arrangements to conduct audits when Johnson would be present.  In March 2007, for example, GMAC delayed an audit until Johnson returned from vacation.  On prior occasions when Johnson was absent during GMAC audits, the auditor left notes to Johnson to identify which cars required payment.  The auditor would also attach a payment schedule. During the parties' 25-year business relationship, GMAC had never before demanded payment on the same day of an audit when Johnson was not present.

[12] When Johnson was on vacation, the dealerships delayed payments to GMAC for sold vehicles because only Johnson could issue checks for the businesses.  Since Johnson was gone for several days before the audit, her absence explained the delay in the dealerships' payment to GMAC for the 14 unpaid vehicles.

[13] Johnson ended her vacation early and returned to work on July 20, 2007, but GMAC had already seized control of the Chevrolet Dealership's assets and refused to permit Plaintiffs to make any payments.

had funds available to pay GMAC $269,405 on July 19 and approximately $400,000 on July 20.[14]

Later the same day, GMAC sent eight guards to the Chevrolet Dealership and GMAC agents seized the titles, keys, and manufacturer's certificates of origin for all cars at the Chevrolet Dealership. GMAC took control of both dealerships' open accounts with GM and all funds contained therein.[15] GMAC instructed GM to cease its vehicle shipments to the dealerships. GMAC also initiated a new policy, in which Plaintiffs could not complete a vehicle sale unless they provided GMAC with a certified check for the full sale proceeds, including any trade-in credit, warranty payments, sales tax, or state registration fees. GMAC also forbade Plaintiffs from adding used cars to the floor plan or selling used cars at auctions to quickly generate income. GMAC billed Plaintiffs for charges associated with GMAC's actions, such as the cost of the security guards stationed at the dealerships. GMAC instituted similar policies at the Chrysler Dealership.

On July 25, 2007, Mente received three letters from William Tierney, GMAC's Director of Commercial lending, demanding he pay $7, 592,393.59 by the end of the following business day. *See* Exs. 41-43. This figure included $6,751,428.25 for the principal owed for vehicles financed by GMAC at both dealerships, $289,643 for unpaid vehicles at the Chevrolet Dealership, $51,321.87 for interest payments, and $500,000 for the balance of the Chevrolet Dealership's line of credit. Ex.

---

[14] On July 19, Plaintiffs had $90,700 in their bank account and expected to receive $65,000 from GM in their open account. Plaintiffs also could have liquidated $144,000 through cars not subject to a floor plan. On July 20, Plaintiffs' account had $145,360 and Plaintiffs had given GMAC $77,000 in certified checks. They also expected to receive $59,000 from GM.

[15] The open account was a shared account between the dealer, Mente, and the manufacturer, GM. Through this account, Mente and GM could deposit and withdraw funds due to, or owed by, the other party. When GMAC seized this account, GM's deposits were transferred directly to GMAC instead of to Plaintiffs. Because there was a cross-collateralization agreement between the two dealerships, GMAC could seize assets from the Chrysler Dealership if the Chevrolet Dealership was in default. Ex. 62.

43.  If Mente failed to make this payment, Tierney told him GMAC could take possession of all dealership property.  Tierney also told Mente his wholesale credit line had been suspended indefinitely.  Mente did not make the $7.5 million payment within 24 hours, and GMAC took possession of the dealerships.

Following GMAC's seizure of the dealerships, Plaintiffs could not raise enough income to pay state-required dealership fees, refunds due to customers, operating costs, or employee salaries. On July 27, 2007, Plaintiffs terminated all employees except Johnson and another essential employee and closed the Dealerships.  Mente and Johnson continued to sell or trade cars to other dealerships and used their personal funds to pay the Dealerships' operating costs.  At the end of September, following 30 days of negotiation, GMAC agreed to return $59,000 of the funds it seized from Plaintiffs and to refrain from enforcing its creditor rights for 90 days if Plaintiffs promised to waive their right to sue GMAC.  This covenant was memorialized in a Forbearance Agreement (the Agreement) drafted by GMAC and presented to Mente and Johnson.  Mente and Johnson signed the Agreement the same day it was presented.[16]  At the time the Forbearance Agreement was signed, Plaintiffs were represented by counsel.  At the end of the forbearance period, Plaintiffs sued GMAC for breach of the WSA.

Discovery was contentious.  While Plaintiffs sought quick relief, GMAC tried to prolong this litigation. GMAC twice moved to continue the case and extend the trial date, and this Court twice

---

[16] The parties disputed the exact signing date by ten days, but this date was not essential to the jury's verdict because Plaintiffs do not argue they had an inadequate amount of time to consider the waiver.  Instead, they argue GMAC wrongfully put them in a dire financial position and only allowed them access to their money if they waived their right to sue.  These circumstances existed on both September 20, 2007, and September 30, 2007, so this Court need not decide which day constituted the execution date of the Forbearance Agreement.

refused to grant such a delay.  GMAC persistently refused to turn over documents and, when documents were produced, delayed the documents' submission to Plaintiffs.[17]  GMAC also continually frustrated Plaintiffs' attempts to identify and locate former and current employees of GM and GMAC who knew the circumstances surrounding the Mente dealerships' closure.

At trial, Plaintiffs argued GMAC breached the WSA by improperly declaring the dealerships out of trust and seizing all of the dealerships' property.  Plaintiffs argued GMAC's declaration Plaintiffs were out of trust was pretextual and part of a scheme to force GM dealerships to close if they were not sufficiently profitable.[18]  Plaintiffs contended they would have fully paid GMAC if they had been given the opportunity to pay upon Johnson's return the following day.  Plaintiffs' experts testified the dealerships' closures caused Plaintiffs to lose approximately $707,000 in profits from vehicle sales, $1.15 million in franchise value, and more than $3 million in dealership value. GMAC asserted Plaintiffs were out of trust because Plaintiffs did not immediately remit payment

---

[17] For example, on June 29, 2009, Plaintiffs served subpoenas for the production of documents related to the relationship between GM and GMAC.  When such documents were not produced, Plaintiffs filed a motion to compel delivery of the requested documents, and other outstanding discovery.  At an August 12, 2009, teleconference, this Court concluded the requested documents were relevant to determining whether an agency relationship existed between GM and GMAC, but allowed GMAC until August 26, 2009, to respond, and entered a formal order on August 18, 2009.  Rather than producing these documents directly to Plaintiffs, on September 22, 2009, GMAC sent the Court a box of documents and a request this Court conduct in camera review to "assess the relevance to the agency relationship plaintiff claims to have existed between GMAC and GM." Letter from Kim N. Nguyen, Lavin, O'Neil, Ricci, Cedrone & Disipio, to Judge Juan R. Sánchez, United States District Court Judge (Sept. 22, 2009), at 2.  This Court, having already declared documents tending to shed light on this relationship were relevant, denied GMAC's request for in camera review and ordered GMAC to transmit the documents directly to Plaintiffs. *See* Order of Oct. 8, 2009.  As a result of GMAC's dilatory conduct, Plaintiffs' counsel received these documents less than a month before trial.

[18] Plaintiffs argued this scheme was beneficial to GM because, under its dealership franchise agreements, GM was obligated to provide financial assistance to a dealer if GM closed a dealership.

when GMAC demanded payment on July 19, 2007. GMAC further argued Plaintiffs' claims were barred by the Forbearance Agreement.

The jury returned a verdict for Plaintiffs and awarded $4,000,000 in damages. The jury found the dealerships were not out of trust on July 19, 2007, and GMAC breached the WSA by its actions on July 19, 2007, and thereafter.[19] Official Verdict Slip (Nov. 19, 2007), at 3-4. The jury also determined the Forbearance Agreement was unenforceable because Mente and Johnson did not sign the agreement "knowingly and voluntarily without duress, fraud or undue influence." *Id.* at 1. The jury further found enforcement of the Forbearance Agreement was barred by the equitable doctrine of unclean hands and some of Plaintiffs' claims accrued after they signed the waiver.[20] *Id.* at 2.

On December 9, 2009, GMAC filed a renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b)[21] and a motion for new trial pursuant to Rule 59. On June 29, 2010, this Court directed the parties to submit supplemental briefing regarding Plaintiffs' ability to recover damages based on the value of the two dealership properties. These properties were owned by entities not joined as parties, Don's Limited Partnership and Don's Second

---

[19] Because the jury found no agency relationship existed between GM and GMAC, it declined to determine whether GMAC was liable for a violation of the federal and state Automobile Dealer's Day in Court Acts. Official Verdict Slip (Nov. 19, 2007), at 3; *see* 15 U.S.C. § 1221, 63 Pa. C.S. § 818.12, *et seq.*. The jury further found GMAC was not liable for conversion and tortious interference with Mente's contracts. *Id.* at 4-5.

[20] The jury declined to invalidate the Forbearance Agreement on other grounds argued by the Plaintiffs. Specifically, it found GMAC did not fraudulently induce Plaintiffs to sign the agreement, the agreement was not signed under duress, and the agreement was supported by adequate consideration under Pennsylvania law. *Id.* at 1-2.

[21] Before the jury considered the case, GMAC moved for judgment as a matter of law. This Court reserved ruling on GMAC's oral motion and directed GMAC to submit its motion in writing.

Limited Partnership. Mente held a majority stake in both partnerships.

In its supplemental brief, GMAC argued Plaintiffs did not produce sufficient evidence at trial or post-trial demonstrating Plaintiffs had "standing" to recover the partnership properties' losses. Plaintiffs asserted the jury assessed damages based on the total value of the dealerships, including the real estate, because the dealerships would have received financial termination assistance from GM and Chrysler if GMAC had not preemptively shut down their operations. In support, Plaintiffs cite the testimony of Thomas Bellairs, who stated the $3 million diminution of property value provided a basis for the amount GM would have paid Plaintiffs in dealer assistance. Plaintiffs further argue the property losses are personal because Mente was named as borrower on the notes and mortgage for the partnership properties, and the foreclosure proceedings on these properties were instituted against Mente personally. In addition, Plaintiffs state the partnerships' general partner (Mente himself) assigned Mente all claims and damages to partnership interests.

Plaintiffs also submitted the organizational documents for Don's Limited Partnership, Don's Second Limited Partnership, and Don's Corporation. The partnership agreements show Mente was the limited partner for both partnerships and held a 98 percent in each. Don's Corporation, for which Mente is the sole shareholder, director, and board member, owned a 2 percent interest in each partnership. The documents include affidavits authorizing Mente to enter into mortgage agreements on behalf of the partnership. These organizational documents were not introduced at trial, but Plaintiffs argue this Court can consider them post-trial because they are public records and were always available to GMAC.[22]

---

[22] Because this Court finds the jury's award of damages may be upheld on a basis other than the loss of property value, it need not decide whether these documents were appropriately submitted for the Court's consideration.

**DISCUSSION**

In support of its renewed motion for judgment as a matter of law, GMAC argues this Court should overturn the jury verdict because: (1) the Forbearance Agreement was valid and barred Plaintiffs' suit; (2) Plaintiffs ratified the Forbearance Agreement by accepting the return of funds from GMAC; (3) Plaintiffs' measure of damages was too speculative for the jury to award any amount; (4) Plaintiffs lacked standing to obtain relief; and (5) the WSA was unambiguous and should not have been submitted to the jury for interpretation.

A district court may grant a defendant's motion for judgment as a matter of law if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis" to rule for the plaintiff. Fed. R. Civ. P. 50(a)(1). A court "should grant such a motion only if, viewing all the evidence in favor of the nonmoving party, no reasonable jury could find liability on a particular point." *Grazier v. City of Philadelphia*, 328 F.3d 120, 123 (3d Cir. 2002). "In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *McDaniels v. Flick*, 59 F.3d 446, 453 (3d Cir. 1995) (citation omitted).

GMAC first asserts the jury's finding Plaintiffs did not sign the Forbearance Agreement "knowingly and voluntarily, without duress, fraud or undue influence" is unsupported by the evidence. A waiver of the right to sue is valid if "made knowingly and voluntarily" and without "evidence of fraud or undue influence," so long as enforcement of the agreement would not be against the public interest. *Jakimas v. Hoffman-La Rouche*, 485 F.3d 770, 781-82 (3d Cir. 2007). To determine the validity of a waiver or release, a court must apply a totality of the circumstances test. *Id.* This test includes consideration of the following non-exclusive factors:

(1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether plaintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the Agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeded the benefits to which the employee was already entitled by contract or law.

*Long v. Sears Roebuck & Co.*, 105 F.3d 1529, 1538 (3d Cir. 1997) (alteration omitted).[23]

Plaintiffs agree the Forbearance Agreement's language was clear and specific, all parties were represented by counsel, Plaintiffs knew the agreement constituted a waiver of their rights, and Plaintiffs signed the waiver for the purpose of receiving a portion of the funds seized by GMAC. Mente admitted his counsel actively negotiated the Forbearance Agreement with GMAC's counsel over the course of 30 days, and he had time to reflect on its terms. Thus, the majority of the factors indicate Mente and Johnson signed the Forbearance Agreement knowingly and voluntarily.

The "consideration" Plaintiffs received, however, is problematic and did not exceed the benefits to which Plaintiffs were already entitled. Consideration is typically required to create an enforceable contract. For consideration to be valid, it must "confer[] a benefit upon the promisor or cause[] a detriment to the promisee" and "be an act, forbearance or return promise bargained for and given in exchange for the original promise." *Blair v. Scott Speciality Gases*, 283 F.3d 595, 603

---

[23] This "totality of the circumstances" test governs Plaintiffs' waiver of their federal claim under the federal Dealers Day in Court Act, while Pennsylvania contract law principles govern Plaintiffs' state law claims. *See Cuchara v. Gai-Tronics Corp.*, No. 03-6573, 2004 WL 1438186, at *7-8 (E.D. Pa. Apr. 7, 2004) (explaining federal law applies to the release of federal claims, while "state law governs the validity of any purported release of Plaintiffs' state law claims"); *Sparler v. Fireman's Ins. Co.*, 521 A.2d 433, 434 (Pa. Super. Ct. 1987) (holding that under Pennsylvania law, written waivers are subject to the general law of contracts). "[T]he test for waiver under contract principles [i]s less rigorous than the totality of the circumstances test applicable to federal [law]." *Cuchara*, 2004 WL 1438186, at *8. Therefore, "a release sufficient to waive federal claims necessarily waives state claims under contract law." *Id.*

(3d Cir. 2002) (quoting *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 299 (3d Cir. 1986)). "Detriment to the promisee is sufficient in the legal sense if at the request of the promisor and upon the strength of that promise, the promisee performs any act which causes the promisee the slightest trouble or inconvenience, and which the promisee is not otherwise obliged to perform." *Adelvision L.P. v. Groff*, 859 F. Supp. 797, 804 (E.D. Pa. 1994); *see also Cohen v. Sabin*, 307 A.2d 845, 849 (Pa. 1973) ("Clearly performance of that which one is already legally obligated to do is not consideration sufficient to support a valid agreement.").

As its purported consideration, GMAC returned $59,000 of the money it seized from Plaintiffs and agreed to refrain from legal action against Plaintiffs for 90 days. At the time Plaintiffs signed the Forbearance Agreement, they were in dire financial circumstances stemming from GMAC's improper actions. Because Plaintiffs were not out of trust, GMAC had no legal right to keep the money it seized from their accounts and the returned $59,000 was money to which Plaintiffs were already entitled. Furthermore, because GMAC caused Plaintiffs' default by refusing to allow them to remit payment, GMAC had no legal right to pursue legal action against Plaintiffs. Thus, GMAC incurred no detriment and there was no consideration for the signing of the Forbearance Agreement.[24]

Despite GMAC's inequitable conduct, when examining the totality of the circumstances, this

---

[24] The jury's finding the Forbearance Agreement was supported by consideration is not dispositive on this issue because the jury was instructed to find consideration present if the agreement contained "an express statement that the signer intend[ed] to be bound." Jury Instructions, at 37; *see also* Uniform Written Obligations Act, 33 Pa. C.S. § 6. The jury did not find, however, that Plaintiffs' waiver was made knowingly and voluntarily, and as part of this finding the jury was instructed to weigh the adequacy of consideration Plaintiffs received. Jury Instructions, at 33-34. Viewing these facts in the light most favorable to Plaintiffs, this Court believes the jury was similarly troubled by the purported consideration for the waiver.

Court is forced to conclude the jury's finding Plaintiffs did not sign the Forbearance Agreement "knowingly and voluntarily" is unsupportable. The terms of the negotiated agreement were clear, Plaintiffs were represented by counsel, and Plaintiffs understood the substance of the agreement. Because the jury's finding is not supported by substantial evidence, the Forbearance Agreement cannot be invalidated on this ground.[25]

The jury verdict, however, also invalidated the Forbearance Agreement by applying the doctrine of unclean hands.[26] This doctrine is applicable to the instant matter. Although GMAC is

---

[25] Plaintiffs also seek to uphold the jury's finding the waiver was invalid by employing the law of undue influence. A contract release signed knowingly and voluntarily can still be voided if there is evidence of duress, fraud, or undue influence. *Jakimas*, 485 F.3d at 781-82. The jury found Plaintiffs were not under duress when they signed the Forbearance Agreement, and undue influence is often equated with duress when analyzing the validity of a release. *See Cuchara v. Gai-Tronics Corp.*, 129 Fed. Appx. 728, 731 (3d Cir. 2005) (applying the law of duress to reject a party's claim of undue influence). The jury did not receive a separate instruction on undue influence because this law is inapplicable to the facts here. Pennsylvania courts generally do not consider undue influence to determine the validity of a release outside the context of trust and estate actions. *See McNeil v. Jordan*, 894 A.2d 1260 (Pa. 2006); *Weir v. Estate of Ciao*, 556 A.2d 819 (Pa. 1989); *In re Estate of Pedrick,* 482 A.2d 215 (Pa. 1984); *Kees v. Green*, 75 A.2d 602 (Pa. 1950). In such cases, undue influence is exerted "when a party to a confidential relationship abuses that relation to secure personal advantages." *Francois v. Francois*, 599 F.2d 1286, 1291 (3d Cir. 1979). A confidential relationship exists where "the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed . . . ." *Frowen v. Blank*, 425 A.2d 412, 416-17 (Pa. 1981). "The relationships that ordinarily fall within the rule are those of parent and child, guardian and ward, husband a wife, physician and patient, attorney and client, clergyman and parishioner . . . undue influence is generally considered in a situation of virtual dependence or absolute trust." *Plechner v. Widener Coll., Inc.*, 418 F. Supp. 1282, 1297 (E.D. Pa. 1976). The evidence presented at trial does not support Plaintiffs' assertion a confidential relationship existed between them and GMAC.

[26] In its post-verdict motions, GMAC argues a jury may not consider an equitable doctrine such as unclean hands because only a judge may decide equitable claims. GMAC asks this Court to treat the jury verdict as "advisory" under Federal Rule of Civil Procedure 39(c). Generally, there is no federal right to a jury trial on equitable issues. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41-42 (1989) (explaining the constitutional right to a jury trial applies only to legal claims). A court may, however, "with the parties' consent, try any issue by a jury whose verdict

the defendant in this action, GMAC asserted waiver as an affirmative defense and asked the Court to dispose of Plaintiffs' claims by enforcing the Forbearance Agreement. This Court is entitled to use its equitable powers to decline to enforce the agreement under the law of unclean hands.[27]

GMAC also argued the doctrine of unclean hands cannot be applied in this matter because Plaintiffs seek legal, not equitable, relief. This argument is similarly unavailing.[28]

---

has the same effect as if a jury trial had been a matter of right." Fed. R. Civ. P. 39(c)(2). When a party fails to raise an objection to a jury trial before the trial begins, the party is deemed to have consented to a trial by jury on all issues, including equitable issues. *See RSACO v Res. Support Assocs., Inc.*, 208 Fed. Appx. 632, 642 (10th Cir. 2006) (finding the objection to a jury verdict made at the close of evidence was improper because failure to object before trial meant the parties "effectively consented" to trial by jury of the equitable claim); *Thompson v. Parkes*, 963 F.2d 885, 888 (6th Cir. 1992) (holding that if a party did not ask for an advisory jury before trial, the court could not set aside a verdict on the theory such verdict was only advisory).

Plaintiffs properly included a jury demand in their Complaint, and GMAC did not object to a jury trial before jury selection began. GMAC is therefore deemed to have consented to a trial by jury on all issues. Moreover, even if this Court were to consider the jury's finding advisory pursuant to Rule 39(c), this Court finds the doctrine of unclean hands is applicable to GMAC's actions in this case.

[27] GMAC argues the unclean hands doctrine can only be asserted by a defendant against a plaintiff. This assertion is without merit. *See Keystone Commercial Props., Inc. v. Pittsburgh*, 347 A.2d 707, 709 (Pa. 1975) (stating unclean hands "is a basis for a court of equity to refuse affirmative relief to either a petitioner or a respondent"); *Imprisoned Citizens Union v. Shapp*, 11 F. Supp. 2d 586, 608 (E.D. Pa. 1998) (considering whether unclean hands bars defendants from seeking equitable relief, and finding it did not); *Scheiber v. Dolby Labs, Inc.*, 293 F.3d 1014, 1022 (7th Cir. 2002) ("[U]nclean hands can be asserted in opposition to an equitable defense as well as being assertible as a defense to a claim for equitable relief.").

[28] The doctrine of unclean hands operates to deny a claim or defense made by a party who seeks equitable relief. *See McAdams v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 756 n.10 (3d Cir. 1990) ("Since [the plaintiff] only seeks damages, the unclean hands doctrine is not applicable."). By raising the waiver as an affirmative defense and asking this Court to enforce it against Plaintiffs, GMAC is seeking equitable relief. *See Sheet Metal Workers Int'l Ass'n Local 10 v. Herre Bros., Inc.*, 238 (3d Cir. 1999) ("[A]n order of specific performance of a contract has been regarded as a classic form of equitable relief."). Thus, this Court has the power to deny GMAC such relief if it finds GMAC acted with unclean hands. *See Greenwood v. Raznick*, 326 Fed. Appx. 362, 369 (6th Cir. 2009) (overturning a district court's grant of summary judgment when the court failed to consider whether unclean hands barred the defendant's equitable defense).

Unclean hands is an equitable doctrine which applies "when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 174 (3d Cir. 2001). A claim is barred under the doctrine of unclean hands when "(1) a party seeking affirmative relief (2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith (3) directly related to the matter in issue (4) that injures the other party and (5) affects the balance of equities between the litigants." *Imprisoned Citizens Union v. Shapp*, 11 F. Supp. 2d 586, 608 (E.D. Pa. 1998) (citation and internal quotation marks omitted); *see also Lucey v. Workmen's Comp Appeal Bd.*, 732 A.2d 1201, 1204 (Pa. 1999) (stating the doctrine of unclean heads "closes the doors of a court of equity to one tainted with iniquity or bad faith relative to the matter in which he seeks relief").[29]

The jury found the dealerships were not out of trust on July 19, 2007, and therefore found GMAC's seizure of the dealerships' finances and property were actions made in bad faith. In June 2007, GMAC agents abruptly notified Mente his credit would be reduced by a quarter of a million dollars. Instead of permitting Mente the standard 90-day period in which to secure alternate funding, GMAC gave him 30 days to comply with their drastic credit reduction. In July 2007, GMAC agents audited the Mente dealership knowing Johnson, the only person who could remit payment, was unavailable. On the date of the audit, the Chevrolet Dealership had been operating under the same

---

[29] This Court charged the jury on the Pennsylvania law of unclean hands because the waiver at issue is governed by Pennsylvania law. The federal doctrine is largely the same as the Pennsylvania standard; in fact, federal law appears to provide a lower threshold for a party asserting its opponent acted with unclean hands. *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945) (granting courts wide discretion in refusing to aid a party who has unclean hands); *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 377 n.7 (3d Cir. 1992) (requiring the party against whom the remedy of unclean hands is sought to have engaged in conduct that suggests "fraud, unconscionability, or bad faith").

floor plan with GMAC for 25 years. During those 25 years, GMAC had never demanded immediate payment of outstanding funds in Johnson's absence. Despite this history, GMAC demanded instant payment and refused Mente's request to allow him 24 hours to locate Johnson and remit payment. When GMAC was not remunerated on the spot, it declared the Chevrolet Dealership out of trust and dispatched a cadre of guards to occupy it and the Chrysler Dealership. GMAC seized both dealerships and all of the dealerships' physical and liquid assets, causing Mente to fall behind on his financial obligations to third parties and making Mente unable to pay his employees. GMAC prohibited Plaintiffs from selling vehicles without GMAC's approval and without receiving immediate and complete payment from all customers. Once GMAC wrongfully seized the dealerships' assets, it offered to partially return these seized items to secure Plaintiffs' promise to forfeit their rights to sue GMAC for its impermissible conduct. As consideration for Plaintiffs' waiver, GMAC offered to refrain from pursuing a creditor's action against the dealerships, despite knowing it was not legally entitled to take such action.

GMAC's improper actions induced Plaintiffs to sign the Forbearance Agreement. By declaring the dealerships out of trust and plundering Plaintiffs' inventory, GMAC stripped the dealerships of the ability to generate income and access their own money, thereby placing Mente in an untenable financial situation. GMAC's actions forced Mente to rely upon GMAC to obtain financing for his operating costs. Mente's floundering finances motivated him to waive his legal rights against GMAC to receive the funds necessary to cover his escalating expenses. GMAC's actions were taken in bad faith for the purpose of shutting down the dealerships, and these actions caused Plaintiffs to sign a release of their legal rights. Thus, the evidence supports the jury's finding that the doctrine of unclean hands  bars enforcement of the Forbearance Agreement. As such,

GMAC may not use the Forbearance Agreement to avoid liability.

In a final attempt to convince the Court to enforce the Forbearance Agreement, GMAC argues Plaintiffs ratified the Forbearance Agreement by accepting its benefits after signing it. Plaintiffs contend GMAC waived its ratification argument because GMAC did not raise the issue until its renewed Rule 50 motion. Ratification is an affirmative defense which must be raised in a responsive pleading or it will be deemed waived. *Jakimas*, 485 F.3d at 773; *Chainey v. Street*, 523 F.3d 200, 209 (3d Cir. 2008); *Johnston v. Katz*, No. 94-6693, 1996 WL 107402, at *4 (E.D. Pa. Mar. 7, 1996). GMAC argues it did not waive its ratification defense because "ratification" is "inextricably intertwined" with claims of undue influence and because "the parties tried the ratification issue by consent." GMAC's Reply in Supp. of GMAC's Renewed Mot. for J. as a Matter of Law, at 10. An affirmative defense is not preserved merely because it relates to another party's claims. Moreover, a "defendant's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the plaintiffs on notice waives the defendant's right to raise the issue in their Rule 50(b) motion." *Chainey*, 523 F.3d at 218 (quoting *Williams v. Runyon*, 130 F.3d 568, 571-72 (3d Cir. 1997)). Because GMAC failed to raise ratification in its oral motion, GMAC has waived it right to assert ratification as an affirmative defense now.

Even if GMAC had raised this issue in a timely manner, the theory of ratification does not render the Forbearance Agreement enforceable. A party may ratify a contract if it "accepts the benefits flowing from it, or remains silent, or acquiesces in the contract for any considerable length of time after the party has the opportunity to annul or avoid the contract." *Retail Brand Alliance, Inc. v. Rockvale Outlet Ctr.*, No. 06-1857, 2006 WL 403885, at *6 (E.D. Pa. Jan. 31, 2007) (quoting *Wahsner v. Am. Motors Sales Corp.*, 597 F. Supp. 991, 998 (E.D. Pa. 1984)). The theory of

ratification allows a promise to "be enforced even though the underlying contract is voidable" on a basis such as duress or fraud. *Jakimas*, 485 F.3d at 782; *United States v. Baird,* 218 F.3d 221, 230-31 (3d Cir. 2000); *see also Levin v. Garfinkle,* 492 F. Supp. 781, 807 (E.D. Pa. 1980) (holding a contract induced by fraud is voidable, not void, so it may be ratified by the parties). Ratification would only apply here if the Forbearance Agreement was voidable on the basis of duress or fraud.[30] Because the jury found no such duress or fraud, the agreement was not voidable.[31] Therefore, the doctrine of ratification does not apply.

This Court next considers the merits of Plaintiffs' breach of contract claim. GMAC first argues the WSA did not contain ambiguous language and GMAC did not breach the plain language of the contract. "A contract is ambiguous if it is reasonably susceptible to different constructions and capable of being understood in more than one sense." *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468-69 (Pa. 2006). Once a court determines a contract is ambiguous, its meaning may be decided by the jury. *Id.* at 469. When deciding the parties' intent, "ambiguities are

---

[30] The jury was properly instructed the law of ratification would allow enforcement of a contract executed while a party was under duress. Jury Instruction 11 reads, in relevant part:

> Even if you find the Agreement was executed under duress, it may still be valid if you find it was subsequently ratified by Mente. Ratification results if a party who executed a contract under duress accepts the benefits flowing from it, or remains silent, or acquiesces in the contract for any considerable length of time after the party has the opportunity to annul or avoid the contract.

Jury Instructions, at 36.

[31] Instead, the jury found the Forbearance Agreement was unenforceable based on the doctrine of unclean hands. An "unenforceable contract" differs from a "voidable contract." The latter may be adopted by ratification, while the former may not. Restatement (Second) of Contracts § 85, cmt. a (2010). Because any subsequent action by a party does not erase the opposing party's wrongful conduct, the doctrine of unclean hands cannot be defeated by ratification.

to be construed against . . . the contract drafter." *Shovel Transfer & Storage v. Pa. Liquor Control Bd.*, 739 A.2d 113, 139 (Pa. 1999).

In ruling on GMAC's motion for summary judgment, this Court determined the phrase "faithfully and promptly" was ambiguous as used in the WSA and consequently submitted interpretation of this phrase to the jury. At trial, Mente testified that 10-14 days typically passed between the day a customer signed a vehicle sale agreement and the day the customer's bank remitted payment for the purchase. After hearing evidence regarding the parties' 25-year business relationship, during which GMAC had never before demanded same-day payment, the jury found the phrase "faithfully and promptly" did not require immediate repayment on the date of purchase. Thus, the evidence is sufficient to support the jury's determination that GMAC breached its contractual obligation to Plaintiffs when GMAC declared the Chevrolet Dealership out of trust.

GMAC next argues Plaintiffs are not entitled to damages because their damages assessment was too speculative. A court reviewing a jury's verdict "has an obligation to uphold the jury's award if there exists a reasonable basis to do so." *Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 351 (3d Cir. 2001) (internal punctuation and citations omitted). Pennsylvania contract law permits "some uncertainty in calculating damages," but "the plaintiff must introduce sufficient facts upon which the jury can determine the amount of damages without conjecture." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 226 (3d Cir. 2003); *see also Cohen v. F.D.I.C.*, No. 91-3944, 2003 WL 21118673, at *6 (E.D. Pa. May 14, 2003) ("Damages are not considered speculative merely because they are not capable of exact calculation.").

Plaintiffs' expert testimony revealed the extent of harm Plaintiffs suffered following GMAC's breach of the WSA. Automotive industry and finance expert Joseph Roesner testified

Plaintiffs lost up to $707,000 in car sales and $1.15 million in franchise value when the dealerships were declared out of trust. Real estate expert Thomas Bellairs testified Plaintiffs' properties diminished in value from $5.69 million in 2007 to $2.43 million in August 2009, as a result of the dealerships' closure. Bellairs further testified the dealerships had no value as of the date of trial because of ongoing foreclosure proceedings. Additionally, both Mente and Bellairs explained that, pursuant to the financial assistance provision of their franchise agreement, if GM had shut down the dealerships, GM would have been obligated to pay Plaintiffs a reasonable price for the properties. Based on this testimony and other evidence presented at trial, the jury had sufficient facts from which to award $4 million in damages.

In addition to disputing the amount of damages, GMAC challenges Plaintiffs' entitlement to damages based on diminution of property value, arguing the entities which owned the properties are not parties to the litigation. The Chrysler Dealership and the Big Lot property are owned by Don's Limited Partnership and Don's Second Limited Partnership, respectively. The Chevrolet Dealership is owned by Mente Chevrolet Oldsmobile, Inc.[32] According to partnership documents submitted after trial, Mente holds a 98 % stake in Don's Limited and Don's Second Limited Partnerships. The remaining interest belongs to Don's Corporation, a corporate entity of which Mente is the sole shareholder.[33]

---

[32] There is no dispute over Plaintiffs' ability to collect property damages for the Chevrolet Dealership because Mente Chevrolet Oldsmobile, Inc. is a plaintiff in this action. A disagreement arose because the testimony regarding diminished property value addressed the combined properties and did not separate the value of each dealership.

[33] Plaintiffs further contend because Mente was the sole owner of the partnerships and the corporation, the diminution in property value resulted in a personal loss. Under Pennsylvania law, however, corporate property belongs to the corporation, and not to the shareholders, even if there is only one shareholder. *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*,

Evidence of diminution of property value is relevant to Plaintiffs' damages. Plaintiffs do not seek reimbursement for the diminution, but argue such diminution reveals the extent of the loss of financial assistance from GM. This lost assistance may be awarded to Plaintiffs as consequential damages because the loss was a reasonably foreseeable consequence of, and caused by, GMAC's contractual breach. *See Atlantic Paper Box Co. v. Whitman's Chocolates*, 844 F. Supp. 1038, 1046 (E.D. Pa. 1994) (citing *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854)) ("[C]onsequential damages . . . stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting."). Under the Service and Sales agreement between GM and Plaintiffs, which was introduced into evidence, GM promised to financially assist Plaintiffs if their contract expired or was terminated by GM. The relevant section states:

> General Motors will provide assistance on owned Premises by either (a) locating a purchaser who will offer to purchase the Premises at a reasonable price; or (b) locating a lessee who will offer to lease the Premises. If General Motors does not locate a purchaser or lessee within a reasonable period of time, General Motors will itself either purchase or, at its option, lease the Premises for a reasonable term at a reasonable rent . . .

Ex. 99. At trial, Mente explained that if GM or Chrysler wanted to close his franchise, under this provision, "they would pay [the dealer] whatever the going rate was for a lease of a building that size or they would buy it from [the dealer]." Trial Tr., Nov. 9, 2009, at 200. Mente further testified when GM and Chrysler cancelled his franchise in August, they refused to provide him with financial assistance because the dealerships were not operational after July 27, 2009, the date Plaintiffs were

---

267 F.3d 340, 348 (3d Cir. 2001).

forced to shut down the dealerships due to GMAC's actions. Plaintiffs' real estate expert Thomas Bellairs explained the diminution in property value is the best estimate of the amount GM would have provided Plaintiffs under the financial assistance clause as a fair measure of compensation–in this case, $3,259,000. Trial Tr., Nov. 17, 2009, at 56. Because there was sufficient testimony established regarding the use of property value to calculate the estimated loss Plaintiff suffered in the absence of GM's financial assistance, the identity of the property owners does not alter Plaintiffs' entitlement to damages. The evidence supports the jury's award of $4 million to Plaintiffs.

GMAC also argues it is entitled to a new trial under Federal Rule of Civil Procedure 59. GMAC believes it is entitled to a new trial because this Court erred by (1) excluding two GMAC expert witnesses; (2) allowing three of Plaintiffs' experts to testify outside of their respective areas of expertise; (3) excluding from evidence alleged account statements of Plaintiffs, which GMAC would have used to impeach Johnson; (4) including the term "undue influence" in the jury instruction; and (5) allowing the jury to consider unclean hands. "In general, a district court may grant a motion for new trial pursuant to Fed. R. Civ. P. 59 if it determines that the verdict is inconsistent with substantial justice because the verdict is against the weight of the evidence." *Younis Bros. & Co. v. CIGNA Worldwide Ins. Co.*, 899 F. Supp. 1385, 1387 (E.D. Pa. 1995). When a party moves for a new trial based on alleged trial error, a court conducts two inquiries: "whether an error was in fact made and whether that error was so prejudicial that refusal to grant the new trial would be 'inconsistent with substantial justice.'" *Bhaya v. Westinghouse Elec. Corp.*, 709 F. Supp. 600, 601 (E.D. Pa. 1989); *see also McKenna v. City of Philadelphia*, No. 07-110, 2008 WL 4450223, at *4 (E.D. Pa. Sept. 30, 2008).

GMAC argues this Court erred by precluding the testimony of its expert witnesses, Paul

Quinn and Fred Caruso.[34]  Under Federal Rule of Civil Procedure 26(a)(2)(c), parties must disclose expert testimony "at the times and in the sequence that the court orders."  When a party fails to make the required expert disclosures, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c).  This Court considers four factors when deciding whether to prohibit evidence: "(1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or wilfulness in failing to comply with a court order or discovery obligation." *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000).  A court must also consider the importance of the excluded testimony.  *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir.1997).

On August 21, 2009, this Court ordered both parties to disclose all experts by September 25, 2009.  GMAC did not reveal the identity of its expert witnesses, Quinn and Caruso, until its October 30, 2009 Pretrial Motion; nor did GMAC request an extension of the disclosure deadline.  Because GMAC did not meet the expert witness disclosure deadline, this Court decided Quinn and Caruso would not be permitted to testify or submit reports.  *See* Order of Nov. 6, 2009.

This Court properly excluded Quinn and Caruso under the factors listed above.  First, GMAC revealed the names of these experts on October 30, 2009, less than two weeks before trial.  Permitting these experts to testify would have prejudiced Plaintiffs because Plaintiffs had insufficient

---

[34] Both Quinn and Caruso were proffered as "rebuttal" experts, who would have testified to damages.  Caruso also would have testified to liability.

time to review the expert reports in preparation for trial.[35]  Second, there was little Plaintiffs could

do to avoid such prejudice due to this Court's unwillingness to continue the impending trial.  Third,

allowing these experts to testify would have interfered with trial because Plaintiffs would have

required additional trial preparation time.  Fourth, GMAC's asserted reason for failing to comply

with this Court's schedule is its characterization of Quinn and Caruso as "rebuttal" experts, which

it argued were exempt from this Court's deadline.  This argument is not supported by law.[36]

Furthermore, GMAC's contentious behavior throughout the course of this litigation leads the Court

to believe GMAC acted in bad faith by failing to reveal experts Quinn and Caruso until ten days

before trial.

GMAC next argues this Court erred by permitting Plaintiffs' experts Joseph Roesner, Carl

Woodwood, and Thomas Bellairs to testify outside their respective areas of expertise.[37]  To testify

as an expert, a witness must have "'specialized knowledge' regarding the area of testimony." *Elock*

*v. K-Mart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).  Such knowledge may be based on "practical

experience as well as academic training and credentials." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d

---

[35] Plaintiffs had insufficient time to schedule depositions of both experts before trial. Although Quinn lives close to this District, Caruso works in Chicago, Illinois.

[36] In support of its argument, GMAC cites to Federal Rule of Civil Procedure 26(a)(2)(C), which states, "Absent a stipulation or a court order, [expert witness] disclosure must be made . . . (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party . . . , within 30 days after the other party's disclosure." Fed R. Civ P. 26(a)(2)(C).  GMAC's reliance on this Rule is misplaced because Rule 26 makes clear the thirty-day time limit may be abrogated by a court order.  This Court issued an Order requiring identification of all expert witnesses by September 25, 2009.  GMAC's choice to construe this Order as inapplicable to two of its expert witnesses was ill-advised and cannot be condoned.

[37] GMAC does not challenge the experts' qualifications in the areas in which they were qualified as experts.

Cir. 1998). Rule 702 contains three requirements: "(1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243-44 (3d Cir. 2008). The minimum admissibility requirement is the expert witness must "possess skill or knowledge greater than the average layman." *Waldorf*, 142 F.3d at 625.

GMAC argues Woodward was not qualified to testify about out of trust dealerships. This Court qualified Woodward as an expert in automotive accounting and practices. At trial, GMAC chose not to make contemporaneous objections during the course of Woodward's testimony, but instead moved to strike the entirety of his testimony after its conclusion. An expert qualified to testify in one area may nonetheless "lack qualifications to testify outside his area of expertise." *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 322 (3d Cir. 2003). When testimony exceeds an expert's area of expertise, the complaining party may submit jury instructions to limit the expert's testimony to its admissible portions. *See Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 410 F. Supp. 2d 417, 422 (W.D. Pa. 2006) (explaining the danger of "prejudice or confusion" caused by admitting opinion testimony can be "cured by an appropriate jury instruction"). Following Woodward's testimony, this Court denied GMAC's motion to strike and found any prejudice resulting from inappropriate testimony could be dealt with by an appropriate jury instruction. GMAC proposed, and this Court read, a limiting jury instruction to strike Woodward's testimony regarding subjective beliefs held by GMAC in relation to Plaintiffs.[38] GMAC did not request an instruction

---

[38] The limiting instruction stated:

I have ruled that certain testimony by a witness, Carl S. Woodward, exceeded the

limiting Woodward's testimony regarding out of trust dealerships. Additionally, if GMAC had requested such an instruction, this Court would have denied it because Woodward was qualified as an expert in automotive accounting and out of trust dealerships–essentially, dealerships' default on their automotive loans–are within an automotive accounting expert's area of expertise. Moreover, on cross-examination, GMAC questioned Woodward thoroughly on his knowledge of the term out of trust, providing the jury with a basis to weigh Woodward's testimony in this area.[39]

Next, GMAC argues this Court erred in allowing Plaintiffs' real estate expert Bellairs to testify in several areas. Bellairs testified he appraised Plaintiffs' properties as worth $2.431 million in August 2009. Comparing this number to a 2007 appraisal, showing the properties were worth $5.69 million, Bellairs concluded the property values dropped $3.259 million from 2007 to 2009.

---

scope of his expertise and must be stricken from the record. The portion of the testimony I am striking is Mr. Woodward's testimony about any subjective beliefs held by GMAC in relation to the plaintiffs in this case. You must disregard and ignore this portion of the testimony.

Jury Instructions, at 43.

[39] This Court also issued a general jury instruction on expert witnesses, stating:

The rules of evidence ordinarily do not permit witnesses to testify to opinions or conclusions. An exception to this rule exists for "expert witnesses." An expert witness is a person who, by education and experience has become an expert in some art, science, profession, or calling. Expert witnesses may state their opinions as to matters in which they profess to be expert, and may also state their reasons for their opinions.

You should consider each expert opinion received in evidence in this case, and give it such weight as you think it deserves. If you should decide that the opinion of an expert witness is not based on sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you feel that it is outweighed by other evidence, you may disregard the opinion entirely.

Jury Instructions, at 42.

GMAC does not dispute Bellairs's methodology, but claims his testimony was outside the scope of his expertise because the property included a car dealership and Bellairs was not qualified to appraise dealerships. GMAC also argues this Court erred in allowing Bellairs to testify Plaintiffs would have received $3.359 from GM as per the financial assistance provision of their contract. On cross-examination, Bellairs admitted discussion of the dealer service relationship was outside the scope of his expertise. As such, the jury was equipped to weigh the credibility of his testimony in this area. GMAC contemporaneously moved to strike parts of Bellairs's testimony, but this Court denied GMAC's motion, stating the objection related to the weight of testimony and not its admissibility. GMAC did not propose a limiting jury instruction for Bellairs. Moreover, Bellairs testimony did not prejudice GMAC since Mente had already discussed the financial assistance provision.

GMAC further argues this Court erred by allowing Roesner, an automotive industry and automotive finance expert, to testify about the commercial reasonableness of the disposition of collateral and blue sky valuation.[40] GMAC did not move to strike any portion of Roesner's testimony or ask for a limiting instruction. Because the contested testimony is merely a sub-section of the automotive finance field, this Court finds Roesner's testimony was within his area of expertise. There is no reason to believe Roesner's testimony created jury confusion. GMAC had ample time to cross-examine Woodword, Bellairs, and Roesner, and this Court concludes GMAC was not prejudiced by the experts' testimony. As such, this Court did not err in allowing the jury to consider their testimony.

GMAC next argues this Court committed prejudicial error by excluding documents which

---

[40] Blue sky valuation is the value of a dealership beyond its physical assets, based on projected future income.

purported to be Plaintiff's account statements, which GMAC attempted to introduce to impeach

Johnson's testimony. During cross-examination of Johnson, GMAC sought to introduce uncertified

printouts purporting to be a series of internal accounts receivable statements GM created for Mente

Chevrolet. This Court excluded these documents because they were not listed on GMAC's exhibit

list.[41] The Eastern District of Pennsylvania's Local Rule of Civil Procedure 16.1(c)(5) requires

identification of all trial exhibits in a party's pretrial memorandum. This Court recognizes that

evidence introduced "solely for impeachment purposes" is admissible even if it is not disclosed

before trial. Fed. R. Civ. P. 26(a)(3). Impeachment is improper, however, when it is "employed as

a guise to present substantive evidence to the jury that would be otherwise inadmissible." *United*

---

[41] This Court also had concerns regarding these documents' authenticity. To authenticate a document, a party must introduce "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901. The authentication requirement exists because evidence is irrelevant unless the evidence is what its proponent claims it is. *United States v. Hernandez-Herrera*, 952 F.2d 352, 343 (10th Cir.1991). To admit a document into evidence, there must be "substantial evidence" from which a jury "could infer that the document [is] authentic." *United States v. Goichman*, 547 F.2d 778, 784 (3d Cir. 1976). There need not be a full argument on the document's admissibility. *Id.*

No evidence was introduced to show the dealerships or Johnson received a copy of this document during the course of their business operations, nor does Johnson appear to be the document's creator. GMAC asserted the Chevrolet Dealership should have received a copy of the statement at some point, but both parties agree the document was never produced as part of the dealership's business records. This Court finds it unlikely that Plaintiffs had a copy of this record and failed to produce it, given that more than 60,000 business records were disclosed to GMAC. Furthermore, the document, on its face, lacks any indicia of reliability. It is unsigned, bears no logos, is not printed on letterhead, and does not contain any information to indicate who prepared it. *See Diaz v. Pima Cnty.*, 34 Fed. Appx. 309, 311 (9th Cir. 2002) (holding a district court did not err by excluding a document that "bore no indicia of origin or filing, such as an official letterhead, seal, or signature, and [included] no certification from the custodian of records," particularly when the witness who attempted to authenticate the exhibit was not its creator). Even if Johnson had examined the document on the stand, she would not have been able to verify the entries without recourse to her own records. These records were inaccessible to Johnson during cross-examination and, without notice from GMAC that it planned to use this document, likely not available in the courtroom.

*States v. Gilbert*, 57 F.3d 709, 711 (9th Cir. 1995) (per curiam). Defendants argue they intended to introduce the document for impeachment purposes only. This Court's review of the document, however, reveals that it purports to address a central trial issue–namely, whether Mente Chevrolet had sufficient funds in its open account with GM to pay GMAC for the cars it sold prior to July 19, 2007. GMAC was aware Plaintiffs intended to introduce trial evidence showing the dealership had sufficient funds to pay GMAC and showing GMAC seized the dealership's open account with GM. Plaintiffs' First Amended Complaint, filed November 10, 2008, asserted GMAC seized Mente's two open accounts with GM on July 19, 2007. The issue continued to be an integral part of Plaintiffs' case; it was addressed in Plaintiffs' responses to both GMAC's motion to dismiss and motion for summary judgment. Therefore, the proffered documents do not constitute "solely" impeachment evidence. If admitted, the document would be substantive evidence supporting GMAC's contention the Mente dealership did not have sufficient funds to pay GMAC the money GMAC demanded.[42]

    To assess whether undisclosed, purported impeachment evidence should be admitted, a court considers the intent of the disclosure requirement in Federal Rule of Civil Procedure 26. This rule "was adopted to end two evils that had threatened civil litigation: expensive and time-consuming pretrial discovery techniques and trial-by-ambush." *Hayes*, 338 F. Supp. 2d at 503. To determine

---

[42] There is no Third Circuit precedent controlling how broadly this Court should interpret the term "solely." Other courts faced with the issue have drawn varying conclusions. *See, e.g.*, *Klonoski v. Mahlab*, 156 F.3d 255 (1st Cir. 1998) (precluding undisclosed evidence from admission at trial, even when offered for the purpose of impeachment); *Hayes v. Cha*, 338 F. Supp. 2d 470, 503 (D.N.J. 2004) (allowing the admission of surprise evidence when it was offered to counter a document the party offering the evidence had not seen before trial, its prejudicial nature could be cured easily, the party introducing the evidence was not acting in bad faith, and the opposing party did not argue it constituted substantive evidence); *Halbasch v. Med-Data, Inc.*, 192 F.R.D. 641 (D. Or. 2000) (admitting undisclosed evidence for impeachment purposes).

whether such evidence should be admitted, a court must consider the Third Circuit's "fairness" factors for the exclusion of evidence, analyzing: (1) the prejudice or actual surprise of the party against whom the information was offered; (2) the ability of that party to cure any prejudice; and (3) the offering party's bad faith or wilfulness in withholding the information. *Id.* at 504. "Because reducing gamesmanship is a core aim of [Rule 26], . . . the last inquiry should carry significant weight." *Id.* at 505.

The fairness factors weigh in favor of this Court's decision to exclude the documents. First, Plaintiffs' counsel told the Court he had never seen these documents before and was unaware of their existence. Both parties agreed the documents were not part of the discovery Plaintiffs produced, nor were they included in the discovery GMAC provided to Plaintiffs.[43] In short, Plaintiffs were in fact surprised by GMAC's attempt to introduce Exhibit 432. Second, given that GMAC produced these documents in the middle of trial, Plaintiffs had no ability to cure this prejudice without delaying the orderly presentation of evidence. If the document were admitted at trial, Plaintiffs' counsel would have had insufficient time to investigate the documents' authenticity and, if authentic, the circumstances surrounding the documents' creation. Given the documents' last-minute production during trial, this Court concludes GMAC wilfully withheld them to ambush Plaintiffs at trial. Counsel could easily access these documents at any time since this lawsuit was filed in 2007, so there is no reason counsel would wait until trial to do so except for the purpose of gamesmanship. Therefore, the Court's exclusion of these documents was proper.

---

[43] This omission is notable because several documents produced by GMAC during discovery were created by GM. GM and GMAC are closely affiliated companies, and the course of discovery in this litigation revealed that GMAC's counsel had access to GM's files. For instance, Exhibit 161, the spreadsheet GMAC ultimately used to cross-examine Johnson, contained metadata that showed it was originally prepared by GM.

Even if this Court's exclusion was erroneous, such error was harmless. After this Court excluded the disputed documents, GMAC used Exhibit 195 (a properly authenticated bank statement) and Exhibit 161 (a spreadsheet created by GM) to show the Chevrolet Dealership did not receive a check for $65,000 until August 2007,[44] despite Johnson's testimony this money was due on July 26, 2007. Moreover, the jury's determination the Chevrolet Dealership was not out of trust makes the dealership's ability to repay GMAC on the date of the audit irrelevant. The jury interpreted the WSA to mean the Chevrolet Dealership did not immediately owe money to GMAC upon demand. Instead, the jury found the dealership was contractually allowed to repay GMAC in accordance with its past practice of waiting until it received sales payments from third-party lenders. Therefore, GMAC suffered no prejudice from the exclusion of the purported GM accounts receivable statements.

Finally, GMAC disagrees with the jury instruction regarding the parties' signing of the waiver. GMAC argues this Court erred by including the term "undue influence" in the jury instruction and on the verdict form. This Court instructed the jury:

> A waiver must be made knowingly and voluntarily, without fraud or undue influence. You must examine the totality of the circumstances to determine if the Forbearance Agreement constitutes a valid waiver of Mente's claims. Because GMAC raises waiver as an affirmative defense, GMAC bears the burden of showing Mente waived its claims knowingly and voluntarily.

---

[44] In fact, the spreadsheet showed this money was paid on August 13, 2007, while the statements GMAC sought to introduce showed the payment occurred on August 9, 2007. Therefore, the later date included in Document 161 made that document more persuasive than the disputed documents which GMAC was precluded from admitting, as it had a greater tendency to show the Chevrolet Dealership had insufficient funds to pay GMAC at the end of July.

Jury Instructions, at 33. This instruction is a proper recitation of the law on the validity of a waiver.[45]

Under Federal Rule of Civil Procedure 51(c)(1), a party "object[ing] to an instruction or failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." *Franklin Prescriptions, Inc. v. N.Y. Times, Co.*, 424 F.3d 336, 339 (3d Cir. 2005) (quoting Fed R. Civ P. 51(c)(1)). The validity of a waiver is a jury question when the circumstances surrounding the signing of the waiver could form the basis for the waiver being rendered void, voidable, or unenforceable. *Callen v. Penn. R.R. Co.*, 332 U.S. 625, 628-29 (1948) (finding waiver issues should have been included in the jury instruction); *Wastak v. Lehigh Valley Health Network*, 342 F.3d 281, 295 (3d Cir. 2003) (stating whether plaintiff signed a waiver involuntarily is a question for the jury).

At the close of trial, GMAC objected to the jury instructions in general, but did not object to the instruction regarding the validity of a release or to the inclusion of undue influence. GMAC also did not suggest an alternative jury instructions on the validity of a release or on undue influence. Thus, this Court did not err by allowing the jury to consider whether Plaintiffs were subject to undue influence when signing the Forbearance Agreement.[46]

GMAC also argues this Court erred in allowing the jury to consider the doctrine of unclean hands,[47] asserting the same arguments dismissed above in the motion for judgment as a matter of a

---

[45] A waiver is valid if "made knowingly and voluntarily, and although the totality of the circumstances test is used to determine the validity of the release, [the court] also consider[s] whether there is evidence of fraud or *undue influence*, or whether enforcement of the agreement would be against the public interest." *Jakimas*, 485 F.3d at 781-82 (emphasis added).

[46] Additionally, this Court has found the evidence was insufficient to support undue influence, making any error caused by this instruction non-prejudicial.

[47] GMAC properly raised this objection at trial.

law.  As stated above, the doctrine of unclean hands was applicable to the signing of the Foreclosure

Agreement.  GMAC does not challenge the wording of the jury instruction on this doctrine.  As such,

this Court did not err in allowing the jury to consider unclean hands.

Accordingly, this Court denies both GMAC's renewed motion for judgment as a matter of

law and GMAC's motion for new trial.

An appropriate order follows.


BY THE COURT:


  \s\ Juan R. Sánchez
Juan R. Sánchez, J.
United States District Judge